Christopher Celentino (State Bar No. 131688)
Yosina M. Lissebeck (State Bar No. 201654)
Christopher B. Ghio (State Bar No. 259094)
**DINSMORE & SHOHL LLP**
655 West Broadway, Ste 800
San Diego, CA 92101
Telephone:  619.400.0500
Facsimile:  619.400.0501
Christopher.Celentino@dinsmore.com
Yosina.Lissebeck@dinsmore.com
Christopher.Ghio@dinsmore.com

Matthew J. Stockl (State Bar No. 329366)
**DINSMORE & SHOHL LLP**
550 South Hope Street, Ste 1765
Los Angeles, CA 90071
Telephone: 213.335.7737
Facsimile: 213.335.7740
Matthew.Stockl@dinsmore.com

Special Counsel to Richard A. Marshack,
Trustee of the LPG Liquidation Trust

# UNITED STATES BANKRUPTCY COURT

## CENTRAL DISTRICT OF CALIFORNIA - SANTA ANA DIVISION

| | |
|---|---|
| In re:<br><br>The Litigation Practice Group P.C.,<br><br>Debtor.<br>_____<br><br>Richard A. Marshack, Trustee of the LPG<br>Liquidation Trust,<br><br>Plaintiff,<br><br>v.<br><br>Laurent Reiss, a Monaco resident; MCA Fund<br>ADV Inc., a New York Corporation; LDR<br>International Ltd., a British Virgin Islands limited<br>liability company; and Does 1-10, inclusive,<br><br>Defendants. | Case No.: 8:23-bk-10571-SC<br><br>Adv. Proc. No. _____<br><br>Chapter 11<br><br>**TRUSTEE'S COMPLAINT FOR:**<br><br>**(1) AVOIDANCE, RECOVERY, AND PRESERVATION OF 2-YEAR ACTUAL FRAUDULENT TRANSFERS;**<br><br>**(2) AVOIDANCE, RECOVERY, AND PRESERVATION OF 2-YEAR CONSTRUCTIVE FRAUDULENT TRANSFERS;**<br><br>**(3) AVOIDANCE, RECOVERY, AND PRESERVATION OF 4-YEAR ACTUAL FRAUDULENT TRANSFERS;**<br><br>**(4) AVOIDANCE, RECOVERY, AND PRESERVATION OF 4-YEAR** |

**CONSTRUCTIVE FRAUDULENT TRANSFERS;**

**(5) AVOIDANCE, RECOVERY, AND PRESERVATION OF UNAUTHORIZED POST-PETITION TRANSFERS;**

**(6) TURNOVER;**

**(7) RACKETEER INFLUENCED AND CORRUPT ORGANIZATIONS ACT VIOLATIONS;**

**(8) CONSPIRACY;**

**(9) AIDING AND ABETTING; AND**

**(10) DECLARATORY RELIEF**

Judge: Hon. Scott C. Clarkson

For his *Complaint for (1) Avoidance, Recovery, and Preservation of 2-Year Actual Fraudulent Transfers; (2) Avoidance, Recovery, and Preservation of 2-Year Constructive Fraudulent Transfers; (3) Avoidance, Recovery, and Preservation of 4-Year Actual Fraudulent Transfers; (4) Avoidance, Recovery, and Preservation of 4-Year Constructive Fraudulent Transfers; (5) Avoidance, Recovery, and Preservation of Unauthorized Post-Petition Transfers; (6) Turnover; (7) Racketeer Influenced and Corrupt Organizations Act Violations; (8) Conspiracy; (9) Aiding and Abetting; and (10) Declaratory Relief* (the "Complaint"), plaintiff Richard A. Marshack, the former Chapter 11 Trustee for the bankruptcy estate ("Estate") of debtor The Litigation Practice Group P.C. ("Debtor" or "LPG") and current liquidating trustee of the LPG Liquidation Trust (collectively, "Trustee" or "Plaintiff") in the above-captioned bankruptcy case (the "Bankruptcy Case"), alleges and avers as follows:

<u>**STATEMENT OF JURISDICTION, NATURE OF PROCEEDING, AND VENUE**</u>

1.      This Court has jurisdiction over this action pursuant to 28 U.S.C. §§ 157(b)(2)(A), (E), (H) and (O), 1334(b), and General Order No. 13-05 of the District Court for the Central District of California because this is a core proceeding arising in and/or related to the Bankruptcy Case, which is a case under chapter 11 of title 11 of the United States Code (the "Bankruptcy Code"), and

which is pending in the United States Bankruptcy Court for the Central District of California, Santa Ana Division (the "Court").

2.    Regardless of whether this proceeding is core, non-core, or otherwise, the Plaintiff consents to the entry of a final order and judgment by the Bankruptcy Court.

3.    Defendants are hereby notified that Rule 7008 of the Federal Rules of Bankruptcy Procedure requires them to plead whether consent is given to the entry of a final order and judgment by the bankruptcy court.

4.    Venue of this adversary proceeding properly lies in this judicial district pursuant to 28 U.S.C. § 1409(a) because this proceeding is related to the Debtor's pending Bankruptcy Case.

## THE PARTIES

5.    Plaintiff, Richard A. Marshack, was the duly-appointed, qualified Chapter 11 Trustee of Debtor's Estate and is now the current liquidating trustee of the LPG Liquidation Trust.

6.    Debtor LPG is, and at all material times was, a professional corporation organized, existing, and in good standing under the laws of the State of California, with its principal place of business in Tustin, California.

7.    On information and belief, Defendant Laurent Reiss ("Reiss") is, and at all material times was, an individual resident of Monaco subject to service of process in accordance with the *Convention of 15 November 1965 on the Service Abroad of Judicial and Extrajudicial Documents in Civil or Commercial Matters* (the "Hague Service Convention") by sending a completed USM-94: Request for Service Abroad of Judicial or Extrajudicial Documents ("USM-94"), along with copies of the summons and Complaint, to the Central Authority for Monaco: Direction des Services Judiciaires, Palais de Justice, 5, rue Colonel Bellando de Castro MC - 98000 Monaco.

8.    Defendant MCA Fund ADV Inc. ("MCA Fund ADV") is, and at all material times represented that it was, a corporation existing under the laws of the State of New York.

9.    MCA Fund ADV may be served by first class mail postage prepaid upon its registered agent for service of process, USACORP INC., 325 Division Ave, Ste 201, Brooklyn, NY, 11211.

10.    LDR International Ltd. ("LDR" and, together with Laurent Reiss and MCA Fund ADV, "Defendants"), is, and at all material times represented that it was, a limited liability company

1    existing under the laws of the British Virgin Islands.

2    11.    LDR may be served in accordance with the Hague Service Convention by sending a

3    completed USM-94, along with copies of the summons and Complaint, to the Central Authority for

4    the British Virgin Islands: Registrar of the Supreme Court, Supreme Court Registry, No. 84 Main

5    Street, P.O. Box 418, Road Town, Tortola, British Virgin Islands VG1110.

6    12.    The true names and capacities, whether individual, corporate associate, or otherwise,

7    of defendants Does 1 through 10, inclusive, are unknown to the Plaintiff, who therefore sues said

8    defendants by such fictitious names. The Plaintiff is informed and believes that each of the defendants

9    designated herein as a fictitiously named defendant is in some manner responsible for the events and

10   happenings referred to, and caused the damage herein alleged. When the Plaintiff has ascertained the

11   true names and capacities of Does 1 through 10, inclusive, it will seek leave of this Court to amend

12   its Complaint by setting forth the same.

13   **GENERAL ALLEGATIONS**

14   **A.    The Bankruptcy Case**

15   13.    On March 20, 2023 ("Petition Date"), Debtor filed a voluntary petition for relief under

16   Chapter 11 of the Bankruptcy Code, commencing the Bankruptcy Case.

17   14.    The Office of the United States Trustee ("UST") filed its *Motion by United States*

18   *Trustee to Dismiss or Convert Case Pursuant to 11 U.S.C. § 1112(b)* [Bankr. Docket No. 21] and

19   creditors Debt Validation Fund II, LLC; MC DVI Fund 1, LLC; and MC DVI Fund 2, LLC filed the

20   *Motion by DVF and MC DVI to Dismiss Chapter 11 Case Pursuant to 11 U.S.C. §§ 105, 305, 349, &*

21   *1112, or in the Alternative Convert This Case to Chapter 7 or Appoint a Trustee* [Bankr. Docket No.

22   44]. On May 4, 2023, the Court entered its *Order Directing United States Trustee to Appoint Chapter*

23   *11 Trustee* [Bankr. Docket No. 58].

24   15.    Pursuant to the *Acceptance of Appointment as Chapter 11 Trustee* [Bankr. Docket No.

25   63], on May 8, 2023, Trustee accepted his appointment as the Chapter 11 Trustee in the Bankruptcy

26   Case. The Court approved the Trustee's appointment in its *Order Approving the U.S. Trustee's*

27   *Application for the Appointment of a Chapter 11 Trustee* [Docket No. 65].

28   16.    Trustee was not appointed until after events of the case and, therefore, bases these

4

allegations on information and belief. *Soo Park v. Thompson*, 851 F.3d 910, 928 (9th Cir. 2017) ("The *Twombly* plausibility standard . . . does not prevent a plaintiff from pleading facts alleged upon information and belief where the facts are peculiarly within the possession and control of the defendant or where the belief is based on factual information that makes the inference of culpability plausible."); *Miller v. City of Los Angeles*, 2014 U.S. Dist. LEXIS 198871, 2014 WL 12610195, at *5 (C.D. Cal. Aug. 7, 2014) (recognizing that the plaintiff's "information and belief" pleading was allowed and "necessary at times"); *see also Mireskandari v. Daily Mail and General Trust PLC*, 2013 U.S. Dist. LEXIS 194437, 2013 WL 12129642, at *4 (C.D. Cal. July 31, 2013) ("The Federal Rules of Civil Procedure allow parties to plead facts on 'information and belief' if the facts 'will likely have evidentiary support after a reasonable opportunity for further investigation or discovery.'" (citations omitted)).

17.    Pursuant to the *Order Confirming Modified First Amended Joint Chapter 11 Plan of Liquidation* entered September 9, 2024, and the *Notice of Occurrence of Effective Date of Modified First Amended Joint Chapter 11 Plan of Liquidation* filed September 24, 2024, Richard A. Marshack became the Liquidating Trustee of the LPG Liquidation Trust, effective September 24, 2024.  [Bankr. Docket Nos. 1646 & 1762].

18.    All claims have been transferred to the Liquidating Trust pursuant to the confirmed plan and Plaintiff brings this action solely in his capacity as the Liquidating Trustee of the LPG Liquidation Trust, for the benefit of Debtor's Estate and its creditors.

**B.    Protective Order**

19.    On or about May 2, 2024, Plaintiff filed that certain Notice and Motion for Entry of Protective Order (the "Protective Order").

20.    On June 3, 2024, the Court entered its *Order Granting Motion for Entry of Protective Order and the Protective Order* [Bankr. Docket No. 1270] (the "Protective Order"). A true and accurate copy of the Protective Order is attached as **<u>Exhibit 1</u>**, and incorporated herein.

21.    By its own terms, the Protective Order applies to this adversary proceeding and governs all discovery conducted herein.

/ / /

## C.      LPG's Ownership and Management

22.      Prior to the Petition Date, LPG operated a law firm for consumers across the country who sought assistance in contesting or resolving debts they would identify.  At all relevant times, LPG was controlled and operated by the individual named Tony Diab ("Diab").

23.      The consumers would pay LPG over a period of time via monthly debits from their bank accounts.

24.      The monthly payments were meant to cover all legal services LPG provided to the consumers including validation of the debts, review of documents to determine enforceability, and court appearances to halt lawsuits to obtain judgments.

25.      In certain instances, LPG would file a lawsuit in an effort to eliminate a disputed debt or to prosecute affirmative claims held by the consumers.

26.      LPG mismanaged the consumers' monthly payments.

27.      Diab and other defendants devised a plan to fraudulently transfer funds, client files, client funds and assets in the form of ACH Receivables (the "ACH Receivables" or "Accounts Receivable") out of LPG to third parties prior to the filing  of bankruptcy.

28.       To obtain consumer clients, LPG contracted with marketing companies, who engaged in illegal capping and would advertise or call to solicit consumers to become clients of LPG in exchange for a percentage of the ACH Receivables collected by LPG from the consumers. The marketing affiliate went so far as to assist with the execution of an engagement letter between the consumer and LPG.

29.      In exchange, LPG agreed to pay the marketing affiliates a percentage the monthly payments collected by LPG from the consumers.

30.      Because LPG received payments from consumers over time, it often sought financing by borrowing against its future cash flows. This borrowing was not only used to finance operations at LPG, but also to pay the fees owed to the marketing companies for providing the client referrals.

31.      Many of the documents executed in connection with such financing described the transactions as accounts receivable purchase agreements.

32.      Diab used entities he controlled, and were his alter egos, including, without limitation,

Vulcan Consulting Group ("Vulcan"), Maverick Management Group LLC ("Maverick"), Prime Logix, LLC ("Prime Logix"), LGS Holdco, LLC ("LGS"), and/or Coast Processing to divert LPG consumer funds and ACH Receivables. Diab would use numerous ACH processing companies in order to easily transfer millions of dollars from Debtor to these entities he controlled, without oversight or detection, and to avoid payment disputes and complications. The money that flowed from Debtor through these bank account to Defendants consisted of Client Funds that Debtor funneled to these entities by means of the ACH processing companies. Debtor also made deposits into these entities bank account such that they received Client Funds directly from Debtor in addition to direct Accounts Receivable.

33.    LPG transferred ACH Receivables and the associated client files in this fashion to defraud creditors in a pyramid scheme and for improper personal gain.

34.    LPG's monthly revenue from client files was primarily received via ACH payments. To process ACH payments, LPG was required to enlist the services of ACH payment processing companies who handle high risk transactions. In this regard, Diab had enlisted numerous ACH processing companies to easily switch between different vendors and have millions of dollars of LPG funds directed to entities Diab controlled, including but not limited to Vulcan, Maverick, Prime Logix, LGS, and/or Coast Processing. Diab utilized these other entities' bank accounts as LPG bank accounts.

35.    Diab instructed lenders and file purchasers to divert LPG loan proceeds or to deposit money otherwise due to LPG into bank accounts he controlled on behalf of LPG but ostensibly held by Vulcan, Maverick, Prime Logix, LPG and/or Coast Processing. Diab used all of these proceeds as if they were LPG funds, because they were.

36.    At or around the Petition Date, Diab transferred or sold approximately 15,000 LPG client files to Oakstone Law Group PC ("Oakstone"), 12,000 LPG files to Consumer Legal Group ("CLG"), and the remaining LPG files, approximated at slightly less than 40,000, to Phoenix Law, PC ("Phoenix").

37.    Pursuant to the asset purchase agreement between LPG and CLG, Diab instructed CLG to initiate the ACH debits on the transferred files, which it did through Optimum Bank and its

1  processing entity LGS Holdco.

2      38.  At or around the Petition Date, Diab transferred, for no consideration, approximately

3  8,000 files (previously transferred to Phoenix) to Heshy Deutsch ("Deutsch") and Israel Reiches

4  ("Reiches").  Diab instructed Deutsch and Reiches, by and through their co-conspirators Sam Geiger

5  and Solomon Feig, to initiate the ACH debits on the transferred files, which they did through BCB

6  Bank and a processing entity known as CLG Processing, into accounts, not in the name of LPG, but

7  that held funds of behalf of LPG and disbursed those funds for LPG.

8      39.  The funds obtained from the ACH debits described in paragraphs 37 and 38 above

9  were deposited in Maverick and Prime Logix accounts, among others.

10      40.  LPG's ACH Receivables were the primary, if not exclusive source of funds, for

11  Validation Partners, Vulcan, Oakstone, PECC, Prime Logix, Coast Processing, LGS, and Maverick.

12  As set forth above, the other sources of funds for these entities are the proceeds of LPG assets (i.e.,

13  file purchase account receivable proceeds) or constitute loan proceeds for which LPG alone was

14  liable.

15      41.  Diab frequently diverted the LPG money pulled from its consumer clients and other

16  funds it received through investors and lenders, to and through these entities.

17      42.  Diab frequently would direct these entities to pay affiliates (aka marketing capers),

18  MCA lenders, and others with LPG assets.

19      43.  Diab would instruct others at LPG and these entities on how to manage and transfer

20  these funds to and from these entities and LPG interchangeably.

21  **D.    $1.5 Million Loan from MCA Fund ADV Inc. and/or LDR International Ltd.**

22      44.  On or about February 7, 2023, BAT Inc aka B.A.T. Inc. ("BAT") and LPG executed

23  a Loan Agreement with MCA Fund ADV and/or LDR to document the terms of the Loan ("Loan").

24  A true and accurate copy of the Loan Agreement is attached hereto as **Exhibit 2**.

25      45.  Upon information and belief, LPG entered into the Loan, which was arranged by

26  attorney Ronald Richards.

27      46.  LPG executed a promissory note ("Note") in the original principal amount of

28  $1,500,000 and accompanying security agreement ("Security Agreement" and, together with the Note

8

and the Loan Agreement, the "Loan Documents") to document the amount owed under the Loan. True and accurate copies of the Note and Security Agreement are attached hereto as **Exhibit 3** and **Exhibit 4**, respectively.

47.    The terms of the Note are:

| | |
|---|---|
| Principal Amount: | $1,500,000.00 |
| Date: | February 7, 2023 |
| Maturity Date: | May 6, 2023 |
| Interest: | 7.0% per month |
| Default Interest: | 24% |

48.    The effect of these terms is that the interest rate on the Note is approximately 84.3% APR and that in exchange for $1,500,000.00, MCA Fund ADV and/or LDR would have received $1,920,000.00, or a return of $420,000.00 on its $1,500,000.00 (28.0%) in four months.

49.    Upon further information and belief, even though Defendant Laurent Reiss was not a party to this Loan, LPG made payments related to the Loan to Laurent Reiss rather than making payments to MCA Fund ADV or LDR.

**E.    Payments to Laurent Reiss**

50.    During the applicable post-petition period and according to records currently available, Prime Logix, who had no other funds except diverted LPG funds, paid Laurent Reiss the sum of at least $1,710,000 between March 2023 and May 2023 (the "Transfers"), to Swiss bank account number ending 6666 at Bank Julius Baer & Co. AG in the name of Laurent Reiss.  A true and accurate list of the known payments made by LPG to Laurent Reiss is attached hereto as **Exhibit 5** and incorporated herein.  True and correct copies of redacted bank statements evidencing the Transfers are attached hereto as **Exhibit 6**.

**F.    LPG's Ponzi Scheme**

51.    The Ponzi Scheme Presumption exists in bankruptcy proceedings.

52.    The Ponzi Scheme Presumption can be utilized to establish a debtor's "intent to defraud future undertakers [investors] from the mere fact that a debtor was running a Ponzi scheme. Indeed, no other reasonable inference is possible.  A Ponzi scheme cannot work forever.  The investor

pool is a limited resource and will eventually run dry.  The perpetrator must know that the scheme

will eventually collapse as a result of the inability to attract new investors.  The perpetrator

nevertheless makes payments to present investors, which, by definition, are meant to attract new

investors.  He must know all along, from the very nature of his activities, that investors at the end of

the line will lose their money.  Knowledge to a substantial certainty constitutes intent in the eyes of

the law," *cf. Restatement (Second) of Torts § 8A* (1963 & 1964), and a debtor's knowledge that future

investors will not be paid is sufficient to establish his actual intent to defraud them.  *Kirkland v. Rund*

*(In re EPD Inv. Co., LLC)*, 114 F.4th 1148, 1153 (9th Cir. 2024) (by definition Ponzi scheme is

destined to fail and the swindler and their entities often end in bankruptcy or equitable receivership);

*Cf. Coleman Am. Moving Servs., Inc. v. First Nat'l Bank & Trust Co. (In re American Properties,*

*Inc.)* 14 B.R. 637, 643 (Bankr. D. Kan. 1981) (intentionally carrying out a transaction with full

knowledge that its effect will be detrimental to creditors is sufficient for actual intent to hinder, delay

or defraud within the meaning of § 548(a)(1))."  *Merrill v. Abbott (In re Independent Clearing House*

*Co.)* (D. Utah 1987) 77 B.R. 843, 860.  A trustee in bankruptcy is not required to show that an operator

of a Ponzi scheme was subjectively aware his Ponzi scheme was destined to fail.  *In re EPD Inv. Co.,*

*LLC*, 114 F.4th at 1153 ("[a] trustee's action to recover assets fraudulently conveyed in the course of

a Ponzi scheme does not require that the trustee also prove the Ponzi-scheme operator was

subjectively aware his Ponzi scheme was destined to fail.").

53.      "But if all the debtor receives in return for a transfer is the use of the defendant's

money to run a Ponzi scheme, there is nothing in the bankruptcy estate for creditors to share.  In fact,

by helping the debtor perpetuate his scheme, the transfers exacerbate the harm to creditors by

increasing the amount of claims while diminishing the debtor's estate.  In such a situation, the use of

the defendant's money cannot objectively be called 'reasonably equivalent value.'"  *In re Independent*

*Clearing House Co.* 77 B.R. at 859.  Therefore, "[t]he trustee can avoid the transfers if they were

preferential or fraudulent.  Transfers to investors in a Ponzi scheme are preferential and fraudulent.

Therefore, they constitute "property of the estate," and the trustee can recover them.  *Id.* at 853 n.17

(citations omitted).

54.      Debtor was operating a Ponzi scheme that utilized affiliates and several other entities

as investors to continue its unlawful business practices by using funds provided by current investors to attract new investors hoping for very high returns.  Therefore, the Debtor was running a Ponzi scheme and the Ponzi Scheme Presumption can be utilized to infer that the Debtor had the intent to defraud investors within the meaning of 11 U.S.C. section 548(a)(1).  This is evidenced by the Court in this Bankruptcy Case declaring that Debtor was operating a Ponzi scheme when it stated the following:

> It is important to note that this Court has never received any significant and trustworthy evidence that Debtor accomplished meaningful results for its clients, but only anecdotal examples of viable success for its clients.  By reviewing the Estate's claims register, there is evidence of consumer claims for the fraud and demanded but undelivered refunds of approximately $500 million. There is ample evidence that the pre-petition Debtor never placed the collected funds into an attorney-client trust account, and that Debtor or its principals simply looted the payments received through the client automatic withdrawals, stiffing both the clients and outside attorneys who may have been working on client cases with the hopes of being paid.  There is also evidence before the Court that Debtor was running a Ponzi scheme and paying some outside (or "network") attorneys with funds obtained from new clients.  In this case, it appears that some of the "lenders" may have been serving as "investors," hoping for very high returns before "the music stopped."  The Ninth Circuit has recently explained, "[b]y definition, a Ponzi scheme is destined to fail because the pool of available investors is not limitless. When the Ponzi scheme operator's pool of investors inevitably runs dry, the scheme collapses and the swindler and their entities often end up in bankruptcy or equitable receivership.  *See generally* David R. Hague, Expanding the Ponzi Scheme Presumption, 64 DePaul L. Rev. 867 (2015).  In bankruptcy, the court-appointed trustee is tasked with taking immediate control of the entity, ceasing ongoing fraudulent activity, locating and collecting assets for the bankruptcy or receivership estate, and achieving a final, equitable distribution of the remaining assets. *See* 11 U.S.C. § 704; *Kirkland v. Rund (In re EPD Inv. Co., LLC)*, 2024 U.S. App. LEXIS 21363, at *15 (9th Cir. Aug. 23, 2024). Finally, there is evidence that Debtor was encumbering (or as some creditors assert, "double or triple selling") their accounts or receivables to multiple lenders.  With respect to Greyson's requested Administrative Claim [Dk. 676], and as more fully described in the concurrently entered order denying the claim, there has been no evidence presented that any work allegedly performed by Greyson assisted any clients or added any value to the Estate.

1  *See, Case 8:23-bk-10571-SC*, Doc 1545 n. 5.

2      55.    Moreover, since the Loan was made with the intent to further the Ponzi scheme, the

3  Debtor did not receive an objectively reasonable equivalent value for the Loan, and the Trustee can

4  avoid the Loan because it was fraudulent.

5      56.    The transactions between Defendants and the Debtor were loans, not the sales of

6  receivables, and as such Defendants were serving as "investors," hoping for very high returns before

7  "the music stopped."

8  **G.    The Criminal Enterprise**

9      57.    Debtor's operations, activities and transfers done in furtherance of the Ponzi scheme,

10  including those in conjunction with its affiliates and its dealings with Defendants, also constituted a

11  criminal enterprise.

12      58.    This, too, is evidenced by the Court's order in the 1046 Action wherein it denied the

13  Motion of Greyson Law Center to Vacate the Preliminary Injunction previously entered in Debtor's

14  main case, and the Court offered the opinion:

15  
16  
17  
18  
19  
20  
21  
22  
23  
> Through the various proceedings and evidence produced in both the main case and the various adversary proceedings, including but not limited to various Motions for Temporary Restraining Orders, Preliminary Injunctions, Motions to Dismiss, a Motion for Appointment of a Chapter 11 Trustee, a Motion to Sell Assets, a multitude of pleadings filed by both secured and unsecured creditors (supported by evidence presented under oath) in support of their claims, and especially the pleadings and evidence presented by the "Watchdog of the Bankruptcy System" aka the Office of the United States Trustee (an arm of the United States Department of Justice), it is clear to this Court that Debtor, since its pre-petition inception (and through the time of the appointment of the Chapter 11 Trustee) was in the Court's opinion, operating criminal enterprise.

24  Case No. 8:23-bk-10571-SC; Adv. No. 8:23-ap-01046-SC [Bankr. Docket No. 1545, p.3 (emphasis

25  in text)].

26      59.    As part of this criminal enterprise, Debtor and Defendants engaged in fraudulent

27  transfers pursuant to the Loan.  The Loan was made by MCA Fund ADV and/or LDR at unlawful

28  usurious interest rates and the Transfers made pursuant to the Loan constituted wire fraud.

**H.    The Sale of LPG's Assets**

60.    On July 7, 2023, Richard Marshack in his capacity as the Chapter 11 Trustee moved the Court for an order (A) Approving Sale, Subject to Overbid, of Assets Free and Clear of All Liens, Claims, Encumbrances and Interests Pursuant to 11 U.S.C. § 363(b), and (B) Approving Assumption and Assignment of Certain Executory Contracts and Unexpired Leases and Other Agreements. [Bankr. Docket No. 191.]  After supplemental briefing that addressed multiple oppositions, holding a lengthy hearing and an auction wherein Morning Law Group was the highest bidder, the Court granted the Sale Motion by order entered August 2, 2023. [Bankr. Docket No. 352.]

**I.    LPG's Prepetition Creditors**

61.    Debtor was insolvent when the Loan was made. This insolvency is evidenced in part by the fact that 14 separate UCC-1 statements were of record securing debts of the Debtor as of September 1, 2022. These statements remained unreleased as of the Petition Date. These statements either reflected secured liens against the Debtor's assets then owned or thereafter acquired, or provided evidence of the assignment or sale of substantial portions of the Debtor's future income. Debtor's insolvency is an adjudicated fact based on the Court's finding of insolvency entered in other adversary proceedings pending before the Court.  *See, e.g.*, Case No. 8:23-bk-10571-SC; Adv. No. 8:24-ap-01002-SC [Adv. Docket No. 28] (finding that "Debtor was insolvent or rendered insolvent at the time of the transfers made to Defendant").

62.    When the Loan was made, these prior UCC-1 statements secured the repayment of the following claimed amounts that are currently known to Trustee and are allegedly owed by the Debtor: (i) $2,374,004.82 owed to Fundura Capital Group as evidenced by Proof of Claim No. 335 purportedly secured by a UCC statement filed on or about May 19, 2021; (ii) approximately $15 million dollars owed to MNS Funding, LLC as evidenced by Proof of Claim No. 1060 purportedly secured by a UCC statement filed on or about May 28, 2021; (iii) approximately $5,000,000 owed to Azzure Capital, LLC as evidenced by Proof of Claim No. 127 secured by a UCC statement filed on or about May 28, 2021; and (iv) approximately $1.5 million dollars owed to Diverse Capital, LLC

purportedly secured by UCC statements filed on or about September 15, 2021, and December 1, 2021.[1]

63.     As alleged above, LPG was borrowing against its assets and future income, often on unfavorable terms, not only to finance operations at LPG, but also to pay the fees owed to the marketing affiliates for providing consumer clients and to pay other loans to creditors that were in default or about to be in default as part of Diab's scheme to keep LPG creditors at bay for a long as possible until he could transfer LPG's assets, client files, Client Funds, and ACH Receivables to other entities under his control. Pursuant to the agreements with the marketing companies, significant percentages of future payments were already promised to be paid to the marketing affiliates from whatever future income the Debtor would receive. And, of course, the payments LPG received in the form of ACH Receivables were also trust funds paid to LPG by its law firm clients, subject to return of funds in the event of a request for refund or termination of the representation before LPG had earned the funds. In this regard, except to the extent earned, the ACH Receivables also represented a liability of the Debtor.

64.     In addition, on Debtor's Schedule E/F [Bankr. Docket No. 33], Debtor scheduled 11 unsecured creditors with priority unsecured claims totaling $374,060.04. These priority unsecured creditors include Indiana Dept. of Revenue, Dept. of Labor and Industries, Arizona Dept. of Economic Security, Arkansas Dept. of Finance & Admin., California Franchise Tax Board, Georgia Dept. of Labor, Internal Revenue Service, Mississippi Dept. of Revenue, Nevada Dept. of Taxation, Utah State Tax Commission, and Wisconsin Dept. of Revenue (collectively, "Priority Unsecured Creditors").

65.     Another group of creditors that Debtor listed on its Schedule E/F [Bankr. Docket No. 33] are nonpriority unsecured creditors. Those 58 creditors have scheduled claims totaling $141,439,158.05 and include Ajilon; Anthem Blue Cross; Azevedo Solutions Groups, Inc.; Carolina Technologies & Consulting Invoice; Collaboration Advisors; Credit Reporting Service Inc.; CT Corporation – Inv.; Debt Pay Pro; Document Fulfillment Services; EnergyCare, LLC; Exela Enterprise Solutions; First Legal Network, LLC; GHA Technologies Inc.; Harrington Electric, Inc.;

---

[1] Trustee reserves all rights, claims, and defenses with respect to these and any other purported secured or unsecured claims.

Imagine Reporting; Juize, Inc.; Krisp Technologies, Inc.; Liberty Mutual; Marc Lemauviel – Allegra; MarkSYS Holdings, LLC; Netsuite-Oracle; Pitney Bowes; Rapid Credit, Inc.; SBS Leasing A Program of De Lage Landen; Security Solutions; Sharp Business Systems; Streamline Performance, Inc.; Thomson Reuters; Twilio, Inc.; Nationwide Appearance Attorneys; Executive Center, LLC; Outsource Accelerator, Ltd.; TaskUs Holdings, Inc.; Marich Bein, LLC; Validation Partners; MC DVI Fund 1, LLC; MC DVI Fund 2, LLC; Debt Validation Fund II, LLC; Tustin Executive Center; LexisNexus; JP Morgan Chase; Business Centers of America; Michael Schwartz; Anibal Colon Jr.; Kathleen Lacey; David Ulery; Kimberly Birdsong; Kevin Carpenter; Karen Suell; Gloria Eaton; Carolyn Beech; Debra Price; Kenneth Topp; Darcey Williamson, Trustee; James Hammett; Johnny Rizo; Beverly Graham; Kathleen Scarlett; and Geneve and Myranda Sheffield (collectively, "Nonpriority Unsecured Creditors" and, together with the Secured Creditors and Priority Unsecured Creditors, "Prepetition Creditors").

66.    The bar date for submitting claims as part of the Bankruptcy Case has passed and Plaintiff now knows that over 5,000 claims were filed totaling approximately $500 million in priority, secured and unsecured claims.

## FIRST CLAIM FOR RELIEF

### Count I - Avoidance, Recovery, and Preservation of Actual Fraudulent Transfers

### [11 U.S.C. §§ 548, 550, and 551]

67.    Plaintiff realleges and incorporates herein by reference each and every allegation contained in paragraphs 1 through 66 as though set forth in full.

68.    The Loan Documents were executed within two years prior to the Petition Date.

69.    LPG received nothing in exchange for the Transfers to Laurent Reiss, who was not a party to the Loan.

70.    LPG was insolvent when Mr. Diab caused it to execute the Loan Documents in February 2023 because its debts exceeded the fair market value of its assets at all relevant times.

71.    The execution of the Loan Documents, and the incurring of the obligations thereunder, happened while Debtor was insolvent or rendered Debtor insolvent.

72.    On or after the date that the Loan Documents were executed, entities to which Debtor

15

was or became indebted include the Prepetition Creditors.

73.    The Debtor made the Transfers to Laurent Reiss even though the Debtor was obligated MCA Fund ADV and/or LDR—not Reiss—under the terms of the Loan Documents.

74.    The Debtor entered into the Loan with actual intent to hinder, delay, or defraud creditors of Debtor.

75.    The Debtor was operating a Ponzi scheme and the Ponzi Scheme Presumption can be utilized to infer the Debtor's actual intent to defraud within the meaning of 11 U.S.C. § 548(a)(1).

76.    Defendants' conduct relating to the Transfers was done with oppression, fraud and malice, as defined in California Civil Code section 3294, entitling Plaintiff to exemplary and punitive damages.

77.    The execution of the Loan Documents is avoidable as fraudulent pursuant to 11 U.S.C. §§ 544, 548(a)(1)(A), 550, and 551, and the common law tort of intentional fraudulent transfers by one or more creditors who held and hold unsecured claims against Debtor that were and are allowable against its Estate under 11 U.S.C. § 502 or that were not and are not allowable only under 11 U.S.C. § 502(e), including, without limitation, the Prepetition Creditors.

78.    The execution of the Loan Documents, and the incurring of the obligations thereunder, should be avoided as fraudulent under 11 U.S.C. § 548(a)(1)(A) and under the common law tort of intentional fraudulent transfers, and such transferred property, or the value thereof, should be recovered and preserved for the benefit of the Estate pursuant to 11 U.S.C. §§ 550 and 551.

## SECOND CLAIM FOR RELIEF

**Count II - Avoidance, Recovery, and Preservation of Constructive Fraudulent Transfers**

**[11 U.S.C. §§ 544, 548(a)(1)(B), 550, and 551]**

79.    Plaintiff realleges and incorporates herein by reference each and every allegation contained in paragraphs 1 through 78 as though set forth in full.

80.    The Loan Documents were executed within two years prior to the Petition Date.

81.    The execution of the Loan Documents, and the incurring of the obligations thereunder, happened while Debtor:

a.    was insolvent or became insolvent as a result;

b.      was engaged or was about to engage in a transaction for which any property remaining with Debtor was of unreasonably small capital; or

c.      intended to incur, or believed that it would incur, debts beyond its ability to pay as such debts matured.

82.      The Debtor received less than reasonably equivalent value of the Transfers because it made the Transfers to Laurent Reiss, who was not a party to the Loan Documents.

83.      Furthermore, even if the Transfers were somehow deemed to be repayments of the Loan, the Debtor did not receive the reasonable equivalent value of the Transfers to MCA Fund ADV and LDR because by using MCA Fund ADV and LDR's money to run a Ponzi scheme there is nothing in Estate for the creditors to share and no benefit to the estate. Rather, the Transfers exacerbated the harm to creditors by increasing the amount of claims while diminishing the Debtor's Estate.  In this situation, the use of the MCA Fund ADV and LDR's money to further the Debtor's Ponzi scheme cannot be consideration for the Transfers and cannot objectively be called reasonably equivalent value.

84.      MCA Fund ADV and LDR were acting as investors in the Debtor's Ponzi scheme.

85.      The execution of the Loan Documents, and the incurring of the obligations thereunder, should be avoided as fraudulent under 11 U.S.C. § 548(a)(1)(B), and such transferred property, or the value thereof, should be recovered and preserved for the benefit of the Estate pursuant to 11 U.S.C. §§ 550 and 551.

**THIRD CLAIM FOR RELIEF**

**Count III - Avoidance, Recovery, and Preservation of Actual Fraudulent Transfers**

**[11 U.S.C. §§ 544(b), 550, and 551; CAL. CIV. CODE §§ 3439.04(b), and 3439.07]**

86.      Plaintiff realleges and incorporates herein by reference each and every allegation contained in paragraphs 1 through 85 as though set forth in full.

87.      The Loan Documents were executed within four years prior to the Petition Date.

88.      On or after the date that such agreements were entered, entities to which Debtor was or became indebted include the Prepetition Creditors.

89.      The execution of the Loan Documents, and the incurring of the obligations thereunder,

1  happened while Debtor was insolvent or Debtor became insolvent shortly after the Loan Documents

2  were executed is evidenced by the filing of the voluntary petition.

3      90.    The Debtor did not receive reasonably equivalent value in exchange for executing the

4  Loan Documents because the Loan was used to further assist Debtor in its Ponzi scheme.

5      91.    The Debtor entered into the Loan with actual intent to hinder, delay, or defraud

6  creditors of Debtor.

7      92.    The Debtor's conduct was done with oppression, fraud, and malice, as defined in Civil

8  Code section 3294, based on the Ponzi Scheme Presumption, entitling the Trustee to, in addition to

9  the actual damages, exemplary and punitive damages.

10      93.    The Loan Documents are avoidable as fraudulent pursuant to 11 U.S.C. § 544(b) and

11  Cal. Civ. Code §§ 3439.04(a), 3439.04(b), and 3439.07 by one or more creditors who held and hold

12  unsecured claims against Debtor that were and are allowable against the Estate under 11 U.S.C. § 502

13  or that were not allowable only under 11 U.S.C. § 502(e) including, without limitation, the Prepetition

14  Creditors.

15      94.    Accordingly, the Loan Documents, and the incurring of the obligations thereunder,

16  should be avoided as fraudulent under 11 U.S.C. §§ 544(b) and CAL. CIV. CODE §§ 3439.04(a) and

17  3439.07, and under the common law tort of intentional fraudulent transfers, and such transferred

18  property, or the value thereof, should be recovered and preserved for the benefit of the Estate pursuant

19  to 11 U.S.C. §§ 550 and 551 and CAL. CIV. CODE § 3439.07.

20                                **FOURTH CLAIM FOR RELIEF**

21  **Count IV - Avoidance, Recovery, and Preservation of Constructive Fraudulent Transfers**

22      **[11 U.S.C. §§ 544(b), 550, and 551; CAL. CIV. CODE §§ 3439.05, and 3439.07]**

23      95.    Plaintiff realleges and incorporates herein by reference each and every allegation

24  contained in paragraphs 1 through 94 as though set forth in full.

25      96.    The Loan Documents were executed within four years prior to the Petition Date.

26      97.    The execution of the Loan Documents, and the incurring of the obligations thereunder,

27  happened while Debtor:

28      a.    was insolvent or became insolvent as a result;

b.      was engaged or was about to engage in a transaction for which any property remaining with Debtor was of unreasonably small capital; or

c.      intended to incur, or believed that it would incur, debts beyond its ability to pay as such debts matured.

98.      Furthermore and objectively, the Debtor did not receive reasonably equivalent value for the Loan because, by Debtor's use of money received from Defendants to run the Ponzi scheme, there is nothing left in the Estate for the creditors to share and no benefit to the Estate. Instead, the Loan exacerbated the harm to creditors by increasing the amount of claims thereby diminishing the Debtor's Estate.

99.      Accordingly, the execution of the Loan Documents, and the incurring of the obligations thereunder, should be avoided pursuant to 11 U.S.C. §§ 544(b) and CAL. CIV. CODE §§ 3439.05 and 3439.07, and such transferred property, or the value thereof, should be recovered and preserved for the benefit of the Estate pursuant to 11 U.S.C. §§ 550 and 551 and CAL. CIV. CODE § 3439.07.

## FIFTH CLAIM FOR RELIEF

### Count V - Avoidance, Recovery, and Preservation of Unauthorized Post-Petition Transfers

### [11 U.S.C. §§ 549, 550, and 551]

100.      Plaintiff realleges and incorporates herein by reference each and every allegation contained in paragraphs 1 through 99 as though set forth in full.

101.      Under 11 U.S.C. § 549(a), the trustee may avoid a transfer of property of the estate that occurs after the commencement of the case and that is not authorized by the court with jurisdiction over the Bankruptcy Estate.

102.      The Transfers were transfers of an interest in property of the Debtor.

103.      Laurent Reiss received the Transfers in the amount of at least $1,710,000 after the Petition Date.

104.      The Transfers were not authorized under the Bankruptcy Code or by the Court.

105.      The Transfers are avoidable transfers pursuant to 11 U.S.C. § 549(a).

106.    Section 550 of the Bankruptcy Code provides that if a transfer is avoided under section 549 of the Bankruptcy Code, Plaintiff may recover the property or the value of the property transferred from the initial transferee, the entity for whose benefit the transfers were made, or any immediate or mediate transferee of the initial transferee.

107.    Laurent Reiss is the initial transferee.

108.    Defendants MCA Fund ADV and LDR are the entities for whose benefit the Transfers were made.

109.    In accordance with the foregoing, the Transfers are avoidable transfers pursuant to 11 U.S.C. § 549(a), and may be recovered and preserved for the benefit of the Estate pursuant to 11 U.S.C. §§ 550 and 551.

## SIXTH CLAIM FOR RELIEF

### Count VI - Turnover of Property of the Estate

### [11 U.S.C. §§ 542]

110.    Plaintiff realleges and incorporates herein by reference each and every allegation contained in paragraphs 1 through 109 as though set forth in full.

111.    Laurent Reiss has possession or control over property of the Estate in the form of the Transfers.

112.    The Transfers are not of inconsequential value to the Estate.

113.    The funds that are the subject of the Transfers are paramount to Debtor's ability to pay creditors.

114.    Accordingly, Trustee is entitled to a judgment for turnover of the Transfers, pursuant to 11 U.S.C. § 542.

## SEVENTH CLAIM FOR RELIEF

### Count VII - Racketeer Influenced and Corrupt Organizations

### [18 U.S.C. § 1962(c)]

115.    Plaintiff realleges and incorporates herein by reference each and every allegation contained in paragraphs 1 through 114 as though set forth in full.

/ / /

### a.  **The Unlawful Activity**

116.    At least two predicate acts underlie this claim for relief based on information known to date.  The first is making an unlawful and usurious loan.  The second is engaging in wire fraud.

117.    The interest rate that MCA Fund ADV and/or LDR charged the Debtor under the Note was 7% per month or approximately 84.3% per annum.

### b.  **The Culpable Persons**

118.    Defendants are "persons" within the meaning of 18 U.S.C. § 1961(3) and 18 U.S.C. § 1962(c) in that each is either an individual, corporation or limited liability company capable of holding a legal interest in property. At all material times, Defendants Laurent Reiss, MCA Fund ADV, and LDR were persons that exist separate and distinct from the Enterprise, described below.

### c.  **The Enterprise**

119.    Defendants constitute an Enterprise (the "Enterprise) within the meaning of 18 U.S.C. §§ 1961(4) and 18 U.S.C. 1962(c).

120.    Defendants are associated in fact through relations with one another for the common purpose of carrying on an ongoing unlawful enterprise. The Enterprise has a common goal of soliciting, funding, servicing and collecting on usurious loans and charging exorbitant interest rates greatly in excess of the permitted interest rate under the applicable usury laws, including those of the State of California.

121.    Since at least 2023 and continuing to date, the members of the Enterprise have had ongoing relations with each other through common control, ownership, shared personnel and/or one or more contracts or agreements relating to and for the purpose of originating, underwriting, servicing and collecting upon unlawful loans issued by the Enterprise to struggling businesses throughout the United States.

122.    The debt evidenced by the Loan constitutes "unlawful debt" within the meaning of 18 U.S.C. § 1961(6); 18 U.S.C. § 1962(c); and 18 U.S.C. § 1962(d) because: (i) the debt is unenforceable under Federal or State law as to principal or interest because of laws relating to usury, and violates the applicable criminal usury statutes; and (ii) the debt was incurred in connection the business of lending money at rates usurious under Federal and State law, and the rates are many times more than

the enforceable rate permitted under the usury laws of California.

123.    Since at least 2023 and continuing to date, the members of the Enterprise have had ongoing relations with each other through common control, ownership, shared personnel, and/or one of more contracts or agreements relating to and for the purpose of collecting fraudulent transfers through electronic wire transfers.

124.    The Enterprise's activity also constitutes "wire fraud" within the meaning of 18 U.S.C. § 1343, which is "racketeering activity" as defined by 18 U.S.C. § 1961(1). The repeated and continuous use of and engaging in such conduct, including the ACH transfers to participate in the affairs of the Enterprise constitutes a pattern of racketeering activity in violation of 18 U.S.C. § 1962(c).

> **d.    Roles of the Defendants in Operating the Enterprise and of the Individual Entities Within the Enterprises**

125.    The Defendants have organized themselves and the Enterprise into a cohesive group with specific responsibilities and a command structure to operate as a unit in order to accomplish the common goals and purposes of collecting upon unlawful debts.

126.    MCA Fund ADV, on information and belief, maintains offices, books, records and bank accounts, some independent of those of the other Defendants but maintained in coordination with them.

127.    LDR, on information and belief, also maintains offices, books, records and bank accounts, some independent of those of the other Defendants but maintained in coordination with them.

128.    Laurent Reiss, on information and belief, has operated, engaged and/or conspired with MCA Fund ADV and LDR as part of an unlawful enterprise to collect upon an unlawful debt and to commit wire fraud.

> **e.    Interstate and Foreign Commerce**

129.    The Enterprise is engaged in interstate and foreign commerce, and uses and has used the instrumentalities of interstate and foreign commerce in its daily business activities.

130.    Members of the Enterprise maintain offices in New York, the British Virgin Islands,

1  and Monaco and use personnel in these offices to originate, underwrite, fund, service and collect upon

2  usurious loans made by the Enterprise to entities in California, including Debtor, and throughout the

3  United States via extensive use of mail, emails, wire transfers and bank withdrawals processed

4  through automated clearing houses.

5      131.    In this Bankruptcy Case, communications between the members of the Enterprise and

6  Debtor were by mail, interstate and foreign email, wire transfers, ACH debits and other interstate and

7  foreign wire communications. The Enterprise used interstate and foreign emails to originate,

8  underwrite, service and collect upon the Loan, and collect the Loan payments via international wire

9  transfers.

10      **f.    Injury and Causation**

11      132.    Plaintiff and the Debtor's Estate and its creditors have been and will continue to be

12  injured by reason of the Enterprise's violations of 18 U.S.C. section 1962(c).

13      133.    The injuries directly, proximately, and reasonably foreseeably resulting from or caused

14  by these violations include, without limitation, millions of dollars in improperly collected usurious

15  loan payments.

16      134.    Plaintiff and the Debtor's Estate also have suffered damages by incurring attorney's

17  fees and costs associated with the prosecution of Defendants' unlawful activities.

18      135.    Pursuant to 18 U.S.C. section 1964(c), Plaintiff is entitled to recover triple damages

19  and costs of suit, including attorney's fees, from Defendants.

20  **EIGHTH CLAIM FOR RELIEF**

21  **Count VIII - Conspiracy**

22  **[18 U.S.C. § 1962(d)]**

23      136.    Plaintiff realleges and incorporates herein by reference each and every allegation

24  contained in paragraphs 1 through 135 as though set forth in full.

25      137.    Defendants have unlawfully, knowingly and willfully, combined, conspired and

26  agreed together to engage in activities that violate 18 U.S.C. section 1962(c), as alleged above, in

27  violation of 18 U.S.C. section 1962(d).

28      138.    By and through Defendants' business relationships with one another, their

coordination with one another in the affairs of the Enterprise, and the frequent email and other communications among the Defendants concerning the underwriting, funding, servicing and collection of the unlawful Loan, each Defendant knew the nature of the Enterprise and each Defendant knew that the Enterprise extended beyond each Defendant's individual role. Moreover, through the same connections and coordination, each Defendant knew that the other Defendants were engaged in a conspiracy to collect upon the unlawful debts in violation of 18 U.S.C. section 1962(c).

139.    Each Defendant agreed to facilitate, conduct and participate in the conduct, management, and/or operation of the Enterprise's affairs in order to collect upon the unlawful debts, including the Loan, in violation of 18 U.S.C. section 1962(c). Each Defendant was a knowing, willing and active participant in the Enterprise and its affairs, and each of the Defendants shared a common purpose, which was the orchestration, planning, preparation and execution of the scheme to solicit, underwrite, fund and collect upon unlawful debts, including the Loan.

140.    Each Defendant agreed to facilitate, conduct and participate, directly or indirectly, in the management and/or operation of the Enterprise's affairs in order to commit wire fraud through a pattern of racketeering activity and collection of unlawful debts in violation of 18 U.S.C. section 1962(c).

141.    The participation and agreement of each Defendant was necessary to implement and perpetuate the commission of the scheme.

142.    Plaintiff and the Debtor's Estate and its creditors have been and will continue to be injured by reason of Defendants' conspiracy in violation of 18 U.S.C section 1962(d), in amounts to be determined at trial.

143.    The injuries to Plaintiff and the Debtor's Estate and to its creditors directly, proximately and reasonably foreseeably resulting from and caused by these violations of 18 U.S.C section 1962(d) include, without limitation, millions of dollars in improperly collected loan payments.

144.    Plaintiff and the Debtor's Estate also suffered damages by incurring attorney's fees and costs associate with the prosecution of Defendants' unlawful activities.

145.    Pursuant to 18 U.S.C. section 1964(c), Plaintiff is entitled to recover triple damages and costs of suit, including attorney's fees, from Defendants.

## NINTH CLAIM FOR RELIEF

### Count IX – Aiding and Abetting

**[18 U.S.C. § 2; 11 U.S.C. §§ 544(b), 550, and 551;**

**CAL. CIV. CODE §§ 3439.04(a), 3439.04(b), and 3439.07]**

146.     Plaintiff realleges and incorporates herein by reference each and every allegation contained in paragraphs 1 through 145 as though set forth in full.

147.     Defendants, based upon information and belief and based on the Ponzi Scheme Presumption, had knowledge of the fraudulent transactions, transfers and illegal agreements that were used to perpetuate and conceal the Ponzi scheme and fraudulent transfers.

148.     Defendants, based upon information and belief and based on the Ponzi Scheme Presumption, had knowledge that Prime Logix was an alter ego of Diab.

149.     Defendants, with the foregoing knowledge, intended to, and did, help the Debtor in perpetuating and concealing the Ponzi scheme and fraudulent transfers of money.

150.     At all material times, Defendants had the intent to facilitate and conceal the Ponzi scheme and fraudulent transfers of money by aiding and abetting the illegal capping scheme and signing up consumer clients to keep the business going.

151.     Defendants, upon information and belief, assisted, and did actually engage in, the commission of fraud and the Ponzi scheme by coordinating, facilitating, and directing payments and transfers of monies and executing documents in furtherance of concealing the true nature of their fraudulent and criminal activity related to the Ponzi scheme.

152.     The injuries to Plaintiff, the Debtor's Estate and to its creditors directly, proximately and reasonably foreseeably resulting from and caused by violations of 18 U.S.C. §§ 1962(d) and 1964(c), as well as Sections 6151 and 6155 of the California Business and Professional Code include, without limitation, millions of dollars in improperly transferred and acquired monies.

153.     Plaintiff and the Debtor's Estate also suffered damages by incurring attorney's fees and costs associated with the prosecution of Defendants' unlawful activities.

/ / /

/ / /

154.   Pursuant to 18 U.S.C. §§ 1962(d), 1964(c), 2, and common law or common count, Plaintiff is entitled to recover treble damages and costs of suit, including attorney's fees, from the Defendants.

**TENTH CLAIM FOR RELIEF**

**Count X – Declaratory Relief**

155.   Plaintiff realleges and incorporates herein by reference each and every allegation contained in paragraphs 1 through 154 as though set forth in full.

156.   An actual controversy exists between Plaintiff and Defendants regarding the enforceability of the Loan.

157.   Plaintiff contends that the Loan is void and unenforceable; the interest rates charged in the Loan are usurious; the law that applies in determining the usurious nature of the agreements is California law and/or federal law; and the Transfers made pursuant to the Loan constitute wire fraud. Defendants dispute each of Plaintiff's contentions.

158.   A judicial determination of the rights, duties and obligation of Plaintiff and Defendants, therefore, is appropriate.

**RESERVATION OF RIGHTS**

Plaintiff reserves the right to bring all other claims or causes of action that Plaintiff may have against defendants, on any and all grounds, as allowed under the law or in equity, including but not limited to, those claims not known by the Trustee at this time but that he may discover during the pendency of this adversary proceeding.

**PRAYER FOR RELIEF**

**WHEREFORE**, Plaintiff prays for a judgment as follows:

**On the First, Second, Third, and Fourth Claims for Relief:**

A.   Avoiding the Loan and related obligations as unenforceable against the Estate;

**On the First and Third Claims for Relief:**

B.   Awarding punitive and exemplary damages according to proof;

**On the Fifth Claim for Relief:**

C.   Avoiding, recovering, and preserving the Transfers against Defendants;

**On the Sixth Claim for Relief:**

D.      Ordering Defendants to immediately turn over the Transfers;

**On the Seventh and Eighth Claims for Relief:**

E.      Awarding Plaintiff monetary damages in the total aggregate amount of not less than $1,710,000.00;

F.      Awarding treble damages;

G.      Awarding costs of suit, including attorneys' fees;

**On the Ninth Claim for Relief:**

H.      Awarding Plaintiff monetary damages in the amount of all fraudulent transfers obtained by Defendants from Debtor;

**On the Tenth Claim for Relief:**

I.      Declaring that the Loan is void and unenforceable, the interest rates charged in the Note are usurious, the law that applies in determining the usurious nature of the interest rates is California law and/or federal law; and the Transfers made pursuant to the Loan constitute wire fraud;

/ / /

/ / /

/ / /

/ / /

/ / /

/ / /

/ / /

/ / /

/ / /

/ / /

/ / /

/ / /

/ / /

/ / /

**On All Claims for Relief:**

J.      Awarding costs of suit;

K.      Awarding punitive damages;

L.      Awarding attorneys' fees;

M.      Awarding pre-judgment interest at the maximum legal rate running from the date of the Complaint to the date of judgment herein;

N.      Awarding post-judgment interest at the maximum legal rate running from the date of judgment herein until the date the judgment is paid in full, plus costs;

O.      Requiring Laurent Reiss to pay forthwith any judgment awarded herein; and

P.      Granting Plaintiff such other and further relief as the Court deems just and proper.

Dated: March 18, 2025                          Respectfully submitted,

                                                             DINSMORE & SHOHL LLP


                                                             By:  /s/ *Matthew J. Stockl*
                                                                    Christopher Celentino
                                                                    Yosina M. Lissebeck
                                                                    Matthew J. Stockl

                                                             *Special Counsel to Richard A. Marshack,*
                                                             *Trustee of the LPG Liquidation Trust*

# EXHIBIT 1

1 CHRISTOPHER B. GHIO (259094)
christopher.ghio@dinsmore.com
2 CHRISTOPHER CELENTINO (131688)
christopher.celentino@dinsmore.com
3 YOSINA M. LISSEBECK (201654)
yosina.lissebeck@dinsmore.com
4 DINSMORE & SHOHL LLP
655 West Broadway, Suite 800
5 San Diego, California 92101
Tele: 619.400.0500
6 Fax: 619.400.0501
7
8 Sarah S. Mattingly (Ky. Bar 94257)
sarah.mattingly@dinsmore.com
9 DINSMORE & SHOHL, LLP
101 S. Fifth Street, Suite 2500
10 Louisville, Kentucky 40202
Tele: 859-425-1096
11 Fax: 502-585-2207
(Admitted pro hac vice)
12
13 Special Counsel to Richard A. Marshack

**FILED & ENTERED**

**JUN 03 2024**

CLERK U.S. BANKRUPTCY COURT
Central District of California
BY mccall     DEPUTY CLERK

14                    **UNITED STATES BANKRUPTCY COURT**

15          **CENTRAL DISTRICT OF CALIFORNIA – SANTA ANA DIVISION**

16 In Re                                    Case No: 23-bk-10571-SC

17                                          Chapter 11

18
The Litigation Practice Group P.C.,        **ORDER GRANTING MOTION FOR**
19                                          **ENTRY OF PROTECTIVE ORDER AND**
                Debtor(s),                  **THE PROTECTIVE ORDER**
20

21                                          Date:    May 23, 2024
                                            Time:    1:30 p.m.
22                                          Judge:   Hon. Scott C. Clarkson
                                            Place:   Courtroom 5C (via Zoom)[1]
23                                                   411 West Fourth Street
                                                     Santa Ana, CA 92701
24

25

26

27 ────────────────

28 [1] Video and audio connection information for each hearing will be provided on Judge Clarkson's
publicly posted hearing calendar, which may be viewed online at:
http://ecf-ciao.cacb.uscourts.gov/CiaoPosted/?jid=SC.

Exhibit 1, page 30

1    The Court has read and considered the Notice of Motion and Motion for Entry of Protective

2    Order (the "Motion") filed by Richard A. Marshack, in his capacity as the Chapter 11 Trustee (the

3    "Trustee") of the Bankruptcy Estate ("Estate") of The Litigation Practice Group P.C., on May 2, 2024,

4    pursuant to Federal Rule of Bankruptcy Procedure 7026 and Federal Rule of Civil Procedure 26(c)(1),

5    as Dk. No. 1164 ("Motion"), and has found good cause to grant the Motion.

6    IT IS HEREBY ORDERED that:

7    1.    The Motion is granted;

8    2.    The below Protective Order shall apply to any contested matter arising

9    in the main bankruptcy case and in all adversary proceedings filed by or against Trustee,

10    present and future; and

11    3.    Govern the discovery conducted therein.

12

13    **PROTECTIVE ORDER**

14    **1.    DEFINITIONS**

15    1.1    "Confidential Information" as used in this Protective Order shall mean documents and

16    other information (regardless of how generated, stored or maintained) that a Party or non-party

17    reasonably believes to contain or reflect non-public financial or business information, bank records,

18    financial records, such as social security numbers, non-public financial or personal information of a

19    Party or non-party, account numbers, sensitive digital information and identifiers, information subject

20    to confidentiality agreements or provisions other than this Protective Order, and other non-public

21    research, development, or commercial information that derives value or avoids injury by virtue of not

22    being known to the public.

23    1.2    This "Action" is defined and hereby means any contested matter arising in the main

24    bankruptcy case and in all adversary proceedings filed by or against Trustee, present and future.

25    1.3    "Designating Party" means a Party or non-party that designates Confidential

26    Information during the Action.

27    1.4    "Receiving Party" means a Party that receives Confidential Information during the

28    Action.

2

1.5    "Party" or "Parties" means person or entity subject to this Protective Order.

**2.      SCOPE OF THIS PROTECTIVE ORDER**

2.1    Unless otherwise ordered, this Protective Order shall govern certain documents and other products of discovery obtained in the Action from the Parties there to, and from third parties. As well as certain information copied or derived therefrom, excerpts, summaries or compilations thereof, including, but not limited to, documents voluntarily exchanged as part of early settlement discussions, documents produced pursuant to initial disclosures, requests authorized by the Federal Rules of Civil Procedure made applicable herein by the Federal Rules of Bankruptcy Procedure, answers to interrogatories, deposition transcripts, responses to requests for production, responses to requests for admission, subpoenas, affidavits, declarations, expert reports, and other such material and information as may be produced during the course of the Action and designated as Confidential Information.

**3.      DESIGNATION OF CONFIDENTIAL INFORMATION**

3.1    This Protective Order shall govern the production and handling of any Confidential Information in this Action. Any Party or non-party who produces Confidential Information in this Action may designate it as "Confidential" or "Attorneys' Eyes Only" consistent with the terms of this Protective Order. Whenever possible, the Designating Party must designate only those portions of a document, written discovery responses, deposition, transcript, or other material that contain the Confidential Information and refrain from designating entire documents. Regardless of any designations made hereunder, the Designating Party is not otherwise restricted from use or disclosure of its Confidential Information outside of this Action or for any business purposes. In addition, any Party may move to modify or seek other relief from any of the terms of this Protective Order if it has first tried in writing and in good faith to resolve its needs or disputes with the other Parties or Party as the case may be under the terms of this Protective Order. Further, nothing in this Protective Order shall prevent a Party from redacting documents consistent with the Federal Rules of Civil Procedure and utilizing the documents as needed through-out the Action.

3.2    <u>Application to Non-Parties:</u> Before a non-party is given copies of documents or materials designated as Confidential Information or Attorneys' Eyes Only as permitted hereunder, it

3

must first sign an acknowledgment to be bound to these terms that is attached hereto as <u>Exhibit</u> A; if it fails to do so, the Parties to this Action must resolve any such dispute before making disclosure of designated information as permitted hereunder to the non-party. If a non-party wishes to make designations hereunder, it must first sign attached <u>Exhibit A.</u>

        3.3    <u>Timing and Provisional Protection:</u> Designations of Confidential Information may be made at any time. To avoid potential waiver of protection hereunder, the Designating Party should designate documents or materials containing Confidential Information at the time of production or disclosure, including on the record during the taking of any deposition. Deposition testimony will be deemed provisionally protected for a period of thirty (30) days after the transcript is released to the Parties by the court reporter, although the Parties may agree at any time to different timelines of provisional protection of information as Confidential or Attorneys' Eyes Only as part of one or more specific depositions. To retain any designations beyond the provisional period, a Designating Party must designate specific pages and lines of deposition testimony before the provisional period has expired. Such designations must be made in writing so that all counsel and court reporters may append the designation to all copies of the transcripts.

        3.4    <u>Manner of Designation:</u> Confidential Information may be designated hereunder in any reasonable manner or method that notifies the Receiving Party of the designation level and identifies with specificity the information to which the designation applies. If made verbally, the Designating Party must promptly confirm the designation in writing. Whenever possible, the Designating Party should stamp, affix, or embed a legend of "CONFIDENTIAL" or "ATTORNEYS' EYES ONLY" on each designated page of the document or electronic image that contains Confidential Information.

    **4.**      **CHALLENGES TO DESIGNATED INFORMATION**

        4.1    In the event that a Receiving Party disagrees at any time with any designation(s) made by the Designating Party, the Receiving Party must first try to resolve such challenge in good faith on an informal basis with the Designating Party. The Receiving Party must provide written notice of the challenge and the grounds therefor to the Designating Party, who must respond in writing to the challenge within fifteen (15) days. At all times, the Designating Party carries the burden of establishing the propriety of the designation and protection level. Unless and until the challenge is

4

1    resolved by the Parties or ruled upon by the Court, the designated information shall remain protected

2    under this Protective Order. The failure of any Receiving Party to challenge a designation does not

3    constitute a concession that the designation is proper or an admission that the designated information

4    is otherwise competent, relevant, or material.

5         **5.**     **LIMITED ACCESS/USE OF PROTECTED INFORMATION**

6         5.1    <u>Restricted Use:</u> Information that is produced or exchanged in the course of the Action

7    and designated under this Protective Order may be used for preparation for trial and preparation for

8    any appeal of any and all matters in the Action, as well as related settlement negotiations, and for no

9    other purpose, without the written consent of the Designating Party. No Confidential Information may

10   be disclosed to any person except in accordance with the terms of this Protective Order, unless the

11   parties are co-counsel or have entered into joint defense agreements. All persons in possession of

12   Confidential Information agree to exercise reasonable care with regard to the custody, use, or storage

13   of such information to ensure that its confidentiality is maintained. This obligation includes, but is

14   not limited to, the Receiving Party providing to the Designating Party prompt notice of the receipt of

15   any subpoena that seeks production or disclosure of any designated information and consulting with

16   the Designating Party before responding to the subpoena. Any use or disclosure of Confidential or

17   Attorneys' Eyes Only information in violation of the terms of this Protective Order may subject the

18   disclosing person or party to sanctions.

19        5.2    <u>Access to "Confidential" Information:</u> The Party(ies) and all persons subject to this

20   Protective Order agree that information designated as "CONFIDENTIAL" may only be accessed or

21   reviewed by the following:

22        a)    The Court, its personnel, and court reporters;

23        b)    Counsel of record, or co-counsel for any Party, or other party that has entered into a

24   joint defense agreement in the Action and their employees who assist counsel of record, or co-counsel

25   in the Action and are informed of the duties and obligations imposed hereunder;

26        c)    The Parties, including their clients, agents and employees who are assisting or have

27   reason to know of the Action;

28   / / /

Exhibit 1, page 34

d)    Experts or consultants employed by the Parties or their counsel, or co-counsel, for purposes of an Action, so long as each such expert or consultant has signed attached <u>Exhibit A;</u> and

e)    Other witnesses or persons with the Designating Party's consent or by court order.

5.3    <u>Access to "Attorneys' Eyes Only" Designations:</u> The Parties and all persons subject to this Protective Order agree that information designated as "ATTORNEYS' EYES ONLY" may only be accessed or reviewed by the following:

a)    The Court, its personnel, and court reporters;

b)    Counsel of record, or co-counsel for any Party, or other party that has entered into a joint defense agreement in the Action and their employees who assist counsel of record in the Action and are informed of the duties hereunder;

c)    In-house counsel for any Party in the Action and Richard A. Marshack, as Chapter 11 Trustee of The Litigation Practice Group P.C. who is informed of the duties and obligations imposed hereunder;

d)    Experts or consultants employed by the Parties or their counsel, or co-counsel for purposes of the Action,  and so long as each such expert or consultant has signed attached <u>Exhibit A;</u> and

e)    Other witnesses or persons to whom the Designating Party agrees in advance of disclosure or by court order.

5.4    <u>Non-Waiver Effect of Designations:</u> Neither the taking of, nor the failure to take, any action to enforce the provisions of this Protective Order, nor the failure to object to any designation, will constitute a waiver of any Party(ies)'s claim or defense in the Action or any other action or proceeding, including, but not limited to, a claim or defense that any designated information is or is not Confidential, is or is not entitled to particular protection, or embodies or does not embody information protectable by law.

5.5    <u>In-Court Use of Designated Information:</u> If information designated under this Protective Order will or may be offered in evidence at a hearing or trial related to any matter in the Action, then the offering party must give advance notice to the party or non-party that designated prior to offering the information so that any use or disclosure may be addressed in accordance with

6

1    the Court's case-management or other pre-trial order, or by a motion *in limine.*   Nothing in this

2    Protective Order shall be construed as a waiver by a Party of any objections that may be raised as to

3    the admissibility at trial of any evidentiary materials.

4          **6.**      **CLAW-BACK REQUESTS**

5          6.1    <u>Failure to Make Designation:</u>   If, at any time, a Party or non-party discovers that it

6    produced or disclosed Confidential Information without designation, it may promptly notify the

7    Receiving Party and identify with particularity the Confidential Information to be designated and the

8    level of designation (the claw-back notification). The Receiving Party may then request substitute

9    production of the newly-designated information. Within thirty (30) days of receiving the claw-back

10   notification, the Receiving Party must: (1) certify to the Designating Party it has appropriately marked

11   or, if substitute production has been requested, destroyed all unmarked copies that it received, made,

12   and/or distributed; and (2) if it was practicably unable to mark or destroy any information because

13   disclosures occurred while the Receiving Party was under no duty of confidentiality under the terms

14   of this Protective Order regarding that information, the Receiving Party must reasonably provide as

15   much information as practicable to aid the Designating Party in protecting the information,

16   consistently with the Receiving Party's attorney-client, work-product, and/or trial-preparation

17   privileges.

18         6.2    <u>Inadvertent Production of Privileged Information:</u> If, at any time, a Party discovers

19   that it produced information that it reasonably believes is subject to protection under the

20   attorney/client, work-product, or trial-preparation privileges, then it must promptly notify each

21   Receiving Party of the claim for protection, the basis for it, amend its privilege log accordingly, and

22   comply with Fed. R. Civ. P. 26(b)(5). Whenever possible, the producing party must produce substitute

23   information that redacts the information subject to the claimed protection. The Receiving Party must

24   thereupon comply with Fed. R. Civ. P. 26(b)(5)(B) as to the information subject to the claimed

25   protection.

26   / / /

27   / / /

28   / / /

7

**7.    DURATION/CONTINUED RESTRICTIONS**

7.1    <u>Handling of Designated Information Upon Conclusion of the Main Bankruptcy Case:</u>
Upon conclusion of the Main Bankruptcy Case, by way of dismissal or closing of the case, the
Designating Party(ies) is/are responsible for ensuring that any Party or person to whom the
Designating Party shared or disclosed designated information in any of the matters under the Action
returns or destroys all of its copies, regardless of the medium in which it was stored. No witness or
Party may retain designated information that it received from any other Party or non-party under this
Protective Order; only counsel of record, or co-counsel, are the authorized agents who may retain one
copy for their respective legal files, and who must also describe to the Designating Party the extra
steps taken to protect its legal file containing paper and/or electronic copies of the designated
information so that it is not accessed, used, or disclosed inconsistently with the obligations under this
Protective Order. This provision does not apply to the Court or Court staff. Moreover, this provision
does not apply to Trustee, who may retain and use – consistent with this Order – Confidential
Information received in any Action during the entirety of the Bankruptcy.

7.2    <u>Continued Restrictions Under this Protective Order:</u> The restrictions on disclosure and
use of Confidential Information shall survive the conclusion of the Bankruptcy case and any matter
in the Action.

**8.    PRIVILEGED OR PROTECTED INFORMATION**

8.1    Nothing in this Protective Order shall require disclosure of information that is
protected by the attorney-client privilege, the work-product protection, or any other legally cognizable
privilege (a "Privilege or Protection").  If information subject to a claim of Privilege or Protection is
inadvertently produced, pursuant to Federal Rule of Evidence 502(d) such production shall not
constitute a waiver of, or estoppel as to, any claim of Privilege or Protection for such information or
any other information that may be protected from disclosure by a Privilege or Protection in any
proceeding.

8.2    If a Party receives a document that appears to be subject to a Privilege or Protection,
then it shall refrain from examining the document any more than is essential to ascertain if it is
privileged or protected and shall promptly notify the producing Party in writing that the receiving

8

Exhibit 1, page 37

Party possesses material that appears to be subject to a Privilege or Protection. The producing Party shall have seven (7) days after receiving such notice to assert a Privilege or Protection over the identified material. If the producing Party does not assert a claim of Privilege or Protection within the seven (7)-day period, the material in question shall be deemed not privileged or protected.

8.3     If a producing Party has produced a document subject to a claim of Privilege or Protection, upon written request by the producing Party, the document for which a claim of Privilege or Protection is made shall be sequestered or destroyed to the extent reasonably practicable, and the receiving Party shall not use the document for any purpose other than in connection with analyzing or disputing a claim of Privilege or Protection or in connection with a motion to compel the production of the document.

8.4     The receiving Party sequestering or destroying such material may then move the Court for an order compelling production of the material. The applicable producing Party bears the burden of establishing the applicable Privilege or Protection of any clawed-back document or information as and to the same extent that it would have borne such burden had it not produced the document or information.  Nothing in this Protective Order shall limit the Court's right or any receiving Party's right to request an in camera review of any information subject to a claim of Privilege or Protection.


                                        ###


Date: June 3, 2024                              *Scott C. Clarkson*
                                        Scott C. Clarkson
                                        United States Bankruptcy Judge


                                        9                    Exhibit 1, page 38

1

2

3

4

5

EXHIBIT "A"

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

1  Christopher B. Ghio (State Bar No. 259094)
   Christopher Celentino (State Bar No. 131688)
2  Yosina M. Lissebeck (State Bar No. 201654)
   **DINSMORE & SHOHL LLP**
3  655 West Broadway, Suite 800
   San Diego, CA 92101
4  Telephone:  619.400.0500
   Facsimile:  619.400.0501
5  christopher.ghio@dinsmore.com
   christopher.celentino@dinsmore.com
6  yosina.lissebeck@dinsmore.com

7  Sarah S. Mattingly (Ky. Bar 94257)
   DINSMORE & SHOHL, LLP
8  101 S. Fifth Street, Suite 2500
   Louisville, KY 40202
9  Telephone: 859-425-1096
   Facsimile: 502-585-2207
10 Sarah.mattingly@dinsmore.com
   (Admitted pro hac vice)

11
   Special Counsel to Richard A. Marshack,
12 Chapter 11 Trustee

13

14

15              **UNITED STATES BANKRUPTCY COURT**

16              **CENTRAL DISTRICT OF CALIFORNIA**

17

18 In Re                              Case No. 8:23-BK-10571-SC

19                                    Chapter 11

20 The Litigation Practice Group P.C.,  **EXHIBIT A TO STIPULATED
                                        ORDER**
   Debtor(s),
21                                    Date:   May 23, 2024
22                                    Time:   1:30 p.m.
23                                    Judge:  Hon. Scott C. Clarkson
                                      Place:  Courtroom 5C[1] - Via Zoom
24                                            411 W. Fourth Street
                                              Santa Ana, CA  92701
25

26

27
   ――――――――――――――――
28 [1] Video and audio connection information for each hearing will be provided on Judge Clarkson's
    publicly posted hearing calendar, which may be viewed online at:
    http://ecf-ciao.cacb.uscourts.gov/CiaoPosted/?jid=SC.

                                      Exhibit 1, page 40

                          1

This is to certify that:

    (a)    I am being given access to Confidential Information pursuant to the Stipulated Protective Order that was entered into the main bankruptcy case for Litigation Practice Group, but which is binding and controlling as set forth by the Court's Order on any and all contested matters and any and all litigation commenced by Trustee;

    (b)    I have read the Stipulated Protective Order; and

    (c)    I agree to be bound by the terms and conditions thereof, including, without limitation, to the obligations regarding the use, non-disclosure and return of such Confidential Information. I further agree that in addition to being contractually bound by the Stipulated Protective Order, I am subject to the jurisdiction of the above reference Court for any violation thereof.

Date: _____

_____
Signature

_____
Printed Name

Exhibit 1, page 41

2

EXHIBIT A
Page 3

# EXHIBIT 2

Exhibit 2. page 42

## LOAN AGREEMENT

THIS LOAN AGREEMENT (the "Loan Agreement") is made as of February 7, 2023 by and between BAT Inc a/k/a B.A.T. Inc. and The Litigation Practice Group PC, ("LPG" or "Borrower" or "Borrowers" which may be used interchangeably), and as personally guaranteed by Daniel March (residing at 20160 Nob Hill Drive, Yorba Linda, CA 92886) and Tony M Diab (an individual residing in California), both of whom are agents and officers of LPG with authority to bind same to this Note ("Guarantor" or "Guarantors" which may be used interchangeably without specification and shall collectively mean everyone identified herein) (LPG, Borrower, and Guarantor may all be used interchangeably throughout this Note) and MCA Fund ADV Inc. maintaining a place of business at 4714 16th Avenue, Brooklyn NY and/or to LDR International Ltd., a British Virgin Islands limited company, having its address at Yamraj Building, Market Square, 3rd Floor, P.O. Box 3175, Road Town, Tortola VG 1110, British Virgin Islands ("Lender" or "Lenders" which may be used interchangeably), or either of their assignees (collectively the "Parties"),

WHEREAS, on or about February 7, 2023, Lender provided a loan to Borrower in the principal amount of One Million Five Hundred Thousand Dollars ($1,500,000.00) (the "Principal") with interest (memorialized in a contemporaneous Promissory Note ("Note") executed by Borrower) due on or prior to May 6, 2023 (the "Maturity Date") subject to a schedule of disbursement(s) as reflected on the Note;

WHEREAS, Borrower has offered to execute and deliver a Promissory Note to Lender in the amount currently due and owing under the Loan, and to grant Lender a first-priority security interest in and lien upon all of Borrower's assets;

NOW, THEREFORE, in consideration of the foregoing premises and other good and valuable consideration, the receipt and sufficiency of which are hereby acknowledged, the Parties hereto agree as follows:

1.     Borrower acknowledges and agrees that, as of the date of this Loan Agreement: the total amount currently due and owing under the Loan, including unpaid principal, interest, charges, advances, penalties, and any other amounts due thereunder, equals One Million Five Hundred Thousand Dollars ($1,500,000.00) with interest (as defined in the Note) (the "Principal"); and Borrower has no rights of setoff or other any other defenses to its immediate obligation to pay this amount in full. Upon the occurrence of an Event of Default (as defined in the Promissory Note(s) or Security Agreement), the Interest Rate shall increase to the lesser of twenty four percent (24%) or the maximum amount permitted by applicable law. Interest shall not accrue on unpaid Interest or Late Charges (as defined below).

2.     All attorney fees and expenses actually incurred by Lender to collect on or enforce the Promissory Note, this Loan Agreement, the Security Agreement, or any Confessions of Judgments furnished by Borrower, to declare or adjudicate any rights under any of those documents, or to marshal any collateral that is security for the performance of Borrower's obligations under any of those documents, whether by suit or any other means whatever, shall be payable by Borrower and shall be added to and constitute party of the outstanding Principal.

1

Exhibit 2. page 43

3.    All payments by Borrower shall be applied first to the payment of any unpaid Late Charges, second to the payment of any unpaid Interest, and third to the reduction of the Principal.

4.    All unpaid Principal, Interest, and Late Charges shall be paid in full by the Borrower on or prior to the Maturity Date.

5.    An event of default (an "Event of Default") shall be deemed to be interpreted and defined as stated in the Promissory Note and/or Security Agreement.

6.    Upon the occurrence of an Event of Default, the Maturity Date shall immediate accelerate to the date of the Event of Default, and all unpaid attorney's fees, Late Charges, Interest, Principal, and other expenses contemplated in the Note, Security Agreement, and this Loan Agreement shall be due and payable.

7.    Borrower shall make all payments due under this Loan Agreement by wire, with immediately available funds or a check acceptable to Lender.

8.    Borrower shall execute and deliver to Lender a promissory note (the "Promissory Note") pursuant to which Borrower shall unconditionally promise to pay Lender the Principal sum on or prior to the Maturity Date.

9.    Borrower shall execute and deliver to Lender a security agreement (the "Security Agreement") pursuant to which Borrower shall grant Lender a first-priority security interest in and lien upon all of Borrower's assets (as defined in the security agreement, the "Collateral") a security for performance of Borrower's obligations under this Loan Agreement and the Promissory Note.

10.    Borrower represents and warrants to Lender that: (a) Borrower has the full right, power and authority to bind the corporations identified herein, enter into and perform the terms of this Loan Agreement and none of the terms or conditions of this Loan Agreement, the Promissory Note, or the Security Agreement are or shall be in violation of any provisions of any other agreement to which Borrower is a party; (b) Borrower is duly organized, validly existing and in good standing under the laws of the state of California; (c) there is no litigation pending against Borrower, its shareholders, officers, or directors, which could, if adversely determined, be reasonably expected to materially impair the right of Borrower to carry on business substantially as now conducted or materially adversely affect the financial condition of Borrower; (d) Borrower and each of the shareholders, officers, and directors of Borrower filed or caused to be filed all federal, state and local tax returns, which are required to be filed, and has paid or caused to be paid all taxes and assessments to the extent that such taxes or assessments have become due, except for any assessment contested in good faith and for which adequate reserves have been set aside; (e) Borrower is not insolvent as of the date of this Loan Agreement and shall not become insolvent as result of its obligations under this Loan Agreement, the Promissory Note, or the Security Agreement; (f) there is no action or proceeding pending, or to the knowledge of Borrower, threatened, which could be reasonably expected to materially and adversely affect the rights of Lender under this Loan Agreement, the Promissory Note, or the Security Agreement, Borrower's ability to perform its obligations hereunder or thereunder, title to the Collateral (as

2

Exhibit 2. page 44

defined in the Security Agreement), or the validity or priority of the security interest in and lien on the Collateral created hereunder and thereunder; (g) there are no judgments against Borrower unpaid or unsatisfied of record in any court of this state or of the United States; (h) at no time has Borrower made an assignment for the benefit of creditors; (i) Borrower has been afforded time and been advised by Lender to retain legal counsel to represent Borrower in this transaction.

11.     Borrower hereby agrees that so long as any amount is owed to Lender under this Loan Agreement, Borrower and its shareholders, officers and directors shall: (a) hold and save Lender free and harmless from any causes of actions, claims, damages and liabilities of a contractual, tort or tax nature due to the acts or omissions of Borrower, and to pay for Lender's counsel to represent and defend Lender against any such causes of actions, claims, damages or liabilities; (b) keep the Collateral free and clear of all liens, charges, encumbrances, taxes, assessments and claims except such as arise hereunder, under the Security Agreement or as may otherwise be permitted by Lender; (c) give Lender immediate notice, in writing, at Lender's designated address, within ten (10) days of obtaining any replacements of the Collateral, and cause to be executed appropriate documents so that such replacements shall be secured in accordance with this Loan Agreement and the Security Agreement; (d) obtain all license renewals and any other required licenses and permits necessary for the continued operation of Borrower's business and preservation of the Collateral; (e) promptly pay all fines, penalties or assessments which may be imposed or assessed on Borrower; (f) fully cooperate with Borrower's insurance carrier in reporting, investigating and defending any claim; (g) keep accurate and complete books and records and maintain the same and permit any authorized representative of Lender and its attorneys, accountants and agents to inspect, examine and make copies and abstracts of Borrower's books of account and records at reasonable times during normal business hours; (h) give Lender immediate notice, in writing, at Lender's designated address, of the occurrence of all liens, charges, encumbrances, taxes, assessments and claims which might materially and adversely affect the rights of Lender under this Loan Agreement, the Promissory Note, or the Security Agreement, Borrower's ability to perform its obligations hereunder or thereunder, title to the Collateral or the validity or priority of the security interest in and lien on the Collateral created hereunder and thereunder; (i) pay all indebtedness due under this Loan Agreement and the Promissory Note in accordance therewith, and strictly abide by all terms, covenants, agreements and conditions set forth in this Loan Agreement, the Promissory Note, the Security Agreement and all other documents executed in connection with the Loan; (j) not issue, split, reclassify or declare payment of or a dividend payable on any capital stock or issue any warrants, or options on its capital stock, for consideration or otherwise; and (k) give notice to Lender of the occurrence of any Event of Default (as herein defined) or circumstance which, through lapse of time, may become an Event of Default.

12.     Borrower shall execute simultaneously with this Loan Agreement and from time to time thereafter any documents required by Lender to perfect and/or continue Lender's security interests in any Collateral.

13.     Borrower hereby authorizes Lender to file financing statements to perfect Lender's first-priority security interest in the Collateral from time to time. Borrower hereby appoints Lender as its attorney-in-fact to sign and file any such documents.

3

Exhibit 2. page 45

14.    Borrower hereby appoints Lender as its attorney-in-fact to process any of the accounts/receivables contemplated herein, in the Security Agreement, or in the Note, or to otherwise protect Lender's interest in the Principal.

15.    Upon request, Borrower shall re-execute any document or instrument signed in connection with the Loan which was incorrectly drafted or signed or execute any document or instrument that Lender requires in connection with this Loan.

16.    Lender's obligations under this Loan Agreement shall be conditioned upon the delivery by Borrower, to Lender in form and substance satisfactory to Lender and its counsel, of the following documents each property executed: (a) the Promissory Note; (b) the Security Agreement; (c) a financing statements under the Uniform Commercial Code (UCC) in appropriate form for filing by Lender, sufficient in form and substance to grant to Lender a first priority perfected security interest in the Collateral (as defined in the Security Agreement); (d) an affidavit for judgment by confession executed by Borrower to be retained by Lender pending default by Borrower in any of the terms, covenants and conditions of this Loan Agreement, the Promissory Note, the Security Agreement, or any other collateral documents executed in connection with the Loan, in which event Lender may enter said confessions of judgment in any court of competent jurisdiction; (e) resolutions of the board of directors or managing member(s) of Borrower, certified by the secretary of Borrower, authorizing the execution and performance of this Loan Agreement, the Promissory Notes, and evidence of consent of 100% of the stockholders or members of Borrower to the aforesaid transaction; (f) an unconditional guarantee of performance of Borrower's obligations under this Loan Agreement and the Promissory Note signed by the directors or managing members of the Borrower; (g) to notify Lender immediately in writing of any events which at any time may cause the representations and warranties herein or in the Loan Agreement to cease to be true or that the Principal or Lender's return of same might be jeopardy.

17.    The occurrence of any of the following events shall constitute an Event of Default under this Loan Agreement: (a) the failure of Borrower to pay when due all amounts due under this Loan Agreement, the Promissory Note, and the Security Agreement; (b) the failure of Borrower to perform, or a breach by Borrower of, any of the terms, covenants or conditions of this Loan Agreement, the Promissory Note, or the Security Agreement; (c) the failure of Borrower to pay or bond any judgment against it or remove or bond any levy, execution or judicial process against any item included in the Collateral within thirty (30) days after Borrower obtains knowledge of the entry, or the filing of any tax deficiency notice or lien against Borrower by any municipal, state or federal government or any agency thereof, unless contested by Borrower in good faith; (d) the failure of Borrower to pay all of its debts as they come due; (e) the filing of a bankruptcy petition by or against borrower, the making an assignment for the benefit of Borrower's creditors, or the appointment of custodian, receiver, or trustee for Borrower or its assets; (e) if any of the representations and warranties made by Borrower in this Loan Agreement, the Security Agreement or any other instrument executed in connection with this Loan Agreement or the Loan are or become untrue, incorrect or misleading; (f) the dissolution or other termination of Borrower; (g) the failure of Borrower (or any shareholder, partner or member of Borrower ) to perform or comply with any covenant or condition contained in any agreement to which Lender and Borrower or any such shareholder, partner or member are parties (including, without limitation, any guaranty or pledge agreement guaranteeing or securing

4

Exhibit 2. page 46

Borrower's obligations hereunder), without the benefit of any applicable grace period, including this and these documents.

18.    In addition to the rights under this Loan Agreement, upon the occurrence of any Event of Default, Lender shall have all rights with respect to the Collateral granted under the Promissory Note, the Security Agreement, the UCC or any other applicable law, subject to any notice required by law.

19.    Borrower agrees to: (a) pay or reimburse Lender for all its out-of-pocket costs and expenses incurred in connection with the development, preparation and execution of, and any amendment, supplement or modification to, this Loan Agreement, the Promissory Note and the Security Agreement and any other documents or instruments executed in connection herewith or therewith, and the consummation of any of the transactions contemplated hereby and thereby, including, without limitation, the fees and disbursements of counsel to Lender; (b) pay or reimburse Lender for all its costs and expenses incurred in connection with the enforcement or preservation of any rights under this Loan Agreement, the Promissory Note, the Security Agreement and any such other documents, including, without limitation, fees and disbursements of counsel to Lender; (c) pay, indemnify, and hold Lender harmless from all recording and filing fees and all liabilities with respect to, or resulting from any delay in paying, stamp, excise and other taxes, if any, which may be payable or determined to be payable in connection with the execution and delivery of, or consummation of any of the transactions contemplated by, or any amendment, supplement or modification of, or any waiver or consent under or in respect of, this Loan Agreement, the Promissory Note, the Security Agreement and any such other documents; and (d) pay, indemnify, and hold Lender harmless from and against all other liabilities, obligations, losses, damages, penalties, actions, judgments, suits, costs, expenses or disbursements of any kind or nature whatsoever with respect to the execution, delivery, enforcement, performance and administration of this Loan Agreement, the Promissory Note, the Security Agreement and any such other documents (all the foregoing, collectively, the "indemnified liabilities"), provided that Borrower shall have no obligation hereunder to Lender with respect to liabilities arising directly from the gross negligence or willful misconduct of Lender. The agreements in this subsection shall survive repayment of the Promissory Note and all other amounts payable hereunder.

20.    All notices shall be in writing and shall be deemed to have been properly given (i) upon delivery, if delivered in person or one (1) Business Day (defined below) after having been deposited for overnight delivery with any reputable overnight courier service or sent by email. Either party by notice to the other may designate additional or different addresses for subsequent notices or communications.  For purposes of this Section, "Business Day" shall mean a day on which banks are not authorized or required by law to close in the State of New York.

21.    The provisions of this Loan Agreement and all instruments and other agreements executed pursuant hereto are severable and in the event any provision hereof or thereof is invalid or contrary to law, the same shall be null and void but the remaining provisions shall be binding among the parties.

22.    All warranties, representations and covenants of the parties shall survive the consummation of the transactions contemplated thereby.

5

Exhibit 2. page 47

23.   This Loan Agreement represents the entire agreement of Lender and Borrower with respect to the subject matter hereof, and there are no promises, undertakings, representations or warranties by Lender relative to the subject matter hereof not expressly set forth herein, the Promissory Note or the Security Agreement or any other documents and instruments executed hereunder or thereunder.

24.   This Loan Agreement shall bind and inure to the benefit of the parties hereto, their respective heirs, legal representatives, successors and permitted assigns. Each Party shall use all reasonable best efforts to take, or cause to be taken, all actions, and to do, or cause to be done, and to assist and cooperate with the other Parties in doing, all things necessary, proper or advisable to carry out the intent and purposes of this Agreement.

25.   This Loan Agreement, the Security Agreement, the Promissory Note and any other document executed in connection with the Loan may not be amended, supplemented or modified except pursuant to a writing executed by the party to be charged with such amendment, supplement or modification. No writing delivered to Borrower by or on behalf of Lender setting forth principal balance, payment or other information regarding the Loan shall constitute any amendment, supplement or modification of this Loan Agreement, the Promissory Note or the obligations of Borrower hereunder or thereunder unless such writing specifically states that it constitutes such an amendment, supplement or modification.

26.   Lender may assign its rights in and to this Loan Agreement, the Promissory Note, the Collateral, the Security Agreement and all other documents and instruments executed hereunder and thereunder.

27.   No failure to exercise and no delay in exercising, on the part of Lender, any right, remedy, power or privilege under this Loan Agreement, the Promissory Note, the Security Agreement, or any other document or instrument executed hereunder or thereunder shall operate as a waiver thereof; nor shall any single or partial exercise of any right, remedy, power or privilege hereunder or thereunder preclude any other or further exercise thereof or the exercise of any other right, remedy, power or privilege. The rights, remedies, powers and privileges herein provided or provided therein are cumulative and not exclusive of any rights, remedies, powers and privileges provided by law.

28.   It is the intent of the parties that the Interest Rate and all other charges to Borrower be lawful. If for any reason the payment of a portion of Interest, fees or charges as required by this Loan Agreement, Security Agreement, or Promissory Note would exceed the limit permitted by applicable law then the obligation to pay interest or charges shall automatically be reduced to such limit and, if any amounts in excess of such limit shall have been paid, then such amounts shall be applied to the unpaid Loan Amount or refunded so that under no circumstances shall interest or charges required hereunder exceed the maximum rate allowed by law as aforesaid.

29.   This Loan Agreement is being delivered in the State of New York and shall be construed and enforced in accordance with the laws of the State of New York without any conflict of law provision. Any action(s) or pursuit of any legal remedy in any legal claim or remedy in any legal forum in connection with this document, arising from this document, or related to any obligation related hereto, same must be commenced in the state or federal court sitting in New York

6

Exhibit 2. page 48

County, New York. Each Party hereby irrevocably and unconditionally submits for itself and its property in any legal action or proceeding relating to this Loan Agreement and the other documents to which it is a party related to the Loan, including, without limitation, the Promissory Note and the Security Agreement, or for recognition and enforcement of any judgment in respect thereof, to the non-exclusive general jurisdiction of the courts of the State of New York venued in New York County or in the Southern District of New York, and appellate courts from any thereof, consents that any such action or proceeding may be brought in such courts and waives any objection that it may now or hereafter have to the venue of any such action or proceeding in any such court or that such action or proceeding was brought in an inconvenient court and agrees not to plead or claim the same, agrees that service of process in any such action or proceeding may be effected by mailing a copy thereof by certified mail (or any substantially similar form of mail), postage prepaid, to its address set forth herein or at such other address of which all of the other parties hereto shall have been notified pursuant thereto; agrees that nothing herein shall affect the right to effect service of process in any other manner permitted by law or shall limit the right to sue in any other jurisdiction or to file any liens/lis pendens in any court to encumber any real property owned by any Borrower whilst an action pursues in the New York courts; and

30.     Each Party agrees to waive a trial by jury in any action or proceeding brought by either of the parties against the other arising out of or in any way connected with this Loan Agreement.

31.     This Agreement may be executed in two or more counterparts each of which is an original, but all of which together shall constitute one and the same instrument. Electronic signatures shall be deemed originals and as if signed in "wet ink." Borrower agrees not to raise any claim or defense as to the lack of an original.

32.     This writing and the documents executed in connection with the Loan contain the entire agreement of the parties with respect to its subject material and no modifications, alterations or waiver of all or any part shall be valid unless made by a writing and signed by all the parties hereto. Each Party shall use all reasonable best efforts to take, or cause to be taken, all actions, and to do, or cause to be done, and to assist and cooperate with the other Parties in doing, all things necessary, proper or advisable to carry out the intent and purposes of this Agreement.

     IN WITNESS WHEREOF, the undersigned have executed and delivered this Loan Agreement as of the day and year first above written.

**GUARANTOR:**                              **BORROWER:**

                                            BAT Inc a/k/a B.A.T. Inc.

By: _____               By: _____
Name: Tony M Diab                           Name: Tony M Diab
                                            Title: Officer

7

Exhibit 2. page 49

**GUARANTOR:**

By: _____
Name: Daniel March

**BORROWER:**

The Litigation Practice Group PC

By: _____
Name: Daniel March
Title: Officer

| **LENDER:** | **LENDER:** |
|---|---|
| MCA Fund ADV Inc. | LDR International Ltd., |
| By: _____ | By: _____ |
| Title: Officer | Title: Officer |

8

Exhibit 2. page 50

# ACKNOWLEDGMENT

A notary public or other officer completing this certificate verifies only the identity of the individual who signed the document to which this certificate is attached, and not the truthfulness, accuracy, or validity of that document.

State of California
County of _____ Orange _____ )

On __February 7, 2023__ before me, Olga Lucia Esquivel, Notary Public
_____
(insert name and title of the officer)

personally appeared __Daniel S. March__ _____,
who proved to me on the basis of satisfactory evidence to be the person(s) whose name(s) is/are subscribed to the within instrument and acknowledged to me that he/she/they executed the same in his/her/their authorized capacity(ies), and that by his/her/their signature(s) on the instrument the person(s), or the entity upon behalf of which the person(s) acted, executed the instrument.

I certify under PENALTY OF PERJURY under the laws of the State of California that the foregoing paragraph is true and correct.

WITNESS my hand and official seal.

Signature _____ (Seal)

OLGA LUCIA ESQUIVEL
COMM. # 2282791
NOTARY PUBLIC-CALIFORNIA
ORANGE COUNTY
MY COMM. EXP. MAR. 25, 2023

Exhibit 2. page 51

# ACKNOWLEDGMENT

A notary public or other officer completing this certificate verifies only the identity of the individual who signed the document to which this certificate is attached, and not the truthfulness, accuracy, or validity of that document.

State of California
County of _____ *Orange* _____ )

On ___ 2|7|23 ___ before me, Vanessa Banken-Buchner _____
(insert name and title of the officer)

personally appeared ___ *Tony Maurice Diab* _____,
who proved to me on the basis of satisfactory evidence to be the person(s) whose name(s) is/are subscribed to the within instrument and acknowledged to me that he/she/they executed the same in his/her/their authorized capacity(ies), and that by his/her/their signature(s) on the instrument the person(s), or the entity upon behalf of which the person(s) acted, executed the instrument.

I certify under PENALTY OF PERJURY under the laws of the State of California that the foregoing paragraph is true and correct.

WITNESS my hand and official seal.

VANESSA BANKEN-BUCHNER
COMM #2364027
NOTARY PUBLIC · CALIFORNIA
RIVERSIDE COUNTY
My Commission Expires July 3, 2025

Signature _Vanessa Banken Bum_    (Seal)

Exhibit 2. page 52

# EXHIBIT 3

THIS NOTE HAS NOT BEEN REGISTERED UNDER THE SECURITIES ACT OF 1933, AS
AMENDED (THE "ACT"), OR ANY STATE SECURITIES LAWS AND NEITHER SUCH
SECURITIES NOR ANY INTEREST THEREIN MAY BE OFFERED, SOLD, PLEDGED,
ASSIGNED OR OTHER WISE TRANSFERRED UNLESS (1) A REGISTRATION
STATEMENT WITH RESPECT THERETO IS EFFECTIVE UNDER THE ACT AND ANY
APPLICABLE STATE SECURITIES LAWS OR (2) AN EXEMPTION TO SUCH
REGISTRATION IS AVAILABLE FOR SUCH OFFER, VALUE PLEDGE, ASSIGNMENT
OR TRANSFER.

## PROMISSORY NOTE

**$1,500,000.00**                                                    Dated: February 7, 2023

1.     **Borrower's Promise to Pay.** For value received, BAT Inc a/k/a B.A.T. Inc. and The
Litigation Practice Group PC, (collectively "LPG" or "Borrower" or "Borrowers" which may be
used interchangeably), and as personally guaranteed by Daniel March (residing at 20160 Nob Hill
Drive, Yorba Linda, CA 92886) and Tony M Diab (an individual residing in California), both of
whom are agents and officers of LPG with authority to bind same to this Note ("Guarantor" or
"Guarantors" which may be used interchangeably without specification and shall collectively
mean everyone identified herein) (LPG, Borrower, and Guarantor may all be used interchangeably
throughout this Note), hereby unconditionally promises to pay to MCA Fund ADV Inc.
maintaining a place of business at 4714 16th Avenue, Brooklyn NY and/or to LDR International
Ltd., a British Virgin Islands limited company, having its address at Yamraj Building, Market
Square, 3rd Floor, P.O. Box 3175, Road Town, Tortola VG 1110, British Virgin Islands ("Lender"
or "Lenders" which may be used interchangeably), or either of their assignees, the principal sum
of One Million Five Hundred Thousand Dollars ($1,500,000.00) (the "Principal") in
accordance with this Promissory Note (the "Promissory Note"), to be disbursed pursuant to
Schedule A, annexed hereto and made a part hereof.

2.     **Maturity Date.** All unpaid Principal, Interest, and Late Charges shall be paid in full by the
Borrower on or prior to May 6, 2023 (the "Maturity Date").

3.     **Interest.** The outstanding principal amount shall bear interest ("Interest") at a rate equal to
seven percent (7.0%) per month. Interest shall be paid monthly on the sixth (6th) of every month
(or if such day is not a business day, on the next succeeding business day) during the term of this
Note. Interest will be calculated based on a 360-day year. Interest payment(s) shall be made
payable as designated the Lender. To the extent the interest rate charged is deemed illegal,
usurious or unenforceable under the law (even *ab initio* or *nunc pro tunc*), the parties hereto agree
that the offending term shall be deemed to have been modified and replaced, *ab initio* or *nunc pro
tunc,* with the maximum interest rate permitted by applicable law.

4.     **Default Interest.** Upon the occurrence of an Event of Default (as provided below), the
Interest Rate shall increase to the lesser of twenty four percent (24%) ("Default Interest") or the
maximum amount permitted by applicable law. To the extent the default interest rate charged is
deemed illegal, usurious or unenforceable under the law (even *ab initio* or *nunc pro tunc*), the

1

parties hereto agree that the offending term shall be deemed to have been modified and replaced, *ab initio* or *nunc pro tunc*, with the maximum default interest rate permitted by applicable law.

5.    **Attorney Fees and Expenses**. All attorney fees, costs, disbursements, and expenses incurred by Lender to collect on or enforce this Promissory Note, to declare or adjudicate any rights under the Promissory Note, to enforce Lenders' rights with respect to a Security Agreement and any other loan document which is executed by Borrower contemporaneously herewith, to marshal any collateral that is security for the performance of Borrower's obligations under the Promissory Note, a Security Agreement and any other loan document which is executed by Borrower contemporaneously herewith, whether by suit or any other means whatever, shall be payable by Borrower and Guarantor and shall be added to and constitute part of the outstanding Principal.

6.    **Application of Payments**. All payments by Borrower shall be applied first to the payment of any unpaid Default Interest and second to payment of or the reduction of the Principal.

7.    **Borrower's Authority**. Borrowers Daniel March and Tony M Diab, as a member/officer of the Entity Borrowers has the authority to bind the Borrower Entities to this Promissory Note and/or has obtained the consent to do so from the other member/officers of each of the Entity Borrowers.

8.    **Event of Default**. An event of default (an "Event of Default") shall occur and be ongoing if Lender does not receive the monthly payment of Interest or the Principal by the Maturity Date, time being of the essence after a five (5) day grace period expires wherein Borrower can cure the default. Additionally, an Event of Default shall occur if Borrower defaults on the Security Agreement and any other loan document which is executed by Borrower contemporaneously herewith. In an Event of Default, all outstanding sums (Principal, Interest, attorneys' fees, miscellaneous fees as provided for herein) shall become immediately due, owing, and payable.

9.    **Lender's Rights Upon Event of Default**. Upon the occurrence of an Event of Default, Lender may, in its sole discretion, exercise any and all of its rights under this Promissory Note, all documents and agreements executed by Borrower in connection with this Promissory Note, and applicable laws, including, without limitation, enforcing its rights with respect to all collateral granted by Borrower as security for this Promissory Note, entering any confessions of judgment executed by Borrower, commencing an action in a court of competent jurisdiction in any state and county in which any of the Entity Borrowers operates its business or owns real property, or process/debit Borrowers' consumer's accounts acting or engaging an ACH processor to debt/collect fees from Borrowers' consumer's accounts, filing any UCC financing statements that Lender deems appropriate in any state and against any person, entity, corporation, or affiliate of Borrower.

10.    **Preservation of Collateral**. Borrower shall not, without the prior written consent of Lender, dispose, transfer, encumber, assign, sell, divert, or otherwise prevent marshaling of any collateral that is pledged as security for the performance of Borrower's obligations under the Promissory Note, or dispose, transfer, encumber, assign, sell, divert, or otherwise prevent marshaling of or any stock, membership interests, or equity of Borrower, whether by sale, transfer, assignment, license, lease, merger, surrender, consolidation (other than sales of

2

products in the ordinary course of Borrower's business), or windup, liquidate or dissolve Borrower's business.

11.    **Transfer by Lender.** Lender may transfer the Promissory Note to any party at any time, in its sole discretion, without notice to or the consent of Borrower. For purposes of this Note, "Lender" shall include Lender, any party to whom the Promissory Note is endorsed and transferred, and any party who holds the Promissory Note if it is endorsed "in blank" by Lender or a transferee.

12.    **Transfer by Borrower.** Borrower may not transfer or assign its rights or obligations under this Promissory Note without the prior written consent of Lender.

13.    **Waiver(s).** Borrower hereby waives any and all rights of presentment for payment, notice of dishonor, protest, notice of protest of this Note or other notice of any kind and all demands whatsoever; and in litigation with Lender, whether or not arising out of or relating to this Note or any collateral security therefore, waives trial by jury, and in addition, expressly waive the right to interpose any defense based on any statute of limitations or any claim of laches and any setoff, counterclaim, or cross-claim of any nature or description. Guarantor unconditionally guarantees payment to Lender of all amounts owing under the Note. This Guarantee remains in effect until the Note is paid in full. Guarantor must pay all amounts due under the Note when Lender makes written demand upon Guarantor. Lender is not required to seek payment from any other source before demanding payment from Guarantor.

14.    **RIGHTS, NOTICES, AND DEFENSES THAT GUARANTOR WAIVES**: To the extent permitted by law,
　　　A. Guarantor waives all rights to:
　　　　　1) Require presentment, protest, or demand upon Borrower;
　　　　　2) Redeem any Collateral before or after Lender disposes of it;
　　　　　3) Have any disposition of Collateral advertised; and
　　　　　4) Require a valuation of Collateral before or after Lender disposes of it.

　　　B. Guarantor waives any notice of:
　　　　　1) Any default under the Note;
　　　　　2) Presentment, dishonor, protest, or demand;
　　　　　3) Execution of the Note;
　　　　　4) Any action or inaction on the Note or Collateral, such as disbursements, payment, nonpayment, acceleration, intent to accelerate, assignment, collection activity, and incurring enforcement expenses;
　　　　　5) Any change in the financial condition or business operations of Borrower or any guarantor;
　　　　　6) Any changes in the terms of the Note or other Loan Documents, except increases in the amounts due under the Note; and
　　　　　7) The time or place of any sale or other disposition of Collateral.

　　　C. Guarantor waives defenses based upon any claim that:
　　　　　1) Lender failed to obtain any guarantee;
　　　　　2) Lender failed to obtain, perfect, or maintain a security interest in any property

3

offered or taken as Collateral;

3) Lender or others improperly valued or inspected the Collateral;

4) The Collateral changed in value, or was neglected, lost, destroyed, or underinsured;

5) Lender impaired the Collateral;

6) Lender did not dispose of any of the Collateral;

7) Lender did not conduct a commercially reasonable sale;

8) Lender did not obtain the fair market value of the Collateral;

9) Lender did not make or perfect a claim upon the death or disability of Borrower or any guarantor of the Note;

10) The financial condition of Borrower or any guarantor was overstated or has adversely changed;

11) Lender made errors or omissions in Loan Documents or administration of the Loan;

12) Lender did not seek payment from the Borrower, any other guarantors, or any Collateral before demanding payment from Guarantor:

13) Lender impaired Guarantor's suretyship rights;

14) Lender modified the Note terms, other than to increase amounts due under the Note. If Lender modifies the Note to increase the amounts due under the Note without Guarantor's consent, Guarantor will not be liable for the increased amounts and related interest and expenses, but remains liable for all other amounts;

15) Borrower has avoided liability on the Note; or

16) Lender has taken an action allowed under the Note, this Guarantee, or other Loan Documents.

15.   **No Waiver by Lender.** Lender's rights and remedies herein are cumulative and not exclusive of any rights or remedies provided by law and may be exercised singly or concurrently. No failure by Lender to exercise any of its rights or remedies under this Promissory Note shall constitute a waiver of such right or remedy or bar Lender from exercising such right or remedy at some later date. Lender may only waive a rights or remedy hereunder in writing. A waiver by Lender of any right or remedy under the terms of this Note, on any one occasion, shall not be construed as a bar to the exercise of any right, power, privilege or remedy which the Holder would otherwise have had on any further occasion.

16.   **Modification.** Any modification or amendment of this Promissory Note must be in writing and signed by Borrower and Lender.

17.   **Governing Law.** This Promissory Note shall be governed by the laws of the State of New York, without giving effect to any choice of law provisions indicating the laws of another state. Any litigation involving or stemming from this Note shall only be filed in the state or federal court located in New York, New York. It is the intent of the parties that the interest rate herein and all other charges to Borrower be lawful. If for any reason the payment of a portion of interest, fees or charges as required by this Note would exceed the limit permitted by applicable law then the obligation to pay interest or charges shall automatically be reduced to such limit and, if any amounts in excess of such limit shall have been paid, then such amounts shall be applied to the unpaid Principal or refunded so that under no circumstances shall interest or charges required hereunder exceed the maximum rate allowed by law. Any provision hereof which may

4

prove unenforceable under any law shall not affect the validity of any other provision hereof.

18.   **Non-Original Submissions.** Borrowers, Guarantor, and Lender hereby agree that electronic/facsimile signatures on this Note may be deemed as if signed in "wet ink." Borrowers and Guarantor hereby waive any defense or argument that Lender failed to submit an "original" Note which was signed in "wet ink."

**IN WITNESS WHEREOF**, Borrowers and Guarantor have duly executed this Promissory Note as of the day and year first above written.

**GUARANTOR:**                                    **BORROWER:**

                                                  BAT Inc a/k/a B.A.T. Inc.

By: _____                      By: _____
Name: Tony M Diab                                 Name: Tony M Diab
                                                  Title: Officer
SSN:

**GUARANTOR:**                                    **BORROWER:**

                                                  The Litigation Practice Group PC

By: _____                      By: _____
Name: Daniel March                                Name: Daniel March
                                                  Title: Officer
SSN: ████9617

STATE OF _____        )
COUNTY OF _____         )

       On February ___, 2023 before me, the undersigned, a Notary Public in and for said State, personally appeared Tony M Diab personally known to me or proved to me on the basis of satisfactory evidence to be the individual whose name is subscribed to the within instrument and acknowledged to me that he executed the same in his capacity, and that by his signature on the instrument, the individual, or the person upon behalf of which the individual acted, executed the instrument.

                                           _____
                                           Notary Public

STATE OF _____        )
COUNTY OF _____         )

       On February ___, 2023 before me, the undersigned, a Notary Public in and for said State, personally appeared Daniel March personally known to me or proved to me on the basis of satisfactory evidence to be the individual whose name is subscribed to the within instrument and acknowledged to me that he executed the same in his capacity, and that by his signature on the instrument, the individual, or the person upon behalf of which the individual acted, execute the           instrument.

                                           _____
                                           Notary Public

5

## Schedule A
Disbursements of the Principal

1.  To The Litigation Practice Group PC, the amount of $1,500,000.00 representative as

    funding of the loan.

    The Litigation Practice Group PC
    17542 E 17th Street, Ste 100
    Tustin, CA 92780
    Routing: ███9593
    Account: █████6512

6

# ACKNOWLEDGMENT

> A notary public or other officer completing this certificate verifies only the identity of the individual who signed the document to which this certificate is attached, and not the truthfulness, accuracy, or validity of that document.

State of California
County of _____Orange_____ )

On __February 7, 2023__ before me, Olga Lucia Esquivel, Notary Public
                                                 (insert name and title of the officer)

personally appeared __Daniel S. March__

who proved to me on the basis of satisfactory evidence to be the person(s) whose name(s) is/are subscribed to the within instrument and acknowledged to me that he/she/they executed the same in his/her/their authorized capacity(ies), and that by his/her/their signature(s) on the instrument the person(s), or the entity upon behalf of which the person(s) acted, executed the instrument.

I certify under PENALTY OF PERJURY under the laws of the State of California that the foregoing paragraph is true and correct.

WITNESS my hand and official seal.

Signature _____ (Seal)

OLGA LUCIA ESQUIVEL
COMM. # 2292791
NOTARY PUBLIC-CALIFORNIA
ORANGE COUNTY
My Comm. Exp. MAR. 25, 2023

Exhibit 3, page 60

# ACKNOWLEDGMENT

> A notary public or other officer completing this
> certificate verifies only the identity of the individual
> who signed the document to which this certificate is
> attached, and not the truthfulness, accuracy, or
> validity of that document.

State of California
County of _____ *Orange* _____ )

On ___ *2/7/23* ___ before me, __ Vanessa Banken-Buchner ___
_____ (insert name and title of the officer)

personally appeared ___ *Tony Maurice Diab* ___ ,
who proved to me on the basis of satisfactory evidence to be the person(s) whose name(s) is/are
subscribed to the within instrument and acknowledged to me that he/she/they executed the same in
his/her/their authorized capacity(ies), and that by his/her/their signature(s) on the instrument the
person(s), or the entity upon behalf of which the person(s) acted, executed the instrument.

I certify under PENALTY OF PERJURY under the laws of the State of California that the foregoing
paragraph is true and correct.

WITNESS my hand and official seal.

VANESSA BANKEN-BUCHNER
COMM #2364027
NOTARY PUBLIC - CALIFORNIA
RIVERSIDE COUNTY
My Commission Expires July 3, 2026

Signature _____ **(Seal)**

# EXHIBIT 4

## SECURITY AGREEMENT

THIS SECURITY AGREEMENT (the "Security Agreement") is made as of February 7, 2023 by and between BAT Inc a/k/a B.A.T. Inc. and The Litigation Practice Group PC, (collectively "LPG" or "Borrower" or "Borrowers" which may be used interchangeably), and as personally guaranteed by Daniel March (residing at 20160 Nob Hill Drive, Yorba Linda, CA 92886) and Tony M Diab (an individual residing in California), both of whom are agents and officers of LPG with authority to bind same to this Note ("Guarantor" or "Guarantors" which may be used interchangeably without specification and shall collectively mean everyone identified herein) (LPG, Borrower, and Guarantor may all be used interchangeably throughout this Note) and MCA Fund ADV Inc. maintaining a place of business at 4714 16th Avenue, Brooklyn NY and/or to LDR International Ltd., a British Virgin Islands limited company, having its address at Yamraj Building, Market Square, 3rd Floor, P.O. Box 3175, Road Town, Tortola VG 1110, British Virgin Islands ("Lender" or "Lenders" which may be used interchangeably), or either of their assignees (collectively the "Parties"),

WHEREAS, Borrower has executed and delivered to Lender a certain Promissory Note dated February 7, 2023 (the "Note"), pursuant to which, among other things, Borrower has promised to pay to the Lender the principal sum of One Millions Five Hundred Thousand Dollars ($1,500,000.00) (the "Principal)) with interest (per the Note) on or before May 6, 2023 (the "Maturity Date").

WHEREAS, to induce Lender to enter into the Note, Borrower has agreed to grant Lender a security interest in the Collateral (as hereinafter defined), as security for Borrower's full and timely performance of the Secured Obligations (as defined below); and

NOW, THEREFORE, in consideration of the foregoing premises and other good and valuable consideration, the receipt and sufficiency of which are hereby acknowledged, the parties hereto agree as follows:

1.    To secure the full and timely performance of all of Borrower's obligations under the Note, including, without limitation, payment of all Principal, interest, and any other amounts due from Borrower to Lender under Note (the collectively, the "Secured Obligations), Borrower hereby grants and conveys to Lender a security interest in and lien upon the following collateral, as such term is used in Article 9 of the Uniform Commercial Code (the "UCC"): all tangible and intangible property, assets, and rights of Borrower now owned or hereafter acquired, including, without limitation, all real estate, real estate interests, membership interests in any corporation/company whether named herein or not, accounts receivables, profits, revenue, cash, tax refunds, loans, financing from banks, fixtures, leases, vehicles, licenses, equipment, contracts, inventory, raw materials, office equipment, computer hardware and software, intellectual property, claims, causes of action, cash, bank accounts, accounts receivable, stock, insurance policies, insurance proceeds and products thereof, books and records, customer lists, credit files, computer files, programs, printouts and other computer materials and records related thereto, the goods which may be more particularly described in the attached exhibits, if any, and all proceeds and products from all collateral covered by this Security Agreement whether or not purchased with loan proceeds, and all substitutions, replacements and accessions thereto, including but not limited to any real property owned by or revenue from any real property owned

1

by any of the corporations stated herein or not, wherever located, as well as the actual account, anticipated revenue/fee(s) generated therefrom, from all of Borrowers' (and their affiliates' and other entities in their control) consumers' accounts which are debited/processed by Borrower which Borrower pledges as security and subject to a UCC financing statement (the "Collateral").

2.      Separately, and by no means limited, Borrower represents and agrees that it shall continuously provide and grant Lender real-time and continuous access to its/their customer relationship management ("CRM") software, being represented that same is currently known as "Debt Pay Pro." If Borrower changes the CRM software that it uses, it shall notify Lender prior to switching and shall provide Lender with whatever login credentials/capabilities are necessary to ensure that Lender is able to access, in real-time and continuously, Borrower's CRM software. Borrower also represents and agrees that the appropriate instructions shall be given to the CRM software administrative personnel to enable Lender to have the access provided for and contemplated herein. Borrower's violation of this provision shall be deemed an Event of Default which if uncured following a one (1) day cure period, shall be deemed a default of this Agreement and an acceleration of any terms contemplated herein and in any other document executed by Borrower in Lender's favor (a Note, Loan Agreement, etc.) and which shall also entitle Lender to exercise any remedies available to it pursuant to this Agreement (and any other document executed by Borrower in Lender's favor (a Note, Loan Agreement, etc.) and/or at law.

3.      Specifically, and by no means of limitation, if Borrower defaults on this Agreement, the Note, or any other document executed by Borrower in Lender's favor, Lender shall automatically have the realized and vested right to engage a processor (such as an ACH processor) to automatically/electronically debit/process/charge the accounts of Borrowers' clients/customers until the Principal, Interest, and any other fees contemplated by the Note, this Agreement, and any other document executed by Borrower in Lender's favor is paid in full to Lender.

4.      Borrower hereby appoints Lender as its attorney-in-fact to process any of the accounts/receivables contemplated herein, in the Security Agreement, or in the Note, or to otherwise protect Lender's interest in the Principal.

5.      Until such time as Lender receives all of the money contemplated in the Note, Borrower agrees, represents, pledges, and promises that it shall not enter into a similar agreement with anyone else, governing or related to the accounts and/or customers of Borrower nor shall Borrower pledge, encumber, transfer, sell, assign, or otherwise interfere with Lender's ability to secure repayment of its Principal. Borrower also pledges, promises, and represents that it will not, directly or indirectly, instruct or guide any of its customers/accounts/merchants/vendors/ clients to pay any other entity for the payments that are contemplated herein which are and should be directed to Lender.

6.      Until such time as Lender receives all of the money contemplated in the Note, the Principal shall be deemed a lien against and over all of Borrower's assets, accounts, receivables, interests, etc. whether material, vested, realized, or not.

7.      Hold harmless and indemnification. Borrower represents that it is in compliance with all applicable laws and has the power and authority to enter into this Agreement and to engage in the actions contemplated herein. Borrower hereby indemnifies and holds harmless Lender, along

Exhibit 4, page 64

with their agents, members, and affiliates from and against any and all claims, actions, suits, proceedings, judgments, damages, liabilities, costs and expenses, including attorneys' fees arising directly or indirectly from challenge or other breach of this Agreement, other than for Lender's own negligence.

8.    Borrower hereby authorizes Lender to pledge, lend, or use the Collateral in a manner which impairs Borrower's rights to redeem it. Borrower hereby permits Lender to file any UCC financing statements against Borrower or any asset of Borrower to secure these obligations in any state throughout the United States, against any entity or individual identified herein, or against any entity or individual subsequently discovered by Lender that Borrower has an interest in, as necessary, in order to secure the Principal.

9.    Lender's sole duty with respect to the custody, safekeeping and physical preservation of the Collateral in its possession, under the UCC or otherwise, shall be to deal with it in the same manner as Lender deals with similar property for its own account. Neither Lender, nor any of its directors, officers, employees or agents, shall be liable for failure to demand, collect or realize upon all or any part of the Collateral or for any delay in doing so.

10.    Borrower makes the following representations: (a) Borrower has the full and unconditional right and corporate authority to grant to Lender this security interest and any lien(s) granted herein; (b) the Collateral is lawfully owned by Borrower and is free and clear of any and all liens, security interests, claims, charges, encumbrances, taxes and assessments except as may otherwise be specifically set forth in this Security Agreement or publicly recorded; (c) except for any financing statement filed in favor of Lender, or other mortgage financing agreement which is on file with the county clerk for the specific property, no financing statement covering any of the Collateral is on file in any public office; (d) no terms or conditions of this Security Agreement are in violation of the provisions of any other agreement to which Borrower is a party; (e) all of the documents which comprise the Collateral are valid, binding and enforceable in accordance with their respective terms; (f) there is no action or proceeding pending, or to Borrower's knowledge, threatened, which in any way could reasonably be expected to materially and adversely affect (i) the rights of Lender under this Security Agreement, (ii) Borrower's ability to perform its obligations hereunder, (iii) title to the Collateral, or (iv) the validity or priority of the security interest and lien in and on the Collateral created hereunder.

11.    Borrower represents that they have all requisite right, power, and authority to execute, deliver, and perform this Agreement, to consummate the transactions contemplated hereby and thereby, and to perform its obligations hereunder and thereunder. The execution and delivery of this Agreement and any related documents notwithstanding the consummation of the transactions contemplated hereby and thereby, have been duly approved by all parties, and no further action is required to authorize this Agreement, any related Agreement to which anyone may be a party, or the transactions contemplated hereby and thereby. This Agreement has been, and each of any related Agreements will be, duly and validly executed and delivered by the parties executing same and, assuming the due and valid authorization, execution, and delivery of this Agreement by the other Parties, and of each such Agreement by the other parties thereto, constitutes, or will constitute, a valid and binding obligation of the named party thereto, enforceable against it in accordance with its terms and conditions, except as enforcement may be limited by applicable

3

bankruptcy, insolvency, reorganization, moratorium, and other Laws affecting enforcement of creditor's rights generally and except insofar as the availability of equitable remedies may be limited by applicable Law.

12.     No consent of any party to any contract, agreement, instrument, lease or license to which any party hereto is a party or to which any of its properties or assets are subject is required for the execution, delivery or performance by Borrower of any term of this Agreement. Borrower represents that it is not required to give any notice to, make any filing with, or obtain any authorization, consent, or approval of, any Governmental Body or Third Party, including a party to any assigned contract, in connection with the execution, delivery, and performance by the parties to this Agreement or any other agreements to which it is a party or the consummation of the transactions contemplated hereby and thereby.

13.     Borrower covenants and agrees as follows: (a) to pay and perform all of the Secured Obligations according to the terms of the Note and to defend the title to the Collateral against all persons and entities and against all claims and demands whatsoever; (b) on demand of Lender, to furnish further assurance of title, execute any written agreement or do any other acts necessary to effectuate the purposes and provisions of this Security Agreement, execute any instrument or statement required by law or otherwise in order to perfect, continue or terminate the security interest of Lender in the Collateral and pay all costs or filing fees in connection therewith; (c) to pay, when due, all taxes, assessments and license fees relating to the Collateral, which if not paid may give rise to a lien, charge or encumbrance on the Collateral; (d) to keep the Collateral, at Borrower's own cost and expense, in good repair and condition and not misuse, abuse, waste or allow the Collateral to deteriorate, except for normal wear and tear, and to make same available for inspection by Lender at all reasonable times; (e) to not sell, exchange, assign, loan, deliver, mortgage, or otherwise dispose of the Collateral during the existence of this Security Agreement without the prior written consent of Lender; (f) to not grant or give a security interest in or financing statement covering the Collateral to anyone other than Lender; (g) to notify Lender immediately in writing of any events which at any time may cause the representations and warranties herein or in the Loan Agreement to cease to be true or that the Principal or Lender's return of same might be jeopardy.

14.     Borrower represents that there is no Action of any nature pending or, to its knowledge, threatened against or by Borrower: (a) relating to or affecting the accounts or receivables contemplated herein or (b) that challenges or seeks to prevent, enjoin, or otherwise delay the transactions contemplated by this Agreement. No event has occurred or circumstance exists that may give rise to, or serve as a basis for, any such action.

15.     Borrower represents that to its knowledge, the accounts or receivables contemplated herein will not be the subject of any litigation or other legal proceedings nor will Borrower permit same to be the subject of any other Agreement, any security agreement such as a UCC, nor subject to any third-party claim without the express written consent of Lender.

16.     The following shall constitute a default by Borrower: (a) any Event of Default under the Note; (b) the failure by Borrower to comply with or perform any provision of this Security Agreement or the Note or any other agreement between Borrower and Lender executed in connection with the Note; (c) any false or misleading representation or warranty made or given

4

by Borrower in connection with this Security Agreement or any information/document furnished by Borrower prior to execution of this Security Agreement; (d) any act of Borrower which imperils the prospect of full performance or satisfaction of the Secured Obligations or impairs the rights of Lender in the Collateral.

17.    Upon any default of Borrower and at the option of Lender, the Secured Obligations secured by this Security Agreement shall immediately become due and payable in full without notice or demand and Lender shall have all the rights, remedies, and privileges with respect to repossession, retention and sale of the Collateral and disposition of the proceeds as are accorded to a Lender by the applicable sections of the UCC respecting "Default," in effect as of the date of this Security Agreement, or as may be granted to Lender pursuant to the Note or other document executed in connection with the Note.

18.    If Borrower fails to pay any part of the Principal or interest thereon when it is due, or otherwise is in default of its obligations under the Note, then Lender shall, in addition to any other rights Lender may have under this Security Agreement, UCC, the Note, any other document executed in connection with the Note, the UCC (including the right to file a UCC against anyone or entity identified herein or against anyone or entity subsequently discovered which relates to Borrower and which may owe an obligation to Lender as security for the Principal or otherwise related hereto), and/or at law or in equity, have the right to: (a) apply any funds which it received pursuant to the provisions of this Security Agreement or the Note to the payment of any amounts due to Lender under the Note in any manner it deems fit in its sole discretion; (b) enter upon Borrower's premises peaceably by Lender's own means or with legal process and take possession of the Collateral, and Borrower agrees not to resist or interfere therewith; (c) require Borrower to assemble Collateral and make it available to Lender at a place to be designated by Lender that is reasonably convenient to both parties (it being agreed that Lender's address set forth above is a place reasonably convenient for such assembling); and (d) sell, assign and deliver Collateral at public or private sale, for cash, on credit or future delivery, with or without advertisement of the time, place or terms of sale and in connection therewith to grant options and to use the services of a broker, except that if the sale be a private sale upon five (5) days' written notice to Borrower of the date, time and place of any sale and the terms of the sale, which notice Borrower agrees is reasonable, all other demands, advertisements and notices being hereby waived. Any sale shall be free and clear of any equity or right of redemption, which Borrower hereby absolutely and irrevocably waives and releases.

19.    At any sale of Collateral by Lender, Lender or its designee may purchase the Collateral. Lender shall not be obligated to make any sale of any Collateral if Lender shall determine not to do so, even if notice of sale may have been given. Lender may, without notice or publication, adjourn any public or private sale or cause the same to be adjourned from time to time and if such sale be a private sale by announcement at the time and place fixed for sale, and such sale may, without further notice, be made at the time and place to which the same was so adjourned. If any of the Collateral is sold by Lender upon credit or for future delivery, Lender shall not be liable for the failure of the purchaser to purchase or pay for the same and, in the event of such failure, Lender may resell such Collateral. In no event shall Borrower be credited with any part of the proceeds of sale of any Collateral until cash payment thereof has been received by Lender. In case of any sale, Lender may first deduct all costs and expenses of collection, sale and delivery of the Collateral and any costs and expenses incidental thereto, including, without

5

limitation, the expense of pursuing, searching for, receiving, taking, keeping and storing the Collateral, advertising the sale of the Collateral, reasonable attorneys' fees and disbursements, brokerage commissions and transfer fees and taxes, and shall apply any residue first to the payment of any advances made by Lender pursuant to the Note, then to late charges, if any, then to payment of interest accrued under the Note and then to the payment of the unpaid Principal. The balance, if any, remaining after payment in full of the unpaid Principal shall be paid to Borrower, to the extent permitted by law, unless there are no other claims from whom Lender has received notice. Any sale conducted upon the foregoing terms or by any other method of sale (if conducted in conformity with practices of any banks disposing of similar security) shall be deemed commercially reasonable. Borrower agrees that Lender shall have the right to continue to retain the Collateral until such time as Lender, in its reasonable judgment, believes that an advantageous price can be obtained for the Collateral and, absent gross negligence, Lender shall not be liable to Borrower for any loss in the value of the Collateral by reason of any such retention of the Collateral by Lender. Further, Lender may elect to retain the Collateral in full satisfaction of the Loan, in which event notice thereof shall be given to Borrower, and if Lender receives an objection in writing from Borrower within twenty-one (21) days after service of the notice, Lender shall commence to dispose of the Collateral in the manner as set forth herein; provided, however, that if the net proceeds to be received from any disposition would be insufficient to satisfy in full any amounts due hereunder or under the Note, Lender shall not be compelled to go forward with such proposed disposition, and shall be entitled to retain the Collateral in full satisfaction of the Note despite any objection by Borrower to such retention.

20.     Upon any default, Lender's attorney's fees and the legal and other expenses for pursuing, searching for, filing against, lawsuits against, receiving, taking, keeping, storing, advertising, and selling the Collateral or recovering the Principal, shall be chargeable to Borrower, and shall become part of the principal indebtedness and shall be deemed secured hereunder and by the Collateral until fully paid.

21.     Borrower shall remain liable for any deficiency resulting from a sale of the Collateral and shall pay any such deficiency forthwith on demand.

22.     If Borrower shall default in the performance of any of the provisions of this Security Agreement on Borrower's part to be performed, Lender may perform same for Borrower's account and any monies expended in so doing shall be chargeable with interest (at the same rate as may be due under the Note from time to time) to Borrower and added to the indebtedness secured hereby.

23.     Upon default, Lender shall have the right, but not the obligation, to seize and operate the Collateral and to use the profits from such operation as it may see fit in its sole discretion, so long as Borrower receives credit for the amount of such profits so earned by Lender. Furthermore, Borrower hereby irrevocably appoints Lender as its attorney-in-fact, which appointment is coupled with an interest, for so long as any portion of the debt remains outstanding, for the purpose of executing and delivering, in the name and on behalf of Borrower, any and all documents, instruments, contracts, forms and writing of any nature whatsoever, which are reasonably required to be executed in order to schedule, advertise and consummate a commercially reasonable disposition of the Collateral following Borrower's default hereunder, or under the Note or other document executed in connection with the Note, and to perform any and

6

all other acts in the name of Borrower and on Borrower's behalf as Lender may reasonably deem necessary or advisable in connection with such disposition of the Collateral in connection with complying with all provisions and requirements provided for under the UCC.

24.     The Note is a separate instrument and may be negotiated by Lender without releasing Borrower or the Collateral, or co-maker. Borrower consents to any extension of time of payment. If there are more than one Borrower or co-maker of this Security Agreement or of Notes secured hereby, the obligation of all shall be primary, joint and several.

25.     The waiver of or acquiescence in any default by Borrower, or failure of Lender to insist upon strict performance by Borrower of any warranties or agreements in this Security Agreement, shall not constitute a waiver of any subsequent or other default or failure.

26.     The UCC shall govern the rights, duties and remedies of the parties and any provisions herein declared invalid under any law shall not invalidate any other provision of this Security Agreement.

27.     Lender may assign its rights in this Security Agreement and in the Collateral, as Lender, in its sole discretion, may deem fit. Borrower may not assign its obligations or rights under this Security Agreement without the written consent of Lender.

28.     Lender is hereby authorized to file UCC financing statements as may be necessary to perfect Lender's interest in the Collateral. Notwithstanding the foregoing, Lender shall have no obligation to comply with any recording, re-recording, filing, refiling or other legal requirements necessary to establish or maintain the validity, priority or enforceability of, or Lender's rights in and to, the Collateral or any part thereof.

29.     All notices shall be in writing and shall be deemed to have been properly given: (a) upon delivery, if delivered in person; (b) one (1) business day (defined below) after having been deposited for overnight delivery with any reputable overnight courier service or if sent by email; or (c) three (3) business days after having been deposited in any post office or mail depository regularly maintained by the U.S. Postal Service and sent by certified mail, postage prepaid, return receipt requested.

**30.     THIS SECURITY AGREEMENT IS BEING DELIVERED IN THE STATE OF NEW YORK AND SHALL BE CONSTRUED AND ENFORCED IN ACCORDANCE WITH THE LAWS OF THE STATE OF NEW YORK WITHOUT ANY CONFLICT OF LAW PROVISION. ANY ACTION(S) OR PURSUIT OF ANY LEGAL CLAIM OR REMEDY IN ANY LEGAL FORUM IN CONNECTION WITH THIS DOCUMENT, ARISING FROM THIS DOCUMENT, OR RELATED TO ANY OBLIGATION RELATED HERETO, SAME MUST BE COMMENCED IN THE STATE OR FEDERAL COURT SITTING IN NEW YORK COUNTY, NEW YORK WHICH SHALL APPLY NEW YORK LAW TO THE MATTER WITHOUT A "CONFLICT OF LAWS" ANALYSIS.**

31.     In the event that any word, sentence, paragraph or article of this Security Agreement is found to be void or voidable, the balance of this Security Agreement shall nevertheless be legal and binding with the same force and effect as though the void or voidable parts were deleted.

32.     Each party shall do and perform, or cause to be done and performed, all such further acts and things, and shall execute and deliver all such other agreements, certificates, instruments and documents, as the other party may reasonably request in order to carry out the intent and accomplish the purposes of this Agreement and the consummation of the transactions contemplated hereby.

33.     This writing and the documents executed in connection with the Loan contain the entire agreement of the parties with respect to its subject material and no modifications, alterations or waiver of all or any part shall be valid unless made by a writing and signed by all the parties hereto. Each Party shall use all reasonable best efforts to take, or cause to be taken, all actions, and to do, or cause to be done, and to assist and cooperate with the other Parties in doing, all things necessary, proper or advisable to carry out the intent and purposes of this Agreement.

34.     This Security Agreement may be executed in two or more counterparts each of which is an original, but all of which together shall constitute one and the same instrument. Electronic signatures shall be deemed originals and as if signed in "wet ink." Borrower agrees not to raise any claim or defense as to the lack of an original.

35.     This Agreement may not be terminated by Borrower until Lender has received all the money, interest, etc. contemplated in the Note.

36.     Confidentiality. All parties to this Agreement agree and acknowledge that all names, terms, representations, agreements, covenants, etc. set forth in this Agreement are confidential (together, the "Confidential Information"). All parties will at all times keep the Confidential Information in confidence and trust. No party hereto will, without the prior written consent of an authorized officer of all parties to this Agreement, (a) copy, use or disclose any Confidential Information, (b) deliver or disclose any Confidential Information to any person or entity outside of this Agreement, or (c) use the Confidential Information for their own use or use it to the detriment of the other parties to this Agreement. Notwithstanding the foregoing, the parties hereto may, without consent, use the Confidential Information and disclose and deliver same to their employees or agents, if applicable, who have a need to know, provided such employees or agents have entered into written agreements approved in writing by Lender and containing provisions at least as restrictive as these provisions. Borrower agrees and understands that the disclosure of the Confidential Information in violation of this Agreement may cause the Lender irreparable harm and that any breach or threatened breach by the Borrower entitles Lender to seek injunctive relief, in addition to any other legal or equitable remedies available to it, in any court of competent jurisdiction.

37.     Successors and Assigns. This Agreement shall be binding upon, and inure to the benefit of, the Parties named herein and their respective successors and permitted assigns (only Lender may assign its rights hereunder though Borrower may assign its rights and obligations hereunder upon written consent from Lender). Neither this Agreement nor any rights or obligations of a Party hereunder shall be assigned by a Party (unless to an Affiliate of such Party) without the prior written consent of the other Parties. This Agreement will be binding upon any permitted assignee of any Party. No assignment shall have the effect of relieving any Party to this Agreement of any of its obligations hereunder.

38.    <u>Expenses and Fees</u>.  Unless otherwise provided for herein, all fees and expenses incurred in connection with the transactions contemplated by this Agreement, including all legal, accounting, financial advisory, consulting and all other fees and expenses of Third Parties incurred by a Party in connection with the negotiation and effectuation of the terms and conditions of this Agreement and the transactions contemplated hereby, shall be the obligation of Borrower.

39.    <u>Specific Performance</u>.  The Parties agree that irreparable damage would occur if any provision of this Agreement was not performed in accordance with the terms hereof and that the Parties shall be entitled to specific performance of the terms hereof, in addition to any other remedy to which they are entitled hereunder, at Law or in equity.

40.    **THE PARTIES HERETO AGREE THAT THEY SHALL WAIVE A TRIAL BY JURY IN ANY ACTION OR PROCEEDING BROUGHT BY EITHER OF THE PARTIES AGAINST THE OTHER ARISING OUT OF OR IN ANY WAY CONNECTED WITH THIS SECURITY AGREEMENT.**

IN WITNESS WHEREOF, the undersigned have executed and delivered this Security Agreement as of the day and year first above written.

**GUARANTOR:**

By: _____
Name: Tony M Diab

**BORROWER:**

BAT Inc a/k/a B.A.T. Inc.

By: _____
Name: Tony M Diab
Title: Officer

**GUARANTOR:**

By: _____
Name: Daniel March

**BORROWER:**

The Litigation Practice Group PC

By: _____
Name: Daniel March
Title: Officer

| **LENDER:** | **LENDER:** |
|---|---|
| MCA Fund ADV Inc. | LDR International Ltd., |
| By: _____ | By: _____ |
| Title: Officer | Title: Officer |

9

# ACKNOWLEDGMENT

> A notary public or other officer completing this certificate verifies only the identity of the individual who signed the document to which this certificate is attached, and not the truthfulness, accuracy, or validity of that document.

State of California

County of _____Orange_____ )

On __February 7, 2023__ before me, __Olga Lucia Esquivel, Notary Public__

(insert name and title of the officer)

personally appeared __Daniel S. March__

who proved to me on the basis of satisfactory evidence to be the person(s) whose name(s) is/are subscribed to the within instrument and acknowledged to me that he/she/they executed the same in his/her/their authorized capacity(ies), and that by his/her/their signature(s) on the instrument the person(s), or the entity upon behalf of which the person(s) acted, executed the instrument.

I certify under PENALTY OF PERJURY under the laws of the State of California that the foregoing paragraph is true and correct.

WITNESS my hand and official seal.

Signature _____ (Seal)

OLGA LUCIA ESQUIVEL
COMM. # 2282791
NOTARY PUBLIC-CALIFORNIA
ORANGE COUNTY
My Comm. Exp. Mar. 25, 2023

# ACKNOWLEDGMENT

A notary public or other officer completing this certificate verifies only the identity of the individual who signed the document to which this certificate is attached, and not the truthfulness, accuracy, or validity of that document.

State of California
County of _____ Orange _____ )

On __2/7/23__ before me, Vanessa Banken-Buchner
_____
(insert name and title of the officer)

personally appeared __Tony Maurice Diab__,
who proved to me on the basis of satisfactory evidence to be the person(s) whose name(s) is/are subscribed to the within instrument and acknowledged to me that he/she/they executed the same in his/her/their authorized capacity(ies), and that by his/her/their signature(s) on the instrument the person(s), or the entity upon behalf of which the person(s) acted, executed the instrument.

I certify under PENALTY OF PERJURY under the laws of the State of California that the foregoing paragraph is true and correct.

WITNESS my hand and official seal.

Signature ___Vanessa Banken Buch___   (Seal)

VANESSA BANKEN-BUCHNER
COMM #2364027
NOTARY PUBLIC - CALIFORNIA
RIVERSIDE COUNTY
My Commission Expires July 3, 2025

# EXHIBIT 5

In re: The Litigation Practice Group PC
Summary of Disbursements
Post-Petition Activity (3/20/2023 - Present)

**GROBSTEIN TEEPLE**

| Bank Name | Account Name | Account Number | Statement Date | Transaction Date | Check Number | Debit/Charge | Memo |
|---|---|---|---|---|---|---|---|
| Bank of America | Prime Logix LLC | 9201 | 3/31/2023 | 3/31/2023 | | 105,000.00 | WIRE TYPE:INTL OUT DATE:230331 TIME:1 616 ET TRN:202303310071 1963 SERVICE REF:750657 BNF:LAURENT REISS ID:CH020851 50006666 BNF BK:BANK JULIUS BAER & CO L ID:00655007340 PMT DET:6MM3MVZ S7 POP Loan Payment |
| Bank of America | Prime Logix LLC | 9201 | 4/30/2023 | 4/6/2023 | | 105,000.00 | WIRE TYPE:INTL OUT DATE:230406 TIME:091 0 ET TRN:2023040600267985 SERVICE REF:1 98400 BNF:LAURENT REISS ID:CH020851 50006666 BNF BKBANK JULIUS BAER & Co L 1D006550073440 PMT DET:4329749 76 LOAN PAYMENT POP OTHER/LOAN PAYMENT |
| Bank of America | Prime Logix LLC | 9201 | 4/30/2023 | 4/25/2023 | | 50,000.00 | WIRE TYPE:INTL OUT DATE230425 TIME1 704 ET TRN20230425004781 19 SERVICE REFQ73702 BNF:LAURENT REISS ID:CH020851 50006666 BNF BKBANK JULIUS BAER & CO L 1D006550073440 PMT DET:4354749 36 POP SERVICES |
| Bank of America | Prime Logix LLC | 9201 | 4/30/2023 | 4/26/2023 | | 100,000.00 | WIRE TYPE:INTL OUT DATE230426 TIME:1 628 ET TRN:2023042600480836 SERVICE REF357121 BNF:LAURENT REISS ID:CH02085150006666 BNF BKBANK JULIUS BAER & CO L 1D006550073440 PMT DET:4356383 58 POP SERVICES |
| Bank of America | Prime Logix LLC | 9201 | 4/30/2023 | 4/28/2023 | | 100,000.00 | WIRE TYPINTL OUT DATE230428 TIME1 311 ET TRN:2023042800529701 SERVICE REF:427036 BNF:LAURENT REISS ID:CH02085150006666 BNF BKBANK JULIUS BAER & CO L 1D006550073440 PMT DET:4360210 86 POP SERVICES |
| Bank of America | Prime Logix LLC | 9201 | 5/31/2023 | 5/3/2023 | | 250,000.00 | WIRE TYPE:INTL OUT DATE:230503 TIME1 708 ET TRN20230503004381 807 SERVICE REF:770508 BNF:LAURENT REISS ID:CH020851 50006666 BNF BKBANK JULIUS BAER & CO L 1D006550073440 PMT DET.54GW97H DQ POP loan payment |
| Bank of America | Prime Logix LLC | 9201 | 5/31/2023 | 5/8/2023 | | 1,000,000.00 | WIRE TYPE:INTL OUT DATE230508 TIME:1 415 Er TRN:2O23050800424500 SERVICE REF:913176 BNF:LAURENT REISS ID:CH02085150006666 BNF BKBANK JULIUS BAER & CO L IDO06550073440 PMT DETCBJHZ5TYT POP loan payment |
| | | | | | | **1,710,000.00** | |

DRAFT FORM - SUBJECT TO CHANGE

Exhibit 5, page 75

# EXHIBIT 6



## Your checking account

PRIME LOGIX LLC   |   Account #  ████████ 9201   |   March 1, 2023 to March 31, 2023

## Withdrawals and other debits - continued

| Date | Description | Amount |
|------|-------------|--------|
| ███ | ████████████████████ ████████████ | ███ |
| 03/31/23 | WIRE TYPE:INTL OUT DATE:230331 TIME:1616 ET TRN:2023033100711963 SERVICE REF:750657 BNF:LAURENT REISS ID:CH02085150006666 BNF BK:BANK JULIUS BAER & CO L ID:006550073440 PMT DET:6MM3MVZ S7 POP Loan Payment | -105,000.00 |
| ███ | ████████████████████ ██████ | ███ |
| ███ | ████ ████ | |
| ███ | ██ ████ | ███ |

Card account # XXXX XXXX XXXX 7115

| | | |
|--|--|--|
| ███ | ███████████ | ███ |
| ███ | ███████████ | |
| ███ | ███████████ | ███ |
| ███ | █████████████ | ███ |
| ███ | ████████ | ███ |
| ███ | ███████████ | ███ |

**Subtotal for card account # XXXX XXXX XXXX 7115**     ███

**Total withdrawals and other debits**     ███

## Checks

| Date | Check # | Amount |   | Date | Check # | Amount |
|------|---------|--------|---|------|---------|--------|
| ███ | ███ | ███ |   | ███ | ███ | ███ |
| ███ | ███ | ███ |   | | | |

**Total checks**     ███

**Total # of checks**     **3**

*   *There is a gap in sequential check numbers*



**Your checking account**

PRIME LOGIX LLC   |   Account # ■■■■■■■ 9201   |   April 1, 2023 to April 30, 2023

## Withdrawals and other debits - continued

| Date | Description | Amount |
|------|-------------|--------|
| 04/06/23 | WIRE TYPE:INTL OUT DATE:230406 TIME:0910 ET TRN:2023040600267985 SERVICE REF:198400 BNF:LAURENT REISS ID:CH02085150006666 BNF BK:BANK JULIUS BAER & CO L ID:006550073440 PMT DET:4329749 76 LOAN PAYMENT POP OTHER/LOAN PAYMENT | -105,000.00 |

*continued on the next page*



**BANK OF AMERICA**

<span style="color:#c00">**Your checking account**</span>

PRIME LOGIX LLC   |   Account #  ████████ 9201   |   April 1, 2023 to April 30, 2023

## Withdrawals and other debits - continued

| Date | Description | Amount |
|------|-------------|--------|
| | ████████ ████████ | ███ |
| | ████████ | ███ |
| | ████████ | ███ |
| | ████████ | ███ |
| | ████████ | ███ |
| | ████████ | |
| | ████████ | ███ |
| | ████████ | |
| 04/25/23 | WIRE TYPE:INTL OUT DATE:230425 TIME:1704 ET TRN:2023042500478119 SERVICE REF:273702 BNF:LAURENT REISS ID:CH02085150006666 BNF BK:BANK JULIUS BAER & CO L ID:006550073440 PMT DET:4354749 36 POP SERVICES | -50,000.00 |
| 04/26/23 | WIRE TYPE:INTL OUT DATE:230426 TIME:1628 ET TRN:2023042600480836 SERVICE REF:357121 BNF:LAURENT REISS ID:CH02085150006666 BNF BK:BANK JULIUS BAER & CO L ID:006550073440 PMT DET:4356383 58 POP SERVICES | -100,000.00 |
| | ████████ | ███ |
| | ████████ | ███ |
| | ████████ | ███ |
| | ████████ | ███ |
| | ████████ | ███ |
| | ████████ | ███ |
| | ████████ | ███ |
| | ████████ | ███ |
| | ████████ | ███ |
| 04/28/23 | WIRE TYPE:INTL OUT DATE:230428 TIME:1311 ET TRN:2023042800529701 SERVICE REF:427036 BNF:LAURENT REISS ID:CH02085150006666 BNF BK:BANK JULIUS BAER & CO L ID:006550073440 PMT DET:4360210 86 POP SERVICES | -100,000.00 |

*continued on the next page*



**Your checking account**

PRIME LOGIX LLC   |   Account # ████████ 9201   |   May 1, 2023 to May 31, 2023

## Deposits and other credits - continued

| Date | Description | Amount |
|------|-------------|--------|
| ████ | ████████████████████ | ████ |
| ████ | ████████████████ ████ | ████ |
| ████ | ██████████████ | ████ |
| ████ | ██████████████ | ████ |
| ████ | ██████████████ | ████ |
| ████ | █████████████████ ███████ | ████ |
| ████ | ██████████████ | ████ |
| ████ | ████████████ ████ | ████ |
| ████ | █████████████████ | ████ |
| ████ | ██████████████ | ████ |

**Total deposits and other credits** ████

## Withdrawals and other debits

| Date | Description | Amount |
|------|-------------|--------|
| | ████████ | ████ |
| ████ | █████████████████ ██████████ | ████ |
| ████ | ████████████████████ ██████ | ████ |
| ████ | ████ █████████████ █ █ | ████ |
| ████ | █████████████████████ ███ | ████ |
| ████ | ██ ████ ████████ █████ █ █████ | |
| ████ | ██ ████████████ █ █ | ████ |
| ████ | █████████████ █ | ████ |
| 05/03/23 | WIRE TYPE:INTL OUT DATE:230503 TIME:1708 ET TRN:2023050300481807 SERVICE REF:770508 BNF:LAURENT REISS ID:CH02085150006666 BNF BK:BANK JULIUS BAER & CO L ID:006550073440 PMT DET:54GW97H DQ POP loan payment | -250,000.00 |

*continued on the next page*

Exhibit 6, page 80

PRIME LOGIX LLC   |   Account # ██████████9201   May 1, 2023 to May 31, 2023

## Withdrawals and other debits - continued



| Date | Description | Amount |
|------|-------------|--------|
| 05/08/23 | WIRE TYPE:INTL OUT DATE:230508 TIME:1415 ET TRN:2023050800424500 SERVICE REF:913176 BNF:LAURENT REISS ID:CH02085150006666 BNF BK:BANK JULIUS BAER & CO L ID:006550073440 PMT DET:CBJHZ5T YT POP loan payment | -1,000,000.00 |

*continued on the next page*

# Adversary Proceeding Cover Sheet

B1040 (FORM 1040) (12/24)

| ADVERSARY PROCEEDING COVER SHEET<br>(Instructions on Reverse) | ADVERSARY PROCEEDING NUMBER<br>(Court Use Only) |
|---|---|

| **PLAINTIFFS**<br>Richard A. Marshack, Trustee of the LPG Liquidation Trust | **DEFENDANTS**<br>Laurent Reiss; MCA Fund ADV Inc.; LDR International Ltd.; and<br>Does 1-10, inclusive |
|---|---|

| **ATTORNEYS** (Firm Name, Address, and Telephone No.)<br>Christopher Celentino (SBN 131688)<br>Yosina M. Lissebeck (SBN 201654)<br>Christopher B. Ghio (SBN 259094)<br>DINSMORE & SHOHL LLP<br>655 West Broadway, Ste 800<br>San Diego, CA 92101   Telephone (619) 400-0500<br>christopher.celentino@dinsmore.com<br>yosina.lissebeck@dinsmore.com<br>christopher.ghio@dinsmore.com<br><br>Matthew J. Stockl (SBN 329266)<br>DINSMORE & SHOHL LLP<br>550 South Hope Street, Ste 1765<br>Los Angeles, CA 90071   Telephone (213) 335-7737<br>matthew.stockl@dinsmore.com | **ATTORNEYS** (If Known) |
|---|---|

**PARTY** (Check One Box Only) [right block]
- [ ] Debtor       [ ] U.S. Trustee/Bankruptcy Admin
- [ ] Creditor    [ ] Other
- [ ] Trustee

**PARTY** (Check One Box Only) [left block]
- [ ] Debtor       [ ] U.S. Trustee/Bankruptcy Admin
- [ ] Creditor    [ ] Other
- [x] Trustee

**CAUSE OF ACTION** (WRITE A BRIEF STATEMENT OF CAUSE OF ACTION, INCLUDING ALL U.S. STATUTES INVOLVED)
**(1)** Avoidance,  Recovery, and Preservation of 2-Year Actual Fraudulent Transfers; **(2)** Avoidance, Recovery, and Preservation of 2-Year Constructive Fraudulent Transfers; **(3)** Avoidance, Recovery, and Preservation of 4-Year Actual Fraudulent Transfers; **(4)** Avoidance, Recovery, and Preservation of 4-Year Constructive Fraudulent Transfers; **(5)** Avoidance, Recovery, and Preservation of Unauthorized Post-Petition Transfers; **(6)** Turnover; **(7)** Racketeer Influenced and Corrupt Organizations Act Violations; **(8)** Conspiracy; **(9)** Aiding and Abetting; and **(10)** Declaratory Relief

## NATURE OF SUIT

(Number up to five (5) boxes starting with lead cause of action as 1, first alternative cause as 2, second alternative cause as 3, etc.)

**FRBP 7001(a) – Recovery of Money/Property**
- [x] 11-Recovery of money/property - §542 turnover of property
- [ ] 12-Recovery of money/property - §547 preference
- [x] 13-Recovery of money/property - §548 fraudulent transfer
- [x] 14-Recovery of money/property - other – §§ 544(b), 549, 550, and 551;
  Cal. Civ. Code §§ 3439.04(a), 3439.04(b), 3439.05, and 3439.07

**FRBP 7001(b) – Validity, Priority or Extent of Lien**
- [ ] 21-Validity, priority or extent of lien or other interest in property

**FRBP 7001(c) – Approval of Sale of Property**
- [ ] 31-Approval of sale of property of estate and of a co-owner - §363(h)

**FRBP 7001(d) – Objection/Revocation of Discharge**
- [ ] 41-Objection / revocation of discharge - §727(c),(d),(e)

**FRBP 7001(e) – Revocation of Confirmation**
- [ ] 51-Revocation of confirmation

**FRBP 7001(f) – Dischargeability**
- [ ] 66-Dischargeability - §523(a)(1),(14),(14A) priority tax claims
- [ ] 62-Dischargeability - §523(a)(2), false pretenses, false representation,
  actual fraud
- [ ] 67-Dischargeability - §523(a)(4), fraud as fiduciary, embezzlement, larceny

**(continued next column)**

**FRBP 7001(f) – Dischargeability (continued)**
- [ ] 61-Dischargeability - §523(a)(5), domestic support
- [ ] 68-Dischargeability - §523(a)(6), willful and malicious injury
- [ ] 63-Dischargeability - §523(a)(8), student loan
- [ ] 64-Dischargeability - §523(a)(15), divorce or separation obligation
  (other than domestic support)
- [ ] 65-Dischargeability - other

**FRBP 7001(g) – Injunctive Relief**
- [ ] 71-Injunctive relief- imposition of stay
- [ ] 72-Injunctive relief - other

**FRBP 7001(h) Subordination of Claim or Interest**
- [ ] 81-Subordination of claim or interest

**FRBP 7001(i) Declaratory Judgment**
- [ ] 91-Declaratory judgment

**FRBP 7001(j) Determination of Removed Action**
- [ ] 01-Determination of remove d claim or cause

**Other**
- [ ] SS-SIPA Case - 15 U.S.C. §§78aaa *et.seq.*
- [ ] 02-Other (e.g. other actions that would have been brought in state court
  if unrelated to bankruptcy case)

| [x] Check if this case involves a substantive issue of state law | [ ] Check if this is asserted to be a class action under FRCP 23 |
|---|---|
| [ ] Check if a jury trial is demanded in complaint | Demand $1,710,000.00 |

Other Relief Sought
Racketeering Influenced and Corrupt Organizations Act Violations; Conspiracy; Aiding and Abetting; and Declaratory Relief

B1040 (FORM 1040) (12/24)

| BANKRUPTCY CASE IN WHICH THIS ADVERSARY PROCEEDING ARISES | | |
|---|---|---|
| NAME OF DEBTOR<br>The Litigation Practice Group P.C. | BANKRUPTCY CASE NO.<br>8:23-bk-10571-SC | |
| DISTRICT IN WHICH CASE IS PENDING<br>Central District of California | DIVISION OFFICE<br>Santa Ana | NAME OF JUDGE<br>Scott C. Clarkson |
| RELATED ADVERSARY PROCEEDING (IF ANY) | | |
| PLAINTIFF | DEFENDANT | ADVERSARY<br>PROCEEDING NO. |
| DISTRICT IN WHICH ADVERSARY IS PENDING | DIVISION OFFICE | NAME OF JUDGE |
| SIGNATURE OF ATTORNEY (OR PLAINTIFF)<br><br>  /s/ Matthew J. Stockl | | |
| DATE<br>March 18, 2025 | PRINT NAME OF ATTORNEY (OR PLAINTIFF)<br>Christopher Celentino<br>Yosina M. Lissebeck<br>Matthew J. Stockl | |

## INSTRUCTIONS

The filing of a bankruptcy case creates an "estate" under the jurisdiction of the bankruptcy court which consists of all of the property of the debtor, wherever that property is located. Because the bankruptcy estate is so extensive and the jurisdiction of the court so broad, there may be lawsuits over the property or property rights of the estate. There also may be lawsuits concerning the debtor's discharge. If such a lawsuit is filed in a bankruptcy court, it is called an adversary proceeding.

A party filing an adversary proceeding must also complete and file Form 1040, the Adversary Proceeding Cover Sheet, unless the party files the adversary proceeding electronically through the court's Case Management/Electronic Case Filing system (CM/ECF). (CM/ECF captures the information on Form 1040 as part of the filing process.) When completed, the cover sheet summarizes basic information on the adversary proceeding. The clerk of court needs the information to process the adversary proceeding and prepare required statistical reports on court activity.

The cover sheet and the information contained on it do not replace or supplement the filing and service of pleadings or other papers as required by law, the Bankruptcy Rules, or the local rules of court. The cover sheet, which is largely self-explanatory, must be completed by the plaintiff's attorney (or by the plaintiff if the plaintiff is not represented by an attorney). A separate cover sheet must be submitted to the clerk for each complaint filed.

**Plaintiffs** and **Defendants.** Give the names of the plaintiffs and defendants exactly as they appear on the complaint.

**Attorneys.** Give the names and addresses of the attorneys, if known.

**Party**. Check the most appropriate box in the first column for the plaintiffs and the second column for the defendants.

**Demand.** Enter the dollar amount being demanded in the complaint.

**Signature.** This cover sheet must be signed by the attorney of record in the box on the second page of the form. If the plaintiff is represented by a law firm, a member of the firm must sign. If the plaintiff is pro se, that is, not represented by an attorney, the plaintiff must sign.