| Attorney or Party Name, Address, Telephone & FAX Nos., State Bar No. & Em Christopher Celentino (131688) , Yossina M. Lissebeck (201654) | FOR COURT USE ONLY |
|---|---|
| Christopher B. Ghio (259094); Jacob R. Bothamley (319457) DINSMORE & SHOHL LLP 655 West Broadway, Suite 800, San Diego, CA 92101 - 619.400.0500 Christopher.celentino@dinsmore.com; Yosina.lissebeck@dinsmore.com Christopher.ghio@dinsmore.com; Jacob.bothamley@dinsmore.com *Attorney for Plaintiff, Richard A. Marshack, Trustee of the LPG Liquidation Trust* | |

## UNITED STATES BANKRUPTCY COURT
## CENTRAL DISTRICT OF CALIFORNIA – SANTA ANA

| In re: | |
|---|---|
| The Litigation Practice Group P.C. | CASE NO.: 8:23-bk-10571-SC CHAPTER: 11 |
| Debtor(s). | ADVERSARY NUMBER: 8:25-ap-01190-SC |
| Richard A. Marshack, Trustee of the LPG Liquidation Trust, Plaintiff(s) Versus Laurent Reiss, a Monaco resident; MCA Fund ADV Inc., a New York Corporation; LDR International Ltd., A British Virgin Islands Limited liability company, and DOES 1-10, inclusive | **ANOTHER SUMMONS AND NOTICE OF STATUS CONFERENCE IN ADVERSARY PROCEEDING [LBR 7004-1]** |

TO THE DEFENDANT(S): A Complaint has been filed by the Plaintiff against you. If you wish to defend against the Complaint, you must file with the court a written pleading in response to the Complaint. You must also serve a copy of your written response on the party shown in the upper left-hand corner of this page. The deadline to file and serve a written response is **30 days after service of this summons.** If you do not timely file and serve the response, the court may enter a judgment by default against you for the relief demanded in the Complaint.

A status conference in the adversary proceeding commenced by the Complaint has been set for:

| | |
|---|---|
| **Date:** | **September 24, 2026** |
| **Time:** | **10:00 a.m.** |
| **Hearing Judge:** | **Scott C Clarkson** |
| **Location:** | **411 W Fourth St., Crtrm 5C, Santa Ana, CA 92701** |

---

This form is mandatory. It has been approved for use in the United States Bankruptcy Court for the Central District of California.

You must comply with LBR 7016-1, which requires you to file a joint status report and to appear at a status conference. All parties must read and comply with the rule, even if you are representing yourself. You must cooperate with the other parties in the case and file a joint status report with the court and serve it on the appropriate parties at least 14 days before a status conference. A court-approved joint status report form is available on the court's website (LBR form F 7016-1.STATUS.REPORT) with an attachment for additional parties if necessary (LBR form F 7016-1.STATUS.REPORT.ATTACH). If the other parties do not cooperate in filing a joint status report, you still must file with the court a unilateral status report and the accompanying required declaration instead of a joint status report 7 days before the status conference. **The court may fine you or impose other sanctions if you do not file a status report. The court may also fine you or impose other sanctions if you fail to appear at a status conference.**

KATHLEEN J. CAMPBELL
CLERK OF COURT

Date of Issuance of Another Summons and Notice of Status Conference in Adversary Proceeding: March 12, 2026

By: _____ "/s/" Nickie Bolte _____

Deputy Clerk



This form is mandatory. It has been approved for use in the United States Bankruptcy Court for the Central District of California.

# ATTACHMENT A
## Names of plaintiffs and defendants

| Plaintiff(s): | Defendant(s): |
|---|---|
| Richard A. Marshack | Laurent Reiss<br><br>MCA Fund ADV Inc.<br>LDR International Ltd. |

This form is mandatory. It has been approved for use in the United States Bankruptcy Court for the Central District of California.

## ATTACHMENT A

# AFFIDAVIT OF SERVICE ON

# LDR INTERNATIONAL, LTD.

**UNITED STATES BANKRUPTCY COURT
CENTRAL DISTRICT OF CALIFORNIA
SANTA ANA DIVISION**

-------------------------------------------------------X

·In Re

The Litigation Practice Group P.C.                              Case No.: 8:23-bk-10571-SC

                Debtor(s)                              Chapter 11

-------------------------------------------------------X

Richard A. Marshack, Trustee of the LPG                         Adv. Proc. No. 8:25-ap-01190-SC
Litigation Trust,
                Plaintiff(s),

                                   **AFFIDAVIT OF SERVICE**

    vs.

Laurent Reiss, a Monaco resident; MCA Fund
ADV Inc., a New York Corporation; LDR
International Ltd., a British Virgin Islands
Limited liability company; and Does 1-10,
inclusive,
                Defendant(s)

-------------------------------------------------------X

I, Lesley-Ann Theodore, Process Server, do hereby make oath and do solemnly swear:

1.  That I am a non-party to this action over the age of 21 years and an adult resident of the
    British Virgin Islands, which is a territory of the United Kingdom;

2.  That I am employed as a clerk by Price Demers & Co., a law firm whose business address
    is Tropic Isle Building, Nibbs Street, Road Town, Tortola, British Virgin Islands, and am
    authorized to serve legal process in the British Virgin Islands;

3.  That on or about April 1, 2026, I was instructed by Susan V. Demers, an attorney admitted
    to practice law in the British Virgin Islands employed by Price Demers & Co., in turn acting
    upon the instructions of Legal Language Services, an international litigation support firm
    located in Leawood, Kansas, in turn acting on the instructions of plaintiff's counsel of the
    US law firm Dinsmore & Shohl LLP. to serve upon defendant LDR International Limited
    the following documents:

- Hague Service Convention "*Notice*"
- Hague Service Convention "*Summary*"
- Another Summons and Notice of Status Conference in Adversary Proceedings
- Trustee's First Amended Complaint with Exhibits 1 – 6
- Adversary Proceeding Cover Sheet
- Notice of Required Compliance with Rule 7026 of the Federal Rules of Bankruptcy Procedure and Rule 7026-1 of the Local Bankruptcy Rules with Exhibits 1-2

4. That according to information provided to Susan V. Demers, the address for service of process upon LDR International Limited is in care of its registered agent Aleman, Cordero, Galindo & Lee Trust (BVI) Limited, 4th Floor, Omar Hodge Building, Road Town, Tortola, British Virgin Islands;

5. That according to the BVI Financial Services Commission, Registry of Corporate Affairs, the current registered agent of LDR International Limited is Aleman, Cordero, Galindo & Lee Trust (BVI) Limited, 4th Floor, Omar Hodge Building, Road Town, Tortola, British Virgin Islands (See Register of Companies Search Report for LDR International Limited attached hereto as Exhibit A);

6. That on the 1st day of April, 2026 at approximately 10:32 AM, I did personally travel to 4th Floor, Omar Hodge Building, Road Town, Tortola, the offices of Aleman, Cordero, Galindo & Lee Trust (BVI) Limited, where I met Ms. Sally Suaco, the Receptionist. I handed the above-referenced documents to Ms. Suaco and she accepted them. Ms. Suaco retained the documents and signed a receipt, attached hereto as Exhibit B, confirming service;

7. That Ms. Suaco is an Hispanic woman, in her 40s, approximately 5 feet 2 inches in height, weighing approximately 160 lbs., with brown eyes and black hair;

8. That I believe service to have been effected in accordance with a method prescribed by the internal laws of the British Virgin Islands for civil matters within this jurisdiction and thus in accordance with sub-paragraph (b) of Article 10 of the *Hague Convention of 15 November 1965 on the Service Abroad of Judicial and Extrajudicial Documents in Civil or Commercial Matters*; and

9. That all information herein given accords with the rules and customary procedures applicable and operative in the British Virgin Islands at the time of effecting service.

I declare under penalty of perjury under the laws of the United States and the British Virgin Islands that the foregoing statements are true and accurate to the best of my knowledge and belief.

_____
Lesley-Ann Theodore, Process Server

Sworn before me in Road Town        )
Tortola, British Virgin Islands      )
This 28th day of April, 2026         )

_____
Notary Public





# EXHIBIT A

# COMPANY SEARCH REPORT

Firefox   https://virgin.bvifse.vg/VIRRGIN/companyProfileSearch.do?dispat...



**BVI Financial Services Commission, Registry of Corporate Affairs**

# Register of Companies Search Report

**Date of Search :** 26/03/2026
This search is accurate as at the Search Date above.

| | |
|---|---|
| **Company Name :** | LDR INTERNATIONAL LIMITED |
| **Company Number :** | 1969667 |

| | | | |
|---|---|---|---|
| **Company Type :** | BC New Incorporation | **Date of Incorporation / Registration :** | 05/02/2018 |

**Current Status :**

| | |
|---|---|
| Status Description: | Active |
| Status Date: | 28/08/2025 |
| Current Registered Agent: | ALEMAN, CORDERO, GALINDO & LEE TRUST (BVI) LIMITED |
| Current Registered Agent Address: | 4th Floor<br>Omar Hodge Building<br>Road Town<br>Tortola<br>VG1110<br>VIRGIN ISLANDS, BRITISH |
| Current Registered Agent Phone Number: | 284-494-4666 |
| Current Registered Agent Fax Number: | 284-494-4679 |
| Current Registered Office : | 4th Floor<br>Omar Hodge Building<br>Road Town<br>Tortola<br>VG1110<br>VIRGIN ISLANDS, BRITISH |
| Telephone: | |
| Agent Fax: | |
| Register of Directors Filed : | Yes |

**Share/Capital Information:**

Maximum Number of Shares the company is authorized to issue:   50,000
Ability to Issue Bearer Shares:   No

**Previous Names History**

| S.No | Previous Name | Foreign Character Name | Date Range or Cease Date | |
|---|---|---|---|---|
| | | | From | To |
| 1 | LDR INTERNATIONAL LIMITED | | 05/02/2018 | |

3/26/2026, 2:55 PM

**Transaction History**

| S.No | Date | Transaction Number | Description | Status | Eforms/Attachments |
|---|---|---|---|---|---|
| 1 | 31/01/2018 | T180076021 | Name Reservation (10 days) | Approved | Name Reservation (10 days) |
| 2 | 05/02/2018 | T180088315 | Application for Incorporation (BC) | Approved | Application for Incorporation (BC) |
| | | | | | Memorandum and Articles of the Company |
| 3 | 13/02/2018 | T180105980 | Register of Directors – Registration | Approved | Register of Directors – Registration |
| 4 | 30/08/2019 | T190589373 | Annual Fee Submission (BC) | Approved | Annual Fee Submission (BC) |
| 5 | 27/04/2020 | T200204057 | Annual Fee Submission (BC) | Approved | Annual Fee Submission (BC) |
| 6 | 14/10/2020 | T200614584 | Request for Certificate of Goodstanding | Approved | Request for Certificate of Goodstanding |
| 7 | 30/04/2021 | T210270289 | Annual Fee Submission (BC) | Approved | Annual Fee Submission (BC) |
| 8 | 13/05/2022 | T220307710 | Annual Fee Submission (BC) | Approved | Annual Fee Submission (BC) |
| 9 | 26/04/2023 | T230221347 | Annual Fee Submission (BC) | Approved | Annual Fee Submission (BC) |
| 10 | 08/05/2024 | T240262297 | Annual Fee Submission (BC) | Approved | Annual Fee Submission (BC) |
| 11 | 26/05/2025 | T250416773 | Annual Fee Submission (BC) | Approved | Annual Fee Submission (BC) |
| 12 | 30/07/2025 | T250634519 | Notice of Failure to File Annual Return | Approved | Notice of Failure to File Annual Return |
| 13 | 27/08/2025 | T250717634 | Notice of Filing of Annual Return | Approved | General Filing |
| | | | | | General Filing - General Filing |
| 14 | 03/12/2025 | T251321522 | Register of Members | Approved | Register of Members |
| 15 | 25/02/2026 | T260295845 | Notice of Change of Registered Office Address | Approved | Notice of Change of Registered Office Address |

**Certificate History**

| S.No | Transaction No. | Type of Certificate | Date of Filing |
|---|---|---|---|
| 1 | T180088315 | Certificate of Incorporation (Original) | 05/02/2018 |
| 2 | T200614584 | Certificate of Good Standing | 14/10/2020 |

**DISCLAIMER:**

Although care has been taken to ensure the accuracy, completeness and reliability of the information provided through the use of this service ("the Information"), neither the Registrar of Corporate Affairs ("the Registrar") nor the Financial Services Commission ("the Commission") assumes any responsibility for the accuracy, completeness and reliability of the Information. This report does not reflect any transactions that may be submitted and not yet registered, or other changes for which the Registrar has not received notice. The user of the Information agrees that the Information is subject to change without notice, and neither the Registrar nor the Commission is responsible for any discrepancies that may result if a transaction is approved for filing after the issuance of this report. Neither the Registrar nor the Commission assumes any responsibility for the consequences of use of the Information, nor for any infringement of third party intellectual property rights which may result from its use. In no event shall the Commission or the Registrar be liable for any direct, indirect, special or incidental damage resulting from, arising out of or in connection with the use of the Information.

of 2

3/26/2026. 2:55 PM

# EXHIBIT B

# COPY OF THE RECEIPT FOR SERVICE

## PRICE DEMERS & CO.
### PFD Corporate Services (BVI) Limited
### Delivery Confirmation Slip

**Delivery Detail**

TO: LDR INTERNATIONAL LIMITED

Company: c/o Aleman, Cordero, Galindo & Lee Trust (BVI) Limited

Address: 4th Floor, Omar Hodge Building

Road Town, Tortola  British Virgin Islands

Document Description: Hague Service Convention "Notice"
Hague Service Convention "Summary"
Another Summons and Notice of Status Conference in Adversary

Special Instructions: Proceedings.  Trustee's First Amended Complaint With Exhibits 1-6
And other Supporting Documents.

Date: 1-04-26          Delivery requested by: S.V.D.          (Initials)

Ref No: _____

**Receipt Details**

Received by: SAILY SUACO          (Please print name)

Signature: _____  Date received: 1-04-26  (Date/Month/Year)

Time received: 10:32  (AM)/ PM

Delivered by: L.A.T.          (Initials)

# AFFIDAVIT OF SERVICE ON
# LAURENT REISS

ENREGISTRÉ à MONACO, le 2 9 AVR. 2026

F°/Bd.......75..........Case....7...........

Reçu cinquante Euros





# SIGNIFICATION

L'AN DEUX MIL VINGT-SIX ET LE *Vingt - huit*
DU MOIS D'AVRIL ;

      A la requête de **la Société de droit américain en liquidation dénommée « THE LITIGATION PRACTICE GROUP P.C. » (LPG)**, ayant son siège 17542 E. 17TH Street, Suite 100, Tustin, California 92780, - Etats-Unis d'Amérique, représentée par **Monsieur Richard A. Marshack, en sa qualité de Syndic Liquidateur** du LPG Liquidation Trust, domicilié et demeurant en cette qualité en ses bureaux, Cabinet d'Avocats MARSHACK HAYS WOOD LLP - 870, Roosevelt, Irvine, Californie 92620, Etats-Unis d'Amérique,

      Représentée par par Me Christopher Celentino, Me Jacob Bothamley, Me Yosina Lissebeck Avocats du Cabinet DINSMORE & SHOHL LLP - sis 655 West Broadway, Suite 800, San Diego, Californie 92101, Etats-Unis d'Amérique,

      Elisant domicile en l'Etude de Maître Richard MULLOT, Avocat-Défenseur près la Cour d'Appel de Monaco, y demeurant 20, boulevard de Suisse,

Je soussignée Claire NOTARI, Maître en droit Huissier près la Cour d'Appel de Monaco y demeurant, 17, boulevard Albert 1er

ACTE SIGNIFIÉ PAR CLERC ASSERMENTÉ    *CN*

      Ai signifié et en-tête de celle des présentes donné à :

      **Monsieur Laurent REISS,** demeurant et domicilié EUROPA RESIDENCE, Place des Moulins à MONACO, où étant et parlant à : *la personne requis de Signer, a dit inutile*

1

1/ une plainte amendée, en langue anglaise « ***TRUSTEE'S FIRST AMENDED COMPLAINT*** », (84 pages), déposée par les Avocats Américains de ma requérante devant le Juge près le Tribunal des Faillites des Etats-Unis, District Central de Californie – Division de Santa Ana, le 15 janvier 2026, enregistrée électroniquement par ladite Cour le 15 janvier 2026, affaire n° 8:25-ap-01190-SC, et **ses six annexes** en langue anglaise et leur traduction intégrale en langue française,

2/ une nouvelle assignation avec notification d'audience de mise en état dans une procédure contradictoire en langue anglaise « ***ANOTHER SUMMONS AND NOTICE OF STATUS CONFERENCE IN ADVERSARY PROCEEDING [LBR 7004-1]*** » (8 pages) par-devant le Tribunal des Faillites (« *Bankruptcy Court* ») des Etats-Unis, DISTRICT CENTRAL DE CALIFORNIE – SANTA ANA, délivrée par ladite Juridiction en date du 12 mars 2026, et signée par le greffier adjoint dans l'affaire n° 8:25-ap-01190-SC, et sa traduction en langue française, fixant la date de la conférence de mise en état au :

**<u>24 septembre 2026 à 10h00,</u>**

**devant le Juge près le Tribunal des Faillites des Etats-Unis, DISTRICT CENTRAL DE CALIFORNIE – SANTA ANA, 411W Fourth St., Crtrm 5C, Santa Ana, CA 92701.**

Déclarant au requis que le délai de réponse porté dans ladite assignation court à compter des présentes,

Lui déclarant en outre que faute par lui d'adresser sa réponse ou comparaitre dans le délai imparti, il sera requis défaut à son encontre,

2

Sous toutes réserves et aux fins qu'il n'en
ignore, je lui ai remis et laissé copie des présentes,
étant et parlant comme devant.

COUT : SIX CENT SOIXANTE CINQ EUROS

_L NOTAl_

| COUT | |
|---|---|
| Enrôlement | 23 |
| Original | 1 |
| Copie | 16 |
| Signification | |
| Magristrale | 564 |
| Rôles | 2 |
| Timbre | 50 |
| Enregistrement | |
| Appel | 2 |
| Répertoire | |
| Transport | |
| Parquet | |
| Total | 665,00 |

3

Christopher Celentino (State Bar No. 131688)
Yosina M. Lissebeck (State Bar No. 201654)
Christopher B. Ghio (State Bar No. 259094)
Jacob R. Bothamley (State Bar No. 319457)
**DINSMORE & SHOHL LLP**
655 West Broadway, Suite 800
San Diego, CA 92101
Telephone:  619.400.0500
Facsimile:  619.400.0501
christopher.ghio@dinsmore.com
christopher.celentino@dinsmore.com
yosina.lissebeck@dinsmore.com
Jacob.bothamley@dinsmore.com

Attorneys to Richard A. Marshack,
Trustee of the LPG Liquidation Trust

## UNITED STATES BANKRUPTCY COURT

## CENTRAL DISTRICT OF CALIFORNIA - SANTA ANA DIVISION

| | |
|---|---|
| In re:<br><br>THE LITIGATION PRACTICE GROUP P.C.,<br><br>Debtor. | Case No.: 8:23-bk-10571-SC<br><br>Adv. Proc. No.  8:25-ap-01190-SC<br><br>Chapter 11 |
| RICHARD A. MARSHACK<br>Trustee of the LPG Liquidation Trust,<br><br>Plaintiff,<br><br>v.<br><br>LAURENT REISS, a Monaco resident; MCA Fund ADV Inc., a New York Corporation; LDR International Ltd., a British Virgin Islands limited liability company; and DOES 1-10, inclusive,<br><br>Defendants. | **TRUSTEE'S FIRST AMENDED COMPLAINT FOR:**<br><br>**(1) AVOIDANCE, RECOVERY, AND PRESERVATION OF 2-YEAR ACTUAL FRAUDULENT TRANSFERS;**<br><br>**(2) AVOIDANCE, RECOVERY, AND PRESERVATION OF 2-YEAR CONSTRUCTIVE FRAUDULENT TRANSFERS;**<br><br>**(3) AVOIDANCE, RECOVERY, AND PRESERVATION OF 4-YEAR ACTUAL FRAUDULENT TRANSFERS;**<br><br>**(4) AVOIDANCE, RECOVERY, AND PRESERVATION OF 4-YEAR CONSTRUCTIVE FRAUDULENT TRANSFERS;** |

1

**(5) AVOIDANCE, RECOVERY, PRESERVATION OF UNAUTHORIZED POST-PETITION TRANSFERS;**

**(6) CONVERSION;**

**(7) PARTICIPATING IN SCHEME TO CONTINUE TO DEEPEN LPG'S CONTINUING INSOLVENCY;**

**(8) AIDING AND ABETTING;**

**(9) TURNOVER; AND**

**(10) DECLARATORY RELIEF**

Judge: Hon. Scott C. Clarkson

For his *First Amended Complaint for (1) Avoidance, Recovery, and Preservation of 2-Year Actual Fraudulent Transfers; (2) Avoidance, Recovery, and Preservation of 2-Year Constructive Fraudulent Transfers; (3) Avoidance, Recovery, and Preservation of 4-Year Actual Fraudulent Transfers; (4) Avoidance, Recovery, and Preservation of 4-Year Constructive Fraudulent Transfers; (5) Avoidance, Recovery, Preservation of Unauthorized Post-Petition Transfers; (6) Conversion; (7) Participating in Scheme to Continue to Deepen LPG's Continuing Insolvency; (8) Aiding and Abetting;(9) Turnover; and (10) Declaratory Relief* (the "FAC"), plaintiff Richard A. Marshack, the former Chapter 11 Trustee for the bankruptcy estate ("Estate") of debtor The Litigation Practice Group P.C. ("Debtor" or "LPG") and current liquidating trustee of the LPG Liquidation Trust (collectively, "Trustee" or "Plaintiff") in the above-captioned bankruptcy case (the "Bankruptcy Case"), alleges and avers as follows:

## STATEMENT OF JURISDICTION, NATURE OF PROCEEDING, AND VENUE

1.     This Court has jurisdiction over this action pursuant to 28 U.S.C. §§ 157(b)(2)(A), (E), (H) and (O), 1334(b), and General Order No. 13-05 of the District Court for the Central District of California because this is a core proceeding arising in and/or related to the Bankruptcy Case,

2

which is a case under chapter 11 of title 11 of the United States Code (the "Bankruptcy Code"), and which is pending in the United States Bankruptcy Court for the Central District of California, Santa Ana Division (the "Court").

2.    Regardless of whether this proceeding is core, non-core, or otherwise, the Plaintiff consents to the entry of a final order and judgment by the Bankruptcy Court.

3.    Defendants are hereby notified that Rule 7008 of the Federal Rules of Bankruptcy Procedure requires them to plead whether consent is given to the entry of a final order and judgment by the bankruptcy court.

4.    Venue of this adversary proceeding properly lies in this judicial district pursuant to 28 U.S.C. § 1409(a) because this proceeding is related to the Debtor's pending Bankruptcy Case.

### THE PARTIES

5.    Plaintiff, Richard A. Marshack, was the duly-appointed, qualified Chapter 11 Trustee of Debtor's Estate and is now the current liquidating trustee of the LPG Liquidation Trust.

6.    Debtor LPG is, and at all material times was, a professional corporation organized, existing, and in good standing under the laws of the State of California, with its principal place of business in Tustin, California.

7.    On information and belief, Defendant Laurent Reiss ("Laurent Reiss") is, and at all material times was, an individual resident of Monaco subject to service of process in accordance with the *Convention of 15 November 1965 on the Service Abroad of Judicial and Extrajudicial Documents in Civil or Commercial Matters* (the "Hague Service Convention") by sending a completed USM-94: Request for Service Abroad of Judicial or Extrajudicial Documents ("USM-94"), along with copies of the summons and Complaint, to the Central Authority for Monaco: Direction des Services Judiciaires, Palais de Justice, 5, rue Colonel Bellando de Castro MC - 98000 Monaco.

8.    Defendant MCA Fund ADV Inc. ("MCA Fund ADV") is, and at all material times represented that it was, a corporation existing under the laws of the State of New York.

9.    MCA Fund ADV may be served by first class mail postage prepaid upon its registered agent for service of process, USACORP INC., 325 Division Ave, Ste 201, Brooklyn, NY, 11211.

///

3

10. LDR International Ltd. ("LDR" and, together with Laurent Reiss and MCA Fund ADV, "Defendants"), is, and at all material times represented that it was, a limited liability company existing under the laws of the British Virgin Islands.

11. LDR may be served in accordance with the Hague Service Convention by sending a completed USM-94, along with copies of the summons and Complaint, to the Central Authority for the British Virgin Islands: Registrar of the Supreme Court, Supreme Court Registry, No. 84 Main Street, P.O. Box 418, Road Town, Tortola, British Virgin Islands VG1110.

12. The true names and capacities, whether individual, corporate associate, or otherwise, of defendants Does 1 through 10, inclusive, are unknown to the Plaintiff, who therefore sues said defendants by such fictitious names. The Plaintiff is informed and believes that each of the defendants designated herein as a fictitiously named defendant is in some manner responsible for the events and happenings referred to and caused the damage herein alleged. When the Plaintiff has ascertained the true names and capacities of Does 1 through 10, inclusive, it will seek leave of this Court to amend its Complaint by setting forth the same.

## GENERAL ALLEGATIONS

**A.    The Bankruptcy Case**

13. On March 20, 2023 ("Petition Date"), Debtor filed a voluntary petition for relief under Chapter 11 of the Bankruptcy Code, commencing the Bankruptcy Case.

14. The Office of the United States Trustee ("UST") filed its *Motion by United States Trustee to Dismiss or Convert Case Pursuant to 11 U.S.C. § 1112(b)* [Bankr. Docket No. 21] and creditors Debt Validation Fund II, LLC; MC DVI Fund 1, LLC; and MC DVI Fund 2, LLC filed the *Motion by DVF and MC DVI to Dismiss Chapter 11 Case Pursuant to 11 U.S.C. §§ 105, 305, 349, & 1112, or in the Alternative Convert This Case to Chapter 7 or Appoint a Trustee* [Bankr. Docket No. 44]. On May 4, 2023, the Court entered its *Order Directing United States Trustee to Appoint Chapter 11 Trustee* [Bankr. Docket No. 58].

15. Pursuant to the *Acceptance of Appointment as Chapter 11 Trustee* [Bankr. Docket No. 63], on May 8, 2023, Trustee accepted his appointment as the Chapter 11 Trustee in the Bankruptcy

///

4

Mᵉ CLAIRE MARI
HUISSIER
17, bd Albert 1ᵉʳ
MONACO ☎ +377 97 97 09 09

Case. The Court approved the Trustee's appointment in its *Order Approving the U.S. Trustee's Application for the Appointment of a Chapter 11 Trustee* [Docket No. 65].

16.    Trustee was not appointed until after events of the case and, therefore, bases these allegations on information and belief. *Soo Park v. Thompson*, 851 F.3d 910, 928 (9th Cir. 2017) ("The *Twombly* plausibility standard . . . does not prevent a plaintiff from pleading facts alleged upon information and belief where the facts are peculiarly within the possession and control of the defendant or where the belief is based on factual information that makes the inference of culpability plausible."); *Miller v. City of Los Angeles*, 2014 U.S. Dist. LEXIS 198871, 2014 WL 12610195, at *5 (C.D. Cal. Aug. 7, 2014) (recognizing that the plaintiff's "information and belief" pleading was allowed and "necessary at times"); *see also Mireskandari v. Daily Mail and General Trust PLC*, 2013 U.S. Dist. LEXIS 194437, 2013 WL 12129642, at *4 (C.D. Cal. July 31, 2013) ("The Federal Rules of Civil Procedure allow parties to plead facts on 'information and belief' if the facts 'will likely have evidentiary support after a reasonable opportunity for further investigation or discovery.'" (citations omitted)).

17.    Pursuant to the *Order Confirming Modified First Amended Joint Chapter 11 Plan of Liquidation* entered September 9, 2024, and the *Notice of Occurrence of Effective Date of Modified First Amended Joint Chapter 11 Plan of Liquidation* filed September 24, 2024, Richard A. Marshack became the Liquidating Trustee of the LPG Liquidation Trust, effective September 24, 2024. [Bankr. Docket Nos. 1646 & 1762].

18.    All claims have been transferred to the Liquidating Trust pursuant to the confirmed plan and Plaintiff brings this action solely in his capacity as the Liquidating Trustee of the LPG Liquidation Trust, for the benefit of Debtor's Estate and its creditors.

19.    Pursuant to Rule 15(a)(1)(B) of the Federal Rules of Civil Procedure, a pleading to which a response is necessary may be amended as a matter of course either 21 days after service of a responsive pleading, or 21 days after service of a motion under Fed. R. Civ. P. 12(b), (e), or (f), whichever is earlier. Fed. R. Civ. P. 15(a)(1)(B). A responsive pleading has not yet been filed. Therefore, the filing of this First Amended Complaint is timely and filed as a matter of right.

///

**B.      Protective Order**

20.      On or about May 2, 2024, Plaintiff filed that certain Notice and Motion for Entry of Protective Order (the "Protective Order").

21.      On June 3, 2024, the Court entered its *Order Granting Motion for Entry of Protective Order and the Protective Order* [Bankr. Docket No. 1270] (the "Protective Order"). A true and accurate copy of the Protective Order is attached as **Exhibit 1** and incorporated herein.

22.      By its own terms, the Protective Order applies to this adversary proceeding and governs all discovery conducted herein.

**C.      LPG's Ownership and Management**

23.      LPG operated as a law firm for consumers across the country who sought assistance in contesting or resolving debts they would identify.

24.      The consumers would pay LPG over a period of time via monthly debits from their bank accounts; LPG was required to hold such funds in trust until it provided equivalently valued legal services which it could be paid.

25.      The monthly payments were meant to cover all legal services LPG provided to the consumers including validation of the debts, review of documents to determine enforceability, to commence certain affirmative claims, and court appearances to halt lawsuits to obtain judgments.

26.      In certain instances, LPG would file a lawsuit in an effort to eliminate a disputed debt or to prosecute affirmative claims held by the consumers.

27.      At all relevant times prior to the appointment of the Trustee, LPG was managed and operated by Dan March, Esq. as its sole member, and legal owner. Tony Diab ("Diab") and other defendants devised a plan to fraudulently transfer funds, client files, client funds and assets in the form of ACH Receivables (the "ACH Receivables" or "Accounts Receivable") out of LPG to third parties prior to the filing of bankruptcy.

28.      To obtain consumer clients, LPG contracted with marketing companies, who engaged in illegal capping and would advertise or call to solicit consumers to become clients of LPG in exchange for a percentage of the ACH Receivables collected by LPG from the consumers.

///

6

29. In exchange, LPG agreed to pay the marketing affiliates a percentage the monthly payments collected by LPG from the consumers.

30. Because LPG received payments from consumers over time, it often sought financing by borrowing against its future cash flows. This borrowing was not only used to finance operations at LPG, but also to pay the fees owed to the marketing companies for providing the client referrals.

31. Diab, working in concert with others, misappropriated, stole, and converted LPG funds from consumer payments and loan transactions to fund his personal expenses and extravagancies to the detriment and harm to LPG and its businesses.

32. Many of the documents executed in connection with such financing described the transactions as accounts receivable purchase agreements.

33. Diab used entities he controlled, and were his alter egos, including, without limitation, Vulcan Consulting Group ("Vulcan"), Maverick Management Group LLC ("Maverick"), Prime Logix, LLC ("Prime Logix"), LGS Holdco, LLC ("LGS"), and/or Coast Processing to divert LPG consumer funds and ACH Receivables. Diab would use numerous ACH processing companies to easily transfer millions of dollars from Debtor to these entities he controlled, without oversight or detection, and to avoid payment disputes and complications. The money that flowed from Debtor through these bank account to Defendants consisted of Client Funds that Debtor funneled to these entities by means of the ACH processing companies. Debtor also made deposits into these entities bank account such that they received Client Funds directly from Debtor in addition to direct Accounts Receivable.

34. Pursuant to the asset purchase agreement between LPG and CLG, on which Diab forged LPG authorized signatures, Diab instructed CLG to initiate the ACH debits on the transferred files, which it did through Optimum Bank and its processing entity LGS Holdco.

35. At or around the Petition Date, Diab transferred, for no consideration, approximately 8,000 files (previously transferred to Phoenix) to Heshy Deutsch ("Deutsch") and Israel Reiches ("Reiches"). Diab instructed Deutsch and Reiches, by and through their co-conspirators Sam Geiger and Solomon Feig, to initiate the ACH debits on the transferred files, which they did through BCB

///

7

Bank and a processing entity known as CLG Processing, into accounts, not in the name of LPG, but that held funds of behalf of LPG and disbursed those funds for LPG.

36.     The funds obtained from the ACH debits described in the foregoing paragraphs were deposited in Maverick and Prime Logix accounts, among others.

37.     LPG's ACH Receivables were the primary, if not exclusive source of funds, for Validation Partners, Vulcan, Oakstone, PECC, Prime Logix, Coast Processing, LGS, and Maverick. As set forth above, the other sources of funds for these entities are the proceeds of LPG assets (i.e., file purchase account receivable proceeds) or constitute loan proceeds for which LPG alone was liable.

38.     Diab frequently diverted the LPG money pulled from its consumer clients and other funds it received through investors and lenders, to and through these entities.

39.     Diab frequently would direct these entities to pay affiliates (aka marketing cappers), MCA lenders, and others with LPG property.

40.     Diab would instruct others at LPG and these entities on how to manage and transfer these funds to and from these entities and LPG interchangeably.

**D.     $1.5 Million Loan from MCA Fund ADV Inc. and/or LDR International Ltd.**

41.     On or about February 7, 2023, BAT and LPG executed a Loan Agreement with MCA Fund ADV and/or LDR to document the terms of the Loan (the "Loan"). A true and accurate copy of the Loan Agreement is attached hereto as **Exhibit 2**.

42.     Upon information and belief, LPG entered into the Loan, which was arranged by attorney Ronald Richards.

43.     LPG executed a promissory note ("Note") in the original principal amount of $1,500,000 and accompanying security agreement ("Security Agreement" and, together with the Note and the Loan Agreement, the "Loan Documents") to document the amount owed under the Loan. True and accurate copies of the Note and Security Agreement are attached hereto as **Exhibit 3** and **Exhibit 4**, respectively.

///

///

8

44.      The terms of the Note are:

Principal Amount:        $1,500,000.00

Date:                    February 7, 2023

Maturity Date:           May 6, 2023

Interest:                7.0% per month

Default Interest:        24%

45.      The effect of these terms is that the interest rate on the Note is approximately 84.3% APR and that in exchange for $1,500,000.00, MCA Fund ADV and/or LDR would have received $1,920,000.00, or a return of $420,000.00 on its $1,500,000.00 (28.0%) in four months.

46.      Upon further information and belief, even though Defendant Laurent Reiss was not a party to the Loan, LPG made payments related to the Loan to Laurent Reiss rather than making payments to MCA Fund ADV or LDR.

**E.      Payments to Laurent Reiss**

47.      During the applicable post-petition period and according to records currently available, Prime Logix, who had no other funds except diverted LPG funds, paid Laurent Reiss the sum of at least $1,710,000 between March 2023 and May 2023 (the "Transfers"), to Swiss bank account number ending 6666 at Bank Julius Baer & Co. AG in the name of Laurent Reiss.  A true and accurate list of the known payments made by LPG to Laurent Reiss is attached hereto as **Exhibit 5** and incorporated herein.  True and correct copies of redacted bank statements evidencing the Transfers are attached hereto as **Exhibit 6**.

**F.      Laurent Reiss's Knowledge of, and Substantial Assistance In Diab's Ponzi Scheme**

48.      On information and belief, Laurent Reiss met with Diab in late 2021 or early 2022 to discuss the possibility of Laurent Reiss getting involved in LPG.

49.      On information and belief, at the time Laurent Reiss met with Diab, Laurent Reiss was already a business partner with Solomon Feig ("Feig"), one of Diab's business partners in LPG.

50.      On information and belief, early in the business relationship, Laurent Reiss expressed skepticism to Diab on why LPG did not seek out traditional loans, and Diab divulged the illegal

business model for LPG, including details related to the unlawful, but intentional, misappropriation of LPG client funds.

51. On information and belief, Diab, and Laurent Reiss discussed potential options for Laurent Reiss to invest in LPG.

52. On information and belief, at all relevant times, Laurent Reiss, being experienced and sophisticated in finance, knew or should have known that Diab was running LPG as an illegal Ponzi scheme, especially after learning the details of LPG's business model from Diab, which explained why LPG could not obtain a conventional loan.

53. On information and belief, Diab and Laurent Reiss decided that Reiss would not be a file purchaser, as Diab had arranged with other investors.

54. Instead, on information and belief, Laurent Reiss would provide an initial $2.5 million loan to LPG, with Reiss providing $1 million and Feig providing the other $1.5 million and an interest rate of 7% per month.

55. As noted above, the first loan to LPG was made in July of 2022[1].

56. On information and belief, at the time Laurent Reiss made the First Loan to LPG, Laurent Reiss understood that the investment needed to be disguised as a loan with a high-risk rate because the LPG was constantly at risk due to its systematic misuse of client funds.

57. On information and belief, Laurent Reiss also knew that any funds LPG paid back to him or for his benefit would be derived from the misappropriated LPG client funds.

58. On information and belief, when repayment of the First Loan came due months later, LPG did not have sufficient funds on hand off the loan, but after an extension of the time to pay, LPG was able to pay off the loan, including interest.

59. On information and belief, by January of 2023, LPG was in need of another loan, and Diab again approached Laurent Reiss, who agreed to make a loan of $1.5 million with a 7% interest rate (previously defined as the Loan).

---

[1] This loan is covered in greater detail in the adversary proceeding styled *Marshack v. Delphine Pastor et al*, 8:25-ap-01192-SC, because the payments from LPG on this loan were paid to Delphine Pastor, who is Laurent Reiss's wife.

Case 8:25-ap-01190-SC    Doc 39    Filed 01/15/26    Entered 01/15/26 18:12:06    Desc
Main Document    Page 11 of 84

60.     On information and belief, at approximately the time Laurent Reiss made the Loan to LPG, LPG was having a dispute with its payment processor, Marich Bein, and had no cash flow, and could not timely pay Laurent Reiss on the Loan.

61.     On information and belief, after LPG failed to timely make the payments on the Loan, Laurent Reiss became aware of the chaotic state of LPG's operations at that time.

## G.    LPG's Ponzi Scheme

62.     The Ponzi Scheme Presumption exists in bankruptcy proceedings.

63.     The Ponzi Scheme Presumption can be utilized to establish a debtor's "intent to defraud future undertakers [investors and lenders] from the mere fact that a debtor was running a Ponzi scheme.  Indeed, no other reasonable inference is possible.  A Ponzi scheme cannot work forever.  The investor pool is a limited resource and will eventually run dry.  The perpetrator must know that the scheme will eventually collapse as a result of the inability to attract new investors.  The perpetrator nevertheless makes payments to present investors, which, by definition, are meant to attract new investors.  He must know all along, from the very nature of his activities, that investors at the end of the line will lose their money.  Knowledge to a substantial certainty constitutes intent in the eyes of the law," *cf. Restatement (Second) of Torts § 8A* (1963 & 1964), and a debtor's knowledge that future investors will not be paid is sufficient to establish his actual intent to defraud them. *Kirkland v. Rund (In re EPD Inv. Co., LLC)*, 114 F.4th 1148, 1153 (9th Cir. 2024) (by definition Ponzi scheme is destined to fail and the swindler and their entities often end in bankruptcy or equitable receivership); *Cf. Coleman Am. Moving Servs., Inc. v. First Nat'l Bank & Trust Co. (In re American Properties, Inc.)* 14 B.R. 637, 643 (Bankr. D. Kan. 1981) (intentionally carrying out a transaction with full knowledge that its effect will be detrimental to creditors is sufficient for actual intent to hinder, delay or defraud within the meaning of § 548(a)(1))." *Merrill v. Abbott (In re Independent Clearing House Co.)* (D. Utah 1987) 77 B.R. 843, 860.

64.     "But if all the debtor receives in return for a transfer is the use of the defendant's money to run a Ponzi scheme, there is nothing in the bankruptcy estate for creditors to share.  In fact, by helping the debtor perpetuate his scheme, the transfers exacerbate the harm to creditors by increasing the amount of claims while diminishing the debtor's estate.  In such a situation, the use of

the defendant's money cannot objectively be called 'reasonably equivalent value.'" *In re Independent Clearing House Co.* 77 B.R. at 859. Therefore, "[t]he trustee can avoid the transfers if they were preferential or fraudulent. Transfers to investors in a Ponzi scheme are preferential and fraudulent. Therefore, they constitute "property of the estate," and the trustee can recover them. *Id.* at 853 n.17 (citations omitted).

65.    Diab used LPG to operate a Ponzi scheme that utilized Defendants and several other entities as investors, whether pursuant to unlawful fee-sharing agreements, cash investments, diversion of funds, or diversion of "loan" proceeds, to continue its unlawful business practices by using funds provided by current investors to attract new investors hoping for very high returns. Therefore, Diab was running a Ponzi scheme with LPG and the Ponzi Scheme Presumption can be utilized to infer that the Debtor had the intent to defraud investors within the meaning of 11 U.S.C. section 548(a)(1). This is evidenced by the Court in this Bankruptcy Case declaring that Debtor was operating a Ponzi scheme when it stated the following:

It is important to note that this Court has never received any significant and trustworthy evidence that Debtor accomplished meaningful results for its clients, but only anecdotal examples of viable success for its clients. By reviewing the Estate's claims register, there is evidence of consumer claims for the fraud and demanded but undelivered refunds of approximately $500 million. There is ample evidence that the pre-petition Debtor never placed the collected funds into an attorney-client trust account, and that Debtor or its principals simply looted the payments received through the client automatic withdrawals, stiffing both the clients and outside attorneys who may have been working on client cases with the hopes of being paid. There is also evidence before the Court that Debtor was running a Ponzi scheme and paying some outside (or "network") attorneys with funds obtained from new clients. In this case, it appears that some of the "lenders" may have been serving as "investors," hoping for very high returns before "the music stopped." The Ninth Circuit has recently explained, "[b]y definition, a Ponzi scheme is destined to fail because the pool of available investors is not limitless. When the Ponzi scheme operator's pool of investors inevitably runs dry, the scheme collapses and the swindler and their entities often end up in bankruptcy or equitable receivership. *See generally* David R. Hague, Expanding the Ponzi Scheme Presumption, 64 DePaul L. Rev. 867 (2015). In bankruptcy, the court-appointed trustee is tasked with taking immediate control of the entity, ceasing ongoing fraudulent activity, locating and collecting assets for the bankruptcy

12

Mᵉ CLAIRE NOTARI
HUISSIER
Albert 1ᵉʳ
MONACO ☎ +377 9...

or receivership estate, and achieving a final, equitable distribution of the remaining assets. *See* 11 U.S.C. § 704; *Kirkland v. Rund (In re EPD Inv. Co., LLC)*, 2024 U.S. App. LEXIS 21363, at *15 (9th Cir. Aug. 23, 2024). Finally, there is evidence that Debtor was encumbering (or as some creditors assert, "double or triple selling") their accounts or receivables to multiple lenders.

*See, Case 8:23-bk-10571-SC*, Doc 1545 n. 5.

66.    Moreover, since the Loan was made with the intent to further the Ponzi scheme, the Debtor did not receive an objectively reasonable equivalent value for the Loan, and the Trustee can avoid the Loan because it was fraudulent.

67.    The transactions between Defendants and the Debtor were loans, not the sales of receivables, and as such Defendants were serving as "investors," hoping for very high returns before "the music stopped."

68.    The debt evidenced by the Loan constitutes "unlawful debt" within the meaning of 18 U.S.C. § 1961(6); 18 U.S.C. § 1962(c); and 18 U.S.C. § 1962(d) because: (i) the debt is unenforceable under Federal or State law as to principal and/or interest because of laws relating to usury, and violates the applicable criminal usury statutes; and (ii) the debt was incurred in connection the business of lending money at rates usurious under Federal and State law, and the rates are more than the enforceable rate permitted under the usury laws of California.

69.    Under California law, unless a lender falls into one of the exemptions approved by the state legislature, it may not charge more than 10% interest per annum on a loan. Cal. Const. Art. XV § 1. An interest rate in excess of 10% is usurious, and if a lender negotiates a loan at a usurious rate absent a qualified exemption, the agreement shall be void and the lender will have no action at law to recover any interest. Cal. Civ. Code § 1916.2. *Dev. Acquisition Group, LLC v. eaConsulting, Inc.*, 776 F. Supp. 2d 1161 (E.D. Cal. 2011).

G.    **The Criminal Enterprise**

70.    Debtor's operations, activities and transfers done in furtherance of the Ponzi scheme, including those in conjunction with its affiliates and its dealings with Defendants, also constituted a criminal enterprise.

///

13

71.    This, too, is evidenced by the Court's order in the 1046 Action wherein it denied the Motion of Greyson Law Center to Vacate the Preliminary Injunction previously entered in Debtor's main case, and the Court offered the opinion:

> Through the various proceedings and evidence produced in both the main case and the various adversary proceedings, including but not limited to various Motions for Temporary Restraining Orders, Preliminary Injunctions, Motions to Dismiss, a Motion for Appointment of a Chapter 11 Trustee, a Motion to Sell Assets, a multitude of pleadings filed by both secured and unsecured creditors (supported by evidence presented under oath) in support of their claims, and especially the pleadings and evidence presented by the "Watchdog of the Bankruptcy System" aka the Office of the United States Trustee (an arm of the United States Department of Justice), *it is clear to this Court that Debtor, since its pre-petition inception (and through the time of the appointment of the Chapter 11 Trustee) was in the Court's opinion, operating a criminal enterprise.*

Case No. 8:23-bk-10571-SC; Adv. No. 8:23-ap-01046-SC [Bankr. Docket No. 1545, p.3 (emphasis in text)].

72.    As part of this criminal enterprise, Debtor and Defendants engaged in fraudulent transfers pursuant to the Loan. The Loan was made by MCA Fund ADV and/or LDR at unlawful usurious interest rates and the Transfers made pursuant to the Loan constituted wire fraud.

**H.    LPG's Prepetition Creditors**

73.    Debtor was insolvent when the Loan was made. This insolvency is evidenced in part by the fact that 14 separate UCC-1 statements were of record securing debts of the Debtor as of September 1, 2022. These statements remained unreleased as of the Petition Date. These statements either reflected alleged secured liens against the Debtor's assets then owned or thereafter acquired, or provided evidence of the assignment or sale of substantial portions of the Debtor's future income.

74.    Plaintiff directs Defendants to the Order Denying Greyson's Motion to Vacate the Preliminary Injunction entered as Bankr. Docket No. 1545 ("Order") where the Court found "it is clear to this Court that Debtor since its pre-petition inception (and through the time of the appointment of the Chapter 1 Trustee) was in the Court's opinion operating a criminal enterprise" and that "[t]here is also evidenced before the Court that the Debtor was running a Ponzi scheme and paying some

outside (or 'network') attorneys with funds obtained from new clients." Order p. 3, 1, 11-13; p. 4,1 14-15. Insolvency is presumed as a matter of law if the debtor operated a Ponzi scheme. *See, e.g., Glob. Money Mgmt., L.P. v. McDonald,* No. 06CV34, 2008 U.S. Dist. LEXIS 128733, at *15 (S.D. Cal. Feb. 27, 2008) (concluding that "if a Ponzi scheme is proven then the debtor is proven insolvent from the time of its inception").

75.    When the Loan was made, these prior UCC-1 statements secured the repayment of the following claimed amounts that are and are allegedly owed by the Debtor: (i) $2,374,004.82 owed to Fundura Capital Group as evidenced by Proof of Claim No. 335 purportedly secured by a UCC statement filed on or about May 19, 2021; (ii) approximately $15 million dollars owed to MNS Funding, LLC as evidenced by Proof of Claim No. 1060 purportedly secured by a UCC statement filed on or about May 28, 2021; (iii) approximately $5,000,000 owed to Azzure Capital, LLC as evidenced by Proof of Claim No. 127 secured by a UCC statement filed on or about May 28, 2021; and (iv) approximately $1.5 million dollars owed to Diverse Capital, LLC purportedly secured by UCC statements filed on or about September 15, 2021, and December 1, 2021.[2]

76.    As alleged above, Diab was cause LPG to borrow against its assets and future income, often on unfavorable terms, not only to finance operations at LPG, but also to pay the fees owed to the marketing affiliates for providing consumer clients, to pay other loans to creditors that were in default or about to be in default as part of Diab's scheme to keep LPG creditors at bay for a long as possible until he could transfer LPG's assets, client files, Client Funds, and ACH Receivables to other entities under his control. Pursuant to the agreements with the marketing companies, significant percentages of future payments were already promised to be paid to the marketing affiliates from whatever future income the Debtor would receive.

77.    In addition, on Debtor's Schedule E/F [Bankr. Docket No. 33], Debtor scheduled 11 unsecured creditors with priority unsecured claims totaling $374,060.04. These priority unsecured creditors include Indiana Dept. of Revenue, Dept. of Labor and Industries, Arizona Dept. of Economic Security, Arkansas Dept. of Finance & Admin., California Franchise Tax Board, Georgia Dept. of

_____

[2] Trustee reserves all rights, claims, and defenses with respect to these and any other purported secured or unsecured claims.

15

Labor, Internal Revenue Service, Mississippi Dept. of Revenue, Nevada Dept. of Taxation, Utah State Tax Commission, and Wisconsin Dept. of Revenue (collectively, "Priority Unsecured Creditors").

78.    Another group of creditors that Debtor listed on its Schedule E/F [Bankr. Docket No. 33] are nonpriority unsecured creditors. Those 58 creditors have scheduled claims totaling $141,439,158.05 and include Ajilon; Anthem Blue Cross; Azevedo Solutions Groups, Inc.; Carolina Technologies & Consulting Invoice; Collaboration Advisors; Credit Reporting Service Inc.; CT Corporation – Inv.; Debt Pay Pro; Document Fulfillment Services; EnergyCare, LLC; Exela Enterprise Solutions; First Legal Network, LLC; GHA Technologies Inc.; Harrington Electric, Inc.; Imagine Reporting; Juize, Inc.; Krisp Technologies, Inc.; Liberty Mutual; Marc Lemauviel – Allegra; MarkSYS Holdings, LLC; Netsuite-Oracle; Pitney Bowes; Rapid Credit, Inc.; SBS Leasing A Program of De Lage Landen; Security Solutions; Sharp Business Systems; Streamline Performance, Inc.; Thomson Reuters; Twilio, Inc.; Nationwide Appearance Attorneys; Executive Center, LLC; Outsource Accelerator, Ltd.; TaskUs Holdings, Inc.; Marich Bein, LLC; Validation Partners; MC DVI Fund 1, LLC; MC DVI Fund 2, LLC; Debt Validation Fund II, LLC; Tustin Executive Center; LexisNexus; JP Morgan Chase; Business Centers of America; Michael Schwartz; Anibal Colon Jr.; Kathleen Lacey; David Ulery; Kimberly Birdsong; Kevin Carpenter; Karen Suell; Gloria Eaton; Carolyn Beech; Debra Price; Kenneth Topp; Darcey Williamson, Trustee; James Hammett; Johnny Rizo; Beverly Graham; Kathleen Scarlett; and Geneve and Myranda Sheffield (collectively, "Nonpriority Unsecured Creditors" and, together with the Secured Creditors and Priority Unsecured Creditors, "Prepetition Creditors").

79.    As of the filing of this complaint, approximately 5,771 claims have been filed with the bankruptcy Court. While Trustee has not reviewed all claims as of the date of this complaint, and reserves all rights to object to those claims, the total amount is in excess of $717,507,462.29. Debtor's profit and loss statements reflect at least $115,000,000 of "Total Income" for the three-year period ending December 31, 2021, and based on information and belief that a substantial portion of this income had not actually been earned by Debtor. Proper accounting treatment of this unearned "income" would have been to record the unearned portion as cash received in client trust or IOLTA bank account with an offsetting client retainer liability account in the same amount. Thus, the

16

unearned portion of the income would be present only on the balance sheet and not on Debtor's profit and loss statement. Debtor's balance sheets reflect two trust accounts, the highest balance of which was approximately $346,000 in November 2021. The balance sheets do not reflect a client retainer liability account. Thus, it appears that Debtor overstated its income during the three years ending December 31, 2021, though the extent to which it is overstated remains unknown. Further, assuming (as it appears to be the case) Debtor did not properly record its unearned income on its balance sheets using a trust account and offsetting client retainer liability account then Debtor's assets and liabilities on those balance sheets would be inaccurate.

80.    Additionally, just because Debtor had incoming cash that does not necessarily mean it was solvent. Based on information and belief,[investors] Debtor's incoming cash was related to unearned income and should have been held in an appropriate trust account and recorded on its balance sheet with an offsetting client retainer payable account until it was earned. This treatment is further reinforced as appropriate by the fact that Debtor offered its clients a refund for unearned income. Thus, Debtor's incoming cash neither increased its assets (due to the offsetting client retainer liability in the same amount) nor would it increase its profitability until services were rendered and the income was actually earned.

81.    Debtor's balance sheets for the 36 months ending December 31, 2021 show only approximately $17,900,000 in total assets (primarily comprised of accounts receivable and merchant loans receivable) at its highest point in November 2021. Obviously, this amount is significantly less than the $700,000,000 of claims filed, further evidencing Debtor's state of insolvency.

**FIRST CLAIM FOR RELIEF**

**Count I - Avoidance, Recovery, and Preservation of Actual Fraudulent Transfers**

**[11 U.S.C. §§ 548, 550, and 551]**

**[Against All Defendants]**

82.    Plaintiff realleges and incorporates herein by reference each and every allegation contained in paragraphs 1 through 81 as though set forth in full.

///

///

17

83.   The Loan Documents were executed within two years prior to the Petition Date.

84.   LPG received nothing in exchange for the Transfers to Laurent Reiss, who was not a party to the Loan.

85.   LPG was insolvent when Diab caused it to execute the Loan Documents in February 2023 because its debts exceeded the fair market value of its assets at all relevant times.

86.   The execution of the Loan Documents, and the incurring of the obligations thereunder, happened while Debtor was insolvent or rendered Debtor insolvent.

87.   On or after the date that the Loan Documents were executed, entities to which Debtor was or became indebted include the Prepetition Creditors.

88.   The Debtor made the Transfers to Laurent Reiss even though the Debtor was obligated MCA Fund ADV and/or LDR—not Reiss—under the terms of the Loan Documents.

89.   The Debtor entered into the Loan with actual intent to hinder, delay, or defraud creditors of Debtor.

90.   The Debtor was operating a Ponzi scheme and the Ponzi Scheme Presumption can be utilized to infer the Debtor's actual intent to defraud within the meaning of 11 U.S.C. § 548(a)(1).

91.   Defendants' conduct relating to the Transfers was done with oppression, fraud and malice, as defined in California Civil Code section 3294, entitling Plaintiff to exemplary and punitive damages.

92.   The execution of the Loan Documents is avoidable as fraudulent pursuant to 11 U.S.C. §§ 544, 548(a)(1)(A), 550, and 551, and the common law tort of intentional fraudulent transfers by one or more creditors who held and hold unsecured claims against Debtor that were and are allowable against its Estate under 11 U.S.C. § 502 or that were not and are not allowable only under 11 U.S.C. § 502(e), including, without limitation, the Prepetition Creditors.

93.   The execution of the Loan Documents, and the incurring of the obligations thereunder, should be avoided as fraudulent under 11 U.S.C. § 548(a)(1)(A) and under the common law tort of intentional fraudulent transfers, and such transferred property, or the value thereof, should be recovered and preserved for the benefit of the Estate pursuant to 11 U.S.C. §§ 550 and 551.

///

## SECOND CLAIM FOR RELIEF

### Count II - Avoidance, Recovery, and Preservation of Constructive Fraudulent Transfers

### [11 U.S.C. §§ 544, 548(a)(1)(B), 550, and 551]
### [Against All Defendants]

94.      Plaintiff realleges and incorporates herein by reference each and every allegation contained in paragraphs 1 through 93 as though set forth in full.

95.      The Loan Documents were executed within two years prior to the Petition Date.

96.      The execution of the Loan Documents, and the incurring of the obligations thereunder, happened while Debtor:

a.      was insolvent or became insolvent as a result;

b.      was engaged or was about to engage in a transaction for which any property remaining with Debtor was of unreasonably small capital; or

c.      intended to incur, or believed that it would incur, debts beyond its ability to pay as such debts matured.

97.      The Debtor received less than reasonably equivalent value of the Transfers because it made the Transfers to Laurent Reiss, who was not a party to the Loan Documents.

98.      Furthermore, even if the Transfers were somehow deemed to be repayments of the Loan, the Debtor did not receive the reasonable equivalent value of the Transfers to MCA Fund ADV and LDR because by using MCA Fund ADV and LDR's money to run a Ponzi scheme there is nothing in Estate for the creditors to share and no benefit to the estate. Rather, the Transfers exacerbated the harm to creditors by increasing the amount of claims while diminishing the Debtor's Estate.  In this situation, the use of the MCA Fund ADV and LDR's money to further the Debtor's and Diab's Ponzi scheme cannot be consideration for the Transfers and cannot objectively be called reasonably equivalent value.

99.      MCA Fund ADV and LDR were acting as investors in the Debtor's Ponzi scheme.

100.      The execution of the Loan Documents, and the incurring of the obligations thereunder, should be avoided as fraudulent under 11 U.S.C. § 548(a)(1)(B), and such transferred property, or the

value thereof, should be recovered and preserved for the benefit of the Estate pursuant to 11 U.S.C. §§ 550 and 551.

## THIRD CLAIM FOR RELIEF

### Count III - Avoidance, Recovery, and Preservation of Actual Fraudulent Transfers

### [11 U.S.C. §§ 544(b), 550, and 551; CAL. CIV. CODE §§ 3439.04(b), and 3439.07]

### [Against All Defendants]

101.    Plaintiff realleges and incorporates herein by reference each and every allegation contained in paragraphs 1 through 100 as though set forth in full.

102.    The Loan Documents were executed within four years prior to the Petition Date.

103.    On or after the date that such documents were executed, entities to which Debtor was or became indebted include the Prepetition Creditors.

104.    The execution of the Loan Documents, and the incurring of the obligations thereunder, happened while Debtor was insolvent or Debtor became insolvent shortly after the Loan Documents were executed is evidenced by the filing of the voluntary petition.

105.    The Debtor did not receive reasonably equivalent value in exchange for executing the Loan Documents because the Loan was used to further assist Diab in the Ponzi scheme.

106.    The Debtor entered into the Loan with actual intent to hinder, delay, or defraud creditors of Debtor.

107.    The Debtor's conduct was done with oppression, fraud, and malice, as defined in Civil Code section 3294, based on the Ponzi Scheme Presumption, entitling the Trustee to, in addition to the actual damages, exemplary and punitive damages.

108.    The Loan Documents are avoidable as fraudulent pursuant to 11 U.S.C. § 544(b) and Cal. Civ. Code §§ 3439.04(a), 3439.04(b), and 3439.07 by one or more creditors who held and hold unsecured claims against Debtor that were and are allowable against the Estate under 11 U.S.C. § 502 or that were not allowable only under 11 U.S.C. § 502(e) including, without limitation, the Prepetition Creditors.

109.    Accordingly, the Loan Documents, and the incurring of the obligations thereunder, should be avoided as fraudulent under 11 U.S.C. §§ 544(b) and CAL. CIV. CODE §§ 3439.04(a) and

3439.07, and under the common law tort of intentional fraudulent transfers, and such transferred property, or the value thereof, should be recovered and preserved for the benefit of the Estate pursuant to 11 U.S.C. §§ 550 and 551 and CAL. CIV. CODE § 3439.07.

### FOURTH CLAIM FOR RELIEF

**Count IV - Avoidance, Recovery, and Preservation of Constructive Fraudulent Transfers**

**[11 U.S.C. §§ 544(b), 550, and 551; CAL. CIV. CODE §§ 3439.05, and 3439.07]**

**[Against All Defendants]**

110.    Plaintiff realleges and incorporates herein by reference each and every allegation contained in paragraphs 1 through 109 as though set forth in full.

111.    The Loan Documents were executed within four years prior to the Petition Date.

112.    The execution of the Loan Documents, and the incurring of the obligations thereunder, happened while Debtor:

a.    was insolvent or became insolvent as a result;

b.    was engaged or was about to engage in a transaction for which any property remaining with Debtor was of unreasonably small capital; or

c.    intended to incur, or believed that it would incur, debts beyond its ability to pay as such debts matured.

113.    Furthermore and objectively, the Debtor did not receive reasonably equivalent value for the Loan because, by Debtor's use of money received from Defendants to run the Ponzi scheme, there is nothing left in the Estate for the creditors to share and no benefit to the Estate. Instead, the Loan exacerbated the harm to creditors by increasing the amount of claims thereby diminishing the Debtor's Estate.

114.    Accordingly, the execution of the Loan Documents, and the incurring of the obligations thereunder, should be avoided pursuant to 11 U.S.C. §§ 544(b) and CAL. CIV. CODE §§ 3439.05 and 3439.07, and such transferred property, or the value thereof, should be recovered and preserved for the benefit of the Estate pursuant to 11 U.S.C. §§ 550 and 551 and CAL. CIV. CODE § 3439.07.

///

## FIFTH CLAIM FOR RELIEF

**Count V - Avoidance, Recovery, and Preservation of Unauthorized Post-Petition Transfers**

**[11 U.S.C. §§ 549, 550, and 551]**

**[Against All Defendants]**

115.   Plaintiff realleges and incorporates herein by reference each and every allegation contained in paragraphs 1 through 114 as though set forth in full.

116.   Under 11 U.S.C. § 549(a), the trustee may avoid a transfer of property of the estate that occurs after the commencement of the case and that is not authorized by the court with jurisdiction over the Bankruptcy Estate.

117.   The Transfers were transfers of an interest in property of the Debtor.

118.   Laurent Reiss received the Transfers in the amount of at least $1,710,000 after the Petition Date.

119.   The Transfers were not authorized under the Bankruptcy Code or by the Court.

120.   The Transfers are avoidable transfers pursuant to 11 U.S.C. § 549(a).

121.   Section 550 of the Bankruptcy Code provides that if a transfer is avoided under section 549 of the Bankruptcy Code, Plaintiff may recover the property or the value of the property transferred from the initial transferee, the entity for whose benefit the transfers were made, or any immediate or mediate transferee of the initial transferee.

122.   Laurent Reiss is the initial transferee.

123.   Defendants MCA Fund ADV and LDR are the entities for whose benefit the Transfers were made.

124.   In accordance with the foregoing, the Transfers are avoidable transfers pursuant to 11 U.S.C. § 549(a), and may be recovered and preserved for the benefit of the Estate pursuant to 11 U.S.C. §§ 550 and 551.

///

///

///

///

Case 8:25-ap-01190-SC   Doc 39   Filed 01/15/26   Entered 01/15/26 18:12:06   Desc
Main Document    Page 23 of 84

## SIXTH CLAIM FOR RELIEF

### Conversion

### [11 U.S.C. §§ 541; California Common Law]

125.    Plaintiff realleges and incorporates herein by reference each and every allegation contained in paragraphs 1 through 124 as though set forth in full.

126.    Defendants have possession or control over property of Debtor in the form of the Transfers and other property of Debtor, made illegal pursuant to illegal and unenforceable agreements and/or business operations.

127.    The Transfers are not of inconsequential value to the Estate.

128.    At all material times, Debtor had rightful ownership and a right to possession and control of its assets.

129.    Defendants unlawfully converted Debtor's assets in the form of the Transfers and other property of the Debtor, by their wrongful execution of unlawful agreements and fraudulent transfers of assets resulting in a disposition of Debtor's possession and control over these assets.

130.    Debtor sustained damages as a result of Defendants' unlawful dominion and control over assets to which Debtor had a right of possession.

131.    Accordingly, Trustee is entitled to a judgment for conversion of the Transfers and any other property belonging to the Debtor which Defendants unlawfully converted to their own use, pursuant to 11 U.S.C. § 541 and California common law.

## SEVENTH CLAIM FOR RELIEF

### Participating in Scheme to Continue to Deepen LPG's Continuing Insolvency

### Against Defendants

### [11 U.S.C. § 541; California Common Law]

132.    Plaintiff realleges and incorporates herein by reference each and every allegation contained in paragraphs 1 through 131 as though set forth in full.

133.    As set forth herein, Defendants were recruited by Diab and/or representatives of LPG to participate in, further, and advance the Diab Ponzi Scheme designed and orchestrated to deplete the assets of LPG and deepen LPG's continuing insolvency.

134. Defendants have engaged in a pattern and course of conduct, including the execution of and entry into unlawful agreements and/or unlawful operations, and the receipt of transfers of assets of the Debtor, which resulted in direct harm to Debtor.

135. Defendants acted in furtherance of the Ponzi scheme by making loans to LPG with usurious interest rates all in furtherance of Diab's Ponzi scheme. These actions converted assets of LPG to Defendants and others, and significantly contributed to the deepening insolvency of Debtor, resulting in exacerbating damage claims of third parties vis-à-vis LPG.

136. Accordingly, Trustee is entitled to a judgment for deepening insolvency of the Debtor in the amount of at least the sum of the Transfers and any other property belonging to the Debtor which Defendants unlawfully converted to their own use, pursuant to 11 U.S.C. § 541 and California common law.

## EIGHTH CLAIM FOR RELIEF

### Aiding and Abetting

### Against Defendants

### [11 U.S.C. §541; California Common Law

137. Plaintiff realleges and incorporates herein by reference each and every allegation contained in paragraphs 1 through 136 as though set forth in full.

138. Laurent Reiss's possession or control over property of the Estate, including, but not limited to the Transfers made pursuant to the Loan Documents that were drafted to perpetuate and conceal the Ponzi Scheme and fraudulent transfers.

139. Defendants had knowledge of the fraudulent transactions, transfers and illegal and unenforceable agreements, including the Loan Documents, that were used to perpetuate and conceal the Ponzi scheme and fraudulent transfers. Defendants' knowledge is evidenced by, among other things, the facts described at ¶¶ 48-61 herein and as otherwise alleged in this complaint.

140. Defendants, with the foregoing knowledge, intended to, and did, help Diab and other scheme participants in perpetuating and concealing the Ponzi scheme and fraudulent transfers of money, causing injury to Debtor. Laurent Reiss's specific knowledge is evidenced by, among other things, the facts described at ¶¶ 48-61 herein and as otherwise alleged in this complaint.

24

141. At all material times, Defendants had the intent to facilitate and conceal the Ponzi scheme and fraudulent transfers of money by aiding and abetting the illegal capping scheme and signing up consumer clients to keep the business operations of LPG and the Ponzi Scheme going.

142. Concealing the true nature of the Ponzi Scheme was paramount to being able to continue to rely on its operation to receive fraudulent transfers of money at Debtor's expense.

143. Without an intent to facilitate and conceal the Ponzi scheme and fraudulent transfers of money by aiding and abetting the illegal capping scheme, Defendants would no longer receive the benefits of said transfers and had a vested interest in keeping the Ponzi scheme moving forward for as long as he possibly could.

144. Defendants assisted, and did actually engage in, Diab's commission of fraud and the Ponzi scheme by coordinating, facilitating, and directing payments and transfers of LPG monies and executing documents in furtherance of concealing the true nature of their fraudulent and criminal activity related to the Ponzi scheme, causing injury to Debtor.

145. The injuries to Debtor directly, proximately and reasonably foreseeably resulting from and caused by these fraudulent transfers and Ponzi scheme include, without limitation, in excess of one million dollars in improperly transferred and acquired monies and the continuation of the criminal enterprise.

146. LPG incurred an overwhelming amount of debt resulting from the Ponzi Scheme. The payments LPG made to Reiss, and demands for further payments, caused LPG to seek out additional streams of income and investments, thereby perpetuating the fraud and deepening LPG's insolvency. Due to the involvement of the Defendants in the Ponzi Scheme, LPG continued to incur far greater debt that it could possibly repay.

147. Defendants furthered the deepening insolvency of LPG by engaging in the Ponzi Scheme. Defendants did so with knowledge that LPG was likely already insolvent. This knowledge is evidenced by, among other things, Laurent Reiss's knowledge that LPG was failing to pay its clients and customers whose accounts were being looted. Laurent Reiss understood the issues faced by LPG affiliates with their own sales floor as he operated such a floor in furtherance of the Diab Ponzi

scheme. By aiding and abetting Diab's Ponzi Scheme, the Defendants delayed LPG's filing for bankruptcy and caused direct injury to LPG by deepening its insolvency.

148. Defendants' continued actions in furtherance of the Ponzi scheme specifically resulted in the deepening insolvency of LPG based on the specific funds which were diverted to Laurent Reiss without any benefit received by LPG.

149. The deepening insolvency of LPG caused by Defendants resulted in LPG incurring a direct harm independent of the harm to its creditors as the harm was not limited to an inability to pay creditors, but extended far deeper into a larger inability to operate as a going concern and continue business operations of any kind whatsoever due to the depletion of resources caused by the Diab Ponzi scheme and Defendants' aiding and abetting of the same.

150. Due to Defendants' aiding and abetting Diab's Ponzi Scheme, Diab caused LPG to engage in the wrongful expenditure of corporate assets thereby prolonging LPG's life through bad debt and causing the dissipation of corporate assets.

151. The property, including but not limited to the Transfers are not of inconsequential value to the Debtor and recovering these funds is paramount to rectifying Debtor's injury.

152. Plaintiff and the Debtor also suffered damages by incurring attorney's fees and costs associated with the prosecution of Defendants' unlawful activities.

153. Defendants, upon information and belief, assisted, and did actually engage in, the commission of fraud and the scheme by coordinating, facilitating, and directing payments and transfers of monies and executing documents in furtherance of concealing the true nature of their fraudulent and criminal activity related to the scheme.

154. "Under the Bankruptcy Code, 'all legal or equitable interests to the debtor in property as of the commencement of [a bankruptcy] case' belong to the bankruptcy estate created at the debtor's filing of the bankruptcy petition." *Bercy v. City of Phx.*, 103 F.4th 591, 594 (9th Cir. 2024) (citing 11 U.S.C. § 541(a)(1)). "A claim belonging to the debtor at the time of the bankruptcy filing is such a property interest." *Id.* "The scope of section 541 is broad, and includes causes of action." *Sierra Switchboard Co. v. Westinghouse Elec. Corp.*, 789 F.2d 705, 707 (9th Cir. 1986) (citing *United States v. Whiting Pools, Inc.*, 462 U.S. 198, 205 & n. 9 (1983)).

26

155. "California imposes liability 'on one who aids and abets the commission of an intentional tort if the person (a) knows the other's conduct constitutes a breach of duty and gives substantial assistance or encouragement to the other to so act or (b) gives substantial assistance to the other in accomplishing a tortious result and the person's own conduct, separately considered, constitutes a breach of duty to the third person.'" *Berger v. Varum*, 35 Cal. App. 5th 1013, 1025 (2019).

156. California recognizes fraud as an intentional tort. *See e.g., Hensley v. McSweeney*, 90 Cal. App. 4th 1081, 1085 (2001) ("Fraud is an intentional tort; it is the element of fraudulent intent, or intent to deceive, that distinguishes it from actionable negligent misrepresentation and from nonactionable innocent misrepresentation.").

157. To be clear, the Trustee is alleging that the Defendants aided and abetted in commission of the following intentional torts: (1) fraud; (2) commission of a fraudulent transfer; and (3) conversion.

158. Defendants, primarily Laurent Reiss, were aware or should have been aware of the intentional torts while Laurent Reiss was being recruited to work with LPG and/or while continuing to work with LPG, and, as a result, every transfer made to Reiss pursuant to Defendants' continued business dealings with LPG were with Defendants' knowledge that they constituted a fraudulent transfer of LPG's assets in furtherance of the scheme.

159. The harm alleged herein was to the Debtor and the result of Defendants' participation, direction, and concerted effort with Diab to advance the Ponzi scheme and the fraudulent conduct outlined herein to the detriment of the Debtor. Stated differently, the Trustee alleges that Defendants' participation, direction, and concerted effort with Diab in furtherance of the Ponzi scheme aided and abetted the fraudulent Ponzi scheme orchestrated by Diab.

160. Defendants substantially assisted in the furtherance of the Ponzi scheme entering into agreements, including the Loan Documents, with LPG through which Laurent Reiss would receive and continue to receive a stream of money from the Debtor thereby facilitating the prolonged operation of the Ponzi scheme. These actions converted assets of LPG to Laurent Reiss and

27

significantly contributed to the deepening insolvency of Debtor, resulting in exacerbating damage claims of third parties vis-à-vis LPG.

161.    Defendants substantially assisted Diab in defrauding Debtor by entering into various unlawful agreements, including the Loan Documents, with Debtor to effectuate and advance the Ponzi scheme and caused Laurent Reiss to receive transfers of Debtor's assets pursuant to the terms of these unlawful agreements, including the Loan Documents.

162.    Defendants substantially assisted in the tort of fraudulent transfer as the transfers of Debtor's assets to Laurent Reiss pursuant to the unlawful agreements, including the Loan Documents at the direction of Diab constitute fraudulent transfers.

163.    Defendants substantially assisted in the tort of conversion as Diab exercised wrongful dominion of assets belonging to Debtor by unlawfully transferring these assets to Laurent Reiss pursuant to unlawful agreements entered into by Defendants.

164.    The conduct of Defendants in continuing to perform under the illegal agreements set forth herein provided the groundwork for Diab to carry out the continued operation of his Ponzi scheme and siphon funds away from LPG to its detriment.

165.    But-for Defendants and other similarly situated business partners of Diab, the unlawful Ponzi scheme would not and could not continue to operate as intended by Diab.

166.    With the performance of the agreements, including the Loan Documents, Defendants' actions directly and specifically deepened the insolvency of the debtor as each fraudulent transfer of LPG's assets to Laurent Reiss further deepened the insolvency of the Debtor into a position where Debtor could no longer carry out ordinary business functions and operate as a going concern. Defendants' participation in the Diab Ponzi scheme thereby resulted in a direct harm to the Debtor which could be specifically traced back to the Defendants based on the amount of each of the fraudulent transfers received by Laurent Reiss.

167.    Because the instant claim for aiding and abetting alleges direct harm to the debtor, and is not a derivative state law creditor claim, pursuant to 11 U.S.C. § 541(a)(1)), the Trustee has standing to pursue this claim against the Defendants in this Adversary Proceeding. *See e.g., Huntsberger v. Umpqua Holdings Corp (In re Berjac of Or.)*, 538 B.R. 67, 82 (D. Or. 2015) ("Here, plaintiff argues

that by aiding and abetting, acting in concert with, and/or conspiring with the Holcombs and others, the bank defendants caused debtor to incur indebtedness to new investors that it had no ability to pay. Consequently, because the Ninth Circuit recognizes that prolonging a debtor's life through bad debt constitutes a cognizable harm to debtor, and plaintiff alleges that the bank defendants caused debtor to incur indebtedness to new investors that it could not pay, thereby, prolonging debtor's life through bad debt, this Court finds that plaintiff has standing to bring its third claim.").

168.    The Trustee bases the foregoing claims in its Amended Complaint on the standing conferred under 11 U.S.C. § 541(a)(1), and does not assert any basis for these claims under 11 U.S.C. § § 544(b), 550, or 551.

## NINTH CLAIM FOR RELIEF

### Turnover of Estate Property

### Against Defendants

### [11 U.S.C. § 542]

169.    Plaintiff realleges and incorporates herein by reference each and every allegation contained in paragraphs 1 through 168 as though set forth in full.

170.    Laurent Reiss has possession or control over property of the Estate in the form of the Transfers made pursuant to illegal and unenforceable agreements, including the Loan Documents.

171.    The Transfers are not of inconsequential value to the Estate.

172.    The funds that are the subject of the Transfers are paramount to Debtor's ability to pay creditors.

173.    Accordingly, Trustee is entitled to a judgment for turnover of the Transfers pursuant to 11 U.S.C. § 542.

## TENTH CLAIM FOR RELIEF

### Declaratory Relief

174.    Plaintiff realleges and incorporates herein by reference each and every allegation contained in paragraphs 1 through 173 as though set forth in full.

175.    An actual controversy exists between Plaintiff and Defendants regarding the enforceability of the Loan.

29

176.    Plaintiff contends that the Loan is void and unenforceable; the interest rates charged in the Loan are usurious; the law that applies in determining the usurious nature of the agreements is California law and/or federal law; and the Transfers made pursuant to the Loan constitute wire fraud. Defendants dispute each of Plaintiff's contentions.

177.    A judicial determination of the rights, duties and obligation of Plaintiff and Defendants, therefore, is appropriate.

## RESERVATION OF RIGHTS

178.    Plaintiff reserves the right to bring all other claims or causes of action that Plaintiff may have against defendants, on any and all grounds, as allowed under the law or in equity, including but not limited to, those claims not known by the Trustee at this time but that he may discover during the pendency of this adversary proceeding.

## PRAYER FOR RELIEF

WHEREFORE, Plaintiff prays for a judgment as follows:

**On the First, Second, Third, and Fourth Claims for Relief:**

A.    Avoiding the Loan and related obligations as unenforceable against the Estate;

**On the First and Third Claims for Relief:**

B.    Awarding punitive and exemplary damages according to proof;

**On the Fifth Claim for Relief:**

C.    Avoiding, recovering, and preserving the Transfers against Defendants;

**On the Sixth, Seventh, and Eighth Claims for Relief:**

D.    Awarding Plaintiff monetary damages in the total aggregate amount of not less than $1,710,000.00;

E.    Awarding costs of suit, including attorneys' fees;

**On the Ninth Claim for Relief:**

F.    Ordering Defendants to immediately turn over the property of the estate, including, but not limited to, the Transfers;

///

///

30

**On the Tenth Claim for Relief:**

G.   Declaring that the Loan is void and unenforceable, the interest rates charged in the Note are usurious, the law that applies in determining the usurious nature of the interest rates is California law and/or federal law; and the Transfers made pursuant to the Loan constitute wire fraud;

**On All Claims for Relief:**

H.   Awarding costs of suit;

I.   Awarding punitive damages;

J.   Awarding attorneys' fees;

K.   Awarding pre-judgment interest at the maximum legal rate running from the date of the Complaint to the date of judgment herein;

L.   Awarding post-judgment interest at the maximum legal rate running from the date of judgment herein until the date the judgment is paid in full, plus costs;

M.   Requiring Laurent Reiss to pay forthwith any judgment awarded herein; and

N.   Granting Plaintiff such other and further relief as the Court deems just and proper.

Dated:  January 15, 2026

Respectfully submitted,

DINSMORE & SHOHL LLP

By:  /s/ Christopher Celentino
     Christopher Celentino
     Yosina M. Lissebeck
     Christopher Ghio
     Jacob R. Bothamley
Attorneys to Richard A. Marshack,
Trustee of the LPG Liquidation Trust

31

Case 8:25-ap-01190-SC    Doc 39    Filed 03/18/26    Entered 03/18/26 18:04:36    Desc
Main Document         Page 32 of 84

# EXHIBIT 1

CHRISTOPHER B. GHIO (259094)
christopher.ghio@dinsmore.com
CHRISTOPHER CELENTINO (131688)
christopher.celentino@dinsmore.com
YOSINA M. LISSEBECK (201654)
yosina.lissebeck@dinsmore.com
DINSMORE & SHOHL LLP
655 West Broadway, Suite 800
San Diego, California 92101
Tele:  619.400.0500
Fax:  619.400.0501

Sarah S. Mattingly (Ky. Bar 94257)
sarah.mattingly@dinsmore.com
DINSMORE & SHOHL, LLP
101 S. Fifth Street, Suite 2500
Louisville, Kentucky 40202
Tele: 859-425-1096
Fax: 502-585-2207
(Admitted pro hac vice)

Special Counsel to Richard A. Marshack

FILED & ENTERED

JUN 03 2024

CLERK U.S. BANKRUPTCY COURT
Central District of California
BY mccall    DEPUTY CLERK

# UNITED STATES BANKRUPTCY COURT

## CENTRAL DISTRICT OF CALIFORNIA – SANTA ANA DIVISION

In Re

The Litigation Practice Group P.C.,

          Debtor(s),

Case No: 23-bk-10571-SC

Chapter 11

**ORDER GRANTING MOTION FOR ENTRY OF PROTECTIVE ORDER AND THE PROTECTIVE ORDER**

Date:    May 23, 2024
Time:    1:30 p.m.
Judge:   Hon. Scott C. Clarkson
Place:   Courtroom 5C (via Zoom)[1]
       411 West Fourth Street
       Santa Ana, CA 92701

---

[1] Video and audio connection information for each hearing will be provided on Judge Clarkson's publicly posted hearing calendar, which may be viewed online at:
http://ecf-ciao.cacb.uscourts.gov/CiaoPosted/?jid=SC.

Exhibit 1, Page 32

The Court has read and considered the Notice of Motion and Motion for Entry of Protective Order (the "Motion") filed by Richard A. Marshack, in his capacity as the Chapter 11 Trustee (the "Trustee") of the Bankruptcy Estate ("Estate") of The Litigation Practice Group P.C., on May 2, 2024, pursuant to Federal Rule of Bankruptcy Procedure 7026 and Federal Rule of Civil Procedure 26(c)(1), as Dk. No. 1164 ("Motion"), and has found good cause to grant the Motion.

IT IS HEREBY ORDERED that:

1. The Motion is granted;

2. The below Protective Order shall apply to any contested matter arising in the main bankruptcy case and in all adversary proceedings filed by or against Trustee, present and future; and

3. Govern the discovery conducted therein.

## PROTECTIVE ORDER

### 1. DEFINITIONS

1.1 "Confidential Information" as used in this Protective Order shall mean documents and other information (regardless of how generated, stored or maintained) that a Party or non-party reasonably believes to contain or reflect non-public financial or business information, bank records, financial records, such as social security numbers, non-public financial or personal information of a Party or non-party, account numbers, sensitive digital information and identifiers, information subject to confidentiality agreements or provisions other than this Protective Order, and other non-public research, development, or commercial information that derives value or avoids injury by virtue of not being known to the public.

1.2 This "Action" is defined and hereby means any contested matter arising in the main bankruptcy case and in all adversary proceedings filed by or against Trustee, present and future.

1.3 "Designating Party" means a Party or non-party that designates Confidential Information during the Action.

1.4 "Receiving Party" means a Party that receives Confidential Information during the Action.

2

Exhibit 1, Page 33

1.5    "Party" or "Parties" means person or entity subject to this Protective Order.

2.    **SCOPE OF THIS PROTECTIVE ORDER**

2.1    Unless otherwise ordered, this Protective Order shall govern certain documents and other products of discovery obtained in the Action from the Parties there to, and from third parties. As well as certain information copied or derived therefrom, excerpts, summaries or compilations thereof, including, but not limited to, documents voluntarily exchanged as part of early settlement discussions, documents produced pursuant to initial disclosures, requests authorized by the Federal Rules of Civil Procedure made applicable herein by the Federal Rules of Bankruptcy Procedure, answers to interrogatories, deposition transcripts, responses to requests for production, responses to requests for admission, subpoenas, affidavits, declarations, expert reports, and other such material and information as may be produced during the course of the Action and designated as Confidential Information.

3.    **DESIGNATION OF CONFIDENTIAL INFORMATION**

3.1    This Protective Order shall govern the production and handling of any Confidential Information in this Action. Any Party or non-party who produces Confidential Information in this Action may designate it as "Confidential" or "Attorneys' Eyes Only" consistent with the terms of this Protective Order. Whenever possible, the Designating Party must designate only those portions of a document, written discovery responses, deposition, transcript, or other material that contain the Confidential Information and refrain from designating entire documents. Regardless of any designations made hereunder, the Designating Party is not otherwise restricted from use or disclosure of its Confidential Information outside of this Action or for any business purposes. In addition, any Party may move to modify or seek other relief from any of the terms of this Protective Order if it has first tried in writing and in good faith to resolve its needs or disputes with the other Parties or Party as the case may be under the terms of this Protective Order. Further, nothing in this Protective Order shall prevent a Party from redacting documents consistent with the Federal Rules of Civil Procedure and utilizing the documents as needed through-out the Action.

3.2    Application to Non-Parties: Before a non-party is given copies of documents or materials designated as Confidential Information or Attorneys' Eyes Only as permitted hereunder, it

3

Exhibit 1, Page 34

Case 8:25-ap-01190-SC   Doc 290   Filed 03/06/24   Entered 03/06/24 13:04:08   Desc
Main Document     Page 36 of 84

must first sign an acknowledgment to be bound to these terms that is attached hereto as Exhibit A; if it fails to do so, the Parties to this Action must resolve any such dispute before making disclosure of designated information as permitted hereunder to the non-party. If a non-party wishes to make designations hereunder, it must first sign attached Exhibit A.

3.3  Timing and Provisional Protection: Designations of Confidential Information may be made at any time. To avoid potential waiver of protection hereunder, the Designating Party should designate documents or materials containing Confidential Information at the time of production or disclosure, including on the record during the taking of any deposition. Deposition testimony will be deemed provisionally protected for a period of thirty (30) days after the transcript is released to the Parties by the court reporter, although the Parties may agree at any time to different timelines of provisional protection of information as Confidential or Attorneys' Eyes Only as part of one or more specific depositions. To retain any designations beyond the provisional period, a Designating Party must designate specific pages and lines of deposition testimony before the provisional period has expired. Such designations must be made in writing so that all counsel and court reporters may append the designation to all copies of the transcripts.

3.4  Manner of Designation: Confidential Information may be designated hereunder in any reasonable manner or method that notifies the Receiving Party of the designation level and identifies with specificity the information to which the designation applies. If made verbally, the Designating Party must promptly confirm the designation in writing. Whenever possible, the Designating Party should stamp, affix, or embed a legend of "CONFIDENTIAL" or "ATTORNEYS' EYES ONLY" on each designated page of the document or electronic image that contains Confidential Information.

4.  **CHALLENGES TO DESIGNATED INFORMATION**

4.1  In the event that a Receiving Party disagrees at any time with any designation(s) made by the Designating Party, the Receiving Party must first try to resolve such challenge in good faith on an informal basis with the Designating Party. The Receiving Party must provide written notice of the challenge and the grounds therefor to the Designating Party, who must respond in writing to the challenge within fifteen (15) days. At all times, the Designating Party carries the burden of establishing the propriety of the designation and protection level. Unless and until the challenge is

resolved by the Parties or ruled upon by the Court, the designated information shall remain protected under this Protective Order. The failure of any Receiving Party to challenge a designation does not constitute a concession that the designation is proper or an admission that the designated information is otherwise competent, relevant, or material.

## 5.   LIMITED ACCESS/USE OF PROTECTED INFORMATION

5.1   Restricted Use: Information that is produced or exchanged in the course of the Action and designated under this Protective Order may be used for preparation for trial and preparation for any appeal of any and all matters in the Action, as well as related settlement negotiations, and for no other purpose, without the written consent of the Designating Party. No Confidential Information may be disclosed to any person except in accordance with the terms of this Protective Order, unless the parties are co-counsel or have entered into joint defense agreements. All persons in possession of Confidential Information agree to exercise reasonable care with regard to the custody, use, or storage of such information to ensure that its confidentiality is maintained. This obligation includes, but is not limited to, the Receiving Party providing to the Designating Party prompt notice of the receipt of any subpoena that seeks production or disclosure of any designated information and consulting with the Designating Party before responding to the subpoena. Any use or disclosure of Confidential or Attorneys' Eyes Only information in violation of the terms of this Protective Order may subject the disclosing person or party to sanctions.

5.2   Access to "Confidential" Information: The Party(ies) and all persons subject to this Protective Order agree that information designated as "CONFIDENTIAL" may only be accessed or reviewed by the following:

a)   The Court, its personnel, and court reporters;

b)   Counsel of record, or co-counsel for any Party, or other party that has entered into a joint defense agreement in the Action and their employees who assist counsel of record, or co-counsel in the Action and are informed of the duties and obligations imposed hereunder;

c)   The Parties, including their clients, agents and employees who are assisting or have reason to know of the Action;

/ / /

5

Case 8:25-ap-01190-SC  Doc 290  Filed 03/16/24  Entered 03/16/24 18:04:08  Desc
Main Document    Page 86 of 184

d)    Experts or consultants employed by the Parties or their counsel, or co-counsel, for purposes of an Action, so long as each such expert or consultant has signed attached Exhibit A; and

e)    Other witnesses or persons with the Designating Party's consent or by court order.

5.3    Access to "Attorneys' Eyes Only" Designations: The Parties and all persons subject to this Protective Order agree that information designated as "ATTORNEYS' EYES ONLY" may only be accessed or reviewed by the following:

a)    The Court, its personnel, and court reporters;

b)    Counsel of record, or co-counsel for any Party, or other party that has entered into a joint defense agreement in the Action and their employees who assist counsel of record in the Action and are informed of the duties hereunder;

c)    In-house counsel for any Party in the Action and Richard A. Marshack, as Chapter 11 Trustee of The Litigation Practice Group P.C. who is informed of the duties and obligations imposed hereunder;

d)    Experts or consultants employed by the Parties or their counsel, or co-counsel for purposes of the Action, and so long as each such expert or consultant has signed attached Exhibit A; and

e)    Other witnesses or persons to whom the Designating Party agrees in advance of disclosure or by court order.

5.4    Non-Waiver Effect of Designations: Neither the taking of, nor the failure to take, any action to enforce the provisions of this Protective Order, nor the failure to object to any designation, will constitute a waiver of any Party(ies)'s claim or defense in the Action or any other action or proceeding, including, but not limited to, a claim or defense that any designated information is or is not Confidential, is or is not entitled to particular protection, or embodies or does not embody information protectable by law.

5.5    In-Court Use of Designated Information: If information designated under this Protective Order will or may be offered in evidence at a hearing or trial related to any matter in the Action, then the offering party must give advance notice to the party or non-party that designated prior to offering the information so that any use or disclosure may be addressed in accordance with

6                              Exhibit 1, Page 37

the Court's case-management or other pre-trial order, or by a motion *in limine*.  Nothing in this Protective Order shall be construed as a waiver by a Party of any objections that may be raised as to the admissibility at trial of any evidentiary materials.

**6.    CLAW-BACK REQUESTS**

6.1    Failure to Make Designation:  If, at any time, a Party or non-party discovers that it produced or disclosed Confidential Information without designation, it may promptly notify the Receiving Party and identify with particularity the Confidential Information to be designated and the level of designation (the claw-back notification). The Receiving Party may then request substitute production of the newly-designated information. Within thirty (30) days of receiving the claw-back notification, the Receiving Party must: (1) certify to the Designating Party it has appropriately marked or, if substitute production has been requested, destroyed all unmarked copies that it received, made, and/or distributed; and (2) if it was practicably unable to mark or destroy any information because disclosures occurred while the Receiving Party was under no duty of confidentiality under the terms of this Protective Order regarding that information, the Receiving Party must reasonably provide as much information as practicable to aid the Designating Party in protecting the information, consistently with the Receiving Party's attorney-client, work-product, and/or trial-preparation privileges.

6.2    Inadvertent Production of Privileged Information: If, at any time, a Party discovers that it produced information that it reasonably believes is subject to protection under the attorney/client, work-product, or trial-preparation privileges, then it must promptly notify each Receiving Party of the claim for protection, the basis for it, amend its privilege log accordingly, and comply with Fed. R. Civ. P. 26(b)(5). Whenever possible, the producing party must produce substitute information that redacts the information subject to the claimed protection. The Receiving Party must thereupon comply with Fed. R. Civ. P. 26(b)(5)(B) as to the information subject to the claimed protection.

/ / /

/ / /

/ / /

7

Case 8:25-ap-01190-SC   Doc 290   Filed 03/16/26   Entered 03/16/26 18:04:26   Desc
Main Document      Page 80 of 184

## 7.    DURATION/CONTINUED RESTRICTIONS

7.1    Handling of Designated Information Upon Conclusion of the Main Bankruptcy Case: Upon conclusion of the Main Bankruptcy Case, by way of dismissal or closing of the case, the Designating Party(ies) is/are responsible for ensuring that any Party or person to whom the Designating Party shared or disclosed designated information in any of the matters under the Action returns or destroys all of its copies, regardless of the medium in which it was stored. No witness or Party may retain designated information that it received from any other Party or non-party under this Protective Order; only counsel of record, or co-counsel, are the authorized agents who may retain one copy for their respective legal files, and who must also describe to the Designating Party the extra steps taken to protect its legal file containing paper and/or electronic copies of the designated information so that it is not accessed, used, or disclosed inconsistently with the obligations under this Protective Order. This provision does not apply to the Court or Court staff. Moreover, this provision does not apply to Trustee, who may retain and use – consistent with this Order – Confidential Information received in any Action during the entirety of the Bankruptcy.

7.2    Continued Restrictions Under this Protective Order: The restrictions on disclosure and use of Confidential Information shall survive the conclusion of the Bankruptcy case and any matter in the Action.

## 8.    PRIVILEGED OR PROTECTED INFORMATION

8.1    Nothing in this Protective Order shall require disclosure of information that is protected by the attorney-client privilege, the work-product protection, or any other legally cognizable privilege (a "Privilege or Protection"). If information subject to a claim of Privilege or Protection is inadvertently produced, pursuant to Federal Rule of Evidence 502(d) such production shall not constitute a waiver of, or estoppel as to, any claim of Privilege or Protection for such information or any other information that may be protected from disclosure by a Privilege or Protection in any proceeding.

8.2    If a Party receives a document that appears to be subject to a Privilege or Protection, then it shall refrain from examining the document any more than is essential to ascertain if it is privileged or protected and shall promptly notify the producing Party in writing that the receiving

Exhibit 1, Page 39

Party possesses material that appears to be subject to a Privilege or Protection. The producing Party shall have seven (7) days after receiving such notice to assert a Privilege or Protection over the identified material. If the producing Party does not assert a claim of Privilege or Protection within the seven (7)-day period, the material in question shall be deemed not privileged or protected.

8.3    If a producing Party has produced a document subject to a claim of Privilege or Protection, upon written request by the producing Party, the document for which a claim of Privilege or Protection is made shall be sequestered or destroyed to the extent reasonably practicable, and the receiving Party shall not use the document for any purpose other than in connection with analyzing or disputing a claim of Privilege or Protection or in connection with a motion to compel the production of the document.

8.4    The receiving Party sequestering or destroying such material may then move the Court for an order compelling production of the material. The applicable producing Party bears the burden of establishing the applicable Privilege or Protection of any clawed-back document or information as and to the same extent that it would have borne such burden had it not produced the document or information.  Nothing in this Protective Order shall limit the Court's right or any receiving Party's right to request an in camera review of any information subject to a claim of Privilege or Protection.

###

Date: June 3, 2024

Scott C. Clarkson
United States Bankruptcy Judge

9

Exhibit 1, Page 40

Case 8:25-ap-01190-SC    Doc 290    Filed 03/06/24    Entered 03/06/24 14:30:28    Desc
Main Document      Page 142 of 124

EXHIBIT "A"

I

M° CLAIRE NOTARI
HUISSIER
17, bd Albert 1ᵉʳ
MONACO ☎ +377 97 97

Christopher B. Ghio (State Bar No. 259094)
Christopher Celentino (State Bar No. 131688)
Yosina M. Lissebeck (State Bar No. 201654)
**DINSMORE & SHOHL LLP**
655 West Broadway, Suite 800
San Diego, CA 92101
Telephone: 619.400.0500
Facsimile: 619.400.0501
christopher.ghio@dinsmore.com
christopher.celentino@dinsmore.com
yosina.lissebeck@dinsmore.com

Sarah S. Mattingly (Ky. Bar 94257)
DINSMORE & SHOHL, LLP
101 S. Fifth Street, Suite 2500
Louisville, KY 40202
Telephone: 859-425-1096
Facsimile: 502-585-2207
Sarah.mattingly@dinsmore.com
(Admitted pro hac vice)

Special Counsel to Richard A. Marshack,
Chapter 11 Trustee

# UNITED STATES BANKRUPTCY COURT

# CENTRAL DISTRICT OF CALIFORNIA

| In Re | Case No. 8:23-BK-10571-SC |
|---|---|
| | Chapter 11 |
| The Litigation Practice Group P.C., | **EXHIBIT A TO STIPULATED ORDER** |
| Debtor(s), | Date: May 23, 2024 |
| | Time: 1:30 p.m. |
| | Judge: Hon. Scott C. Clarkson |
| | Place: Courtroom 5C¹ - Via Zoom |
| | 411 W. Fourth Street |
| | Santa Ana, CA 92701 |

¹ Video and audio connection information for each hearing will be provided on Judge Clarkson's
publicly posted hearing calendar, which may be viewed online at:
http://ecf-ciao.cacb.uscourts.gov/CiaoPosted/?jid=SC.

1

Case 8:25-ap-01190-SC    Doc 290    Filed 03/16/25    Entered 03/16/25 13:42:58    Desc
Main Document      Page 121 of 124

This is to certify that:

    (a)    I am being given access to Confidential Information pursuant to the Stipulated Protective Order that was entered into the main bankruptcy case for Litigation Practice Group, but which is binding and controlling as set forth by the Court's Order on any and all contested matters and any and all litigation commenced by Trustee;

    (b)    I have read the Stipulated Protective Order; and

    (c)    I agree to be bound by the terms and conditions thereof, including, without limitation, to the obligations regarding the use, non-disclosure and return of such Confidential Information. I further agree that in addition to being contractually bound by the Stipulated Protective Order, I am subject to the jurisdiction of the above reference Court for any violation thereof.

Date: _____

_____
Signature

_____
Printed Name

Mᵉ CLAIRE NOTARI
HUISSIER
17, bd Albert 1ᵉʳ
MONACO ☎ +377 97 97 09 09

# EXHIBIT 2

## LOAN AGREEMENT

THIS LOAN AGREEMENT (the "Loan Agreement") is made as of February 7, 2023 by and between BAT Inc a/k/a B.A.T. Inc. and The Litigation Practice Group PC, ("LPG" or "Borrower" or "Borrowers" which may be used interchangeably), and as personally guaranteed by Daniel March (residing at 20160 Nob Hill Drive, Yorba Linda, CA 92886) and Tony M Diab (an individual residing in California), both of whom are agents and officers of LPG with authority to bind same to this Note ("Guarantor" or "Guarantors" which may be used interchangeably without specification and shall collectively mean everyone identified herein) (LPG, Borrower, and Guarantor may all be used interchangeably throughout this Note) and MCA Fund ADV Inc. maintaining a place of business at 4714 16ᵗʰ Avenue, Brooklyn NY and/or to LDR International Ltd., a British Virgin Islands limited company, having its address at Yamraj Building, Market Square, 3ʳᵈ Floor, P.O. Box 3175, Road Town, Tortola VG 1110, British Virgin Islands ("Lender" or "Lenders" which may be used interchangeably), or either of their assignees (collectively the "Parties"),

WHEREAS, on or about February 7, 2023, Lender provided a loan to Borrower in the principal amount of One Million Five Hundred Thousand Dollars ($1,500,000.00) (the "Principal") with interest (memorialized in a contemporaneous Promissory Note ("Note") executed by Borrower) due on or prior to May 6, 2023 (the "Maturity Date") subject to a schedule of disbursement(s) as reflected on the Note;

WHEREAS, Borrower has offered to execute and deliver a Promissory Note to Lender in the amount currently due and owing under the Loan, and to grant Lender a first-priority security interest in and lien upon all of Borrower's assets;

NOW, THEREFORE, in consideration of the foregoing premises and other good and valuable consideration, the receipt and sufficiency of which are hereby acknowledged, the Parties hereto agree as follows:

1.      Borrower acknowledges and agrees that, as of the date of this Loan Agreement: the total amount currently due and owing under the Loan, including unpaid principal, interest, charges, advances, penalties, and any other amounts due thereunder, equals One Million Five Hundred Thousand Dollars ($1,500,000.00) with interest (as defined in the Note) (the "Principal"); and Borrower has no rights of setoff or other any other defenses to its immediate obligation to pay this amount in full. Upon the occurrence of an Event of Default (as defined in the Promissory Note(s) or Security Agreement), the Interest Rate shall increase to the lesser of twenty four percent (24%) or the maximum amount permitted by applicable law. Interest shall not accrue on unpaid Interest or Late Charges (as defined below).

2.      All attorney fees and expenses actually incurred by Lender to collect on or enforce the Promissory Note, this Loan Agreement, the Security Agreement, or any Confessions of Judgments furnished by Borrower, to declare or adjudicate any rights under any of those documents, or to marshal any collateral that is security for the performance of Borrower's obligations under any of those documents, whether by suit or any other means whatever, shall be payable by Borrower and shall be added to and constitute party of the outstanding Principal.

Exhibit 2, Page 45

3.   All payments by Borrower shall be applied first to the payment of any unpaid Late Charges, second to the payment of any unpaid Interest, and third to the reduction of the Principal.

4.   All unpaid Principal, Interest, and Late Charges shall be paid in full by the Borrower on or prior to the Maturity Date.

5.   An event of default (an "Event of Default") shall be deemed to be interpreted and defined as stated in the Promissory Note and/or Security Agreement.

6.   Upon the occurrence of an Event of Default, the Maturity Date shall immediate accelerate to the date of the Event of Default, and all unpaid attorney's fees, Late Charges, Interest, Principal, and other expenses contemplated in the Note, Security Agreement, and this Loan Agreement shall be due and payable.

7.   Borrower shall make all payments due under this Loan Agreement by wire, with immediately available funds or a check acceptable to Lender.

8.   Borrower shall execute and deliver to Lender a promissory note (the "Promissory Note") pursuant to which Borrower shall unconditionally promise to pay Lender the Principal sum on or prior to the Maturity Date.

9.   Borrower shall execute and deliver to Lender a security agreement (the "Security Agreement") pursuant to which Borrower shall grant Lender a first-priority security interest in and lien upon all of Borrower's assets (as defined in the security agreement, the "Collateral") a security for performance of Borrower's obligations under this Loan Agreement and the Promissory Note.

10.   Borrower represents and warrants to Lender that: (a) Borrower has the full right, power and authority to bind the corporations identified herein, enter into and perform the terms of this Loan Agreement and none of the terms or conditions of this Loan Agreement, the Promissory Note, or the Security Agreement are or shall be in violation of any provisions of any other agreement to which Borrower is a party; (b) Borrower is duly organized, validly existing and in good standing under the laws of the state of California; (c) there is no litigation pending against Borrower, its shareholders, officers, or directors, which could, if adversely determined, be reasonably expected to materially impair the right of Borrower to carry on business substantially as now conducted or materially adversely affect the financial condition of Borrower; (d) Borrower and each of the shareholders, officers, and directors of Borrower filed or caused to be filed all federal, state and local tax returns, which are required to be filed, and has paid or caused to be paid all taxes and assessments to the extent that such taxes or assessments have become due, except for any assessment contested in good faith and for which adequate reserves have been set aside; (e) Borrower is not insolvent as of the date of this Loan Agreement and shall not become insolvent as result of its obligations under this Loan Agreement, the Promissory Note, or the Security Agreement; (f) there is no action or proceeding pending, or to the knowledge of Borrower, threatened, which could be reasonably expected to materially and adversely affect the rights of Lender under this Loan Agreement, the Promissory Note, or the Security Agreement, Borrower's ability to perform its obligations hereunder or thereunder, title to the Collateral (as

2

Exhibit 2, Page 46

defined in the Security Agreement), or the validity or priority of the security interest in and lien on the Collateral created hereunder and thereunder; (g) there are no judgments against Borrower unpaid or unsatisfied of record in any court of this state or of the United States; (h) at no time has Borrower made an assignment for the benefit of creditors; (i) Borrower has been afforded time and been advised by Lender to retain legal counsel to represent Borrower in this transaction.

11.    Borrower hereby agrees that so long as any amount is owed to Lender under this Loan Agreement, Borrower and its shareholders, officers and directors shall: (a) hold and save Lender free and harmless from any causes of actions, claims, damages and liabilities of a contractual, tort or tax nature due to the acts or omissions of Borrower, and to pay for Lender's counsel to represent and defend Lender against any such causes of actions, claims, damages or liabilities; (b) keep the Collateral free and clear of all liens, charges, encumbrances, taxes, assessments and claims except such as arise hereunder, under the Security Agreement or as may otherwise be permitted by Lender; (c) give Lender immediate notice, in writing, at Lender's designated address, within ten (10) days of obtaining any replacements of the Collateral, and cause to be executed appropriate documents so that such replacements shall be secured in accordance with this Loan Agreement and the Security Agreement; (d) obtain all license renewals and any other required licenses and permits necessary for the continued operation of Borrower's business and preservation of the Collateral; (e) promptly pay all fines, penalties or assessments which may be imposed or assessed on Borrower; (f) fully cooperate with Borrower's insurance carrier in reporting, investigating and defending any claim; (g) keep accurate and complete books and records and maintain the same and permit any authorized representative of Lender and its attorneys, accountants and agents to inspect, examine and make copies and abstracts of Borrower's books of account and records at reasonable times during normal business hours; (h) give Lender immediate notice, in writing, at Lender's designated address, of the occurrence of all liens, charges, encumbrances, taxes, assessments and claims which might materially and adversely affect the rights of Lender under this Loan Agreement, the Promissory Note, or the Security Agreement, Borrower's ability to perform its obligations hereunder or thereunder, title to the Collateral or the validity or priority of the security interest in and lien on the Collateral created hereunder and thereunder; (i) pay all indebtedness due under this Loan Agreement and the Promissory Note in accordance therewith, and strictly abide by all terms, covenants, agreements and conditions set forth in this Loan Agreement, the Promissory Note, the Security Agreement and all other documents executed in connection with the Loan; (j) not issue, split, reclassify or declare payment of or a dividend payable on any capital stock or issue any warrants, or options on its capital stock, for consideration or otherwise; and (k) give notice to Lender of the occurrence of any Event of Default (as herein defined) or circumstance which, through lapse of time, may become an Event of Default.

12.    Borrower shall execute simultaneously with this Loan Agreement and from time to time thereafter any documents required by Lender to perfect and/or continue Lender's security interests in any Collateral.

13.    Borrower hereby authorizes Lender to file financing statements to perfect Lender's first-priority security interest in the Collateral from time to time. Borrower hereby appoints Lender as its attorney-in-fact to sign and file any such documents.

3

Exhibit 2, Page 47

14.    Borrower hereby appoints Lender as its attorney-in-fact to process any of the accounts/receivables contemplated herein, in the Security Agreement, or in the Note, or to otherwise protect Lender's interest in the Principal.

15.    Upon request, Borrower shall re-execute any document or instrument signed in connection with the Loan which was incorrectly drafted or signed or execute any document or instrument that Lender requires in connection with this Loan.

16.    Lender's obligations under this Loan Agreement shall be conditioned upon the delivery by Borrower, to Lender in form and substance satisfactory to Lender and its counsel, of the following documents each property executed: (a) the Promissory Note; (b) the Security Agreement; (c) a financing statements under the Uniform Commercial Code (UCC) in appropriate form for filing by Lender, sufficient in form and substance to grant to Lender a first priority perfected security interest in the Collateral (as defined in the Security Agreement); (d) an affidavit for judgment by confession executed by Borrower to be retained by Lender pending default by Borrower in any of the terms, covenants and conditions of this Loan Agreement, the Promissory Note, the Security Agreement, or any other collateral documents executed in connection with the Loan, in which event Lender may enter said confessions of judgment in any court of competent jurisdiction; (e) resolutions of the board of directors or managing member(s) of Borrower, certified by the secretary of Borrower, authorizing the execution and performance of this Loan Agreement, the Promissory Notes, and evidence of consent of 100% of the stockholders or members of Borrower to the aforesaid transaction; (f) an unconditional guarantee of performance of Borrower's obligations under this Loan Agreement and the Promissory Note signed by the directors or managing members of the Borrower; (g) to notify Lender immediately in writing of any events which at any time may cause the representations and warranties herein or in the Loan Agreement to cease to be true or that the Principal or Lender's return of same might be jeopardy.

17.    The occurrence of any of the following events shall constitute an Event of Default under this Loan Agreement: (a) the failure of Borrower to pay when due all amounts due under this Loan Agreement, the Promissory Note, and the Security Agreement; (b) the failure of Borrower to perform, or a breach by Borrower of, any of the terms, covenants or conditions of this Loan Agreement, the Promissory Note, or the Security Agreement; (c) the failure of Borrower to pay or bond any judgment against it or remove or bond any levy, execution or judicial process against any item included in the Collateral within thirty (30) days after Borrower obtains knowledge of the entry, or the filing of any tax deficiency notice or lien against Borrower by any municipal, state or federal government or any agency thereof, unless contested by Borrower in good faith; (d) the failure of Borrower to pay all of its debts as they come due; (e) the filing of a bankruptcy petition by or against borrower, the making an assignment for the benefit of Borrower's creditors, or the appointment of custodian, receiver, or trustee for Borrower or its assets; (e) if any of the representations and warranties made by Borrower in this Loan Agreement, the Security Agreement or any other instrument executed in connection with this Loan Agreement or the Loan are or become untrue, incorrect or misleading; (f) the dissolution or other termination of Borrower; (g) the failure of Borrower (or any shareholder, partner or member of Borrower ) to perform or comply with any covenant or condition contained in any agreement to which Lender and Borrower or any such shareholder, partner or member are parties (including, without limitation, any guaranty or pledge agreement guaranteeing or securing

4

Exhibit 2, Page 48

Borrower's obligations hereunder), without the benefit of any applicable grace period, including this and these documents.

18.   In addition to the rights under this Loan Agreement, upon the occurrence of any Event of Default, Lender shall have all rights with respect to the Collateral granted under the Promissory Note, the Security Agreement, the UCC or any other applicable law, subject to any notice required by law.

19.   Borrower agrees to: (a) pay or reimburse Lender for all its out-of-pocket costs and expenses incurred in connection with the development, preparation and execution of, and any amendment, supplement or modification to, this Loan Agreement, the Promissory Note and the Security Agreement and any other documents or instruments executed in connection herewith or therewith, and the consummation of the transactions contemplated hereby and thereby, including, without limitation, the fees and disbursements of counsel to Lender; (b) pay or reimburse Lender for all its costs and expenses incurred in connection with the enforcement or preservation of any rights under this Loan Agreement, the Promissory Note, the Security Agreement and any such other documents, including, without limitation, fees and disbursements of counsel to Lender; (c) pay, indemnify, and hold Lender harmless from all recording and filing fees and all liabilities with respect to, or resulting from any delay in paying, stamp, excise and other taxes, if any, which may be payable or determined to be payable in connection with the execution and delivery of, or consummation of any of the transactions contemplated by, or any amendment, supplement or modification of, or any waiver or consent under or in respect of, this Loan Agreement, the Promissory Note, the Security Agreement and any such other documents; and (d) pay, indemnify, and hold Lender harmless from and against all other liabilities, obligations, losses, damages, penalties, actions, judgments, suits, costs, expenses or disbursements of any kind or nature whatsoever with respect to the execution, delivery, enforcement, performance and administration of this Loan Agreement, the Promissory Note, the Security Agreement and any such other documents (all the foregoing, collectively, the "indemnified liabilities"), provided that Borrower shall have no obligation hereunder to Lender with respect to liabilities arising directly from the gross negligence or willful misconduct of Lender. The agreements in this subsection shall survive repayment of the Promissory Note and all other amounts payable hereunder.

20.   All notices shall be in writing and shall be deemed to have been properly given (i) upon delivery, if delivered in person or one (1) Business Day (defined below) after having been deposited for overnight delivery with any reputable overnight courier service or sent by email. Either party by notice to the other may designate additional or different addresses for subsequent notices or communications. For purposes of this Section, "Business Day" shall mean a day on which banks are not authorized or required by law to close in the State of New York.

21.   The provisions of this Loan Agreement and all instruments and other agreements executed pursuant hereto are severable and in the event any provision hereof or thereof is invalid or contrary to law, the same shall be null and void but the remaining provisions shall be binding among the parties.

22.   All warranties, representations and covenants of the parties shall survive the consummation of the transactions contemplated thereby.

5

23.     This Loan Agreement represents the entire agreement of Lender and Borrower with respect to the subject matter hereof, and there are no promises, undertakings, representations or warranties by Lender relative to the subject matter hereof not expressly set forth herein, the Promissory Note or the Security Agreement or any other documents and instruments executed hereunder or thereunder.

24.     This Loan Agreement shall bind and inure to the benefit of the parties hereto, their respective heirs, legal representatives, successors and permitted assigns. Each Party shall use all reasonable best efforts to take, or cause to be taken, all actions, and to do, or cause to be done, and to assist and cooperate with the other Parties in doing, all things necessary, proper or advisable to carry out the intent and purposes of this Agreement.

25.     This Loan Agreement, the Security Agreement, the Promissory Note and any other document executed in connection with the Loan may not be amended, supplemented or modified except pursuant to a writing executed by the party to be charged with such amendment, supplement or modification. No writing delivered to Borrower by or on behalf of Lender setting forth principal balance, payment or other information regarding the Loan shall constitute any amendment, supplement or modification of this Loan Agreement, the Promissory Note or the obligations of Borrower hereunder or thereunder unless such writing specifically states that it constitutes such an amendment, supplement or modification.

26.     Lender may assign its rights in and to this Loan Agreement, the Promissory Note, the Collateral, the Security Agreement and all other documents and instruments executed hereunder and thereunder.

27.     No failure to exercise and no delay in exercising, on the part of Lender, any right, remedy, power or privilege under this Loan Agreement, the Promissory Note, the Security Agreement, or any other document or instrument executed hereunder or thereunder shall operate as a waiver thereof; nor shall any single or partial exercise of any right, remedy, power or privilege hereunder or thereunder preclude any other or further exercise thereof or the exercise of any other right, remedy, power or privilege. The rights, remedies, powers and privileges herein provided or provided therein are cumulative and not exclusive of any rights, remedies, powers and privileges provided by law.

28.     It is the intent of the parties that the Interest Rate and all other charges to Borrower be lawful. If for any reason the payment of a portion of Interest, fees or charges as required by this Loan Agreement, Security Agreement, or Promissory Note would exceed the limit permitted by applicable law then the obligation to pay interest or charges shall automatically be reduced to such limit and, if any amounts in excess of such limit shall have been paid, then such amounts shall be applied to the unpaid Loan Amount or refunded so that under no circumstances shall interest or charges required hereunder exceed the maximum rate allowed by law as aforesaid.

29.     This Loan Agreement is being delivered in the State of New York and shall be construed and enforced in accordance with the laws of the State of New York without any conflict of law provision. Any action(s) or pursuit of any legal remedy in any legal claim or remedy in any legal forum in connection with this document, arising from this document, or related to any obligation related hereto, same must be commenced in the state or federal court sitting in New York

6

Exhibit 2, Page 50

County, New York. Each Party hereby irrevocably and unconditionally submits for itself and its property in any legal action or proceeding relating to this Loan Agreement and the other documents to which it is a party related to the Loan, including, without limitation, the Promissory Note and the Security Agreement, or for recognition and enforcement of any judgment in respect thereof, to the non-exclusive general jurisdiction of the courts of the State of New York venued in New York County or in the Southern District of New York, and appellate courts from any thereof, consents that any such action or proceeding may be brought in such courts and waives any objection that it may now or hereafter have to the venue of any such action or proceeding in any such court or that such action or proceeding was brought in an inconvenient court and agrees not to plead or claim the same, agrees that service of process in any such action or proceeding may be effected by mailing a copy thereof by certified mail (or any substantially similar form of mail), postage prepaid, to its address set forth herein or at such other address of which all of the other parties hereto shall have been notified pursuant thereto; agrees that nothing herein shall affect the right to effect service of process in any other manner permitted by law or shall limit the right to sue in any other jurisdiction or to file any liens/lis pendens in any court to encumber any real property owned by any Borrower whilst an action pursues in the New York courts; and

30.     Each Party agrees to waive a trial by jury in any action or proceeding brought by either of the parties against the other arising out of or in any way connected with this Loan Agreement.

31.     This Agreement may be executed in two or more counterparts each of which is an original, but all of which together shall constitute one and the same instrument. Electronic signatures shall be deemed originals and as if signed in "wet ink." Borrower agrees not to raise any claim or defense as to the lack of an original.

32.     This writing and the documents executed in connection with the Loan contain the entire agreement of the parties with respect to its subject material and no modifications, alterations or waiver of all or any part shall be valid unless made by a writing and signed by all the parties hereto. Each Party shall use all reasonable best efforts to take, or cause to be taken, all actions, and to do, or cause to be done, and to assist and cooperate with the other Parties in doing, all things necessary, proper or advisable to carry out the intent and purposes of this Agreement.

IN WITNESS WHEREOF, the undersigned have executed and delivered this Loan Agreement as of the day and year first above written.

GUARANTOR:

By: _____
Name: Tony M Diab

BORROWER:

BAT Inc a/k/a B.A.T. Inc.

By: _____
Name: Tony M Diab
Title: Officer

7

**GUARANTOR:**

By: _____
Name: Daniel March

**BORROWER:**

The Litigation Practice Group PC

By: _____
Name: Daniel March
Title: Officer

| **LENDER:** | **LENDER:** |
|---|---|
| MCA Fund ADV Inc. | LDR International Ltd., |
| By: _____ <br> Title: Officer | By: _____ <br> Title: Officer |

8

# ACKNOWLEDGMENT

A notary public or other officer completing this certificate verifies only the identity of the individual who signed the document to which this certificate is attached, and not the truthfulness, accuracy, or validity of that document.

State of California
County of _____ Orange _____ )

On _Febnuary 7, 2023_ before me, Olga Lucia Esquivel, Notary Public
(insert name and title of the officer)

personally appeared _Daniel S. March_

who proved to me on the basis of satisfactory evidence to be the person(s) whose name(s) is/are subscribed to the within instrument and acknowledged to me that he/she/they executed the same in his/her/their authorized capacity(ies), and that by his/her/their signature(s) on the instrument the person(s), or the entity upon behalf of which the person(s) acted, executed the instrument.

I certify under PENALTY OF PERJURY under the laws of the State of California that the foregoing paragraph is true and correct.

WITNESS my hand and official seal.

Signature _Olga Esquivel_ (Seal)

OLGA LUCIA ESQUIVEL
COMM. # 2282791
NOTARY PUBLIC-CALIFORNIA
ORANGE COUNTY
MY COMM. EXP. MAR. 25, 2023

Exhibit 2, Page 53

# ACKNOWLEDGMENT

A notary public or other officer completing this certificate verifies only the identity of the individual who signed the document to which this certificate is attached, and not the truthfulness, accuracy, or validity of that document.

State of California
County of ___Orange___ )

On ___2/7/23___ before me, Vanessa Banken-Buchner
(insert name and title of the officer)

personally appeared ___Tony Maurice Diab___,
who proved to me on the basis of satisfactory evidence to be the person(s) whose name(s) is/are subscribed to the within instrument and acknowledged to me that he/she/they executed the same in his/her/their authorized capacity(ies), and that by his/her/their signature(s) on the instrument the person(s), or the entity upon behalf of which the person(s) acted, executed the instrument.

I certify under PENALTY OF PERJURY under the laws of the State of California that the foregoing paragraph is true and correct.

WITNESS my hand and official seal.

Signature _Vanessa Banken Bun_   (Seal)

VANESSA BANKEN-BUCHNER
COMM #2364027
NOTARY PUBLIC - CALIFORNIA
RIVERSIDE COUNTY
My Commission Expires July 3, 2025

Exhibit 2, Page 54

# EXHIBIT 3

THIS NOTE HAS NOT BEEN REGISTERED UNDER THE SECURITIES ACT OF 1933, AS AMENDED (THE "ACT"), OR ANY STATE SECURITIES LAWS AND NEITHER SUCH SECURITIES NOR ANY INTEREST THEREIN MAY BE OFFERED, SOLD, PLEDGED, ASSIGNED OR OTHER WISE TRANSFERRED UNLESS (1) A REGISTRATION STATEMENT WITH RESPECT THERETO IS EFFECTIVE UNDER THE ACT AND ANY APPLICABLE STATE SECURITIES LAWS OR (2) AN EXEMPTION TO SUCH REGISTRATION IS AVAILABLE FOR SUCH OFFER, VALUE PLEDGE, ASSIGNMENT OR TRANSFER.

## PROMISSORY NOTE

**$1,500,000.00**

Dated: February 7, 2023

1.    **Borrower's Promise to Pay.** For value received, BAT Inc a/k/a B.A.T. Inc. and The Litigation Practice Group PC, (collectively "LPG" or "Borrower" or "Borrowers" which may be used interchangeably), and as personally guaranteed by Daniel March (residing at 20160 Nob Hill Drive, Yorba Linda, CA 92886) and Tony M Diab (an individual residing in California), both of whom are agents and officers of LPG with authority to bind same to this Note ("Guarantor" or "Guarantors" which may be used interchangeably without specification and shall collectively mean everyone identified herein) (LPG, Borrower, and Guarantor may all be used interchangeably throughout this Note), hereby unconditionally promises to pay to MCA Fund ADV Inc. maintaining a place of business at 4714 16th Avenue, Brooklyn NY and/or to LDR International Ltd., a British Virgin Islands limited company, having its address at Yamraj Building, Market Square, 3rd Floor, P.O. Box 3175, Road Town, Tortola VG 1110, British Virgin Islands ("Lender" or "Lenders" which may be used interchangeably), or either of their assignees, the principal sum of One Million Five Hundred Thousand Dollars ($1,500,000.00) (the "Principal") in accordance with this Promissory Note (the "Promissory Note"), to be disbursed pursuant to Schedule A, annexed hereto and made a part hereof.

2.    **Maturity Date.** All unpaid Principal, Interest, and Late Charges shall be paid in full by the Borrower on or prior to May 6, 2023 (the "Maturity Date").

3.    **Interest.** The outstanding principal amount shall bear interest ("Interest") at a rate equal to seven percent (7.0%) per month. Interest shall be paid monthly on the sixth (6th) of every month (or if such day is not a business day, on the next succeeding business day) during the term of this Note. Interest will be calculated based on a 360-day year. Interest payment(s) shall be made payable as designated the Lender. To the extent the interest rate charged is deemed illegal, usurious or unenforceable under the law (even *ab initio* or *nunc pro tunc*), the parties hereto agree that the offending term shall be deemed to have been modified and replaced, *ab initio* or *nunc pro tunc*, with the maximum interest rate permitted by applicable law.

4.    **Default Interest.** Upon the occurrence of an Event of Default (as provided below), the Interest Rate shall increase to the lesser of twenty four percent (24%) ("Default Interest") or the maximum amount permitted by applicable law. To the extent the default interest rate charged is deemed illegal, usurious or unenforceable under the law (even *ab initio* or *nunc pro tunc*), the

1

parties hereto agree that the offending term shall be deemed to have been modified and replaced, *ab initio* or *nunc pro tunc*, with the maximum default interest rate permitted by applicable law.

5.    **Attorney Fees and Expenses.** All attorney fees, costs, disbursements, and expenses incurred by Lender to collect on or enforce this Promissory Note, to declare or adjudicate any rights under the Promissory Note, to enforce Lenders' rights with respect to a Security Agreement and any other loan document which is executed by Borrower contemporaneously herewith, to marshal any collateral that is security for the performance of Borrower's obligations under the Promissory Note, a Security Agreement and any other loan document which is executed by Borrower contemporaneously herewith, whether by suit or any other means whatever, shall be payable by Borrower and Guarantor and shall be added to and constitute part of the outstanding Principal.

6.    **Application of Payments.** All payments by Borrower shall be applied first to the payment of any unpaid Default Interest and second to payment of or the reduction of the Principal.

7.    **Borrower's Authority.** Borrowers Daniel March and Tony M Diab, as a member/officer of the Entity Borrowers has the authority to bind the Borrower Entities to this Promissory Note and/or has obtained the consent to do so from the other member/officers of each of the Entity Borrowers.

8.    **Event of Default.** An event of default (an "Event of Default") shall occur and be ongoing if Lender does not receive the monthly payment of Interest or the Principal by the Maturity Date, time being of the essence after a five (5) day grace period expires wherein Borrower can cure the default. Additionally, an Event of Default shall occur if Borrower defaults on the Security Agreement and any other loan document which is executed by Borrower contemporaneously herewith. In an Event of Default, all outstanding sums (Principal, Interest, attorneys' fees, miscellaneous fees as provided for herein) shall become immediately due, owing, and payable.

9.    **Lender's Rights Upon Event of Default.** Upon the occurrence of an Event of Default, Lender may, in its sole discretion, exercise any and all of its rights under this Promissory Note, all documents and agreements executed by Borrower in connection with this Promissory Note, and applicable laws, including, without limitation, enforcing its rights with respect to all collateral granted by Borrower as security for this Promissory Note, entering any confessions of judgment executed by Borrower, commencing an action in a court of competent jurisdiction in any state and county in which any of the Entity Borrowers operates its business or owns real property, or process/debit Borrowers' consumer's accounts acting or engaging an ACH processor to debt/collect fees from Borrowers' consumer's accounts, filing any UCC financing statements that Lender deems appropriate in any state and against any person, entity, corporation, or affiliate of Borrower.

10.    **Preservation of Collateral.** Borrower shall not, without the prior written consent of Lender, dispose, transfer, encumber, assign, sell, divert, or otherwise prevent marshaling of any collateral that is pledged as security for the performance of Borrower's obligations under the Promissory Note, or dispose, transfer, encumber, assign, sell, divert, or otherwise prevent marshaling of or any stock, membership interests, or equity of Borrower, whether by sale, transfer, assignment, license, lease, merger, surrender, consolidation (other than sales of

2

products in the ordinary course of Borrower's business), or windup, liquidate or dissolve Borrower's business.

11.     **Transfer by Lender.** Lender may transfer the Promissory Note to any party at any time, in its sole discretion, without notice to or the consent of Borrower. For purposes of this Note, "Lender" shall include Lender, any party to whom the Promissory Note is endorsed and transferred, and any party who holds the Promissory Note if it is endorsed "in blank" by Lender or a transferee.

12.     **Transfer by Borrower.** Borrower may not transfer or assign its rights or obligations under this Promissory Note without the prior written consent of Lender.

13.     **Waiver(s).** Borrower hereby waives any and all rights of presentment for payment, notice of dishonor, protest, notice of protest of this Note or other notice of any kind and all demands whatsoever; and in litigation with Lender, whether or not arising out of or relating to this Note or any collateral security therefore, waives trial by jury, and in addition, expressly waive the right to interpose any defense based on any statute of limitations or any claim of laches and any setoff, counterclaim, or cross-claim of any nature or description. Guarantor unconditionally guarantees payment to Lender of all amounts owing under the Note. This Guarantee remains in effect until the Note is paid in full. Guarantor must pay all amounts due under the Note when Lender makes written demand upon Guarantor. Lender is not required to seek payment from any other source before demanding payment from Guarantor.

14.     **RIGHTS, NOTICES, AND DEFENSES THAT GUARANTOR WAIVES**: To the extent permitted by law,

   A. Guarantor waives all rights to:
      1) Require presentment, protest, or demand upon Borrower;
      2) Redeem any Collateral before or after Lender disposes of it;
      3) Have any disposition of Collateral advertised; and
      4) Require a valuation of Collateral before or after Lender disposes of it.

   B. Guarantor waives any notice of:
      1) Any default under the Note;
      2) Presentment, dishonor, protest, or demand;
      3) Execution of the Note;
      4) Any action or inaction on the Note or Collateral, such as disbursements, payment, nonpayment, acceleration, intent to accelerate, assignment, collection activity, and incurring enforcement expenses;
      5) Any change in the financial condition or business operations of Borrower or any guarantor;
      6) Any changes in the terms of the Note or other Loan Documents, except increases in the amounts due under the Note; and
      7) The time or place of any sale or other disposition of Collateral.

   C. Guarantor waives defenses based upon any claim that:
      1) Lender failed to obtain any guarantee;
      2) Lender failed to obtain, perfect, or maintain a security interest in any property

3

offered or taken as Collateral;

3) Lender or others improperly valued or inspected the Collateral;

4) The Collateral changed in value, or was neglected, lost, destroyed, or underinsured;

5) Lender impaired the Collateral;

6) Lender did not dispose of any of the Collateral;

7) Lender did not conduct a commercially reasonable sale;

8) Lender did not obtain the fair market value of the Collateral;

9) Lender did not make or perfect a claim upon the death or disability of Borrower or any guarantor of the Note;

10) The financial condition of Borrower or any guarantor was overstated or has adversely changed;

11) Lender made errors or omissions in Loan Documents or administration of the Loan;

12) Lender did not seek payment from the Borrower, any other guarantors, or any Collateral before demanding payment from Guarantor;

13) Lender impaired Guarantor's suretyship rights;

14) Lender modified the Note terms, other than to increase amounts due under the Note. If Lender modifies the Note to increase the amounts due under the Note without Guarantor's consent, Guarantor will not be liable for the increased amounts and related interest and expenses, but remains liable for all other amounts;

15) Borrower has avoided liability on the Note; or

16) Lender has taken an action allowed under the Note, this Guarantee, or other Loan Documents.

15. **No Waiver by Lender.** Lender's rights and remedies herein are cumulative and not exclusive of any rights or remedies provided by law and may be exercised singly or concurrently. No failure by Lender to exercise any of its rights or remedies under this Promissory Note shall constitute a waiver of such right or remedy or bar Lender from exercising such right or remedy at some later date. Lender may only waive a rights or remedy hereunder in writing. A waiver by Lender of any right or remedy under the terms of this Note, on any one occasion, shall not be construed as a bar to the exercise of any right, power, privilege or remedy which the Holder would otherwise have had on any further occasion.

16. **Modification.** Any modification or amendment of this Promissory Note must be in writing and signed by Borrower and Lender.

17. **Governing Law.** This Promissory Note shall be governed by the laws of the State of New York, without giving effect to any choice of law provisions indicating the laws of another state. Any litigation involving or stemming from this Note shall only be filed in the state or federal court located in New York, New York. It is the intent of the parties that the interest rate herein and all other charges to Borrower be lawful. If for any reason the payment of a portion of interest, fees or charges as required by this Note would exceed the limit permitted by applicable law then the obligation to pay interest or charges shall automatically be reduced to such limit and, if any amounts in excess of such limit shall have been paid, then such amounts shall be applied to the unpaid Principal or refunded so that under no circumstances shall interest or charges required hereunder exceed the maximum rate allowed by law. Any provision hereof which may

4

prove unenforceable under any law shall not affect the validity of any other provision hereof.

18.     **Non-Original Submissions.** Borrowers, Guarantor, and Lender hereby agree that electronic/facsimile signatures on this Note may be deemed as if signed in "wet ink." Borrowers and Guarantor hereby waive any defense or argument that Lender failed to submit an "original" Note which was signed in "wet ink."

**IN WITNESS WHEREOF**, Borrowers and Guarantor have duly executed this Promissory Note as of the day and year first above written.

**GUARANTOR:**

By: _____
Name: Tony M Diab

SSN:

**GUARANTOR:**

By: _____
Name: Daniel March

SSN: ████9617

**BORROWER:**

BAT Inc a/k/a B.A.T. Inc.

By: _____
Name: Tony M Diab
Title: Officer

**BORROWER:**

The Litigation Practice Group PC

By: _____
Name: Daniel March
Title: Officer

STATE OF _____ )
COUNTY OF _____ )

On February __, 2023 before me, the undersigned, a Notary Public in and for said State, personally appeared Tony M Diab personally known to me or proved to me on the basis of satisfactory evidence to be the individual whose name is subscribed to the within instrument and acknowledged to me that he executed the same in his capacity, and that by his signature on the instrument, the individual, or the person upon behalf of which the individual acted, executed the instrument.

_____
Notary Public

STATE OF _____ )
COUNTY OF _____ )

On February __, 2023 before me, the undersigned, a Notary Public in and for said State, personally appeared Daniel March personally known to me or proved to me on the basis of satisfactory evidence to be the individual whose name is subscribed to the within instrument and acknowledged to me that he executed the same in his capacity, and that by his signature on the instrument, the individual, or the person upon behalf of which the individual acted, execute the instrument.

_____
Notary Public

5

## Schedule A
### Disbursements of the Principal

1. To The Litigation Practice Group PC, the amount of $1,500,000.00 representative as funding of the loan.

The Litigation Practice Group PC
17542 E 17th Street, Ste 100
Tustin, CA 92780
Routing: ████9593
Account: ████6512

6

## ACKNOWLEDGMENT

A notary public or other officer completing this certificate verifies only the identity of the individual who signed the document to which this certificate is attached, and not the truthfulness, accuracy, or validity of that document.

State of California
County of _____ Orange _____ )

On __February 7, 2023__ before me, __Olga Lucia Esquivel, Notary Public__
(insert name and title of the officer)

personally appeared __Daniel S. March__ ,
who proved to me on the basis of satisfactory evidence to be the person(s) whose name(s) is/are subscribed to the within instrument and acknowledged to me that he/she/they executed the same in his/her/their authorized capacity(ies), and that by his/her/their signature(s) on the instrument the person(s), or the entity upon behalf of which the person(s) acted, executed the instrument.

I certify under PENALTY OF PERJURY under the laws of the State of California that the foregoing paragraph is true and correct.

WITNESS my hand and official seal.

Signature _____ (Seal)

OLGA LUCIA ESQUIVEL
COMM. # 2292791
NOTARY PUBLIC-CALIFORNIA
ORANGE COUNTY
My Comm. Exp. MAR. 26, 2023

## ACKNOWLEDGMENT

A notary public or other officer completing this certificate verifies only the identity of the individual who signed the document to which this certificate is attached, and not the truthfulness, accuracy, or validity of that document.

State of California
County of _____ Orange _____ )

On __2/7/23__ before me, Vanessa Banken-Buchner
(insert name and title of the officer)

personally appeared ___Tony Maurice Diab___
who proved to me on the basis of satisfactory evidence to be the person(s) whose name(s) is/are subscribed to the within instrument and acknowledged to me that he/she/they executed the same in his/her/their authorized capacity(ies), and that by his/her/their signature(s) on the instrument the person(s), or the entity upon behalf of which the person(s) acted, executed the instrument.

I certify under PENALTY OF PERJURY under the laws of the State of California that the foregoing paragraph is true and correct.

WITNESS my hand and official seal.

Signature _____    (Seal)

VANESSA BANKEN-BUCHNER
COMM #2384027
NOTARY PUBLIC - CALIFORNIA
RIVERSIDE COUNTY
My Commission Expires July 3, 2026

Exhibit 3, Page 63

# EXHIBIT 4

## SECURITY AGREEMENT

THIS SECURITY AGREEMENT (the "Security Agreement") is made as of February 7, 2023 by and between BAT Inc a/k/a B.A.T. Inc. and The Litigation Practice Group PC, (collectively "LPG" or "Borrower" or "Borrowers" which may be used interchangeably), and as personally guaranteed by Daniel March (residing at 20160 Nob Hill Drive, Yorba Linda, CA 92886) and Tony M Diab (an individual residing in California), both of whom are agents and officers of LPG with authority to bind same to this Note ("Guarantor" or "Guarantors" which may be used interchangeably without specification and shall collectively mean everyone identified herein) (LPG, Borrower, and Guarantor may all be used interchangeably throughout this Note) and MCA Fund ADV Inc. maintaining a place of business at 4714 16th Avenue, Brooklyn NY and/or to LDR International Ltd., a British Virgin Islands limited company, having its address at Yamraj Building, Market Square, 3rd Floor, P.O. Box 3175, Road Town, Tortola VG 1110, British Virgin Islands ("Lender" or "Lenders" which may be used interchangeably), or either of their assignees (collectively the "Parties").

WHEREAS, Borrower has executed and delivered to Lender a certain Promissory Note dated February 7, 2023 (the "Note"), pursuant to which, among other things, Borrower has promised to pay to the Lender the principal sum of One Millions Five Hundred Thousand Dollars ($1,500,000.00) (the "Principal")) with interest (per the Note) on or before May 6, 2023 (the "Maturity Date").

WHEREAS, to induce Lender to enter into the Note, Borrower has agreed to grant Lender a security interest in the Collateral (as hereinafter defined), as security for Borrower's full and timely performance of the Secured Obligations (as defined below); and

NOW, THEREFORE, in consideration of the foregoing premises and other good and valuable consideration, the receipt and sufficiency of which are hereby acknowledged, the parties hereto agree as follows:

1.    To secure the full and timely performance of all of Borrower's obligations under the Note, including, without limitation, payment of all Principal, interest, and any other amounts due from Borrower to Lender under Note (the collectively, the "Secured Obligations), Borrower hereby grants and conveys to Lender a security interest in and lien upon the following collateral, as such term is used in Article 9 of the Uniform Commercial Code (the "UCC"): all tangible and intangible property, assets, and rights of Borrower now owned or hereafter acquired, including, without limitation, all real estate, real estate interests, membership interests in any corporation/company whether named herein or not, accounts receivables, profits, revenue, cash, tax refunds, loans, financing from banks, fixtures, leases, vehicles, licenses, equipment, contracts, inventory, raw materials, office equipment, computer hardware and software, intellectual property, claims, causes of action, cash, bank accounts, accounts receivable, stock, insurance policies, insurance proceeds and products thereof, books and records, customer lists, credit files, computer files, programs, printouts and other computer materials and records related thereto, the goods which may be more particularly described in the attached exhibits, if any, and all proceeds and products from all collateral covered by this Security Agreement whether or not purchased with loan proceeds, and all substitutions, replacements and accessions thereto, including but not limited to any real property owned by or revenue from any real property owned

1

by any of the corporations stated herein or not, wherever located, as well as the actual account, anticipated revenue/fee(s) generated therefrom, from all of Borrowers' (and their affiliates' and other entities in their control) consumers' accounts which are debited/processed by Borrower which Borrower pledges as security and subject to a UCC financing statement (the "Collateral").

2.      Separately, and by no means limited, Borrower represents and agrees that it shall continuously provide and grant Lender real-time and continuous access to its/their customer relationship management ("CRM") software, being represented that same is currently known as "Debt Pay Pro." If Borrower changes the CRM software that it uses, it shall notify Lender prior to switching and shall provide Lender with whatever login credentials/capabilities are necessary to ensure that Lender is able to access, in real-time and continuously, Borrower's CRM software. Borrower also represents and agrees that the appropriate instructions shall be given to the CRM software administrative personnel to enable Lender to have the access provided for and contemplated herein. Borrower's violation of this provision shall be deemed an Event of Default which if uncured following a one (1) day cure period, shall be deemed a default of this Agreement and an acceleration of any terms contemplated herein and in any other document executed by Borrower in Lender's favor (a Note, Loan Agreement, etc.) and which shall also entitle Lender to exercise any remedies available to it pursuant to this Agreement (and any other document executed by Borrower in Lender's favor (a Note, Loan Agreement, etc.) and/or at law.

3.      Specifically, and by no means of limitation, if Borrower defaults on this Agreement, the Note, or any other document executed by Borrower in Lender's favor, Lender shall automatically have the realized and vested right to engage a processor (such as an ACH processor) to automatically/electronically debit/process/charge the accounts of Borrowers' clients/customers until the Principal, Interest, and any other fees contemplated by the Note, this Agreement, and any other document executed by Borrower in Lender's favor is paid in full to Lender.

4.      Borrower hereby appoints Lender as its attorney-in-fact to process any of the accounts/receivables contemplated herein, in the Security Agreement, or in the Note, or to otherwise protect Lender's interest in the Principal.

5.      Until such time as Lender receives all of the money contemplated in the Note, Borrower agrees, represents, pledges, and promises that it shall not enter into a similar agreement with anyone else, governing or related to the accounts and/or customers of Borrower nor shall Borrower pledge, encumber, transfer, sell, assign, or otherwise interfere with Lender's ability to secure repayment of its Principal. Borrower also pledges, promises, and represents that it will not, directly or indirectly, instruct or guide any of its customers/accounts/merchants/vendors/ clients to pay any other entity for the payments that are contemplated herein which are and should be directed to Lender.

6.      Until such time as Lender receives all of the money contemplated in the Note, the Principal shall be deemed a lien against and over all of Borrower's assets, accounts, receivables, interests, etc. whether material, vested, realized, or not.

7.      Hold harmless and indemnification. Borrower represents that it is in compliance with all applicable laws and has the power and authority to enter into this Agreement and to engage in the actions contemplated herein. Borrower hereby indemnifies and holds harmless Lender, along

2

Exhibit 4, Page 66

with their agents, members, and affiliates from and against any and all claims, actions, suits, proceedings, judgments, damages, liabilities, costs and expenses, including attorneys' fees arising directly or indirectly from challenge or other breach of this Agreement, other than for Lender's own negligence.

8.    Borrower hereby authorizes Lender to pledge, lend, or use the Collateral in a manner which impairs Borrower's rights to redeem it. Borrower hereby permits Lender to file any UCC financing statements against Borrower or any asset of Borrower to secure these obligations in any state throughout the United States, against any entity or individual identified herein, or against any entity or individual subsequently discovered by Lender that Borrower has an interest in, as necessary, in order to secure the Principal.

9.    Lender's sole duty with respect to the custody, safekeeping and physical preservation of the Collateral in its possession, under the UCC or otherwise, shall be to deal with it in the same manner as Lender deals with similar property for its own account. Neither Lender, nor any of its directors, officers, employees or agents, shall be liable for failure to demand, collect or realize upon all or any part of the Collateral or for any delay in doing so.

10.    Borrower makes the following representations: (a) Borrower has the full and unconditional right and corporate authority to grant to Lender this security interest and any lien(s) granted herein; (b) the Collateral is lawfully owned by Borrower and is free and clear of any and all liens, security interests, claims, charges, encumbrances, taxes and assessments except as may otherwise be specifically set forth in this Security Agreement or publicly recorded; (c) except for any financing statement filed in favor of Lender, or other mortgage financing agreement which is on file with the county clerk for the specific property, no financing statement covering any of the Collateral is on file in any public office; (d) no terms or conditions of this Security Agreement are in violation of the provisions of any other agreement to which Borrower is a party; (e) all of the documents which comprise the Collateral are valid, binding and enforceable in accordance with their respective terms; (f) there is no action or proceeding pending, or to Borrower's knowledge, threatened, which in any way could reasonably be expected to materially and adversely affect (i) the rights of Lender under this Security Agreement, (ii) Borrower's ability to perform its obligations hereunder, (iii) title to the Collateral, or (iv) the validity or priority of the security interest and lien in and on the Collateral created hereunder.

11.    Borrower represents that they have all requisite right, power, and authority to execute, deliver, and perform this Agreement, to consummate the transactions contemplated hereby and thereby, and to perform its obligations hereunder and thereunder. The execution and delivery of this Agreement and any related documents notwithstanding the consummation of the transactions contemplated hereby and thereby, have been duly approved by all parties, and no further action is required to authorize this Agreement, any related Agreement to which anyone may be a party, or the transactions contemplated hereby and thereby. This Agreement has been, and each of any related Agreements will be, duly and validly executed and delivered by the parties executing same and, assuming the due and valid authorization, execution, and delivery of this Agreement by the other Parties, and of each such Agreement by the other parties thereto, constitutes, or will constitute, a valid and binding obligation of the named party thereto, enforceable against it in accordance with its terms and conditions, except as enforcement may be limited by applicable

3

bankruptcy, insolvency, reorganization, moratorium, and other Laws affecting enforcement of creditor's rights generally and except insofar as the availability of equitable remedies may be limited by applicable Law.

12.    No consent of any party to any contract, agreement, instrument, lease or license to which any party hereto is a party or to which any of its properties or assets are subject is required for the execution, delivery or performance by Borrower of any term of this Agreement. Borrower represents that it is not required to give any notice to, make any filing with, or obtain any authorization, consent, or approval of, any Governmental Body or Third Party, including a party to any assigned contract, in connection with the execution, delivery, and performance by the parties to this Agreement or any other agreements to which it is a party or the consummation of the transactions contemplated hereby and thereby.

13.    Borrower covenants and agrees as follows: (a) to pay and perform all of the Secured Obligations according to the terms of the Note and to defend the title to the Collateral against all persons and entities and against all claims and demands whatsoever; (b) on demand of Lender, to furnish further assurance of title, execute any written agreement or do any other acts necessary to effectuate the purposes and provisions of this Security Agreement, execute any instrument or statement required by law or otherwise in order to perfect, continue or terminate the security interest of Lender in the Collateral and pay all costs or filing fees in connection therewith; (c) to pay, when due, all taxes, assessments and license fees relating to the Collateral, which if not paid may give rise to a lien, charge or encumbrance on the Collateral; (d) to keep the Collateral, at Borrower's own cost and expense, in good repair and condition and not misuse, abuse, waste or allow the Collateral to deteriorate, except for normal wear and tear, and to make same available for inspection by Lender at all reasonable times; (e) to not sell, exchange, assign, loan, deliver, mortgage, or otherwise dispose of the Collateral during the existence of this Security Agreement without the prior written consent of Lender; (f) to not grant or give a security interest in or financing statement covering the Collateral to anyone other than Lender; (g) to notify Lender immediately in writing of any events which at any time may cause the representations and warranties herein or in the Loan Agreement to cease to be true or that the Principal or Lender's return of same might be jeopardy.

14.    Borrower represents that there is no Action of any nature pending or, to its knowledge, threatened against or by Borrower: (a) relating to or affecting the accounts or receivables contemplated herein or (b) that challenges or seeks to prevent, enjoin, or otherwise delay the transactions contemplated by this Agreement. No event has occurred or circumstance exists that may give rise to, or serve as a basis for, any such action.

15.    Borrower represents that to its knowledge, the accounts or receivables contemplated herein will not be the subject of any litigation or other legal proceedings nor will Borrower permit same to be the subject of any other Agreement, any security agreement such as a UCC, nor subject to any third-party claim without the express written consent of Lender.

16.    The following shall constitute a default by Borrower: (a) any Event of Default under the Note; (b) the failure by Borrower to comply with or perform any provision of this Security Agreement or the Note or any other agreement between Borrower and Lender executed in connection with the Note; (c) any false or misleading representation or warranty made or given

4

Exhibit 4, Page 68

by Borrower in connection with this Security Agreement or any information/document furnished by Borrower prior to execution of this Security Agreement; (d) any act of Borrower which imperils the prospect of full performance or satisfaction of the Secured Obligations or impairs the rights of Lender in the Collateral.

17.    Upon any default of Borrower and at the option of Lender, the Secured Obligations secured by this Security Agreement shall immediately become due and payable in full without notice or demand and Lender shall have all the rights, remedies, and privileges with respect to repossession, retention and sale of the Collateral and disposition of the proceeds as are accorded to a Lender by the applicable sections of the UCC respecting "Default," in effect as of the date of this Security Agreement, or as may be granted to Lender pursuant to the Note or other document executed in connection with the Note.

18.    If Borrower fails to pay any part of the Principal or interest thereon when it is due, or otherwise is in default of its obligations under the Note, then Lender shall, in addition to any other rights Lender may have under this Security Agreement, UCC, the Note, any other document executed in connection with the Note, the UCC (including the right to file a UCC against anyone or entity identified herein or against anyone or entity subsequently discovered which relates to Borrower and which may owe an obligation to Lender as security for the Principal or otherwise related hereto), and/or at law or in equity, have the right to: (a) apply any funds which it received pursuant to the provisions of this Security Agreement or the Note to the payment of any amounts due to Lender under the Note in any manner it deems fit in its sole discretion; (b) enter upon Borrower's premises peaceably by Lender's own means or with legal process and take possession of the Collateral, and Borrower agrees not to resist or interfere therewith; (c) require Borrower to assemble Collateral and make it available to Lender at a place to be designated by Lender that is reasonably convenient to both parties (it being agreed that Lender's address set forth above is a place reasonably convenient for such assembling); and (d) sell, assign and deliver Collateral at public or private sale, for cash, on credit or future delivery, with or without advertisement of the time, place or terms of sale and in connection therewith to grant options and to use the services of a broker, except that if the sale be a private sale upon five (5) days' written notice to Borrower of the date, time and place of any sale and the terms of the sale, which notice Borrower agrees is reasonable, all other demands, advertisements and notices being hereby waived. Any sale shall be free and clear of any equity or right of redemption, which Borrower hereby absolutely and irrevocably waives and releases.

19.    At any sale of Collateral by Lender, Lender or its designee may purchase the Collateral. Lender shall not be obligated to make any sale of any Collateral if Lender shall determine not to do so, even if notice of sale may have been given. Lender may, without notice or publication, adjourn any public or private sale or cause the same to be adjourned from time to time and if such sale be a private sale by announcement at the time and place fixed for sale, and such sale may, without further notice, be made at the time and place to which the same was so adjourned. If any of the Collateral is sold by Lender upon credit or for future delivery, Lender shall not be liable for the failure of the purchaser to purchase or pay for the same and, in the event of such failure, Lender may resell such Collateral. In no event shall Borrower be credited with any part of the proceeds of sale of any Collateral until cash payment thereof has been received by Lender. In case of any sale, Lender may first deduct all costs and expenses of collection, sale and delivery of the Collateral and any costs and expenses incidental thereto, including, without

5

limitation, the expense of pursuing, searching for, receiving, taking, keeping and storing the Collateral, advertising the sale of the Collateral, reasonable attorneys' fees and disbursements, brokerage commissions and transfer fees and taxes, and shall apply any residue first to the payment of any advances made by Lender pursuant to the Note, then to late charges, if any, then to payment of interest accrued under the Note and then to the payment of the unpaid Principal. The balance, if any, remaining after payment in full of the unpaid Principal shall be paid to Borrower, to the extent permitted by law, unless there are no other claims from whom Lender has received notice. Any sale conducted upon the foregoing terms or by any other method of sale (if conducted in conformity with practices of any banks disposing of similar security) shall be deemed commercially reasonable. Borrower agrees that Lender shall have the right to continue to retain the Collateral until such time as Lender, in its reasonable judgment, believes that an advantageous price can be obtained for the Collateral and, absent gross negligence, Lender shall not be liable to Borrower for any loss in the value of the Collateral by reason of any such retention of the Collateral by Lender. Further, Lender may elect to retain the Collateral in full satisfaction of the Loan, in which event notice thereof shall be given to Borrower, and if Lender receives an objection in writing from Borrower within twenty-one (21) days after service of the notice, Lender shall commence to dispose of the Collateral in the manner as set forth herein; provided, however, that if the net proceeds to be received from any disposition would be insufficient to satisfy in full any amounts due hereunder or under the Note, Lender shall not be compelled to go forward with such proposed disposition, and shall be entitled to retain the Collateral in full satisfaction of the Note despite any objection by Borrower to such retention.

20.     Upon any default, Lender's attorney's fees and the legal and other expenses for pursuing, searching for, filing against, lawsuits against, receiving, taking, keeping, storing, advertising, and selling the Collateral or recovering the Principal, shall be chargeable to Borrower, and shall become part of the principal indebtedness and shall be deemed secured hereunder and by the Collateral until fully paid.

21.     Borrower shall remain liable for any deficiency resulting from a sale of the Collateral and shall pay any such deficiency forthwith on demand.

22.     If Borrower shall default in the performance of any of the provisions of this Security Agreement on Borrower's part to be performed, Lender may perform same for Borrower's account and any monies expended in so doing shall be chargeable with interest (at the same rate as may be due under the Note from time to time) to Borrower and added to the indebtedness secured hereby.

23.     Upon default, Lender shall have the right, but not the obligation, to seize and operate the Collateral and to use the profits from such operation as it may see fit in its sole discretion, so long as Borrower receives credit for the amount of such profits so earned by Lender. Furthermore, Borrower hereby irrevocably appoints Lender as its attorney-in-fact, which appointment is coupled with an interest, for so long as any portion of the debt remains outstanding, for the purpose of executing and delivering, in the name and on behalf of Borrower, any and all documents, instruments, contracts, forms and writing of any nature whatsoever, which are reasonably required to be executed in order to schedule, advertise and consummate a commercially reasonable disposition of the Collateral following Borrower's default hereunder, or under the Note or other document executed in connection with the Note, and to perform any and

6

Exhibit 4, Page 70

all other acts in the name of Borrower and on Borrower's behalf as Lender may reasonably deem necessary or advisable in connection with such disposition of the Collateral in connection with complying with all provisions and requirements provided for under the UCC.

24.   The Note is a separate instrument and may be negotiated by Lender without releasing Borrower or the Collateral, or co-maker. Borrower consents to any extension of time of payment. If there be more than one Borrower or co-maker of this Security Agreement or of Notes secured hereby, the obligation of all shall be primary, joint and several.

25.   The waiver of or acquiescence in any default by Borrower, or failure of Lender to insist upon strict performance by Borrower of any warranties or agreements in this Security Agreement, shall not constitute a waiver of any subsequent or other default or failure.

26.   The UCC shall govern the rights, duties and remedies of the parties and any provisions herein declared invalid under any law shall not invalidate any other provision of this Security Agreement.

27.   Lender may assign its rights in this Security Agreement and in the Collateral, as Lender, in its sole discretion, may deem fit. Borrower may not assign its obligations or rights under this Security Agreement without the written consent of Lender.

28.   Lender is hereby authorized to file UCC financing statements as may be necessary to perfect Lender's interest in the Collateral. Notwithstanding the foregoing, Lender shall have no obligation to comply with any recording, re-recording, filing, refiling or other legal requirements necessary to establish or maintain the validity, priority or enforceability of, or Lender's rights in and to, the Collateral or any part thereof.

29.   All notices shall be in writing and shall be deemed to have been properly given: (a) upon delivery, if delivered in person; (b) one (1) business day (defined below) after having been deposited for overnight delivery with any reputable overnight courier service or if sent by email; or (c) three (3) business days after having been deposited in any post office or mail depository regularly maintained by the U.S. Postal Service and sent by certified mail, postage prepaid, return receipt requested.

30.   **THIS SECURITY AGREEMENT IS BEING DELIVERED IN THE STATE OF NEW YORK AND SHALL BE CONSTRUED AND ENFORCED IN ACCORDANCE WITH THE LAWS OF THE STATE OF NEW YORK WITHOUT ANY CONFLICT OF LAW PROVISION. ANY ACTION(S) OR PURSUIT OF ANY LEGAL CLAIM OR REMEDY IN ANY LEGAL FORUM IN CONNECTION WITH THIS DOCUMENT, ARISING FROM THIS DOCUMENT, OR RELATED TO ANY OBLIGATION RELATED HERETO, SAME MUST BE COMMENCED IN THE STATE OR FEDERAL COURT SITTING IN NEW YORK COUNTY, NEW YORK WHICH SHALL APPLY NEW YORK LAW TO THE MATTER WITHOUT A "CONFLICT OF LAWS" ANALYSIS.**

31.   In the event that any word, sentence, paragraph or article of this Security Agreement is found to be void or voidable, the balance of this Security Agreement shall nevertheless be legal and binding with the same force and effect as though the void or voidable parts were deleted.

7

32.    Each party shall do and perform, or cause to be done and performed, all such further acts and things, and shall execute and deliver all such other agreements, certificates, instruments and documents, as the other party may reasonably request in order to carry out the intent and accomplish the purposes of this Agreement and the consummation of the transactions contemplated hereby.

33.    This writing and the documents executed in connection with the Loan contain the entire agreement of the parties with respect to its subject material and no modifications, alterations or waiver of all or any part shall be valid unless made by a writing and signed by all the parties hereto. Each Party shall use all reasonable best efforts to take, or cause to be taken, all actions, and to do, or cause to be done, and to assist and cooperate with the other Parties in doing, all things necessary, proper or advisable to carry out the intent and purposes of this Agreement.

34.    This Security Agreement may be executed in two or more counterparts each of which is an original, but all of which together shall constitute one and the same instrument. Electronic signatures shall be deemed originals and as if signed in "wet ink." Borrower agrees not to raise any claim or defense as to the lack of an original.

35.    This Agreement may not be terminated by Borrower until Lender has received all the money, interest, etc. contemplated in the Note.

36.    Confidentiality. All parties to this Agreement agree and acknowledge that all names, terms, representations, agreements, covenants, etc. set forth in this Agreement are confidential (together, the "Confidential Information"). All parties will at all times keep the Confidential Information in confidence and trust. No party hereto will, without the prior written consent of an authorized officer of all parties to this Agreement, (a) copy, use or disclose any Confidential Information, (b) deliver or disclose any Confidential Information to any person or entity outside of this Agreement, or (c) use the Confidential Information for their own use or use it to the detriment of the other parties to this Agreement. Notwithstanding the foregoing, the parties hereto may, without consent, use the Confidential Information and disclose and deliver same to their employees or agents, if applicable, who have a need to know, provided such employees or agents have entered into written agreements approved in writing by Lender and containing provisions at least as restrictive as these provisions. Borrower agrees and understands that the disclosure of the Confidential Information in violation of this Agreement may cause the Lender irreparable harm and that any breach or threatened breach by the Borrower entitles Lender to seek injunctive relief, in addition to any other legal or equitable remedies available to it, in any court of competent jurisdiction.

37.    Successors and Assigns. This Agreement shall be binding upon, and inure to the benefit of, the Parties named herein and their respective successors and permitted assigns (only Lender may assign its rights hereunder though Borrower may assign its rights and obligations hereunder upon written consent from Lender). Neither this Agreement nor any rights or obligations of a Party hereunder shall be assigned by a Party (unless to an Affiliate of such Party) without the prior written consent of the other Parties. This Agreement will be binding upon any permitted assignee of any Party. No assignment shall have the effect of relieving any Party to this Agreement of any of its obligations hereunder.

38.   Expenses and Fees. Unless otherwise provided for herein, all fees and expenses incurred in connection with the transactions contemplated by this Agreement, including all legal, accounting, financial advisory, consulting and all other fees and expenses of Third Parties incurred by a Party in connection with the negotiation and effectuation of the terms and conditions of this Agreement and the transactions contemplated hereby, shall be the obligation of Borrower.

39.   Specific Performance. The Parties agree that irreparable damage would occur if any provision of this Agreement was not performed in accordance with the terms hereof and that the Parties shall be entitled to specific performance of the terms hereof, in addition to any other remedy to which they are entitled hereunder, at Law or in equity.

40.   **THE PARTIES HERETO AGREE THAT THEY SHALL WAIVE A TRIAL BY JURY IN ANY ACTION OR PROCEEDING BROUGHT BY EITHER OF THE PARTIES AGAINST THE OTHER ARISING OUT OF OR IN ANY WAY CONNECTED WITH THIS SECURITY AGREEMENT.**

IN WITNESS WHEREOF, the undersigned have executed and delivered this Security Agreement as of the day and year first above written.

GUARANTOR:

By: _____
Name: Tony M Diab

BORROWER:

BAT Inc a/k/a B.A.T. Inc.

By: _____
Name: Tony M Diab
Title: Officer

GUARANTOR:

By: _____
Name: Daniel March

BORROWER:

The Litigation Practice Group PC

By: _____
Name: Daniel March
Title: Officer

| LENDER: | LENDER: |
|---|---|
| MCA Fund ADV Inc. | LDR International Ltd., |
| By: _____ <br> Title: Officer | By: _____ <br> Title: Officer |

9

Exhibit 4, Page 73

# ACKNOWLEDGMENT

A notary public or other officer completing this
certificate verifies only the identity of the individual
who signed the document to which this certificate is
attached, and not the truthfulness, accuracy, or
validity of that document.

State of California
County of _____Orange_____ )

On __February 1, 2023__ before me, __Olga Lucia Esquivel, Notary Public__
                                      (insert name and title of the officer)

personally appeared __Daniel S. March__

who proved to me on the basis of satisfactory evidence to be the person(s) whose name(s) is/are
subscribed to the within instrument and acknowledged to me that he/she/they executed the same in
his/her/their authorized capacity(ies), and that by his/her/their signature(s) on the instrument the
person(s), or the entity upon behalf of which the person(s) acted, executed the instrument.

I certify under PENALTY OF PERJURY under the laws of the State of California that the foregoing
paragraph is true and correct.

WITNESS my hand and official seal.

Signature __Olga Esquivel__ (Seal)

OLGA LUCIA ESQUIVEL
COMM. # 2282791
NOTARY PUBLIC-CALIFORNIA
ORANGE COUNTY
MY COMM. EXP. MAR. 25, 2023

Exhibit 4, Page 74

# ACKNOWLEDGMENT

A notary public or other officer completing this certificate verifies only the identity of the individual who signed the document to which this certificate is attached, and not the truthfulness, accuracy, or validity of that document.

State of California
County of _____ Orange _____ )

On __2/7/23__ before me, __Vanessa Banken-Buchner__
                                          (insert name and title of the officer)

personally appeared __Tony Maurice Diab__
who proved to me on the basis of satisfactory evidence to be the person(s) whose name(s) is/are subscribed to the within instrument and acknowledged to me that he/she/they executed the same in his/her/their authorized capacity(ies), and that by his/her/their signature(s) on the instrument the person(s), or the entity upon behalf of which the person(s) acted, executed the instrument.

I certify under PENALTY OF PERJURY under the laws of the State of California that the foregoing paragraph is true and correct.

WITNESS my hand and official seal.

Signature _____    (Seal)

VANESSA BANKEN-BUCHNER
COMM #2364027
NOTARY PUBLIC - CALIFORNIA
RIVERSIDE COUNTY
My Commission Expires July 3, 2025

Exhibit 4, Page 75

# EXHIBIT 5

In re: The Litigation Practice Group PC
Summary of Disbursements
Post-Petition Activity (3/20/2023 - Present)



| Bank Name | Account Name | Account Number | Statement Date | Transaction Date | Check Number | Debit/Charge | Memo |
|---|---|---|---|---|---|---|---|
| Bank of America | Prime Logix LLC | 9201 | 3/31/2023 | 3/31/2023 | | 105,000.00 | WIRE TYPE:INTL OUT DATE:230331 TIME:1 616 ET TRN:202303310071 1963 SERVICE REF:750657 BNF:LAURENT REISS ID:CH020851 50006666 BNF BK:BANK JULIUS BAER & CO L ID:006550073440 PMT DET:6MM3MVZ 57 POP Loan Payment |
| Bank of America | Prime Logix LLC | 9201 | 4/30/2023 | 4/6/2023 | | 105,000.00 | WIRE TYPE:INTL OUT DATE:230406 TIME:091 0 ET TRN:2023040600267985 SERVICE REF:1 98400 BNF:LAURENT REISS ID:CH020851 50006666 BNF BKBANK JULIUS BAER & Co L 1D006550073440 PMT DET:4329749 76 LOAN PAYMENT POP OTHER/LOAN PAYMENT |
| Bank of America | Prime Logix LLC | 9201 | 4/30/2023 | 4/25/2023 | | 50,000.00 | WIRE TYPE:INTL OUT DATE230425 TIME1 704 ET TRN20230425004781 19 SERVICE REFQ73702 BNF:LAURENT REISS ID:CH020851 50006666 BNF BKBANK JULIUS BAER & CO L 1D0065S0073440 PMT DET:4354749 36 POP SERVICES |
| Bank of America | Prime Logix LLC | 9201 | 4/30/2023 | 4/26/2023 | | 100,000.00 | WIRE TYPE:INTL OUT DATE230426 TIME:1 628 ET TRN:2023042600480836 SERVICE REF357121 BNF:LAURENT REISS ID:CH02085150006666 BNF BKBANK JULIUS BAER & CO L ID006550073440 PMT DET:4356383 58 POP SERVICES |
| Bank of America | Prime Logix LLC | 9201 | 4/30/2023 | 4/28/2023 | | 100,000.00 | WIRE TYPINTL OUT DATE230428 TIME1 311 ET TRN:2023042800529701 SERVICE REF:427036 BNF:LAURENT REISS ID:CH020851 50006666 BNF BKBANK JULIUS BAER & CO L 1D006550073440 PMT DET:4360210 86 POP SERVICES |
| Bank of America | Prime Logix LLC | 9201 | 5/31/2023 | 5/3/2023 | | 250,000.00 | WIRE TYPE.INTL OUT DATE 230503 TIME1 708 ET TRN2023050300481 807 SERVICE REF.770508 BNF:LAURENT REISS ID:CH020851 50006666 BNF BKBANK JULIUS BAER & CO L 1D006550073440 PMT DET.54GW97H DQ POP loan payment |
| Bank of America | Prime Logix LLC | 9201 | 5/31/2023 | 5/8/2023 | | 1,000,000.00 | WIRE TYPE:INTL OUT DATE230508 TIME:1 415 Er TRN:2O23050800424500 SERVICE REF:913176 BNF:LAURENT REISS ID:CH02085150006666 BNF BKBANK JULIUS BAER & L IDG06550073440 PMT DETCBJHZSTYT POP loan payment |
| | | | | | | 1,710,000.00 | |

1 of 1

DRAFT FORM - SUBJECT TO CHANGE

Exhibit 5, Page 77

Mᵉ CLAIRE NOTARI
HUISSIER
17, bd Albert 1er
MONACO ☎ +377 97 9

# EXHIBIT 6

**BANK OF AMERICA**　　　　　　　　**Your checking account**

PRIME LOGIX LLC  |  Account # ▆▆▆▆ 9201  |  March 1, 2023 to March 31, 2023

## Withdrawals and other debits - continued

| Date | Description | Amount |
|---|---|---|
| 03/31/23 | WIRE TYPE:INTL OUT DATE:230331 TIME:1616 ET TRN:2023033100711963 SERVICE REF:750657 BNF:LAURENT REISS ID:CH0208515006666 BNF BK:BANK JULIUS BAER & CO L ID:006550073440 PMT DET:6MM3MVZ S7 POP Loan Payment | -105,000.00 |

Card account # XXXX XXXX XXXX 7115

**Subtotal for card account # XXXX XXXX XXXX 7115**
**Total withdrawals and other debits**

## Checks

| Date | Check # | Amount | | Date | Check # | Amount |
|---|---|---|---|---|---|---|
| | | | | | | |
| | | | | | | |
| | | | | **Total checks** | | |
| | | | | **Total # of checks** | | 3 |

* There is a gap in sequential check numbers

**Your checking account**

**BANK OF AMERICA**

PRIME LOGIX LLC  |  Account #

April 1, 2023 to April 30, 2023

## Withdrawals and other debits - continued

| Date | Description | Amount |
|------|-------------|--------|
| 04/06/23 | WIRE TYPE:INTL OUT DATE:230406 TIME:0910 ET TRN:2023040600267985 SERVICE REF:198400 BNF:LAURENT REISS ID:CH02085150006666 BNF BK:BANK JULIUS BAER & CO L ID:006550073440 PMT DET:4329749 76 LOAN PAYMENT POP OTHER/LOAN PAYMENT | -105,000.00 |

continued on the next page

Exhibit 6, Page 80

Page 5 of 16

**BANK OF AMERICA** 🇺🇸

**Your checking account**

PRIME LOGIX LLC  |  Account # ████████ 9201  |  April 1, 2023 to April 30, 2023

## Withdrawals and other debits - continued

| Date | Description | Amount |
|------|-------------|--------|
| 04/25/23 | WIRE TYPE:INTL OUT DATE:230425 TIME:1704 ET TRN:2023042500478119 SERVICE REF:273702 BNF:LAURENT REISS ID:CH02085150006666 BNF BK:BANK JULIUS BAER & CO L ID:006550073440 PMT DET:4354749 36 POP SERVICES | -50,000.00 |
| 04/26/23 | WIRE TYPE:INTL OUT DATE:230426 TIME:1628 ET TRN:2023042600480836 SERVICE REF:357121 BNF:LAURENT REISS ID:CH02085150006666 BNF BK:BANK JULIUS BAER & CO L ID:006550073440 PMT DET:4356383 58 POP SERVICES | -100,000.00 |
| 04/28/23 | WIRE TYPE:INTL OUT DATE:230428 TIME:1311 ET TRN:2023042800529701 SERVICE REF:427036 BNF:LAURENT REISS ID:CH02085150006666 BNF BK:BANK JULIUS BAER & CO L ID:006550073440 PMT DET:4360210 86 POP SERVICES | -100,000.00 |

continued on the next page

Exhibit 6, Page 81

**BANK OF AMERICA**

**Your checking account**

PRIME LOGIX LLC  |  Account # ████ 9201  | May 1, 2023 to May 31, 2023

## Deposits and other credits - continued

| Date | Description | Amount |
|------|-------------|--------|
| ████ | ████████████████████████ | ████ |
| ████ | ██████████████████████████ | ████ |
| ████ | ██████ | ████ |
| ████ | ██████████████████████ | ████ |
| ████ | ████████████████████████ | ████ |
| ████ | ██████████████████████████ | ████ |
| ████ | ████████████████████████ | ████ |
| ████ | ██████████ | ████ |
| ████ | ██████████████████████ | ████ |
| ████ | ██████████████████████ | ████ |
| ████ | ██████ | ████ |

**Total deposits and other credits**

## Withdrawals and other debits

| Date | Description | Amount |
|------|-------------|--------|
| ████ | ██████████████ | ████ |
| ████ | ██████████████████████ | ████ |
| ████ | ██████████████████████ | ████ |
| ████ | ████████████████ | ████ |
| ████ | ██ ████ ████████ █ | ████ |
| ████ | ████████████████████ | ████ |
| ████ | ██████████████ | ████ |
| ████ | ████████ ██████ | ████ |
| ████ | ████ | ████ |
| ████ | ████████████ █ | ████ |
| ████ | ████████████ █ █ | ████ |
| ████ | ██████████████ | ████ |
| 05/03/23 | WIRE TYPE:INTL OUT DATE:230503 TIME:1708 ET TRN:2023050300481807 SERVICE REF:770508 BNF:LAURENT REISS ID:CH02085150006666 BNF BK:BANK JULIUS BAER & CO L ID:006550073440 PMT DET:54GW97H DQ POP loan payment | -250,000.00 |

*continued on the next page*

Exhibit 6, Page 82

PRIME LOGIX LLC  |  Account # ███████

## Withdrawals and other debits - continued

| Date | Description | Amount |
|------|-------------|--------|
| 05/08/23 | WIRE TYPE:INTL OUT DATE:230508 TIME:1415 ET TRN:2023050800424500 SERVICE REF:913176 BNF:LAURENT REISS ID:CH02085150006666 BNF BK:BANK JULIUS BAER & CO L ID:006550073440 PMT DET:CBJHZ5T YT POP loan payment | -1,000,000.00 |

continued on the next page

Exhibit 6, Page 83

Me CLAIRE NOTARI
HUISSIER
17, bd Albert 1er
MONACO ☎ +377 97 97 97 09 09

**TRADUCTION SIMPLE**

Christopher Celentino (Barreau d'État n° 131688)
Yosina M. Lissebeck (Barreau d'État n° 201654)
Christopher B. Ghio (Barreau d'État n° 259094)
Jacob R. Bothamley (Barreau d'État n° 319457)
**DINSMORE & SHOHL LLP**
655 West Broadway, Suite 800
San Diego, CA 92101
Téléphone : 619.400.0500
Fax : 619.400.0501
christopher.ghio@dinsmore.com
christopher.celentino@dinsmore.com
yosina.lissebeck@dinsmore.com
Jacob.bothamley@dinsmore.com

Avocats de Richard A. Marshack,
Administrateur Judiciaire du Trust de liquidation de LPG

## TRIBUNAL DES FAILLITES DES ÉTATS-UNIS

## DISTRICT CENTRAL DE CALIFORNIE - DIVISION SANTA ANA

| | |
|---|---|
| In re :<br>LE GROUPE DE PRATIQUE CONTENTIEUX P.C.,<br><br>Débiteur. | Dossier n° : 8:23-bk-10571-SC<br><br>Procédure avancée n° 8:25-ap-01190-SC<br><br>Chapitre 11 |
| RICHARD A. MARSHACK<br>Administrateur judiciaire du Fonds de liquidation de LPG,<br><br>Demandeur,<br><br>v.<br><br>LAURENT REISS, résident monégasque ; MCA Fund ADV Inc., une société new-yorkaise ; LDR International Ltd., une société à responsabilité limitée des îles Vierges britanniques ; et DOES 1-10, inclus,<br><br>Défendeurs. | **PREMIÈRE PLAINTE MODIFIÉE DU SYNDIC POUR :**<br><br>**(1) LA RÉVOCATION, LE RECOUVREMENT ET LA CONSERVATION DES TRANSFERTS FRAUDULEUX EFFECTUÉS SUR UNE PÉRIODE DE 2 ANS ;**<br><br>**(2) LA RÉVOCATION, LE RECOUVREMENT ET LA CONSERVATION DES TRANSFERTS FRAUDULEUX PRÉSUMÉS SUR UNE PÉRIODE DE 2 ANS ;**<br><br>**(3) LA RÉVOCATION, LE RECOUVREMENT ET LA CONSERVATION DES TRANSFERTS FRAUDULEUX EFFECTUÉS SUR UNE PÉRIODE DE 4 ANS ;** |

1



**(4) LA RÉVOCATION, LE RECOUVREMENT ET LA CONSERVATION DES TRANSFERTS FRAUDULEUX PRÉSUMÉS SUR UNE PÉRIODE DE 4 ANS ;**

**(5) RÉVOCATION, RECOUVREMENT, CONSERVATION DES TRANSFERTS NON AUTORISÉS APRÈS LA PÉTITION ;**

**(6) DÉTOURNEMENT ;**

**(7) PARTICIPATION À UN SYSTÈME VISANT À CONTINUER D'AGGRAVER L'INSOLVABILITÉ CONTINUE DE LPG ;**

**(8) AIDE ET COMPLICITÉ ;**

**(9) BLANCHIMENT ; ET**

**(10) MESURE DÉCLARATOIRE**

Juge : L'honorable Scott C. Clarkson

Pour sa *première plainte modifiée concernant (1) la révocation, le recouvrement et la conservation de transferts frauduleux effectués sur une période de 2 ans ; (2) la révocation, le recouvrement et la préservation des transferts frauduleux présumés sur une période de 2 ans ; (3) la révocation, le recouvrement et la conservation des transferts frauduleux effectués sur une période de 4 ans ; (4) la révocation, le recouvrement et la préservation des transferts frauduleux présumés sur une période de 4 ans ; (5 )Révocation, recouvrement, préservation des transferts non autorisés après la pétition ; (6) Détournement ; (7) Participation à un dispositif visant à continuer d'approfondir l'insolvabilité persistante de LPG ; (8) Aide et complicité ; (9) Blanchiment ; et (10) mesure déclaratoire* (le « FAC »), le demandeur Richard A. Marshack, ancien administrateur judiciaire pour le patrimoine de la faillite en vertu du chapitre 11 (« Patrimoine ») du débiteur The Litigation Practice Group P.C. (« Débiteur » ou « LPG ») et liquidateur judiciaire actuel de LPG Liquidation Trust

2



(collectivement « Syndic » ou « Demandeur ») dans l'affaire de faillite sous-titrée ci-dessus (l'« Affaire de faillite »), allègue et affirme ce qui suit :

## DÉCLARATION DE COMPÉTENCE, NATURE DE LA PROCÉDURE ET COMPÉTENCE

1. Cette Cour a compétence sur cette action en vertu de l'article 28 U.S.C. §§ 157(b)(2)(A), (E), (H) et (O), 1334(b), et de l'ordonnance générale n° 13-05 du tribunal de district pour le district central de Californie, car il s'agit d'une procédure centrale découlant de l'affaire de faillite et/ou liée à celle-ci, qui relève du chapitre 11 du titre 11 du Code des États-Unis (le « Code de la faillite ») pendante devant la Cour des faillites des États-Unis pour le district central de Californie, division Santa Ana (la « Cour »).

2. Que cette procédure soit essentielle, non essentielle ou autre, le demandeur consent au prononcé d'une ordonnance définitive et d'un jugement par le tribunal de faillite.

3. Par la présente, les défendeurs sont informés que la règle 7008 des Règles fédérales de procédure de faillite exige qu'ils plaident si leur consentement est donné pour le prononcé d'une ordonnance définitive et d'un jugement par le tribunal de faillite.

4. Le lieu de cette procédure contradictoire se situe légitimement dans ce district judiciaire conformément à l'article 28 U.S.C. § 1409(a), car cette procédure est liée à l'affaire de faillite en cours contre le débiteur.

## LES PARTIS

5. Le demandeur, Richard A. Marshack, était le l'administrateur judiciaire en vertu du Chapitre 11 dûment nommé et qualifié du patrimoine du débiteur et est désormais le fiduciaire liquidateur actuel de LPG Liquidation Trust.

6. Le débiteur LPG est, et a toujours été, une société professionnelle organisée, existante et en règle selon les lois de l'État de Californie, dont le principal siège est à Tustin, en Californie.

7. Sur la base de ses informations et convictions, le défendeur Laurent Reiss (« Laurent Reiss ») est, et a toujours été, présent comme une personne résidant à Monaco soumis à la signification d'actes de justice conformément à la *Convention du 15 novembre 1965 relative à la signification à l'étranger des documents judiciaires et extrajudiciaires en matière civile ou commerciale* (la « Convention de La Haye sur le service ») en envoyant une demande « USM-94 » compltétée :

3

Demande de notification à l'étranger de documents judiciaires ou extrajudiciaires (« USM-94 »), accompagné de copies de la convocation et de la plainte, à l'Autorité centrale pour Monaco soit : Direction des Services Judiciaires, Palais de Justice, 5, rue Colonel Bellando de Castro MC - 98000 Monaco.

8.   Le défendeur MCA Fund ADV Inc. (« MCA Fund ADV ») est, et à tous les moments importants a été présenté, comme une société existant selon les lois de l'État de New York.

9.   Le fonds MCA ADV peut être signifié par un affranchissement de première classe prépayé à son agent enregistré pour signification d'acte de procédure, USACORP INC., 325 Division Ave, Ste 201, Brooklyn, NY, 11211.

///

10.   LDR International Ltd. (« LDR » et, avec Laurent Reiss et MCA Fund ADV, « Défendeurs »), est, et a toujours été présentée à des moments importants, comme une société à responsabilité limitée existant en vertu des lois des îles Vierges britanniques.

11.   La société LDR peut être signifiée conformément à la Convention de La Haye en envoyant une demande « USM-94 » complétée, accompagnée de copies de la convocation et de la plainte, à l'Autorité centrale pour les îles Vierges britanniques : Greffier de la Cour suprême, Greffe de la Cour suprême, n° 84 Main Street, P.O. Box 418, Road Town, Tortola, Îles Vierges britanniques VG1110.

12.   Les véritables noms et capacités, qu'ils soient individuels, associés d'entreprise ou autres, des défendeurs inconnus 1 à 10, inclus, sont inconnus du Demandeur, qui poursuit donc ces défendeurs sous de tels noms fictifs.  Le demandeur est informé et croit que chacun des défendeurs désignés ici comme un défendeur fictivement nommé est d'une manière ou d'une autre responsable des événements et événements mentionnés et a causé les dommages ici allégués.  Lorsque le demandeur aura déterminé les véritables noms et capacités des Causes 1 à 10, inclusivement, il demandera à cette Cour la permission de modifier sa plainte en la reformulant.

## ALLÉGATIONS GÉNÉRALES

**A.   L'affaire de faillite**

13.   Le 20 mars 2023 (« Date de la requête »), le débiteur a déposé une requête volontaire

4

en réparation en vertu du chapitre 11 du Code de la faillite, entamant ainsi la procédure de faillite.

14. Le Bureau du Fiduciaire des États-Unis (« UST ») a déposé sa *requête du Fiduciaire des États-Unis en vue de rejeter ou de convertir l'affaire conformément à 11 U.S.C. § 1112(b)* [Dossier bancaire n° 21] et de ses créanciers Debt Validation Fund II, LLC ; MC DVI Fund 1, LLC ; et MC DVI Fund 2, LLC a déposé la *requête de DVF et MC DVI pour rejeter une affaire en vertu du chapitre 11 conformément à 11 U.S.C. §§ 105, 305, 349 & 1112, ou en alternative, convertir cette affaire en chapitre 7 ou nommer un fiduciaire* [Dossier bancaire n° 44]. Le 4 mai 2023, la Cour a rendu son *ordonnance ordonnant au fiduciaire des États-Unis de nommer un fiduciaire en vertu du chapitre 11* [Dossier bancaire n° 58].

15. Conformément à l' *acceptation de la nomination en tant que fiduciaire en vertu du chapitre 11* [dossier bancaire n° 63], le 8 mai 2023, le fiduciaire a accepté sa nomination en tant que fiduciaire en vertu du chapitre 11 dans l'affaire de faillite. La Cour a approuvé la nomination du fiduciaire dans son *ordonnance approuvant la demande du fiduciaire américain pour la nomination d'un fiduciaire au titre du chapitre 11* [dossier n° 65].

16. L'administrateur judiciaire n'a été nommé qu'après les événements de l'affaire et, par conséquent, base ces allégations sur des informations et convictions. *Soo Park c. Thompson*, 851 F.3d 910, 928 (9th Cir. 2017) (« La norme de plausibilité *de Twombly* . . . n'empêche pas un demandeur d'invoquer des faits allégués sur la base d'informations et convictions lorsque ces faits relèvent particulièrement de la possession et du contrôle du défendeur ou lorsque la conviction repose sur des informations factuelles rendant plausible l'inférence de culpabilité. ») ; *Miller c. City of Los Angeles*, 2014 U.S. Dist. LEXIS 198871, 2014 WL 12610195, à *5 (C.D. Cal. 7 août 2014) (reconnaissant que la plaidoirie « d'information et de conviction » du demandeur était permise et « parfois nécessaire ») ; *voir aussi Mireskandari c. Daily Mail and General Trust PLC*, 2013 U.S. Dist. LEXIS 194437, 2013 WL 12129642, à *4 (C.D. Cal. 31 juillet 2013) (« Les Règles Fédérales de Procédure Civile permettent aux parties de plaider des faits sur 'information et conviction' si les faits 'auront probablement un soutien probatoire après une opportunité raisonnable d'enquête ou de recherche de preuves supplémentaire.' » (citations omises)).

17. Conformément à l' *ordonnance confirmant le premier plan de liquidation conjoint*

5

*modifié du chapitre 11* modifié entré en vigueur le 9 septembre 2024, et à l' *avis de survenance de la date d'entrée en vigueur du premier plan de liquidation conjoint modifié du chapitre 11* modifié déposé le 24 septembre 2024, Richard A. Marshack est devenu le fiduciaire liquidateur de LPG Liquidation Trust, à compter du 24 septembre 2024. [Dossiers bancaires n° 1646 et 1762].

18. Toutes les créances ont été transférées au Trust liquidateur conformément au plan confirmé et le demandeur engage cette action uniquement en sa qualité de fiduciaire liquidateur du Trust de liquidation de LPG, au bénéfice du patrimoine du débiteur et de ses créanciers.

19. Conformément à la règle 15(a)(1)(B) des Règles fédérales de procédure civile, un plaidoyer auquel une réponse est nécessaire peut être modifié de manière courante soit 21 jours après la signification d'un acte de réponse, soit 21 jours après la signification d'une requête en vertu de la Fed. R. Civ. P. 12(b), (e) ou (f), en fonction du premier évènement survenu. Fed. R. Civ. P. 15(a)(1)(B). Aucune requête en réponse n'a encore été déposée. Par conséquent, le dépôt de cette première plainte modifiée n'est pas prescrit et déposé de droit.

**B.    Ordonnance de protection**

20. Aux alentours du 2 mai 2024, le demandeur a déposé cet avis et une requête afin d'ordonnance de protection (l'« ordonnance de protection »).

21. Le 3 juin 2024, la Cour a rendu son *ordonnance accordant la requête afin d'ordonnance de protection et l'ordonnance de protection* [Bankr. Docket n° 1270] (l'« ordonnance de protection »). Une copie fidèle et exacte de l'ordonnance de protection est jointe en **Annexe 1** et y est incorporée.

22. Selon ses propres termes, l'ordonnance de protection s'applique à cette procédure adversaire et régit toute la découverte menée dans ce cas.

**C.    Propriété et gestion de LPG**

23. LPG fonctionnait comme cabinet d'avocats pour les consommateurs à travers le pays qui cherchaient de l'aide pour contester ou résoudre les dettes qu'ils auraient identifiées.

24. Les consommateurs payaient LPG sur une période de temps via des débits mensuels depuis leurs comptes bancaires ; LPG était tenu de conserver ces fonds en fiducie jusqu'à ce qu'il fournisse des services juridiques d'une valeur équivalente qu'il pouvait être rémunéré.

6

Me CLAIRE NOTARI
HUISSIER
17, bd Albert 1er
MONACO ☎ +377 97 97 09 09

25.    Les paiements mensuels étaient destinés à couvrir tous les services juridiques fournis par LPG aux consommateurs, y compris la validation des dettes, l'examen des documents pour déterminer l'exécution, le dépôt de certaines demandes affirmatives, et les comparutions devant les tribunaux pour arrêter les poursuites visant à obtenir des jugements.

26.    Dans certains cas, LPG intentait un procès dans le but d'éliminer une dette contestée ou de poursuivre des revendications affirmatives détenues par les consommateurs.

27.    À tous les moments pertinents avant la nomination du fiduciaire, LPG était géré et exploité par Dan March, Esq., en tant que seul membre et propriétaire légal. Tony Diab (« Diab ») et d'autres défendeurs ont élaboré un plan visant à transférer frauduleusement des fonds, dossiers clients, fonds clients et actifs sous forme de créances ACH (les « comptes clients ACH » ou « comptes clients ») hors de LPG vers des tiers avant le dépôt de la faillite.

28.    Pour démarcher de nouveaux clients consommateurs, LPG a passé des contrats avec des sociétés de commercialisation qui pratiquaient des plafonnements illégaux et faisaient de la publicité ou appelaient pour solliciter des consommateurs afin qu'ils deviennent clients de LPG en échange d'un pourcentage des créances ACH perçues par LPG auprès des consommateurs.

29.    En échange, LPG acceptait de verser aux affiliés marketing un pourcentage des paiements mensuels perçus par LPG auprès des consommateurs.

30.    Comme LPG recevait des paiements des consommateurs au fil du temps, il cherchait souvent à financer en empruntant sur ses flux de trésorerie futurs. Cet emprunt servait non seulement à financer les opérations chez LPG, mais aussi à payer les honoraires dus aux sociétés de marketing pour la fourniture de recommandations clients.

31.    Diab, travaillant de concert avec d'autres, détournait, volait et utilisait des fonds de LPG provenant des paiements à la consommation et des transactions de prêt pour financer ses dépenses personnelles et extravagances, au détriment et au préjudice de LPG et de ses activités.

32.    Beaucoup de documents signés en lien avec ce financement décrivaient les transactions comme des contrats d'achat de comptes clients.

33.    Diab utilisait des entités qu'il contrôlait, et étaient ses alters ego, notamment, sans être exhaustif, Vulcan Consulting Group (« Vulcan »), Maverick Management Group LLC (« Maverick

7

»), Prime Logix, LLC (« Prime Logix »), LGS Holdco, LLC (« LGS ») et/ou Coast Processing , afin de détourner les fonds de consommation de LPG et les créances ACH. Diab utilisait de nombreuses entreprises de traitement ACH pour transférer facilement des millions de dollars du débiteur vers ces entités qu'il contrôlait, sans surveillance ni détection, et pour éviter des litiges de paiement et des complications. L'argent qui circulait du débiteur via ces comptes bancaires vers les défendeurs consistait en des fonds clients que le débiteur redirigeait vers ces entités via les sociétés de traitement ACH. Le débiteur effectuait également des dépôts sur les comptes bancaires de ces entités afin de recevoir directement des fonds clients de la part du débiteur en plus des comptes clients directs.

34.    Conformément à l'accord d'achat d'actifs entre LPG et CLG, sur lequel Diab a falsifié les signatures autorisées de LPG, Diab a demandé à CLG d'initier les débits ACH sur les fichiers transférés, ce qu'elle a fait via Optimum Bank et son entité de traitement LGS Holdco.

35.    À la date ou autour de la date de la requête, Diab a transféré, sans contrepartie, environ 8 000 dossiers (précédemment transférés à Phoenix) à Heshy Deutsch (« Deutsch ») et Israel Reiches (« Reiches »). Diab a ordonné à Deutsch et Reiches, par l'intermédiaire de leurs complices Sam Geiger et Solomon Feig, d'initier les débits ACH sur les fichiers transférés, ce qu'ils ont fait via BCB Bank et une entité de traitement appelée CLG Processing, dans des comptes, non pas au nom de LPG, mais qui détenaient des fonds au nom de LPG et ont déboursé ces fonds pour LPG.

36.    Les fonds obtenus grâce aux débits ACH décrits dans les paragraphes précédents ont été déposés sur des comptes Maverick et Prime Logix, entre autres.

37.    Les créances ACH de LPG étaient la principale, si ce n'est l'exclusive source de fonds pour Validation Partners, Vulcan, Oakstone, PECC, Prime Logix, Coast Processing, LGS et Maverick. Comme indiqué ci-dessus, les autres sources de fonds pour ces entités sont les produits des actifs de LPG (c'est-à-dire les produits des comptes clients de dépôt des comptes clients) ou constituent des produits de prêt dont LPG seul était responsable.

38.    Diab détournait fréquemment l'argent de LPG retiré de ses clients consommateurs et d'autres fonds reçus par les investisseurs et prêteurs, vers et via ces entités.

39.    Diab demandait fréquemment à ces entités de payer des affiliés (appelés cappers marketing), des prêteurs MCA et d'autres personnes avec des biens en LPG.

8



40.    Diab instruirait d'autres personnes chez LPG et ces entités sur la gestion et le transfert de ces fonds vers et depuis ces entités ainsi que LPG de manière interchangeable.

**D.    Prêt de 1,5 million de dollars de MCA Fund ADV Inc. et/ou LDR International Ltd.**

41.    Vers le 7 février 2023, BAT et LPG ont signé un contrat de prêt avec MCA Fund ADV et/ou LDR pour documenter les conditions du prêt (le « Prêt »). Une copie fidèle et exacte du contrat de prêt est jointe ici en **annexe 2**.

42.    Sur la base d'informations et de convictions, LPG a conclu le prêt, qui a été arrangé par l'avocat Ronald Richards.

43.    LPG a signé une note à ordre (« Note ») du montant principal initial de 1 500 000 $ et un accord de garantie associé (« Accord de garantie » et, avec le Billet et le Contrat de Prêt, les « Documents de Prêt ») pour documenter le montant dû dans le cadre du Prêt. Des copies vraies et exactes de la Note et de l'Accord de Garantie sont jointes ici en tant que **Annexes 3** et **Annexe 4**, respectivement.

44.    Les termes de la note sont les suivants :

| | |
|---|---|
| Montant principal : | 1 500 000,00 $ |
| Date : | 7 février 2023 |
| Date d'échéance : | 6 mai 2023 |
| Intérêt : | 7,0 % par mois |
| Défaut d'intérêt : | 24% |

45.    L'effet de ces conditions est que le taux d'intérêt du billet est d'environ 84,3 % TAEG et qu'en échange de 1 500 000,00 $, le MCA Fund ADV et/ou LDR aurait reçu 1 920 000,00 $, soit un rendement de 420 000,00 $ sur son taux de 1 500 000,00 $ (28,0 %) en quatre mois.

46.    Sur la base d'informations et de convictions supplémentaires, même si le défendeur Laurent Reiss n'était pas partie au prêt, LPG a effectué des paiements liés au prêt à Laurent Reiss plutôt que de faire des paiements au MCA Fund ADV ou à la LDR.

**E.    Paiements à Laurent Reiss**

47.    Pendant la période applicable postérieure à la demande et selon les documents actuellement disponibles, Prime Logix, qui ne disposait d'aucun autre fonds que des fonds de LPG

9

détournés, a versé à Laurent Reiss la somme d'au moins 1 710 000 $ entre mars 2023 et mai 2023 (les « Transferts »), vers le compte bancaire suisse se terminant 6666 chez Bank Julius Baer & Co. AG au nom de Laurent Reiss. Une liste fidèle et exacte des paiements connus effectués par LPG à Laurent Reiss est jointe ici en **annexe 5** et intégrée dans la présente. Des copies authentiques et exactes des relevés bancaires expurgés attestant des transferts sont jointes ici en **Annexe 6**.

F.      **La connaissance de Laurent Reiss et son aide substantielle dans le système de Ponzi de Diab**

48.      Sur la base de ses informations et convictions, Laurent Reiss a rencontré Diab fin 2021 ou début 2022 pour discuter de la possibilité que Laurent Reiss s'implique dans LPG.

49.      Sur la base de ses informations et convictions, au moment où Laurent Reiss a rencontré Diab, il était déjà associé commercial de Solomon Feig (« Feig »), l'un des partenaires commerciaux de Diab chez LPG.

50.      Sur la base de ses informations et convictions, au début de la relation commerciale, Laurent Reiss a exprimé son scepticisme envers Diab quant aux raisons pour lesquelles LPG ne recherchait pas de prêts traditionnels, et Diab a révélé le modèle économique illégal de LPG, y compris des détails liés à l'appropriation illégale, mais intentionnelle, des fonds clients de LPG.

51.      Sur la base de ses informations et convictions, Diab et Laurent Reiss ont discuté des options potentielles pour que Laurent Reiss investisse dans LPG.

52.      Sur la base de ses informations et de convictions, à tous les moments pertinents, Laurent Reiss, expérimenté et féru en finance, savait ou aurait dû savoir que Diab exploitait LPG comme un système Ponzi illégal, surtout après avoir appris les détails du modèle économique de LPG grâce à Diab, ce qui expliquait pourquoi LPG ne pouvait pas obtenir un prêt conventionnel.

53.      Sur la base de ses informations et convictions, Diab et Laurent Reiss décidèrent que Reiss ne serait pas un acheteur de fichiers, comme Diab l'avait convenu avec d'autres investisseurs.

54.      Au lieu de cela, sur la base de ses informations et convictions, Laurent Reiss accorderait un prêt initial de 2,5 millions de dollars à LPG, Reiss fournissant 1 million et Feig 1,5 million restant avec un taux d'intérêt de 7 % par mois.

10

55. Comme mentionné plus haut, le premier prêt à LPG a été accordé en juillet 2022[1].

56. D'après ses informations et convictions, au moment où Laurent Reiss a accordé le premier prêt à LPG, il comprenait que l'investissement devait être déguisé en prêt à taux à haut risque, car LPG était constamment à risque en raison de son utilisation systématique des fonds clients.

57. D'après ses informations et convictions, Laurent Reiss savait également que tout fonds que LPG lui rembourserait ou à son profit serait promu des fonds détournés par les clients de LPG.

58. D'après ses informations et convictions, lorsque le remboursement du premier prêt arriva à échéance quelques mois plus tard, LPG ne disposait pas de fonds suffisants pour le prêt, mais après une prolongation du délai de paiement, LPG put rembourser le prêt, intérêts compris.

59. D'après ses informations et convictions, en janvier 2023, LPG avait besoin d'un autre prêt, et Diab a de nouveau approché Laurent Reiss, qui a accepté de contracter un prêt de 1,5 million de dollars avec un taux d'intérêt de 7 % (précédemment défini comme le Prêt).

60. Selon ses informations et convictions, à peu près au moment où Laurent Reiss a accordé le prêt à LPG, LPG était en litige avec son processeur de paiement, Marich Bein, et n'avait pas de flux de trésorerie, et ne pouvait pas payer Laurent Reiss à temps pour le prêt.

61. Sur la base de ses informations et convictions, après que LPG n'ait pas effectué les paiements à temps sur le prêt, Laurent Reiss a pris conscience de l'état chaotique des opérations de LPG à cette époque.

G. **Le système Ponzi de LPG**

62. La présomption du système Ponzi existe dans les procédures de faillite.

63. La présomption du système Ponzi peut être utilisée pour établir l'« intention d'un débiteur de frauder les futurs entrepreneurs [investisseurs et prêteurs » du simple fait qu'un débiteur gérait un système Ponzi. En effet, aucune autre inférence raisonnable n'est possible. Un système Ponzi ne peut pas fonctionner éternellement. Le vivier d'investisseurs est une ressource limitée et finira par s'épuiser. L'auteur doit savoir que le dispositif finira par s'effondrer en raison de l'incapacité

---

[1] Ce prêt est traité plus en détail dans la procédure contradictoire intitulée *Marshack c. Delphine Pastor et al*, 8:25-ap-01192-SC, car les paiements de LPG sur ce prêt ont été versés à Delphine Pastor, qui est l'épouse de Laurent Reiss.

11

à attirer de nouveaux investisseurs. L'auteur effectue néanmoins des paiements aux investisseurs actuels, qui, par définition, sont destinés à attirer de nouveaux investisseurs. Il doit savoir depuis le début, par la nature même de ses activités, que les investisseurs au bout de la ligne perdront leur argent. La connaissance avec une certitude substantielle constitue une intention aux yeux de la loi », *cf. Restatement (Second) of Torts § 8A* (1963 & 1964), et la connaissance du débiteur que les futurs investisseurs ne seront pas payés suffit à établir son intention réelle de les frauder. *Kirkland c. Rund (In re EPD Inv. Co., LLC)*, 114 F.4th 1148, 1153 (9e Cir. 2024) (par définition, le système Ponzi est voué à l'échec et l'escroc ainsi que ses entités se terminent souvent en faillite ou en séquestre équitable) ; *Cf. Coleman Am. Moving Servs., Inc. c. First Nat'l Bank & Trust Co. (In re American Properties, Inc.)* 14 B.R. 637, 643 (Bankr. D. Kan. 1981) (effectuer intentionnellement une transaction en pleine connaissance que son effet sera préjudiciable aux créanciers suffit à justifier l'intention réelle de entraver, retarder ou frauder au sens de l'article 548(a)(1)). »*Merrill c. Abbott (In re Independent Clearing House Co.)* (D. Utah 1987) 77 B.R. 843, 860.

64.    « Mais si tout ce que le débiteur reçoit en échange d'un transfert est l'utilisation de l'argent du défendeur pour faire fonctionner un système Ponzi, il n'y a rien dans la succession de faillite que les créanciers puissent partager. En fait, en aidant le débiteur à perpétuer son régime, les transferts aggravent le préjudice pour les créanciers en augmentant le montant des créances tout en diminuant la succession du débiteur. Dans une telle situation, l'utilisation de l'argent du défendeur ne peut être objectivement qualifiée de 'valeur raisonnablement équivalente'. » *In re Independent Clearing House Co.* 77 B.R. à 859. Par conséquent, « [l]e syndic peut éviter les transferts s'ils étaient préférentiels ou frauduleux. Les transferts aux investisseurs dans un système Ponzi sont préférentiels et frauduleux. Par conséquent, elles constituent un « actif du patrimoine », et le fiduciaire peut les récupérer. *Id.* à 853 n.17 (citations omises).

65.    Diab a utilisé LPG pour exploiter un système Ponzi qui utilisait les défendeurs et plusieurs autres entités comme investisseurs, que ce soit dans le cadre d'accords illégaux de partage des honoraires, d'investissements en espèces, de détournement de fonds ou de détournements de « prêts », afin de poursuivre ses pratiques commerciales illégales en utilisant les fonds fournis par les investisseurs actuels pour attirer de nouveaux investisseurs espérant des rendements très élevés. Par

12



conséquent, Diab utilisait un système Ponzi avec LPG et la présomption du régime de Ponzi peut être utilisée pour déduire que le débiteur avait l'intention de frauder les investisseurs au sens de la section 548(a)(1) de l'article 11 U.S.C. Cela est démontré par la Cour dans cette affaire de faillite qui a déclaré que le débiteur utilisait un système Ponzi lorsqu'elle a déclaré ce qui suit :

> Il est important de noter que cette Cour n'a jamais reçu de preuve significative et fiable que le débiteur ait obtenu des résultats significatifs pour ses clients, mais seulement des exemples anecdotiques de succès viable pour ses clients. En examinant le registre des réclamations de la succession, il existe des preuves de réclamations de consommateurs pour la fraude et des remboursements exigés mais non livrés d'environ 500 millions de dollars. Il existe de nombreuses preuves que le débiteur pré-requête n'a jamais placé les fonds collectés dans un compte en fiducie avocat-client, et que le débiteur ou ses dirigeants ont simplement pillé les paiements reçus via les retraits automatiques du client, épuisant à la fois les clients et les avocats externes qui pouvaient travailler sur des dossiers clients dans l'espoir d'être payés. Il existe également devant le tribunal que le débiteur menait un système Ponzi et payait certains avocats externes (ou « en réseau ») avec des fonds obtenus auprès de nouveaux clients. Dans ce cas, il semble que certains des « prêteurs » aient pu agir comme des « investisseurs », espérant des rendements très élevés avant que « la musique ne s'arrête ». La Cour d'appel du neuvième circuit a récemment expliqué : « [d]e définition, un système Ponzi est voué à l'échec parce que le vivier d'investisseurs disponibles n'est pas illimité. Lorsque le vivier d'investisseurs de l'opérateur de la schéma de Ponzi s'épuise inévitablement, le dispositif s'effondre et l'escroc ainsi que ses entités se retrouvent souvent en faillite ou en redressement judiciaire équitable. *Voir en général* David R. Hague, Expanding the Ponzi Scheme Presumption, 64 DePaul L. Rev. 867 (2015). En cas de faillite, le fiduciaire nommé par le tribunal est chargé de prendre immédiatement le contrôle de l'entité, de mettre fin à toute activité frauduleuse en cours, de localiser et de récupérer les actifs pour la succession en faillite ou en redressement judiciaire, et d'obtenir une répartition finale et équitable des actifs restants. *Voir* 11 U.S.C. § 704 ; *Kirkland c. Rund (In re EPD Inv. Co., LLC)*, 2024 U.S. App. LEXIS 21363, à *15 (9e Cir. 23 août 2024). Enfin, il existe des preuves que le débiteur chargeait (ou, comme certains créanciers l'affirment, « vendait double ou triple ») ses comptes ou créances à plusieurs prêteurs.

*Voir, Affaire 8:23-bk-10571-SC*, Doc 1545 n. 5.

66. De plus, puisque le prêt a été accordé dans l'intention de faire avancer le système

13

Ponzi, le débiteur n'a pas reçu une valeur équivalente objectivement raisonnable pour le prêt, et le syndic peut éviter le prêt parce qu'il était frauduleux.

67.    Les transactions entre les défendeurs et le débiteur étaient des prêts, pas des ventes de créances, et en tant que tels, les défendeurs servaient d'« investisseurs », espérant des rendements très élevés avant que « la musique ne s'arrête ».

68.    La dette attestée par le prêt constitue une « dette illégale » au sens de l'article 18 U.S.C. § 1961(6) ; 18 U.S.C. § 1962(c) ; et 18 U.S.C. § 1962(d) parce que : (i) la dette est inexécutoire en vertu de la loi fédérale ou étatique concernant le capital et/ou les intérêts en raison des lois relatives à l'usure, et viole les lois pénales applicables sur l'usure ; et (ii) la dette a été contractée dans le cadre du prêt d'argent à des taux usuraires selon la loi fédérale et étatique, et les taux sont supérieurs au taux exécutoire autorisé par les lois californiennes sur l'usure.

69.    Selon la loi californienne, à moins qu'un prêteur ne relève de l'une des exemptions approuvées par la législature de l'État, il ne peut pas facturer plus de 10 % d'intérêt annuel sur un prêt. Constitution de Californie art. XV § 1. Un taux d'intérêt supérieur à 10 % est usuraire, et si un prêteur négocie un prêt à un taux usuraire sans exemption qualifiée, l'accord sera nul et le prêteur n'aura aucune mesure légale pour récupérer les intérêts. Code civil de Californie § 1916.2. *Dev. Acquisition Group, LLC c. eaConsulting, Inc.*, 776 F. Supp. 2d 1161 (E.D. Cal. 2011).

## G.    L'Entreprise Criminelle

70.    Les opérations, activités et transferts du débiteur effectués dans le cadre du système Ponzi, y compris ceux en collaboration avec ses affiliés et ses relations avec les prévenus, constituaient également une entreprise criminelle.

71.    Cela est également démontré par l'ordonnance de la Cour dans l'Action 1046, dans laquelle elle a rejeté la requête du Greyson Law Center visant à annuler l'injonction préliminaire précédemment rendue dans l'affaire principale du débiteur, et la Cour a rendu l'avis suivant :

> À travers les différentes procédures et preuves produites tant dans l'affaire principale que dans les diverses procédures adverses, y compris, mais sans s'y limiter, diverses requêtes en ordonnances restrictives temporaires, injonctions préliminaires, requêtes en rejet, requêtes en nomination d'un syndic en vertu du chapitre 11, requête en vente d'actifs, ainsi qu'une multitude de requêtes déposées par des créanciers garantis et non garantis (étayées par des preuves

14



présentées sous serment) à l'appui de leurs réclamations, et en particulier les plaidoiries et preuves présentées par le « Watchdog of the Bankruptcy System », également appelé le Bureau du Syndic des États-Unis (une branche du Département de la Justice des États-Unis), *il est clair pour cette Cour que le Débiteur, depuis sa création avant la requête (et jusqu'au moment de la nomination du Syndic du Chapitre 11), était, selon l'avis de la Cour, Gérer une entreprise criminelle.*

Dossier n° 8:23-bk-10571-SC ; Avocat n° 8:23-ap-01046-SC [Dossier bancaire n° 1545, p.3 (souligné dans le texte)].

72.    Dans le cadre de cette entreprise criminelle, le débiteur et les défendeurs ont effectué des transferts frauduleux en vertu du prêt. Le prêt a été accordé par MCA Fund ADV et/ou LDR à des taux d'intérêt usuraires illégaux et les transferts effectués dans le cadre du prêt constituaient une fraude électronique.

**H.    Créanciers pré-pétition de LPG**

73.    Le débiteur était insolvable lorsque le prêt a été accordé. Cette insolvabilité est en partie attestée par le fait que 14 relevés UCC-1 distincts étaient enregistrés garantissant les dettes du débiteur au 1er septembre 2022. Ces déclarations restaient inédites à la date de la requête. Ces déclarations reflétaient soit des privilèges garantis présumés sur les actifs du débiteur alors détenus ou acquis par la suite, soit constituaient des preuves de la cession ou de la vente d'une part substantielle des revenus futurs du débiteur.

74.    Le demandeur dirige les défendeurs vers l'ordonnance refusant la requête de Greyson en annulation de l'injonction préliminaire rendue en tant que dossier bancaire n° 1545 (« ordonnance ») où la Cour a estimé « qu'il est clair pour cette Cour que le débiteur, depuis sa création avant la requête (et jusqu'au moment de la nomination du syndic du chapitre 1), dirigeait selon la Cour une entreprise criminelle » et que « [l]'il est également démontré devant la Cour que le débiteur utilisait un système Ponzi et en rémunération de certains avocats extérieurs (ou « en réseau ») avec des fonds obtenus auprès de nouveaux clients. » Ordre p. 3, 1, 11-13 ; p. 4,1 14-15. L'insolvabilité est présumée en droit si le débiteur a mis en place un système Ponzi. *Voyez, par exemple, Glob. Money Mgmt., L.P. c. McDonald*, n° 06CV34, 2008 U.S. Dist. LEXIS 128733, à *15 (S.D. Cal. 27 février 2008)

(concluant que « si un système Ponzi est prouvé, alors le débiteur est prouvé insolvable dès sa création »).

75.     Au moment de l'octroi du prêt, ces relevés UCC-1 antérieurs garantissaient le remboursement des montants réclamés suivants, qui seraient donc dus par le débiteur : (i) 2 374 004,82 $ dus à Fundura Capital Group, comme en témoigne la preuve de réclamation n° 335, prétendument garantie par un relevé UCC déposé aux alentours du 19 mai 2021 ; (ii) environ 15 millions de dollars dus à MNS Funding, LLC, comme en témoigne la preuve de la revendication n° 1060, prétendument garantie par une déclaration UCC déposée vers le 28 mai 2021 ; (iii) environ 5 000 000 $ dus à Azzure Capital, LLC, comme en témoigne la preuve de la réclamation n° 127 garantie par une déclaration UCC déposée vers le 28 mai 2021 ; et (iv) environ 1,5 million de dollars dus à Diverse Capital, LLC, prétendument garantis par des déclarations UCC déposées aux alentours du 15 septembre 2021 et du 1er décembre 2021.[2]

76.     Comme allégué plus haut, Diab a poussé LPG à emprunter sur ses actifs et ses revenus futurs, souvent à des conditions défavorables, non seulement pour financer les opérations de LPG, mais aussi pour payer les frais dus aux affiliés commercialisateurs pour fournir des clients aux consommateurs, pour rembourser d'autres prêts aux créanciers en défaut ou sur le point de l'être, dans le cadre du plan de Diab visant à tenir les créanciers du LPG à distance aussi longtemps que possible jusqu'à ce qu'il puisse transférer les actifs de LPG, les dossiers clients, les fonds clients et les créances ACH vers d'autres entités sous son contrôle. Conformément aux accords avec les sociétés de marketing, des pourcentages significatifs des paiements futurs étaient déjà promis à être versés aux affiliés marketing à partir de tout revenu futur que le débiteur recevrait.

77.     De plus, sur l'annexe E/F du débiteur [Dossier bancaire n° 33], le débiteur a inscrit 11 créanciers non garantis avec priorité totalisant 374 060,04 $. Ces créanciers non garantis prioritaires incluent le Département des revenus de l'Indiana, le Département du Travail et de l'Industrie, le Département de la sécurité économique de l'Arizona, le Département des finances et de l'administration de l'Arkansas, le Conseil des franchises fiscales de Californie, le Département du

---

[2] Le fiduciaire réserve tous les droits, revendications et défenses concernant ces créances et toute autre prétendue garantie ou non garantie.

16



Me CLAIRE NOTARI
HUISSIER
17, bd Albert 1er
MONACO ☎ +377 97 97 09 09

travail de Géorgie, l'Internal Revenue Service, le Département des recettes du Mississippi, le Département des impôts du Nevada, la Commission fiscale de l'État de l'Utah et le Département des recettes du Wisconsin (collectivement, « créanciers non garantis prioritaires »).

78.    Un autre groupe de créanciers inscrit par le débiteur dans son Annexe E/F [Dossier bancaire n° 33] est constitué de créanciers non garantis prioritaires. Ces 58 créanciers ont des créances prévues totalisant 141 439 158,05 $ et incluent Ajilon ; Anthem Blue Cross ; Azevedo Solutions Groups, Inc. ; Facture de Carolina Technologies & Consulting ; Conseillers en collaboration ; Credit Reporting Service Inc. ; CT Corporation – Inv. ; Debt Pay Pro ; Services de traitement des documents ; EnergyCare, LLC ; Exécuta Enterprise Solutions ; First Legal Network, LLC ; GHA Technologies Inc. ; Harrington Electric, Inc. ; Imaginez le reportage ; Juize, Inc. ; Krisp Technologies, Inc. ; Liberty Mutual ; Marc Lemauviel – Allegra ; MarkSYS Holdings, LLC ; Netsuite-Oracle ; Pitney Bowes ; Rapid Credit, Inc. ; SBS Leasing : Un programme de De Lage Landen ; Solutions de sécurité ; Sharp Business Systems ; Streamline Performance, Inc. ; Thomson Reuters ; Twilio, Inc. ; Avocats en comparution nationale ; Executive Center, LLC ; Externaliser Accelerator, Ltd. ; TaskUs Holdings, Inc. ; Marich Bein, LLC ; Partenaires de validation ; MC DVI Fund 1, LLC ; MC DVI Fund 2, LLC ; Debt Validation Fund II, LLC ; Centre exécutif Tustin ; LexisNexus ; JP Morgan Chase ; Centres d'affaires d'Amérique ; Michael Schwartz ; Anibal Colón Jr. ; Kathleen Lacey ; David Ulery ; Kimberly Birdsong ; Kevin Carpenter ; Karen Suell ; Gloria Eaton ; Carolyn Beech ; Debra Price ; Kenneth Topp ; Darcey Williamson, administrateur ; James Hammett ; Johnny Rizo ; Beverly Graham ; Kathleen Scarlett ; et Geneve et Myranda Sheffield (collectivement, « créanciers non garantis non prioritaires » et, avec les créanciers garantis et les créanciers non garantis prioritaires, les « créanciers pré-pétitionnaires »).

79.    Au moment du dépôt de cette plainte, environ 5 771 demandes ont été déposées auprès du tribunal de faillite. Bien que l'administrateur judiciaire n'ait pas examiné toutes les réclamations à la date de cette plainte et se réserve tout droit de s'y opposer, le montant total dépasse 717 507 462,29 $. Les états de bénéfices et pertes du débiteur reflètent au moins 115 000 000 $ de « revenu total » pour la période de trois ans se terminant le 31 décembre 2021, et sur la base d'informations et de la conviction qu'une part substantielle de ces revenus n'a pas réellement été perçue par le débiteur. Le

17

traitement comptable approprié de ce « revenu » non gagné aurait été d'enregistrer la partie non gagnée comme de l'argent reçu dans un compte bancaire en fiducie client ou IOLTA, avec un compte de dette à provision du client compensant pour le même montant. Ainsi, la part non acquise du revenu ne serait présente que sur le bilan et non sur le compte des résultats du débiteur. Les bilans du débiteur reflètent deux comptes en fiducie, dont le solde le plus élevé était d'environ 346 000 $ en novembre 2021. Les bilans ne font pas apparaître de passif au titre des acomptes versés par les clients. Ainsi, il semble que le débiteur ait surestimé ses revenus durant les trois années se terminant le 31 décembre 2021, bien que l'ampleur de la surestimation reste inconnue. De plus, en supposant (comme cela semble être le cas) que le débiteur n'ait pas correctement enregistré ses revenus non acquis dans ses bilans en utilisant un compte en fiducie et en compensant le compte de dette à la provision du client, alors les actifs et passifs du débiteur sur ces bilans seraient inexacts.

80.     De plus, ce n'est pas parce que le débiteur avait de l'argent entrant que cela signifie nécessairement qu'il était solvable. D'après les informations et les convictions,[investisseurs] la trésorerie entrante du débiteur était liée à des revenus non gagnés et aurait dû être détenue dans un compte en fiducie approprié et enregistrée dans son bilan avec un compte client à payer compensant jusqu'à ce qu'elle soit acquise. Ce traitement est renforcé, si c'est approprié, par le fait que le débiteur a proposé à ses clients un remboursement pour les revenus non gagnés. Ainsi, la trésorerie entrante du débiteur n'augmentait ni ses actifs (en raison de la compensation de la dette de la provision du client du même montant) ni n'augmentait sa rentabilité tant que les services n'étaient pas rendus et que le revenu était effectivement gagné.

81.     Les bilans des débiteurs pour les 36 mois se terminant le 31 décembre 2021 montrent seulement environ 17 900 000 $ d'actifs totaux (principalement en comptes clients et prêts commerciaux) à son plus haut niveau en novembre 2021. Évidemment, ce montant est nettement inférieur aux 700 000 000 $ de réclamations déposées, ce qui témoigne davantage de l'état d'insolvabilité du débiteur.

## PREMIÈRE DEMANDE DE RÉPARATION

### Chef I - Révocation, récupération et préservation des transferts frauduleux effectués
[11 U.S.C. §§ 548, 550 et 551]

18



**[Contre tous les accusés]**

82.     Le demandeur réinvoque et intègre par référence chacune des allégations contenues aux paragraphes 1 à 81 comme si elles étaient exposées dans leur intégralité.

83.     Les documents de prêt ont été signés dans les deux ans précédant la date de la requête.

84.     LPG n'a rien reçu en échange des transferts à Laurent Reiss, qui n'était pas partie au prêt.

85.     LPG était insolvable lorsque Diab l'a contraint à signer les documents de prêt en février 2023, car ses dettes dépassaient la juste valeur marchande de ses actifs à tous les moments pertinents.

86.     L'exécution des documents de prêt, ainsi que la création des obligations qui en découlent, ont eu lieu alors que le débiteur était insolvable ou l'avait rendu insolvable.

87.     À la date de signature des documents de prêt, les entités auxquelles le débiteur était ou est devenu endetté incluent les créanciers de la demande préalable.

88.     Le débiteur a effectué les transferts à Laurent Reiss même si le débiteur était obligé auprès de MCA Fund ADV et/ou LDR — et non de Reiss — selon les termes des documents de prêt.

89.     Le débiteur a conclu le prêt avec l'intention réelle de gêner, retarder ou escroquer les créanciers du débiteur.

90.     Le débiteur utilisait un système Ponzi et la présomption du système Ponzi peut être utilisée pour déduire l'intention réelle du débiteur de frauder au sens de l'article 11 U.S.C. § 548(a)(1).

91.     Le comportement des défendeurs concernant les transferts a été commis avec oppression, fraude et malveillance, tels que définis à l'article 3294 du Code civil californien, donnant droit au demandeur à des dommages-intérêts exemplaires et punitifs.

92.     L'exécution des documents de prêt est révocable en tant que frauduleuse conformément aux articles 11 U.S.C. §§ 544, 548(a)(1)(A), 550 et 551, ainsi qu'en raison de la responsabilité délictuelle prévue par la common law concernant les transferts frauduleux intentionnels par un ou plusieurs créanciers qui détenaient et détiennent des créances non garanties contre un débiteur qui étaient et sont admises contre sa succession en vertu de l'article 11 U.S.C. § 502 ou qui n'étaient pas et ne sont pas autorisées uniquement en vertu de l'article 11 U.S.C. § 502(e), y compris, sans s'y limiter, les créanciers de la demande préalable.

19

93.     L'exécution des documents de prêt, ainsi que l'accroissement des obligations qui en découlent, doivent être écartés comme frauduleux en vertu de l'article 11 U.S.C. § 548(a)(1)(A) et en vertu du délit de common law des transferts frauduleux intentionnels, et ces biens transférés, ou leur valeur, doivent être récupérés et préservés au bénéfice de la succession conformément aux articles 11 U.S.C. §§ 550 et 551.

## DEUXIÈME DEMANDE DE RÉPARATION

### Chef II - Révocation, recouvrement et préservation des transferts frauduleux présumés

**[11 U.S.C. §§ 544, 548(a)(1)(B), 550 et 551]**
**[Contre tous les accusés]**

94.     Le demandeur réinvoque et intègre ici par référence chacune des allégations contenues aux paragraphes 1 à 93 comme si elles étaient exposées dans leur intégralité.

95.     Les documents de prêt ont été signés dans les deux ans précédant la date de la requête.

96.     L'exécution des documents de prêt, ainsi que la création des obligations qui en découlent, ont eu lieu alors que le débiteur :

a.     était insolvable ou devint insolvable en conséquence ;

b.     était engagé ou s'apprêtait à conclure une transaction pour laquelle tout bien restant chez le débiteur était d'un capital déraisonnablement faible ; ou

c.     destiné à contracter, ou croyait qu'il contracterait, des dettes dépassant sa capacité à payer à mesure que ces dettes arrivaient à échéance.

97.     Le débiteur a reçu une valeur inférieure à celle raisonnablement équivalente aux transferts parce qu'il a effectué les transferts à Laurent Reiss, qui n'était pas partie aux documents de prêt.

98.     De plus, même si les transferts étaient considérés comme des remboursements du prêt, le débiteur n'a pas reçu la valeur raisonnablement équivalente aux transferts au MCA Fund ADV et au LDR, car en utilisant l'argent du MCA Fund ADV et LDR pour gérer un système Ponzi, il n'y a rien dans le patrimoine que les créanciers puissent partager et aucun bénéfice pour le patrimoine. Au contraire, les transferts aggravaient le préjudice pour les créanciers en augmentant le montant des créances tout en diminuant le patrimoine du débiteur. Dans cette situation, l'utilisation de l'argent du

20



MCA Fund ADV et de LDR pour faire avancer le système Ponzi du débiteur et de Diab ne peut être considéré comme une contrepartie pour les transferts et ne peut être objectivement qualifiée de valeur raisonnablement équivalente.

99. MCA Fund ADV et LDR agissaient en tant qu'investisseurs dans le système Ponzi du débiteur.

100. La signature des documents de prêt, ainsi que la création des obligations qui en découlent, doivent être révoquées comme frauduleux en vertu de l'article 11 U.S.C. § 548(a)(1)(B), et ces biens transférés, ou leur valeur, doivent être récupérés et préservés au bénéfice de la succession conformément aux articles 11 U.S.C. §§ 550 et 551.

## TROISIÈME DEMANDE DE RÉPARATION

### Chef III - Révocation, récupération et conservation des transferts frauduleux effectués

### [11 U.S.C. §§ 544(b), 550 et 551 ; CODE CIVIL DE Californie §§ 3439.04(b), et 3439.07]

### [Contre tous les accusés]

101. Le demandeur réinvoque et intègre par référence chacune des allégations contenues aux paragraphes 1 à 100 comme si elles étaient exposées dans leur intégralité.

102. Les documents de prêt ont été signés dans les quatre ans précédant la date de la requête.

103. À la date de signature de ces documents, les entités auxquelles le débiteur était ou est devenu endetté incluent les créanciers de la requête.

104. L'exécution des documents de prêt, ainsi que la création des obligations qui en découlent, ont eu lieu pendant que le débiteur était insolvable ou peu après la signature des documents de prêt, ce qui est attesté par le dépôt de la requête volontaire.

105. Le débiteur n'a pas reçu une valeur raisonnablement équivalente en échange de la signature des documents de prêt, car le prêt a été utilisé pour aider davantage Diab dans le système Ponzi.

106. Le débiteur a conclu le prêt avec l'intention réelle de gêner, retarder ou escroquer les créanciers du débiteur.

21

107.    La conduite du débiteur a été commise avec oppression, fraude et malveillance, telle que définie à l'article 3294 du Code civil, fondée sur la présomption de régime Ponzi, donnant au fiduciaire, en plus des dommages-intérêts réels, des dommages-intérêts exemplaires et punitifs.

108.    Les documents de prêt sont révocables en tant que frauduleux en vertu de l'article 11 U.S.C. § 544(b) et du Code civil de Californie §§ 3439.04(a), 3439.04(b) et 3439.07 par un ou plusieurs créanciers qui détenaient et détiennent des créances non garanties contre le débiteur qui étaient et sont autorisées contre le patrimoine en vertu de l'article 11 U.S.C. § 502 ou qui n'étaient pas autorisées uniquement en vertu de l'article 11 U.S.C. § 502(e), y compris,  sans s'y limiter, les créanciers de la requête préalable.

109.    En conséquence, les documents de prêt, ainsi que la création des obligations qui en vertu de ceux-ci, doivent être écartés comme frauduleux en vertu de l'article 11 U.S.C. §§ 544(b) et du CAL. CIV. CODE §§ 3439.04(a) et 3439.07, et en vertu du délit de common law sur les transferts frauduleux intentionnels, et ces biens transférés, ou leur valeur, doivent être récupérés et préservés au bénéfice du patrimoine de la faillite conformément à 11 U.S.C. §§ 550 et 551 et au CAL. CIV. CODE § 3439.07.

## QUATRIÈME DEMANDE DE RÉPARATION

**Chef IV - Révocation, recouvrement et conservation des transferts frauduleux présumés**

**[11 U.S.C. §§ 544(b), 550 et 551 ; CODE CIVIL DE Californie §§ 3439.05 et 3439.07]**

**[Contre tous les accusés]**

110.    Le demandeur réinvoque et intègre ici par référence chacune des allégations contenues aux paragraphes 1 à 109 comme si elles étaient exposées dans leur intégralité.

111.    Les documents de prêt ont été signés dans les quatre ans précédant la date de la requête.

112.    L'exécution des documents de prêt, ainsi que la création des obligations qui en découlent, ont eu lieu alors que le débiteur :

a.    était insolvable ou devint insolvable en conséquence ;

b.    était engagé ou s'apprêtait à conclure une transaction pour laquelle tout bien restant chez le débiteur était d'un capital déraisonnablement faible ; ou

c.    destiné à contracter, ou croyait qu'il contracterait, des dettes dépassant sa capacité à

22



payer à mesure que ces dettes arrivaient à échéance.

113.    De plus, et objectivement, le débiteur n'a pas reçu une valeur raisonnablement équivalente pour le prêt car, par l'utilisation par le débiteur de l'argent reçu des défendeurs pour faire fonctionner le système Ponzi, il ne reste plus rien dans le patrimoine que les créanciers peuvent partager et aucun avantage pour le patrimoine. Au contraire, le prêt a aggravé le préjudice pour les créanciers en augmentant le montant des créances, diminuant ainsi le patrimoine du débiteur.

114.    En conséquence, la signature des documents de prêt, ainsi que la création des obligations qui en découlent, doivent être écartées conformément à l'article 11 U.S.C. §§ 544(b) et LE CAL. CIV. Code §§ 3439.05 et 3439.07, ainsi que ces biens transférés, ou leur valeur, doivent être récupérés et préservés au bénéfice de la succession conformément à l'article 11 U.S.C. §§ 550 et 551 et LE CODE CIVIL DE Californie § 3439.07.

## CINQUIÈME DEMANDE DE RÉPARATION

**Chef V - Révocation, recouvrement et conservation des transferts non autorisés postérieurs à la pétition**

**[11 U.S.C. §§ 549, 550 et 551]**

**[Contre tous les accusés]**

115.    Le demandeur réinvoque et intègre par référence chacune des allégations contenues aux paragraphes 1 à 114 comme si elles étaient exposées dans leur intégralité.

116.    En vertu de l'article 11 U.S.C. § 549(a), le fiduciaire peut éviter un transfert de biens du patrimoine de la faillite qui intervient après le début de l'affaire et qui n'est pas autorisé par le tribunal compétent sur le patrimoine de faillite.

117.    Les transferts étaient des transferts d'un intérêt dans les biens du débiteur.

118.    Laurent Reiss a reçu les transferts d'au moins 1 710 000 $ après la date de la requête.

119.    Les transferts n'étaient pas autorisés par le Code de la faillite ni par le tribunal.

120.    Les transferts sont des transferts écartables conformément à l'article 11 U.S.C. § 549(a).

121.    L'article 550 du Code de la faillite prévoit que si un transfert est écarté en vertu de l'article 549 du Code de la faillite, le demandeur peut récupérer le bien ou la valeur du bien transféré

23

auprès du cessionnaire initial, de l'entité au bénéfice de laquelle les transferts ont été effectués, ou de tout cessionnaire immédiat ou médiateur du cessionnaire initial.

122. Laurent Reiss est le premier transfert.

123. Les défendeurs du MCA Fund ADV et LDR sont les entités pour lesquelles les transferts ont été effectués.

124. Conformément à ce qui précède, les Transferts sont des transferts révocables conformément à l'article 11 U.S.C. § 549(a), et peuvent être récupérés et préservés au bénéfice du patrimoine de la faillite conformément aux articles 11 U.S.C. §§ 550 et 551.

## SIXIÈME DEMANDE DE RÉPARATION

### Détournement

### [11 U.S.C. §§ 541 ; Common Law de Californie]

125. Le demandeur réinvoque et intègre ici par référence chacune des allégations contenues aux paragraphes 1 à 124 comme si elles étaient exposées en entier.

126. Les défendeurs détiennent la possession ou le contrôle des biens du débiteur sous forme de transferts et d'autres biens du débiteur, rendus illégaux en vertu d'accords et/ou d'opérations commerciales illégaux et inapplicables.

127. Les Transferts n'ont pas une valeur négligeable pour le patrimoine.

128. En tout moment important, le débiteur avait la propriété légitime et le droit de possession et de contrôle de ses actifs.

129. Les défendeurs ont illégalement détourné les biens du débiteur sous forme de transferts et d'autres biens du débiteur, par leur exécution illégale d'accords illicites et des transferts frauduleux d'actifs ayant entraîné la perte de la possession et du contrôle du débiteur sur ces actifs.

130. Le débiteur a subi des dommages-intérêts en raison du contrôle illégal et du contrôle des défendeurs sur des biens auxquels il avait droit de possession.

131. En conséquence, l'administrateur judiciaire a droit à un jugement pour le détournement des Transferts et de tout autre bien appartenant au Débiteur que les défendeurs ont illégalement détourné à leur propre usage, conformément à l'article 11 U.S.C. § 541 et à la common law californienne.

24

## SEPTIÈME DEMANDE DE RÉPARATION

**Participation à un programme visant à continuer d'approfondir l'insolvabilité persistante de LPG**

**Contre les défendeurs**

**[11 U.S.C. § 541 ; Common Law de Californie]**

132.    Le demandeur réinvoque et intègre par référence chacune des allégations contenues aux paragraphes 1 à 131 comme si elles étaient exposées dans leur intégralité.

133.    Comme indiqué ici, les défendeurs ont été recrutés par Diab et/ou des représentants de LPG pour participer, poursuivre et faire avancer le système Ponzi du Diab, conçu et orchestré pour épuiser les actifs de LPG et aggraver l'insolvabilité persistante de LPG.

134.    Les défendeurs ont suivi un schéma et un comportement, incluant l'exécution et la conclusions d'accords illégaux et/ou d'opérations illégales, ainsi que la réception de transferts d'actifs du débiteur, ce qui a entraîné un préjudice direct au débiteur.

135.    Les défendeurs ont agi en faveur du système Ponzi en accordant des prêts au LPG avec des taux d'intérêt usuraires, le tout dans le cadre du système Ponzi de Diab. Ces actions ont détournés les actifs de LPG au bénéfice des défendeurs et autres, et ont contribué de manière significative à l'aggravation de l'insolvabilité du débiteur, aggravant les réclamations en dommages et intérêts de tiers vis-à-vis de LPG.

136.    En conséquence, l'administrateur judiciaire a droit à un jugement pour approfondissement de l'insolvabilité du débiteur pour le montant d'au moins la somme des transferts et de tout autre bien appartenant au débiteur que les défendeurs ont illégalement détourné à leur propre usage, conformément à l'article 11 U.S.C. § 541 et à la common law californienne.

## HUITIÈME DEMANDE DE RECOURS

**Aide et complicité**

**Contre les défendeurs**

**[11 U.S.C. §541 ; Common Law californien**

137.    Le demandeur réaffirme et intègre par référence chacune des allégations contenues aux paragraphes 1 à 136 comme si elles étaient exposées dans leur intégralité.

25

138. La possession ou le contrôle par Laurent Reiss sur les biens du patrimoine de la faillite, y compris, mais sans s'y limiter, les transferts effectués conformément aux documents de prêt rédigés pour perpétuer et dissimuler le système Ponzi et les transferts frauduleux.

139. Les défendeurs avaient connaissance des transactions frauduleuses, des transferts et des accords illégaux et inexécutoires, y compris les documents de prêt, utilisés pour perpétuer et dissimuler le système Ponzi et les transferts frauduleux. La connaissance des défendeurs est attestée, entre autres, par les faits décrits aux ¶¶ 48-61 ici et tels que retenus dans cette plainte.

140. Les défendeurs, avec la connaissance ci-dessus, avaient l'intention de, et ont, aidé Diab et d'autres participants au schéma à perpétuer et dissimuler le système Ponzi et les transferts frauduleux d'argent, causant un préjudice au débiteur. La connaissance spécifique de Laurent Reiss est attestée, entre autres, par les faits décrits au ¶¶ 48-61 ici et tels qu'allégués dans cette plainte.

141. À tout moment important, les défendeurs avaient l'intention de faciliter et dissimuler le système Ponzi et les transferts frauduleux d'argent en aidant et en encourageant le système illégal de plafonnement et en recrutant des clients consommateurs pour maintenir les activités commerciales de LPG et du système Ponzi.

142. Dissimuler la véritable nature du système Ponzi était primordial pour pouvoir continuer à compter sur son fonctionnement afin de recevoir des transferts frauduleux d'argent aux frais du débiteur.

143. Sans intention de faciliter et de dissimuler le système Ponzi et les transferts frauduleux d'argent en aidant et en encourageant le système illégal de plafonnement des portes, les défendeurs ne bénéficieraient plus de ces transferts et avaient un intérêt direct à maintenir le système Ponzi aussi longtemps que possible.

144. Les défendeurs ont aidé, et ont effectivement participé, à la commission de fraude de Diab et au système Ponzi en coordonnant, facilitant et dirigeant les paiements et transferts de fonds de LPG et en signant des documents afin de dissimuler la véritable nature de leurs activités frauduleuses et criminelles liées au système Ponzi, causant un préjudice au débiteur.

145. Les préjudices subis directement, de manière immédiate et raisonnable par le débiteur résultant et causés par ces transferts frauduleux et ce système Ponzi incluent, sans s'y limiter, plus

26

d'un million de dollars en fonds transférés et acquis de manière inappropriée ainsi que la poursuite de l'entreprise criminelle.

146. LPG a contracté une dette écrasante à cause du système Ponzi. Les paiements effectués par LPG à Reiss, ainsi que les demandes de nouveaux paiements, ont poussé LPG à chercher des sources supplémentaires de revenus et d'investissements, perpétuant ainsi la fraude et aggravant l'insolvabilité de LPG. En raison de l'implication des défendeurs dans le système Ponzi, LPG continuait à contracter une dette bien plus importante qu'il ne pouvait éventuellement rembourser.

147. Les défendeurs ont accentué l'insolvabilité croissante de LPG en recourant au système Ponzi. Les défendeurs l'ont fait en sachant que LPG était probablement déjà insolvable. Cette connaissance est attestée, entre autres, par la connaissance de Laurent Reiss que LPG ne payait pas ses clients et les clients dont les comptes étaient pillés. Laurent Reiss comprenait les problèmes auxquels étaient confrontés les affiliés au LPG disposant de leur propre plancher de vente, car il exploitait ce plancher dans le cadre du système Ponzi de Diab. En aidant et en encourageant le système Ponzi de Diab, les défendeurs ont retardé le dépôt de faillite de LPG et ont causé un préjudice direct à LPG en aggravant son insolvabilité.

148. Les poursuites des actions des défendeurs en faveur du système Ponzi ont spécifiquement entraîné l'approfondissement de l'insolvabilité de LPG basé sur les fonds spécifiques qui ont été détournés vers Laurent Reiss sans aucun bénéfice reçu par LPG.

149. L'aggravation de l'insolvabilité de LPG causée par les défendeurs a entraîné un préjudice direct au LPG, indépendamment du préjudice subi par ses créanciers, car le préjudice ne se limitait pas à l'incapacité de payer les créanciers, mais s'étendait bien plus profondément à une incapacité plus large à fonctionner en tant qu'entreprise active et à poursuivre ses activités commerciales de quelque nature que ce soit, en raison de l'épuisement des ressources causé par le système Ponzi Diab et l'aide et l'encouragement des défendeurs à celui-ci.

150. En raison de l'aide et de l'encouragement des défendeurs au système Ponzi de Diab, ce dernier a poussé LPG à dépenser illicitement des actifs de l'entreprise, prolongeant ainsi la vie de LPG par des créances douteuses et entraînant la dissipation des actifs de l'entreprise.

27

151. Les biens, y compris mais sans s'y limiter aux Transferts, n'ont pas une valeur insignifiante pour le débiteur et la récupération de ces fonds est essentielle pour réparer le préjudice du débiteur.

152. Le demandeur et le débiteur ont également subi des dommages-intérêts en ayant encouru des honoraires d'avocat et des frais liés à la poursuite des activités illégales des défendeurs.

153. Les prévenus, sur la base des informations et convictions, ont aidé, et ont effectivement participé à la commission de fraude et du stratagème en coordonnant, facilitant et dirigeant les paiements et transferts d'argent et en signant des documents afin de dissimuler la véritable nature de leurs activités frauduleuses et criminelles liées au système.

154. « Selon le Code de la faillite, 'tous les intérêts légaux ou équitables du débiteur dans les biens au début d'[une affaire de faillite]' appartiennent à la succession de faillite créée lors du dépôt de la requête en faillite par le débiteur. »*Bercy c. Ville de Phx.*, 103 F.4th 591, 594 (9th Cir. 2024) (citant 11 U.S.C. § 541(a)(1)). « Une réclamation appartenant au débiteur au moment du dépôt de la faillite constitue un tel intérêt foncier. »*Id.* « Le champ d'application de l'article 541 est large et inclut les causes d'action. »*Sierra Switchboard Co. c. Westinghouse Elec. Corp.*, 789 F.2d 705, 707 (9e Cir. 1986) (citant *United States c. Whiting Pools, Inc.*, 462 U.S. 198, 205 & n. 9 (1983)).

155. « La Californie impose la responsabilité à celui qui aide et encourage la commission d'un délit intentionnel si la personne (a) sait que la conduite de l'autre constitue une violation du devoir et apporte une aide ou un encouragement substantiel à agir ainsi ou (b) apporte une assistance substantielle à l'autre pour obtenir un résultat délictueux et la conduite de la personne elle-même, considéré séparément, constitue une violation du devoir envers le tiers. » » *Berger c. Varum*, 35 Cal. App. 5th 1013, 1025 (2019).

156. La Californie reconnaît la fraude comme un délit intentionnel. *Voir par exemple Hensley c. McSweeney*, 90 Cal. App. 4th 1081, 1085 (2001) (« La fraude est un délit intentionnel ; c'est l'élément d'intention frauduleuse, ou d'intention de tromper, qui la distingue de la fausse déclaration négligente passible d'action et de la fausse déclaration innocente non poursuivable. »).

28



157.   Pour être clair, l'administrateur judiciaire allègue que les défendeurs ont aidé et encouragé dans la commission des délits intentionnels suivants : (1) fraude ; (2) commission d'un transfert frauduleux ; et (3) détournement.

158.   Les défendeurs, principalement Laurent Reiss, étaient au courant ou auraient dû être au courant des délits intentionnels pendant que Laurent Reiss était recruté pour travailler avec LPG et/ou tout en continuant à travailler avec LPG, et, par conséquent, chaque transfert effectué à Reiss dans le cadre des relations commerciales continues des Défendeurs avec LPG était en connaissance des défendeurs qu'il constituait un transfert frauduleux des actifs de LPG dans le cadre du projet.

159.   Le préjudice allégué ici était pour le débiteur et résultait de la participation, de la direction et des efforts concertés des défendeurs avec Diab pour faire avancer le système Ponzi et la conduite frauduleuse décrite ici au détriment du débiteur. Autrement dit, le fiduciaire allègue que la participation, la direction et l'effort concerté des défendeurs avec Diab pour faire avancer le système Ponzi ont aidé et encouragé le système frauduleux orchestré par Diab.

160.   Les défendeurs ont largement aidé à faire avancer le système Ponzi en concluant des accords, y compris les documents de prêt, avec LPG par lesquels Laurent Reiss recevrait et continuerait de recevoir un flux d'argent du débiteur, facilitant ainsi la prolongation du fonctionnement du système Ponzi. Ces actions ont converti les actifs de LPG en Laurent Reiss et ont considérablement contribué à l'aggravation de l'insolvabilité du débiteur, aggravant les réclamations pour dommages et intérêts de tiers vis-à-vis de LPG.

161.   Les défendeurs ont considérablement aidé Diab à frauder le débiteur en concluant divers accords illicites, y compris les documents de prêt, avec le débiteur pour mettre en œuvre et faire avancer le système Ponzi, ce qui a poussé Laurent Reiss à recevoir des transferts des actifs du débiteur conformément aux termes de ces accords illicites, y compris les documents de prêt.

162.   Les défendeurs ont largement contribué au délit de transfert frauduleux, car les transferts des actifs du débiteur à Laurent Reiss en vertu des accords illicites, y compris les documents de prêt sur ordre de Diab, constituent des transferts frauduleux.

29

163. Les défendeurs ont largement contribué au délit de détournement, car Diab exerçait une domination illégale sur les biens appartenant au débiteur en transférant illégalement ces actifs à Laurent Reiss conformément à des accords illégaux conclus par les défendeurs.

164. La conduite des défendeurs qui ont continué à exercer en vertu des accords illégaux énoncés ici a permis à Diab de poursuivre son système Ponzi et de détourner des fonds de LPG à son détriment.

165. Mais pour les défendeurs et autres partenaires commerciaux dans une situation similaire de Diab, le système illégal de Ponzi ne fonctionnerait pas et ne pourrait pas continuer à fonctionner comme prévu par Diab.

166. Avec l'exécution des accords, y compris les documents de prêt, les actions des défendeurs ont directement et spécifiquement approfondi l'insolvabilité du débiteur, chaque transfert frauduleux des actifs de LPG à Laurent Reiss aggravant davantage l'insolvabilité du débiteur, au point que le débiteur ne pouvait plus exercer ses fonctions commerciales ordinaires et fonctionner comme une entreprise active. La participation des défendeurs au système Ponzi Diab a ainsi entraîné un préjudice direct pour le débiteur, qui pouvait être spécifiquement retracé jusqu'aux défendeurs en fonction du montant de chacun des transferts frauduleux reçus par Laurent Reiss.

167. Parce que la réclamation actuelle pour complicité aligne un préjudice direct au débiteur, et ne constitue pas une réclamation dérivée du créancier de l'État conformément à l'article 11 U.S.C. § 541(a)(1)), le fiduciaire a qualité pour agir contre les défendeurs dans la présente procédure adverse. *Voir par exemple, Huntsberger c. Umpqua Holdings Corp (In re Berjac of Or.),* 538 B.R. 67, 82 (D. Or. 2015) ("Ici, le demandeur soutient qu'en aidant et encourageant, agissant de concert avec les Holcomb et d'autres, et/ou conspirant avec les Holcomb et d'autres, les défendeurs bancaires ont fait en sorte que le débiteur contracte une dette envers de nouveaux investisseurs qu'il n'avait pas la capacité de payer. Par conséquent, parce que la Cour d'appel du neuvième circuit reconnaît que prolonger la vie d'un débiteur par dettes douteuses constitue un préjudice reconnu pour ce dernier, et que le demandeur allègue que les défendeurs bancaires ont causé au débiteur de contracter des dettes envers de nouveaux investisseurs qu'elle ne pouvait pas payer, prolongeant ainsi

30



la vie du débiteur par des créances douteuses, cette Cour estime que le demandeur a qualité pour déposer sa troisième demande. »).

168.    Le fiduciaire fonde les revendications susmentionnées dans sa plainte modifiée sur la qualité pour agir en vertu de l'article 11 U.S.C. § 541(a)(1), et ne présente aucun fondement pour ces revendications en vertu de l'article 11 U.S.C. § § 544(b), 550 ou 551.

## NEUVIÈME DEMANDE DE RÉPARATION

### Blanchiment

### Contre les défendeurs

### [11 U.S.C. § 542]

169.    Le demandeur réaffirme et intègre par référence chacune des allégations contenues aux paragraphes 1 à 168 comme si elles étaient exposées dans leur intégralité.

170.    Laurent Reiss détient la possession ou le contrôle des biens du patrimoine de la faillite sous forme de transferts effectués conformément à des accords illégaux et inapplicables, y compris les documents de prêt.

171.    Les Transferts n'ont pas une valeur négligeable pour le patrimoine de la faillite.

172.    Les fonds soumis aux transferts sont essentiels à la capacité du débiteur à payer les créanciers.

173.    En conséquence, le fiduciaire a droit à un jugement pour la remise des transferts conformément à l'article 11 U.S.C. § 542.

## DIXIÈME DEMANDE DE RÉPARATION

### Mesure déclaratoire

174.    Le demandeur réaffirme et intègre ici par référence chacune des allégations contenues aux paragraphes 1 à 173 comme si elles étaient exposées dans leur intégralité.

175.    Un véritable différend existe entre le demandeur et les défendeurs concernant l'applicabilité du prêt.

176.    Le demandeur soutient que le prêt est nul et inexécutoire ; les taux d'intérêt appliqués dans le prêt sont usuraires ; la loi applicable pour déterminer la nature usuraire des accords est la loi californienne et/ou la loi fédérale ; et les transferts effectués dans le cadre du prêt constituent une

31

fraude électronique. Les défendeurs contestent chacune des argumentations du demandeur.

177.   Une détermination judiciaire des droits, devoirs et obligations du demandeur et des défendeurs est donc appropriée.

## RÉSERVE DE DROITS

178.   Le demandeur se réserve le droit d'engager toutes les autres réclamations ou causes d'action que le demandeur pourrait avoir contre les défendeurs, pour tous les motifs autorisés par la loi ou en équité, y compris mais sans s'y limiter, les réclamations non connues du fiduciaire à ce moment-là mais qu'il peut découvrir pendant la procédure adversaire.

## DEMANDES DE RÉPARATION

PAR QUOI, le demandeur demande un jugement comme suit :

**Concernant les première, deuxième, troisième et quatrième demandes de réparation :**

A.   Révoquer le prêt et les obligations associées comme non exécutoires contre la succession ;

**Sur les première et troisième demandes de réparation :**

B.   Accorder des dommages-intérêts punitifs et exemplaires selon les preuves ;

**Sur la cinquième demande de réparation :**

C.   Révoquer, récupérer et préserver les transferts contre les défendeurs ;

**Sur les sixième, septième et huitième demandes de réparation :**

D.   Accorder au demandeur des dommages-intérêts monétaires d'un montant total d'au moins 1 $,710,000.00;

E.   Attribuer les frais de poursuite, y compris les honoraires d'avocat ;

**Sur la neuvième demande de réparation :**

F.   Ordonner aux Défendeurs de céder immédiatement les biens de la succession, y compris, mais sans s'y limiter, les Transferts ;

**Sur la dixième demande de réparation :**

G.   Déclarer que le prêt est nul et inapplicable, que les taux d'intérêt appliqués dans le billet sont usuraires, que la loi applicable pour déterminer la nature usuraire des taux d'intérêt est la loi californienne et/ou fédérale ; et les transferts effectués dans le cadre du prêt constituent une fraude

32



électronique ;

**Sur toutes les demandes de réparation :**

H.    Attribuer les frais de procès ;

I.    Accorder des dommages-intérêts punitifs ;

J.    Attribuer les honoraires d'avocat ;

K.    Accorder des intérêts pré-jugement au taux légal maximal allant de la date de la plainte à la date du jugement ici indiqué ;

L.    Accorder des intérêts post-jugement au taux légal maximal allant de la date du jugement jusqu'à la fin du jugement, plus les frais ;

M.    Exiger que Laurent Reiss verse immédiatement tout jugement rendu dans la présente procédure ; et

N.    Accorder au demandeur les autres mesures supplémentaires et supplémentaires que la Cour juge juste et appropriées.

Daté : 15 janvier 2026

Présenté respectueusement,

DINSMORE & SHOHL LLP

Par : /s/      Christopher Celentino
Christopher Celentino
Yosina M. Lissebeck
Jacob R. Bothamley
Avocats de Richard A. Marshack,
Fiduciaire du Trust de liquidation de LPG

33

# ANNEXE 1

CHRISTOPHER B. GHIO (259094)
christopher.ghio@dinsmore.com
CHRISTOPHER CELENTINO (131688)
christopher.celentino@dinsmore.com
YOSINA M. LISSEBECK (201654)
yosina.lissebeck@dinsmore.com
DINSMORE & SHOHL S.E.N.C.R.L., S.R.L.
655 West Broadway, bureau 800
San Diego, Californie 92101
Tél. : 619.400.0500
Télécopieur : 619.400.0501

Sarah S. Mattingly (Ky. Bar 94257)
sarah.mattingly@dinsmore.com
DINSMORE & SHOHL, S.E.N.C.R.L., S.R.L.
101, rue S., bureau 2500
Louisville, Kentucky 40202
Téléphone : 859-425-1096
Télécopieur : 502-585-2207
(Admise pro hac vice)
Conseiller spécial de Richard A. Marshack

## TRIBUNAL DES FAILLITES DES ÉTATS-UNIS
## DISTRICT CENTRAL DE CALIFORNIE – DIVISION DE SANTA ANA

| | |
|---|---|
| In Re | Cas n° : 23-BK-10571-SC |
| Le groupe de pratique Litige C.P., | Chapitre 11 |
| Débiteur(s), | **ORDONNANCE FAISANT DROIT À LA REQUÊTE EN INSCRIPTION DE L'ORDONNANCE CONSERVATOIRE ET DE L'ORDONNANCE CONSERVATOIRE**<br><br>Date : 23 mai 2024<br>Heure : 13 h 30<br>Juge : Hon. Scott C. Clarkson<br>Lieu : Salle d'audience 5C (via Zoom)[1]<br>    411, rue Fourth Ouest<br>    Santa Ana, Californie 92701 |

La Cour a lu et examiné l'avis de requête et la requête en inscription d'une ordonnance conservatoire (la « Requête ») déposés par Richard A. Marshack, en sa qualité de syndic du chapitre 11 (le « syndic ») de l'actif de la faillite (« Actif ») de The Litigation Practice Group P.C., le 2 mai 2024, conformément à la règle fédérale de procédure de faillite 7026 et à la règle fédérale de procédure civile 26(c)(1), en tant que Dk. n° 1164 (« Requête »), et a trouvé un motif valable pour faire droit à la Requête.

IL EST ORDONNÉ ce qui suit :

1. La requête est accueillie ;

---

[1] Les informations de connexion vidéo et audio pour chaque audience seront fournies sur le calendrier d'audience du juge Clarkson affiché publiquement, qui peut être consulté en ligne à l'adresse suivante :
http://ecf-ciao.cacb.uscourts.gov/CiaoPosted/?jid=SC.

2. L'ordonnance conservatoire ci-dessous s'applique à toute question contestée survenant dans l'affaire principale de faillite et dans toutes les procédures contradictoires intentées par ou contre le syndic, présentes et futures ; et

3. Régir l'interrogatoire préalable qui y est effectué.

## ORDONNANCE DE PROTECTION

### 1. DÉFINITIONS

1.1 Les « informations confidentielles » telles qu'elles sont utilisées dans la présente ordonnance de protection désignent les documents et autres informations (quelle que soit la manière dont ils sont générés, stockés ou conservés) qu'une partie ou un tiers croit raisonnablement contenir ou refléter des informations financières ou commerciales non publiques, des registres bancaires, des dossiers financiers, tels que des numéros de sécurité sociale, des informations financières ou personnelles non publiques d'une partie ou d'un tiers, les numéros de compte, les informations et identifiants numériques sensibles, les informations soumises à des accords de confidentialité ou à des dispositions autres que la présente ordonnance de protection, et d'autres informations non publiques sur la recherche, le développement ou le commerce qui tirent de la valeur ou évitent un préjudice du fait qu'elles ne sont pas connues du public.

1.2 La présente « Action » est définie et désigne par les présentes toute question contestée survenant dans le cas principal de faillite et dans toutes les procédures contradictoires intentées par ou contre le syndic, présentes et futures.

1.3 « Partie désignante » désigne une Partie ou un non-Partie qui désigne des Informations confidentielles au cours de l'Action.

1.4 « Partie réceptrice » désigne une Partie qui reçoit des Informations confidentielles au cours de l'Action.

1.5 « Partie » ou « Parties » désigne la personne ou l'entité soumise à la présente ordonnance de protection.

### 2. CHAMP D'APPLICATION DE LA PRÉSENTE ORDONNANCE DE PROTECTION

2.1 Sauf ordonnance contraire, la présente ordonnance conservatoire régit certains documents et autres produits de découverte obtenus dans le cadre de l'action auprès des parties à celles-ci et de tiers. Ainsi que certaines informations copiées ou dérivées de ceux-ci, des extraits, des résumés ou des compilations de ceux-ci, y compris, mais sans s'y limiter, les documents échangés volontairement dans le cadre de discussions de règlement anticipé, les documents produits à la suite des divulgations initiales, les demandes autorisées par les règles fédérales de procédure civile rendues applicables aux présentes par les règles fédérales de procédure de faillite, les réponses aux interrogatoires, transcriptions de dépositions, réponses aux demandes de production,

réponses aux demandes d'admission, assignations à comparaître, affidavits, déclarations, rapports d'experts et autres documents et informations qui peuvent être produits au cours de l'action et désignés comme des informations confidentielles.

## 3. DÉSIGNATION DES RENSEIGNEMENTS CONFIDENTIELS

3.1 La présente Ordonnance de protection régit la production et le traitement de toute Information confidentielle dans le cadre de la présente Action. Toute partie ou non-partie qui produit des informations confidentielles dans le cadre de la présente action peut les désigner comme « confidentielles » ou « réservées aux avocats », conformément aux conditions de la présente ordonnance de protection. Dans la mesure du possible, la partie désignante ne doit désigner que les parties d'un document, d'une réponse écrite à l'interrogatoire préalable, d'une déposition, d'une transcription ou de tout autre document qui contiennent les informations confidentielles et s'abstenir de désigner des documents entiers. Indépendamment de toute désignation faite en vertu des présentes, la partie désignée n'est pas autrement empêchée d'utiliser ou de divulguer ses informations confidentielles en dehors de la présente action ou à des fins commerciales. En outre, toute partie peut demander une modification ou une autre mesure de redressement de l'une ou l'autre des conditions de la présente ordonnance de protection si elle a d'abord tenté par écrit et de bonne foi de résoudre ses besoins ou ses différends avec les autres parties ou la partie, selon le cas, selon les termes de la présente ordonnance de protection. De plus, rien dans la présente ordonnance de protection n'empêche une partie d'expurger des documents conformément aux règles fédérales de procédure civile et d'utiliser les documents au besoin tout au long de l'action.

3.2 <u>Application aux non-parties</u> : Avant qu'un non-partie ne reçoive des copies de documents ou de documents désignés comme des informations confidentielles ou des avocats uniquement comme autorisé en vertu des présentes, il doit d'abord signer une reconnaissance d'être lié aux présentes conditions qui est jointe aux présentes en tant qu'annexe A ; s'il ne le fait pas, les parties à cette action doivent résoudre un tel différend avant de divulguer les informations désignées comme autorisé par les présentes à l'non-partie. Si un non-partie souhaite faire des désignations en vertu des présentes, il doit d'abord signer l'annexe A ci-jointe.

3.3 <u>Calendrier et protection provisoire</u> : Des désignations d'informations confidentielles peuvent être faites à tout moment. Pour éviter une éventuelle renonciation à la protection en vertu des présentes, la Partie à l'origine de la désignation doit désigner les documents ou les documents contenant des Informations confidentielles au moment de la production ou de la divulgation, y compris dans le dossier lors de la prise de toute déposition. Les dépositions seront réputées provisoirement protégées pour une période de trente (30) jours après que la transcription a été remise aux Parties par le sténographe judiciaire, bien que les Parties puissent convenir à tout moment de délais différents pour la protection provisoire des informations en tant que Confidentiel ou Yeux des avocats uniquement dans le cadre d'une ou plusieurs dépositions spécifiques. Pour conserver des désignations au-delà de la période provisoire, une Partie à l'origine de la désignation doit désigner des pages et des lignes précises de dépositions avant l'expiration de la période provisoire. Ces désignations doivent être

faites par écrit afin que tous les avocats et sténographes judiciaires puissent y apposer une copie de la transcription.

3.4 Mode de désignation : Les informations confidentielles peuvent être désignées en vertu des présentes de toute manière ou méthode raisonnable qui informe la partie destinataire du niveau de désignation et identifie avec précision les informations auxquelles la désignation s'applique. Si elle est faite verbalement, la partie qui désigne doit rapidement confirmer la désignation par écrit. Dans la mesure du possible, la partie désignée doit tamponner, apposer ou intégrer une légende « CONFIDENTIEL » ou « YEUX D'AVOCATS UNIQUEMENT » sur chaque page désignée du document ou de l'image électronique contenant des informations confidentielles.

## 4. CONTESTATIONS DE L'INFORMATION DÉSIGNÉE

4.1 Dans le cas où une Partie destinataire serait en désaccord à tout moment avec une ou plusieurs désignations faites par la Partie désignante, la Partie destinataire doit d'abord tenter de résoudre cette contestation de bonne foi sur une base informelle avec la Partie désignante. La Partie destinataire doit fournir un avis écrit de la contestation et des motifs de celle-ci à la Partie désignée, qui doit répondre par écrit à la contestation dans un délai de quinze (15) jours. À tout moment, il incombe à la partie désignante d'établir le bien-fondé de la désignation et du niveau de protection. À moins que et jusqu'à ce que la contestation soit résolue par les parties ou tranchée par le tribunal, les informations désignées resteront protégées en vertu de la présente ordonnance conservatoire. Le fait qu'une partie réceptrice ne conteste pas une désignation ne constitue pas une concession que la désignation est correcte ou un aveu que les informations désignées sont par ailleurs compétentes, pertinentes ou importantes.

## 5. ACCÈS/UTILISATION LIMITÉS DES INFORMATIONS PROTÉGÉES

5.1 Utilisation restreinte : Les renseignements qui sont produits ou échangés dans le cadre de l'action et qui sont désignés en vertu de la présente ordonnance conservatoire peuvent être utilisés pour la préparation du procès et de tout appel de toutes les questions de l'action, ainsi que pour les négociations de règlement connexes, et à aucune autre fin, sans le consentement écrit de la partie désignée. Aucune information confidentielle ne peut être divulguée à quiconque, sauf conformément aux termes de la présente ordonnance de protection, à moins que les parties ne soient co-avocates ou n'aient conclu des accords de défense conjointe. Toutes les personnes en possession d'informations confidentielles conviennent de faire preuve de diligence raisonnable en ce qui concerne la garde, l'utilisation ou le stockage de ces informations afin de garantir leur confidentialité. Cette obligation inclut, sans s'y limiter, que la partie destinataire fournisse à la partie désignée un préavis rapide de la réception de toute assignation à comparaître demandant la production ou la divulgation de toute information désignée et qu'elle consulte la partie désignée avant de répondre à l'assignation. Toute utilisation ou divulgation d'informations confidentielles ou réservées aux avocats en violation des termes de la présente ordonnance de protection peut exposer la personne ou la partie divulgatrice à des sanctions.

5.2 Accès aux renseignements « confidentiels » : Les parties et toutes les personnes visées par la présente ordonnance de protection conviennent que les renseignements désignés comme « CONFIDENTIELS » ne peuvent être consultés ou examinés que par les personnes suivantes :

a) La Cour, son personnel et les sténographes judiciaires ;

b) L'avocat inscrit au dossier, ou le co-avocat de toute partie, ou toute autre partie qui a conclu un accord de défense conjointe dans l'action et leurs employés qui assistent l'avocat inscrit au dossier, ou le co-conseil dans l'action et qui sont informés des devoirs et obligations imposés en vertu des présentes ;

c) Les Parties, y compris leurs clients, agents et employés qui assistent ou ont des raisons d'avoir connaissance de l'Action ;

/ / /

d) Les experts ou consultants employés par les Parties ou leurs avocats, ou co-conseils, aux fins d'une Action, à condition que chacun de ces experts ou consultants ait signé l'Annexe A ci-jointe ; et

e) D'autres témoins ou personnes avec le consentement de la Partie désignée ou sur décision de justice.

5.3 Accès aux désignations « Avocats réservés » : Les Parties et toutes les personnes visées par la présente Ordonnance conservatoire conviennent que les informations désignées comme « AVOCATS UNIQUEMENT » ne peuvent être consultées ou examinées que par les personnes suivantes :

a) La Cour, son personnel et les sténographes judiciaires ;

b) L'avocat inscrit au dossier, ou le co-avocat de toute partie, ou toute autre partie qui a conclu un accord de défense conjointe dans l'action et leurs employés qui assistent l'avocat inscrit au dossier dans l'action et sont informés des obligations en vertu des présentes ;

c) L'avocat interne de toute partie à l'action et Richard A. Marshack, en tant que fiduciaire du chapitre 11 de The Litigation Practice Group P.C., qui est informé des devoirs et obligations imposés en vertu des présentes ;

d) Les experts ou consultants employés par les Parties ou leurs avocats, ou co-conseils aux fins de l'Action, et pour autant que chacun de ces experts ou consultants ait signé la pièce A ci-jointe ; et

e) D'autres témoins ou personnes avec lesquels la partie désignée a donné son accord avant la divulgation ou sur décision de justice.

5.4 <u>Effet de non-renonciation des désignations</u> : Ni l'adoption ni l'omission de prendre une mesure pour faire appliquer les dispositions de la présente ordonnance conservatoire, ni l'absence d'objection à une désignation, ne constitueront une renonciation à la réclamation ou à la défense d'une ou des parties dans l'action ou toute autre action ou procédure, y compris, mais sans s'y limiter, une réclamation ou une défense selon laquelle des informations désignées sont ou ne sont pas confidentielles, ont ou n'ont pas droit à une protection particulière, ou incorporent ou n'incarnent pas des informations protégeables par la loi.

5.5 <u>Utilisation des renseignements désignés au tribunal</u> : Si des renseignements désignés en vertu de la présente ordonnance conservatoire seront ou peuvent être présentés en preuve lors d'une audience ou d'un procès lié à une question visée par l'action, la partie qui fait l'offre doit en aviser à l'avance la partie ou l'exclusivité qui a été désignée avant de fournir les renseignements afin que toute utilisation ou divulgation puisse être traitée conformément à l'ordonnance de gestion de l'instance ou à toute autre ordonnance préparatoire au procès du tribunal, soit par une motion in limine. Aucune disposition de la présente ordonnance de protection ne doit être interprétée comme une renonciation par une partie à toute objection qui pourrait être soulevée quant à l'admissibilité au procès de tout élément de preuve.

## 6. DEMANDES DE RÉCUPÉRATION

6.1 <u>Défaut de désignation</u> : Si, à tout moment, une Partie ou un non-Partie découvre qu'il a produit ou divulgué des Renseignements confidentiels sans désignation, il peut en aviser rapidement la Partie destinataire et identifier avec précision les Renseignements confidentiels à désigner et le niveau de désignation (l'avis de récupération). La partie réceptrice peut alors demander la production de substitution des informations nouvellement désignées. Dans les trente (30) jours suivant la réception de l'avis de récupération, la partie destinataire doit : (1) certifier à la partie désignante qu'elle a correctement marqué ou, si une production de remplacement a été demandée, détruit toutes les copies non marquées qu'elle a reçues, fabriquées et/ou distribuées ; et (2) s'il n'était pratiquement pas en mesure de marquer ou de détruire des informations parce que les divulgations ont eu lieu alors que la partie destinataire n'était pas tenue à la confidentialité en vertu des termes de la présente ordonnance conservatoire concernant ces informations, la partie destinataire doit raisonnablement fournir autant d'informations que possible pour aider la partie désignée à protéger les informations, conformément aux privilèges avocat-client, produit du travail et/ou préparation au procès de la partie destinataire.

6.2 <u>Production par inadvertance d'informations privilégiées</u> : Si, à tout moment, une partie découvre qu'elle a produit des informations qu'elle estime raisonnablement être protégées en vertu des privilèges avocat/client, du produit du travail ou de la préparation du procès, elle doit informer rapidement chaque partie réceptrice de la demande de protection, du fondement de celle-ci, modifier son registre des privilèges en conséquence et se conformer à Fed. R. Civ. P. 26(b)(5). Dans la mesure du possible, la partie productrice doit produire des informations de remplacement qui expurgent les informations faisant l'objet de la protection revendiquée. La partie destinataire doit alors se conformer à Fed. R. Civ. P. 26(b)(5)(B) en ce qui concerne les informations faisant l'objet de la protection revendiquée.



/ / /

/ / /

/ / /

## 7. DURÉE/RESTRICTIONS CONTINUES

7.1 <u>Traitement des informations désignées lors de la conclusion du dossier de faillite principal</u> : À la conclusion du dossier de faillite principal, par le biais du rejet ou de la clôture du dossier, la ou les parties désignées sont responsables de s'assurer que toute partie ou personne à qui la partie désignée a partagé ou divulgué des informations désignées dans l'une des affaires relevant de l'action retourne ou détruit toutes ses copies, quel que soit le support sur lequel il a été stocké. Aucun témoin ou partie ne peut conserver les informations désignées qu'il a reçues d'une autre partie ou d'un tiers en vertu de la présente ordonnance de protection ; seuls les avocats inscrits au dossier, ou co-avocats, sont les agents autorisés qui peuvent en conserver une copie pour leurs dossiers juridiques respectifs, et qui doivent également décrire à la partie désignée les mesures supplémentaires prises pour protéger son dossier juridique contenant des copies papier et/ou électroniques des informations désignées afin qu'elles ne soient pas consultées, utilisées ou divulguées de manière incompatible avec les obligations en vertu de la présente ordonnance conservatoire. Cette disposition ne s'applique pas à la Cour ni au personnel de la Cour. De plus, cette disposition ne s'applique pas au syndic, qui peut conserver et utiliser, conformément à la présente ordonnance, les renseignements confidentiels reçus dans le cadre d'une action pendant toute la durée de la faillite.

7.2 <u>Restrictions continues en vertu de la présente ordonnance de protection</u> : Les restrictions sur la divulgation et l'utilisation des informations confidentielles survivront à la conclusion de l'affaire de faillite et à toute question dans l'action.

## 8. INFORMATIONS PRIVILÉGIÉES OU PROTÉGÉES

8.1 Rien dans la présente ordonnance de protection n'exige la divulgation d'informations protégées par le secret professionnel de l'avocat, la protection du produit du travail ou tout autre privilège juridiquement reconnu (un « privilège ou une protection »). Si des informations faisant l'objet d'une revendication de privilège ou de protection sont produites par inadvertance, conformément à la règle fédérale de preuve 502(d), cette production ne constitue pas une renonciation ou une préclusion à l'égard de toute revendication de privilège ou de protection pour ces informations ou toute autre information qui peut être protégée contre la divulgation par un privilège ou une protection dans toute procédure.

8.2 Si une Partie reçoit un document qui semble être soumis à un Privilège ou à une Protection, elle s'abstiendra d'examiner le document au-delà de ce qui est nécessaire pour déterminer s'il est privilégié ou protégé et notifiera

rapidement et notifiera par écrit à la Partie productrice que la Partie destinataire possède du matériel qui semble être soumis à un Privilège ou à une Protection. La Partie productrice dispose de sept (7) jours après la réception d'un tel avis pour faire valoir un privilège ou une protection sur le matériel identifié. Si la Partie productrice ne fait pas valoir une revendication de privilège ou de protection dans le délai de sept (7) jours, le matériel en question sera réputé non privilégié ou protégé.

8.3 Si une Partie productrice a produit un document faisant l'objet d'une revendication de Privilège ou de Protection, sur demande écrite de la Partie productrice, le document pour lequel une revendication de Privilège ou de Protection est faite sera séquestré ou détruit dans la mesure du possible, et la Partie destinataire ne pourra pas utiliser le document à d'autres fins que dans le cadre de l'analyse ou de la contestation d'une revendication de Privilège ou de Protection ou en relation avec avec une requête visant à contraindre à la production du document.

8.4 La partie destinataire qui met sous séquestre ou détruit ce matériel peut alors demander au tribunal d'ordonner la production du matériel. Il incombe à la partie productrice concernée d'établir le privilège ou la protection applicable à tout document ou renseignement récupéré de la même manière et dans la même mesure qu'elle aurait assumé ce fardeau si elle n'avait pas produit le document ou l'information. Rien dans la présente ordonnance conservatoire ne limite le droit du tribunal ou de toute partie destinataire de demander un examen à huis clos de toute information faisant l'objet d'une revendication de privilège ou de protection.

###

Date : 3 juin 2024

Scott C. Clarkson
Juge des faillites des États-Unis



ANNEXE « A »

Christopher B. Ghio (Barreau d'État n° 259094)
Christopher Celentino (Barreau d'État n° 131688)
Yosina M. Lissebeck (Barreau d'État n° 201654)
**DINSMORE & SHOHL S.E.N.C.R.L., S.R.L.**
655 West Broadway, bureau 800
San Diego, Californie 92101
Téléphone : 619.400.0500
Télécopieur : 619.400.0501
christopher.ghio@dinsmore.com
christopher.celentino@dinsmore.com
yosina.lissebeck@dinsmore.com

Sarah S. Mattingly (Ky. Bar 94257)
DINSMORE & SHOHL, S.E.N.C.R.L., S.R.L.
101, rue S., bureau 2500
Louisville, KY 40202
Téléphone : 859-425-1096
Télécopieur : 502-585-2207
Sarah.mattingly@dinsmore.com
(Admise pro hac vice)

Conseiller spécial de Richard A. Marshack,
Chapitre 11 Fiduciaire

### TRIBUNAL DES FAILLITES DES ÉTATS-UNIS
### DISTRICT CENTRAL DE CALIFORNIE

| | |
|---|---|
| In Re | Cas n° 8:23-BK-10571-SC |
| Le groupe de pratique Litige C.P., | Chapitre 11 |
| Débiteur(s), | **PIÈCE A À L'ORDONNANCE STIPULÉE** |
| | Date : 23 mai 2024 |
| | Heure : 13 h 30 |
| | Juge : Hon. Scott C. Clarkson |
| | Lieu : Salle d'audience 5C² – Via Zoom |
| | 411, rue Fourth Ouest |
| | Santa Ana, Californie 92701 |

Il s'agit de certifier que :

(a) J'ai accès à des renseignements confidentiels en vertu de l'ordonnance conservatoire stipulée qui a été inscrite dans le dossier de faillite principal du groupe de pratique du litige, mais qui est exécutoire et déterminante comme indiqué par l'ordonnance du tribunal sur toutes les questions contestées et tout litige entamé par le syndic ;

b) J'ai lu l'ordonnance de protection stipulée ; et

(c) J'accepte d'être lié par les termes et conditions de celle-ci, y compris, sans s'y limiter, les obligations concernant l'utilisation, la non-divulgation et le retour de ces informations confidentielles. Je conviens en

---

¹ Les informations de connexion vidéo et audio pour chaque audience seront fournies sur le calendrier d'audience du juge Clarkson affiché publiquement, qui peut être consulté en ligne à l'adresse suivante : http://ecf-ciao.cacb.uscourts.gov/CiaoPosted/?jid=SC.

outre qu'en plus d'être lié contractuellement par l'ordonnance de protection stipulée, je suis soumis à la juridiction du tribunal de référence ci-dessus pour toute violation de celle-ci.

Date:_____

_____
Signature

_____
Nom imprimé

# ANNEXE 2

Me CLAIRE NOTARI
HUISSIER
17, bd Albert 1er
MONACO ☎ +377 97 97 97 09 09

## CONTRAT DE PRÊT

LE PRÉSENT CONTRAT DE PRÊT (le « Contrat de prêt ») est conclu en date du 7 février 2023 par et entre BAT Inc a/k/a B.A.T. Inc. et The Litigation Practice Group PC, (« LPG » ou « Emprunteur » ou « Emprunteurs » qui peuvent être utilisés de manière interchangeable), et tel que garanti personnellement par Daniel March (résidant au 20160 Nob Hill Drive, Yorba Linda, CA 92886) et Tony M Diab (une personne physique résidant en Californie), qui sont tous deux des agents et des dirigeants de LPG avec le pouvoir de les lier à la présente Note (« Garant » ou « Garants » qui peuvent être utilisés de manière interchangeable sans spécification et désigneront collectivement toutes les personnes identifiées dans les présentes) (LPG, Emprunteur et Garant peuvent tous être utilisés de manière interchangeable tout au long de la présente Note) et MCA Fund ADV Inc. ayant un lieu d'affaires au 4 714 1 6u1 A, Brooklyn NY et/ou à LOR International Ltd., une société à responsabilité limitée des Îles Vierges britanniques, dont le siège social est situé à Yamraj Building, Market Square, 3rd Floor, P.O. Box 3175., Road Town, Tortola VG 1110, Îles Vierges britanniques (« Prêteur » ou « Prêteurs » qui peuvent être utilisés de manière interchangeable), ou l'un de leurs cessionnaires (collectivement les « Parties »),

ATTENDU QUE, le ou vers le 7 février 2023, le prêteur a accordé à l'emprunteur un prêt d'un montant principal d'un million cinq cent mille dollars (1 500 000,00 $) (le « principal ») avec intérêts (commémoratifs dans un billet à ordre contemporain (« billet ») signé par l'emprunteur) échéant au plus tard le 6 mai 2023 (la « date d'échéance »), sous réserve d'un calendrier de décaissement tel qu'indiqué sur le billet ;

ATTENDU QUE l'Emprunteur a proposé de signer et de remettre au Prêteur un billet à ordre d'un montant actuellement dû et dû en vertu du Prêt, et d'accorder au Prêteur une sûreté de premier rang et un privilège sur tous les actifs de l'Emprunteur ;

À CES CAUSES, en considération des prémisses susmentionnées et d'autres contreparties valables et valables, dont la réception et la suffisance sont reconnues par les présentes, les Parties conviennent de ce qui suit :

1. L'Emprunteur reconnaît et convient qu'à compter de la date du présent Contrat de prêt : le montant total actuellement dû et dû en vertu du Prêt, y compris le capital impayé, les intérêts, les frais, les avances, les pénalités et tout autre montant dû en vertu de celui-ci, est égal à un million cinq cent mille dollars (1 500 000,00 $) avec intérêts (tels que définis dans le Note) (le « Capital ») ; et l'Emprunteur n'a aucun droit de compensation ou d'autres moyens de défense à son obligation immédiate de payer ce montant en totalité. En cas de survenance d'un Cas de défaut (tel que défini dans le(s) Billet(s) à ordre ou le Contrat de sûreté), le Taux d'intérêt passera au moindre de vingt-quatre pour cent (24 %) ou du montant maximal autorisé par la loi applicable. Les intérêts ne s'accumulent pas sur les intérêts impayés ou les frais de retard (tels que définis ci-dessous).

2. Tous les honoraires et frais d'avocat effectivement encourus par le Prêteur pour recouvrer ou exécuter le billet à ordre, le présent contrat de prêt, le contrat de sûreté ou toute confession de jugement fournie par l'emprunteur, pour déclarer ou statuer sur des droits en vertu de l'un de ces documents, ou pour constituer une garantie pour l'exécution des obligations de l'emprunteur en vertu de l'un de ces documents, que ce soit par voie de poursuite ou par tout autre moyen que ce soit, sont payables par l'emprunteur et s'ajoutent au principal impayé et en constituent une partie.

3. Tous les paiements de l'emprunteur seront appliqués d'abord au paiement de tous les frais de retard impayés, deuxièmement au paiement de tout intérêt impayé et troisièmement à la réduction du principal.

4. Tous les frais de principal, d'intérêts et de retard impayés doivent être payés en totalité par l'emprunteur au plus tard à la date d'échéance.

5. Un cas de défaut (un « cas de défaut ») est réputé être interprété et défini comme indiqué dans le billet à ordre et/ou le contrat de sûreté.

6. En cas de survenance d'un cas de défaut, la date d'échéance sera immédiatement devancée jusqu'à la date de l'événement de défaut, et tous les honoraires d'avocat, frais de retard, intérêts, capital et autres dépenses impayés envisagés dans la note, le contrat de garantie et le présent contrat de prêt seront dus et payables.

7. L'emprunteur doit effectuer tous les paiements dus en vertu du présent accord de prêt par virement, avec des fonds immédiatement disponibles ou un chèque acceptable pour le prêteur.

8. L'emprunteur doit signer et remettre au prêteur un billet à ordre (le « billet à ordre ») en vertu duquel l'emprunteur doit promettre inconditionnellement de payer au prêteur la somme principale au plus tard à la date d'échéance.

9. L'Emprunteur doit signer et remettre au Prêteur un contrat de sûreté (le « Contrat de sûreté ») en vertu duquel l'Emprunteur doit accorder au Prêteur une sûreté de premier rang et un privilège sur tous les actifs de l'Emprunteur (tels que définis dans le contrat de sûreté, le « Garantie ») une garantie pour l'exécution des obligations de l'Emprunteur en vertu du présent Contrat de prêt et du Billet à ordre.

10. L'Emprunteur déclare et garantit au Prêteur que : (a) l'Emprunteur a le droit, le pouvoir et l'autorité de lier les sociétés identifiées dans les présentes, de conclure et d'exécuter les conditions du présent Accord de prêt et qu'aucune des conditions du présent Accord de prêt, du billet à ordre ou de l'Accord de sûreté n'est ou ne sera en violation des dispositions de tout autre accord auquel l'Emprunteur est partie ; (b) L'emprunteur est dûment organisé, existe valablement et est en règle en vertu des lois de l'État de Californie ; (c) il n'y a pas de litige en cours contre l'Emprunteur, ses actionnaires, ses dirigeants ou ses administrateurs, qui pourrait, s'il était déterminé défavorablement, être raisonnablement susceptible de porter atteinte de manière importante au droit de l'Emprunteur d'exercer ses activités de manière substantiellement telle qu'elle est actuellement menée ou d'affecter négativement de manière importante la situation financière de l'Emprunteur ; (d) L'Emprunteur et chacun des actionnaires, dirigeants et administrateurs de l'Emprunteur ont déposé ou fait déposer toutes les déclarations de revenus fédérales, étatiques et locales, qui doivent être déposées, et ont payé ou fait payer toutes les taxes et cotisations dans la mesure où ces taxes ou cotisations sont devenues exigibles, à l'exception de toute cotisation contestée de bonne foi et pour laquelle des réserves adéquates ont été mises de côté ; (e) L'Emprunteur n'est pas insolvable à la date du présent Contrat de prêt et ne deviendra pas insolvable en raison de ses obligations en vertu du présent Contrat de prêt, du billet à ordre ou du Contrat de sûreté ; (f) il n'y a pas d'action ou de procédure en cours, ou à la connaissance de l'Emprunteur, qui pourrait raisonnablement être susceptible d'affecter de manière importante et défavorable les droits du Prêteur en vertu du présent Contrat de prêt, du Billet à ordre ou du Contrat de sûreté, la capacité de l'Emprunteur à exécuter ses obligations en vertu des présentes ou de celui-ci, le titre de propriété de la Garantie (telle que définie dans le Contrat de sûreté), ou la validité ou la priorité de la sûreté et du privilège sur les biens grevés créés en vertu des présentes et en vertu des présentes ; (g) il n'y a aucun jugement contre l'emprunteur impayé ou non satisfait enregistré dans un tribunal de cet État ou des États-Unis ; (h) à aucun moment l'Emprunteur n'a effectué de cession au profit des créanciers ; (i) Le prêteur a accordé à l'emprunteur le temps dont il a été avisé de retenir les services d'un avocat pour le représenter dans le cadre de cette transaction.

11. L'Emprunteur convient par les présentes que, tant qu'un montant est dû au Prêteur en vertu du présent Accord de prêt, l'Emprunteur et ses actionnaires, dirigeants et administrateurs doivent : (a) libérer et dégager le Prêteur de toute cause d'action, réclamation, dommage et responsabilité de nature contractuelle, délictuelle ou fiscale en raison des actes ou omissions de l'Emprunteur, et de payer les honoraires de l'avocat du prêteur pour représenter et défendre le prêteur contre de telles causes d'actions, réclamations, dommages ou responsabilités ; (b) garder la garantie libre et libre de tous privilèges, charges, charges, taxes, évaluations et réclamations, sauf ceux qui découlent des présentes, en vertu de la convention de sûreté ou qui peuvent autrement être autorisés par le prêteur ; (c) donner au prêteur un avis immédiat, par écrit, à l'adresse désignée par le prêteur, dans les dix (10) jours suivant l'obtention de tout remplacement de la garantie, et faire signer les documents appropriés afin que ces remplacements soient garantis conformément au présent contrat de prêt et au contrat de sûreté ; (d) obtenir tous les renouvellements de licence et toutes autres licences et permis requis nécessaires à la poursuite de l'exploitation de l'entreprise de l'Emprunteur et à la préservation de la garantie ; (e) payer rapidement toutes les amendes, pénalités ou cotisations qui peuvent être imposées ou imposées à l'Emprunteur ; (f) coopérer pleinement avec la compagnie d'assurance de l'Emprunteur dans le signalement, l'enquête et la défense de toute réclamation ; (g) tenir des livres et des registres exacts et complets et les tenir et permettre à tout représentant autorisé du prêteur et de ses avocats, comptables et agents d'inspecter, d'examiner et de faire des copies et des résumés des livres de comptes et des registres de l'emprunteur à des heures raisonnables pendant les heures normales de bureau ; (h) aviser immédiatement le prêteur, par écrit, à l'adresse désignée par le prêteur, de la survenance de tous les privilèges, charges, charges, taxes, évaluations et réclamations qui pourraient avoir une incidence importante et défavorable sur les droits du prêteur en vertu du présent contrat de prêt, du billet à ordre ou du contrat de sûreté, de la capacité de l'emprunteur à exécuter ses obligations en vertu des présentes ou de celui-ci, du titre de propriété de la garantie ou de la validité ou de la priorité de la sûreté et du privilège sur la garantie créée en vertu des présentes et en dessous de celle-ci ; (i) payer toutes les dettes exigibles en vertu du présent contrat de prêt et du billet à ordre conformément à celui-ci, et se conformer strictement à tous les termes, engagements, accords et conditions énoncés dans le présent contrat de prêt, le billet à ordre, le contrat de sûreté et tous les autres documents signés en relation avec le prêt ; j) ne pas émettre, scinder, reclasser ou déclarer le paiement d'un dividende payable sur un capital-actions ou émettre des bons de souscription ou des options sur son capital-actions, à titre onéreux ou autrement ; et (k) aviser le prêteur de la survenance d'un événement de défaut (tel que défini dans les présentes) ou d'une circonstance qui, par l'écoulement du temps, peut devenir un événement de défaut.

12. L'emprunteur doit signer simultanément avec le présent contrat de prêt et, de temps à autre par la suite, tous les documents requis par le prêteur pour parfaire et/ou maintenir les sûretés du prêteur sur toute garantie.

13. Par les présentes, l'emprunteur autorise le prêteur à déposer des états de financement afin de parfaire la sûreté de premier rang du prêteur sur la garantie de temps à autre. Par la présente, l'emprunteur désigne le prêteur comme son mandataire pour signer et déposer ces documents.

14. Par les présentes, l'emprunteur désigne le prêteur à titre de mandataire pour traiter les comptes ou les créances envisagés aux présentes, dans le contrat de sûreté ou dans le billet, ou pour protéger autrement l'intérêt du prêteur dans le principal.

15. Sur demande, l'emprunteur doit signer de nouveau tout document ou instrument signé dans le cadre du prêt qui a été mal rédigé ou signé, ou signer tout document ou instrument que le prêteur exige dans le cadre de ce prêt.

16. Les obligations du prêteur en vertu du présent contrat de prêt sont subordonnées à la remise par l'emprunteur, au prêteur, dans une forme et une substance satisfaisantes pour le prêteur et son avocat, des documents suivants que chaque propriété a signés : (a) le billet à ordre ; b) le contrat constitutif constitutif de sûreté ; c) des états financiers en vertu du Code de commerce uniforme (UCC) en la forme appropriée pour le dépôt par le prêteur, suffisants quant à la forme et au fond pour

accorder au prêteur une sûreté de premier rang opposable sur le bien grevé (tel que défini dans le contrat de sûreté) ; (d) un affidavit pour un jugement par confession signé par l'Emprunteur devant être conservé par le Prêteur jusqu'à ce que l'Emprunteur fasse défaut à l'un des termes, engagements et conditions du présent Contrat de prêt, du billet à ordre, du Contrat de sûreté ou de tout autre document accessoire signé en relation avec le Prêt, auquel cas le Prêteur peut inscrire lesdits aveux de jugement devant tout tribunal compétent ; (e) les résolutions du conseil d'administration ou du ou des membres gérants de l'Emprunteur, certifiées par le secrétaire de l'Emprunteur, autorisant la signature et l'exécution du présent Contrat de Prêt et des Billets à Ordre, et la preuve du consentement de I 00 % des actionnaires ou membres de l'Emprunteur à ladite transaction ; (t) une garantie inconditionnelle de l'exécution des obligations de l'Emprunteur en vertu du présent Contrat de prêt et du Billet à ordre signé par les administrateurs ou les membres gérants de l'Emprunteur ; (g) d'informer immédiatement le prêteur par écrit de tout événement qui, à tout moment, pourrait faire en sorte que les déclarations et garanties énoncées aux présentes ou dans le contrat de prêt cessent d'être vraies ou que le remboursement de celles-ci par le mandant ou le prêteur pourrait être compromis.

17. La survenance de l'un des événements suivants constitue un cas de défaut en vertu du présent contrat de prêt : (a) le défaut de l'emprunteur de payer, à l'échéance, tous les montants dus en vertu du présent contrat de prêt, du billet à ordre et du contrat de sûreté ; (b) l'inexécution par l'Emprunteur, ou une violation par l'Emprunteur de l'une des modalités, engagements ou conditions du présent Contrat de prêt, du Billet à ordre ou du Contrat de sûreté ; (c) le défaut de l'Emprunteur de payer ou de cautionner tout jugement contre lui ou d'enlever ou de cautionner tout prélèvement, exécution ou procédure judiciaire contre tout élément inclus dans la garantie dans les trente (30) jours suivant la date à laquelle l'Emprunteur a pris connaissance de l'inscription, ou du dépôt de tout avis d'insuffisance fiscale ou privilège contre l'Emprunteur par une municipalité, le gouvernement fédéral ou de l'État ou l'un de ses organismes, à moins qu'il ne soit contesté de bonne foi par l'Emprunteur ; (d) le défaut de l'Emprunteur de payer toutes ses dettes à leur échéance ; (e) le dépôt d'une demande de mise en faillite par ou contre l'emprunteur, la cession au profit des créanciers de l'emprunteur, ou la nomination d'un dépositaire, d'un séquestre ou d'un syndic pour l'emprunteur ou ses actifs ; (e) si l'une des déclarations et garanties faites par l'Emprunteur dans le présent Contrat de prêt, le Contrat de sûreté ou tout autre instrument signé en relation avec le présent Contrat de prêt ou le Prêt est ou devient fausse, incorrecte ou trompeuse ; (t) la dissolution ou toute autre résiliation de l'Emprunteur ; (g) l'incapacité de l'Empruntcur (ou de tout actionnaire, partenaire ou membre de l'Emprunteur) à exécuter ou à respecter tout engagement ou condition contenu dans tout accord auquel le Prêteur et l'Emprunteur ou un tel actionnaire, partenaire ou membre sont parties (y compris, sans s'y limiter, tout accord de garantie ou de nantissement garantissant ou garantissant les obligations de l'Emprunteur en vertu des présentes), sans bénéficier d'un délai de grâce applicable, y compris celui-ci et ces documents.

18. En plus des droits prévus par le présent contrat de prêt, en cas de survenance d'un cas de défaut, le prêteur aura tous les droits à l'égard de la garantie accordée en vertu du billet à ordre, du contrat de sûreté, de l'UCC ou de toute autre loi applicable, sous réserve de tout avis requis par la loi.

19. L'Emprunteur s'engage à : (a) payer ou rembourser au Prêteur tous les frais et dépenses qu'il a engagés dans le cadre de l'élaboration, de la préparation et de l'exécution du présent Contrat de prêt, du Billet à ordre et du Contrat de sûreté, ainsi que de tout amendement, supplément ou modification à ceux-ci, ainsi que de tout autre document ou instrument signé en relation avec les présentes ou avec celui-ci, et la réalisation des transactions envisagées par les présentes et par celles-ci, y compris, sans s'y limiter, les honoraires et les débours des avocats du prêteur ; (b) payer ou rembourser au prêteur tous les frais et dépenses encourus dans le cadre de l'exécution ou de la préservation de tout droit en vertu du présent contrat de prêt, du billet à ordre, du contrat de sûreté et de tout autre document similaire, y compris, sans s'y limiter, les honoraires et débours de l'avocat du prêteur ; (c) payer, indemniser et dégager le prêteur de toute responsabilité à l'égard de tous les frais d'enregistrement et de dépôt et de toutes les responsabilités à l'égard de, ou résultant de tout retard dans le paiement, des

taxes de timbre, des taxes d'accise et d'autres taxes, le cas échéant, qui peuvent être payables ou jugés comme étant payables relativement à l'exécution et à la livraison ou à la réalisation de l'une des opérations envisagées par, ou tout amendement, supplément ou modification, ou toute renonciation ou consentement en vertu du présent contrat de prêt, du billet à ordre, du contrat de sûreté et de tout autre document ou à l'égard de ceux-ci ; et (d) payer, indemniser et dégager le Prêteur de toute responsabilité à l'égard de toutes autres responsabilités, obligations, pertes, dommages, pénalités, actions, jugements, poursuites, coûts, dépenses ou débours de quelque nature que ce soit en ce qui concerne l'exécution, la livraison, l'exécution, l'exécution et l'administration du présent Contrat de prêt, du billet à ordre, du Contrat de sûreté et de tout autre document similaire (tout ce qui précède, collectivement, les « passifs indemnisés »), à condition que l'emprunteur n'ait aucune obligation en vertu des présentes envers le prêteur à l'égard des passifs découlant directement de la négligence grave ou de l'inconduite délibérée du prêteur. Les accords prévus dans le présent paragraphe survivront au remboursement du billet à ordre et de tous les autres montants payables en vertu des présentes.

20. Tous les avis doivent être donnés par écrit et sont réputés avoir été correctement donnés (i) à la livraison, s'ils sont remis en personne ou un (1) jour ouvrable (défini ci-dessous) après avoir été déposés pour une livraison le lendemain auprès d'un service de messagerie de nuit réputé ou envoyés par courriel. L'une ou l'autre des parties, par notification à l'autre, peut désigner des adresses supplémentaires ou différentes pour les notifications ou communications ultérieures. Aux fins de la présente section, « jour ouvrable » désigne un jour où les banques ne sont pas autorisées ou tenues par la loi de fermer dans l'État de New York.

21. Les dispositions du présent contrat de prêt et tous les instruments et autres accords signés en vertu des présentes sont séparables et dans le cas où l'une des dispositions des présentes ou de celui-ci serait invalide ou contraire à la loi, celle-ci sera nulle et non avenue, mais les autres dispositions seront contraignantes entre les parties.

22. Toutes les garanties, déclarations et engagements des parties survivront à la consommation des transactions qui y sont envisagées.

23. La présente convention de prêt représente l'intégralité de l'entente entre le prêteur et l'emprunteur en ce qui concerne l'objet des présentes, et il n'y a aucune promesse, engagement, déclaration ou garantie de la part du prêteur relativement à l'objet des présentes qui ne soit expressément énoncé dans les présentes, le billet à ordre ou la convention de sûreté ou tout autre document et instrument signé en vertu des présentes ou en vertu de celles-ci.

24. Le présent accord de prêt lie et s'applique au profit des parties aux présentes, de leurs héritiers, représentants légaux, successeurs et ayants droit autorisés respectifs. Chaque partie déploiera tous les efforts raisonnables pour prendre ou faire prendre toutes les mesures, et pour faire ou faire faire, et pour aider et coopérer avec les autres parties dans l'accomplissement de tout ce qui est nécessaire, approprié ou souhaitable pour réaliser l'intention et les objectifs du présent accord.

25. Le présent contrat de prêt, le contrat de sûreté, le billet à ordre et tout autre document signé en rapport avec le prêt ne peuvent être amendés, complétés ou modifiés qu'en vertu d'un écrit signé par la partie à qui l'on doit être chargé de cet amendement, supplément ou modification. Aucun écrit remis à l'emprunteur par le prêteur ou en son nom, énonçant le solde principal, le paiement ou d'autres informations concernant le prêt ne constitue un écrit. amendement, supplément ou modification du présent contrat de prêt, du billet à ordre ou des obligations de l'emprunteur en vertu des présentes ou de celui-ci, à moins que cet écrit ne stipule spécifiquement qu'il constitue un tel amendement, supplément ou modification.

26. Le prêteur peut céder ses droits à l'égard du présent contrat de prêt, du billet à ordre, de la garantie, du contrat de sûreté et de tous les autres documents et instruments signés en vertu des présentes et en vertu de celui-ci.

27. Le défaut d'exercer et le retard dans l'exercice, de la part du prêteur, d'un droit, d'un recours, d'un pouvoir ou d'un privilège en vertu du présent contrat de prêt, du billet à ordre, du contrat de sûreté ou de tout autre document ou instrument signé en vertu des présentes ou de celui-ci ou en vertu de celui-ci ne constituent une renonciation à celui-ci ; De même, l'exercice unique ou partiel d'un droit, d'un recours, d'un pouvoir ou d'un privilège en vertu des présentes ou des présentes n'empêchera pas tout autre exercice ultérieur de celui-ci ou l'exercice de tout autre droit, recours, pouvoir ou privilège. Les droits, recours, pouvoirs et privilèges prévus aux présentes ou aux présentes sont cumulatifs et non exclusifs des droits, recours, pouvoirs et privilèges prévus par la loi.

28. L'intention des parties est que le taux d'intérêt et tous les autres frais facturés à l'emprunteur soient légaux. Si, pour quelque raison que ce soit, le paiement d'une partie des intérêts, des frais ou des charges exigés par le présent contrat de prêt, le contrat de sûreté ou le billet à ordre dépasse la limite autorisée par la loi applicable, l'obligation de payer les intérêts ou les frais sera automatiquement réduite à cette limite et, si des montants supérieurs à cette limite ont été payés : alors ces montants seront appliqués au montant du prêt impayé ou remboursés de sorte qu'en aucun cas les intérêts ou les frais requis en vertu des présentes ne dépasseront le taux maximum autorisé par la loi comme indiqué ci-dessus.

29. Le présent contrat de prêt est livré dans l'État de New York et doit être interprété et appliqué conformément aux lois de l'État de New York, sans aucune disposition en matière de conflit de lois. Toute action ou poursuite d'un recours juridique dans toute réclamation ou recours juridique dans tout forum juridique en relation avec le présent document, découlant de ce document, ou liée à toute obligation liée aux présentes, doit être intentée devant le tribunal d'État ou fédéral siégeant dans le comté de New York, New York. Par les présentes, chaque partie se soumet irrévocablement et inconditionnellement pour elle-même et ses biens dans toute action en justice ou procédure relative au présent contrat de prêt et aux autres documents auxquels elle est partie en relation avec le prêt, y compris, sans s'y limiter, le billet à ordre et le contrat de sûreté, ou pour la reconnaissance et l'exécution de tout jugement à cet égard, à la juridiction générale non exclusive des tribunaux de l'État de New York apparus dans le comté de New York ou dans le district sud de New York, et des cours d'appel de l'un quelconque de ces tribunaux, consent à ce qu'une telle action ou procédure puisse être intentée devant ces tribunaux et renonce à toute objection qu'il pourrait avoir maintenant ou ultérieurement au lieu d'une telle action ou procédure devant un tel tribunal ou que cette action ou procédure a été intentée devant un tribunal incommode et convient de ne pas plaider ou réclamer celle-ci, convient que la signification de l'acte de procédure dans une telle action ou procédure peut être effectuée par l'envoi d'une copie de celle-ci par courrier certifié (ou toute forme de courrier substantiellement similaire), affranchi, à son adresse indiquée aux présentes ou à toute autre adresse dont toutes les autres parties aux présentes auront été informées conformément aux présentes ; convient que rien dans les présentes n'affectera le droit d'effectuer la signification d'un acte de procédure de toute autre manière autorisée par la loi ou ne limitera le droit d'intenter une action dans toute autre juridiction ou de déposer des privilèges/litispendances devant un tribunal pour grever tout bien immobilier appartenant à un emprunteur pendant qu'une action se poursuit devant les tribunaux de New York ; et

30. Chacune des Parties convient de renoncer à un procès devant jury dans toute action ou procédure intentée par l'une des parties contre l'autre découlant du présent Contrat de prêt ou s'y rapportant de quelque manière que ce soit.

31. Le présent accord peut être signé en deux ou plusieurs exemplaires, dont chacun est un original, mais qui constituent ensemble un seul et même instrument. Les signatures électroniques sont considérées comme des originaux et comme si elles étaient signées à l'encre humide. L'emprunteur s'engage à ne pas soulever de réclamation ou de défense quant à l'absence d'un original.



32. Le présent écrit et les documents signés dans le cadre du prêt contiennent l'intégralité de l'accord des parties en ce qui concerne le matériel en question et aucune modification, altération ou renonciation à tout ou partie de la totalité ou d'une partie ne sera valide à moins d'être faite par écrit et signée par toutes les parties aux présentes. Chaque partie déploiera tous les efforts raisonnables pour prendre ou faire prendre toutes les mesures, et pour faire ou faire faire, et pour aider et coopérer avec les autres parties dans l'accomplissement de tout ce qui est nécessaire, approprié ou souhaitable pour réaliser l'intention et les objectifs du présent accord.

EN FOI DE QUOI, les soussignés ont signé et remis la présente convention de prêt au jour et à l'année susmentionnés.

**GARANT:**

Par:_____

Nom : Tony M DIAB

**EMPRUNTEUR**

BAT Inc a/k/a B.A.T. Inc.

Par:_____

Nom : Tony M Diab

Titre : Officier

**GARANT:**

Par:_____

Nom : Daniel March

**EMPRUNTEUR**

Le groupe de pratique Litige PC

Par:_____

Nom : Daniel March

Titre : Officier

| **PRÊTEUR:** | **PRÊTEUR:** |
|---|---|
| Fonds MCA ADV Inc. | LDR International Ltd., |
| _____<br>Par:_____<br>Titre : Officier | _____<br>Par:_____<br>Titre : Officier |

### RECONNAISSANCE

> Un notaire ou un autre fonctionnaire qui remplit ce certificat ne vérifie que l'identité de la personne qui a signé le document auquel ce certificat est joint, et non la véracité, l'exactitude ou la validité de ce document.

État de Californie
Comté d'Orange

Sur *7 février 2023* devant moi,     <u>Olga Lucia Esquivel, notaire</u>
(insérer le nom et le titre de l'agent)

A comparu personnellement *Daniel S. March*, qui m'a prouvé, sur la base de preuves satisfaisantes, qu'il était la ou les personnes dont le(s) nom(s) est/sont souscrit(s) à l'instrument ci-joint et m'a reconnu qu'il/elle/elles l'ont signé en son/ses qualité(s) autorisée(s), et que par son/ses signature(s) sur l'acte, la (les) personne(s), ou l'entité pour le compte de laquelle la ou les personnes ont agi, exécuté, l'Instrument.

Je certifie en vertu de la PEINE DE PARJURE en vertu des lois de l'État de Californie que le paragraphe précédent est vrai et correct.

TÉMOIN ma main et mon sceau officiel.

Signature _____ (sceau)

**RECONNAISSANCE**

Un notaire ou un autre fonctionnaire qui remplit ce certificat ne vérifie que l'identité de la personne qui a signé le document auquel ce certificat est joint, et non la véracité, l'exactitude ou la validité de ce document.

État de Californie
Comté d' *Orange*

Sur *02/07/2023* devant moi, <u>Vanessa Banken-Buchner</u>
(insérer le nom et le titre de l'agent)

Comparution en personne *Tony Maurice Diab*, qui m'a prouvé, sur la base de preuves satisfaisantes, qu'il était la ou les personnes dont le(s) nom(s) est/sont abonné(s) à l'instrument ci-joint et m'a reconnu qu'il/elle/elles l'ont signé en sa (ses) capacité(s) autorisée(s), et que par son/ses signature(s) sur l'acte, la (les) personne(s), ou l'entité pour le compte de laquelle la ou les personnes ont agi, exécuté. l'Instrument.

Je certifie en vertu de la PEINE DE PARJURE en vertu des lois de l'État de Californie que le paragraphe précédent est vrai et correct.

TÉMOIN ma main et mon sceau officiel.

Signature _____ **(sceau)**

# ANNEXE 3

LE PRÉSENT BILLET N'A PAS ÉTÉ ENREGISTRÉ EN VERTU DE LA LOI SUR LES VALEURS MOBILIÈRES DE 1933, TELLE QUE MODIFIÉE (LA « LOI »), NI EN VERTU DES LOIS SUR LES VALEURS MOBILIÈRES D'UN ÉTAT, ET NI CES VALEURS MOBILIÈRES NI AUCUN INTÉRÊT DANS CEUX-CI NE PEUVENT ÊTRE OFFERTS, VENDUS, MIS EN GAGE, CÉDÉS OU AUTREMENT TRANSFÉRÉS À MOINS QUE (I) UNE DÉCLARATION D'ENREGISTREMENT À CET ÉGARD NE SOIT EN VIGUEUR EN VERTU DE LA LOI ET DE TOUTE LOI SUR LES VALEURS MOBILIÈRES APPLICABLE OU (2) QU'UNE DISPENSE D'INSCRIPTION SOIT DISPONIBLE POUR UNE TELLE OFFRE. VALEUR NANTISSEMENT, CESSION OU TRANSFERT.

## BILLET À ORDRE

**1 500 000,00 $**

Daté : 7 février 2023

1. **Promesse de paiement de l'emprunteur**. Pour la valeur reçue, BAT Inc a/k/a B.A.T. Inc. et The Litigation Practice Group PC, (collectivement « LPG » ou « Emprunteur » ou « Emprunteurs » qui peuvent être utilisés de manière interchangeable), et comme personnellement garantis par Daniel March (résidant au 20160 Nob Hill Drive, Yorba Linda, CA 92886) et Tony M Diab (une personne physique résidant en Californie), qui sont tous deux des agents et des dirigeants de LPG ayant le pouvoir de les lier à la présente Note (« Garant » ou « Garants » qui peuvent être utilisé de manière interchangeable sans spécification et signifie collectivement que toutes les personnes identifiées dans les présentes) (LPG, Emprunteur et Garant peuvent tous être utilisés de manière interchangeable tout au long de la présente Note), s'engage par la présente inconditionnellement à payer à MCA Fund ADV Inc. ayant un siège social au 4714 16th Avenue, Brooklyn NY et/ou à LDR International Ltd., une société à responsabilité limitée des îles Vierges britanniques, ayant son adresse à Yamraj Building, Market Square, 3rd Floor, P.O. Box 3175, Road Town, Tortola VG 1110, Îles Vierges britanniques (« Prêteur » ou « Prêteurs » qui peuvent être utilisés de manière interchangeable), ou l'un de leurs cessionnaires, la somme principale d'un million cinq cent mille dollars (1 500 000,00 $) (le « principal ») conformément au présent billet à ordre (le « billet à ordre »), à débourser conformément à l'annexe A, ci-annexée, et en faire partie intégrante.

2. **Date d'échéance**. Tous les frais de capital, d'intérêts et de retard impayés doivent être payés en totalité par l'emprunteur au plus tard le 6 mai 2023 (la « date d'échéance »).

3. **Intérêts.** Le montant principal restant dû portera intérêt (« Intérêt ») à un taux égal à sept pour cent (7,0 %) par mois. Les intérêts seront payés mensuellement le sixième (6) de chaque mois (ou si ce jour n'est pas un jour ouvrable, le jour ouvrable suivant) pendant la durée du présent billet. Les intérêts seront calculés sur une base annuelle de 360 jours. Les paiements d'intérêts doivent être payables comme désigné par le prêteur. Dans la mesure où le taux d'intérêt facturé est jugé illégal, usuraire ou inapplicable en vertu de la loi (même ab initto ou nunc pro tune), les parties aux présentes conviennent que la condition incriminée sera réputée avoir été modifiée et remplacée, ab initio ou nunc pro tune, par le taux d'intérêt maximum autorisé par la loi applicable.

4. **Intérêts moratoires**. En cas de survenance d'un cas de défaut (tel que prévu ci-dessous), le taux d'intérêt passera au moindre de vingt-quatre pour cent (24 %) (« intérêts sur défaut ») ou du montant maximal autorisé par la loi applicable. Dans la mesure où le taux d'intérêt moratoire facturé est jugé illégal, usuraire ou inapplicable en vertu de la loi (même *ab initio* ou *nune pro tune*), les parties aux présentes conviennent que la condition incriminée sera réputée avoir été modifiée et remplacée, ab initio ou *nune pro tune*, par le taux d'intérêt moratoire maximal autorisé par la loi applicable.

5. **Honoraires et frais d'avocat.** Tous les honoraires d'avocat, coûts, débours et dépenses encourus par le Prêteur pour recouvrer ou exécuter ce billet à ordre, pour déclarer ou faire valoir des droits en vertu du billet à ordre, pour faire respecter les droits des prêteurs à l'égard d'un contrat de sûreté et de tout autre document de prêt qui est signé par l'Emprunteur en même temps que les présentes, pour constituer toute garantie qui constitue une garantie pour l'exécution des obligations de l'Emprunteur en vertu du billet à ordre, un contrat de sûreté et tout autre document de prêt qui est signé par l'emprunteur en même temps que les présentes, que ce soit par voie de poursuite ou par tout autre moyen que ce soit, sont payables par l'emprunteur et le garant et sont ajoutés au principal impayé et en font partie intégrante.

6. **Affectation des paiements.** Tous les paiements de l'Emprunteur seront appliqués d'abord au paiement de tout intérêt de retard impayé et ensuite au paiement ou à la réduction du principal.

7. **Pouvoir de l'emprunteur.** Les Emprunteurs Daniel March et Tony M Diab, en tant que membre/dirigeant de l'Entité Emprunteur, ont le pouvoir de lier les Entités Emprunteuses au présent billet à ordre et/ou ont obtenu le consentement à cet effet des autres membres/dirigeants de chacune des Entités Emprunteurs.

8. **Cas de défaut.** Un cas de défaut (un « cas de défaut ») se produit et se poursuit si le prêteur ne reçoit pas le paiement mensuel des intérêts ou du capital avant la date d'échéance, le délai étant essentiel après l'expiration d'une période de grâce de cinq (5) jours au cours de laquelle l'emprunteur peut remédier au défaut. De plus, un cas de défaut se produira si l'emprunteur ne respecte pas le contrat de sûreté et tout autre document de prêt signé par l'emprunteur en même temps que les présentes. En cas de défaut, toutes les sommes impayées (principal, intérêts, honoraires d'avocat, frais divers tels que prévus aux présentes) deviendront immédiatement exigibles, exigibles et payables.

9. **Droits du prêteur en cas de défaut.** En cas de survenance d'un cas de défaut, le prêteur peut, à sa seule discrétion, exercer tous ses droits en vertu du présent billet à ordre, de tous les documents et accords signés par l'emprunteur en relation avec le présent billet à ordre et des lois applicables, y compris, sans s'y limiter, faire valoir ses droits à l'égard de toutes les garanties accordées par l'emprunteur à titre de garantie pour ce billet à ordre, l'inscription d'aveux de jugement signés par l'Emprunteur, l'introduction d'une action devant un tribunal compétent dans tout État et comté dans lequel l'une des Entités Emprunteurs exploite son entreprise ou possède des biens immobiliers, ou traite/débite les comptes des consommateurs des Emprunteurs agissant ou engageant un processeur ACH pour endetter/percevoir des frais sur les comptes des consommateurs des Emprunteurs, déposer toute déclaration de financement UCC que le prêteur juge appropriée dans n'importe quel État et contre toute personne, entité, société ou société affiliée de l'emprunteur.

10. **Conservation des garanties.** L'Emprunteur ne doit pas, sans le consentement écrit préalable du Prêteur, céder, transférer, grever ou céder, vendre, détourner ou empêcher de toute autre manière la constitution de toute garantie qui est donnée en garantie de l'exécution des obligations de l'Emprunteur en vertu du billet à ordre, ni céder, transférer, grever du contrat, céder, vendre, détourner ou empêcher de toute autre manière la mobilisation d'actions, de participations ou de capitaux propres de l'Emprunteur, que ce soit par vente, transfert, cession, licence, location, fusion, abandon, consolidation (autre que la vente de produits dans le cours normal des activités de l'emprunteur), ou liquidation, liquidation ou dissolution de l'entreprise de l'emprunteur.

11. **Transfert par le prêteur.** Le prêteur peut transférer le billet à ordre à n'importe quelle partie à tout moment, à sa seule discrétion, sans préavis ni consentement de l'emprunteur. Aux fins du présent billet, le terme « prêteur » comprend le prêteur, toute partie à qui le billet à ordre est endossé et transféré, et toute partie qui détient le billet à ordre s'il est endossé « en blanc » par le prêteur ou un cessionnaire.

12. **Transfert par l'emprunteur**. L'emprunteur ne peut pas transférer ou céder ses droits ou obligations en vertu du présent billet à ordre sans le consentement écrit préalable du prêteur.

13. **Renonciation(s)**. L'emprunteur renonce par la présente à tout droit de présentation de paiement, d'avis de déshonneur, de protêt, d'avis de protestation de ce billet ou de tout autre avis de quelque nature que ce soit et de toutes demandes quelles qu'elles soient ; et en cas de litige avec le prêteur, qu'il découle ou non du présent billet ou de toute garantie accessoire ou s'y rapportant, renonce ainsi à un procès devant jury, et en outre, renoncez expressément au droit d'interposer toute défense fondée sur tout délai de prescription ou toute réclamation de laches et toute compensation, demande reconventionnelle ou demande reconventionnelle de quelque nature ou description que ce soit. Le garant garantit inconditionnellement le paiement au prêteur de tous les montants dus en vertu du billet. Cette garantie reste en vigueur jusqu'à ce que le billet soit payé en totalité. Le garant doit payer tous les montants dus en vertu du billet lorsque le prêteur fait une demande écrite au garant. Le prêteur n'est pas tenu de demander le paiement d'une autre source avant d'exiger le paiement du garant.

## 14. DROITS, AVIS ET DÉFENSES AUXQUELS LE GARANT RENONCE : Dans la mesure permise par la loi,

A. Le garant renonce à tous les droits de :

1) Exiger une présentation, une protestation ou une demande à l'emprunteur ;
2) Racheter toute garantie avant ou après que le prêteur en dispose ;
3) Faire annoncer toute disposition de la garantie ; et
4) Exiger une évaluation de la garantie avant ou après que le prêteur en dispose.

B. Le garant renonce à tout avis de :

1) Tout défaut en vertu de la Note ;
2) Présentation, déshonneur, protestation ou demande ;
3) Exécution de la Note ;
4) Toute action ou inaction sur le billet ou la garantie, telle que les débours, le paiement, le non-paiement, l'accélération, l'intention d'accélérer, la cession, l'activité de recouvrement et l'engagement de frais d'exécution ;
5) Tout changement dans la situation financière ou les opérations commerciales de l'Emprunteur ou de tout garant ;
6) Toute modification des conditions du billet ou d'autres documents de prêt, à l'exception de l'augmentation des montants dus en vertu du billet ; et
7) Le moment ou le lieu de toute vente ou autre disposition de la garantie.

C. Le garant renonce aux défenses fondées sur toute réclamation selon laquelle :

1) Le prêteur n'a pas obtenu de garantie ;
2) Le prêteur n'a pas obtenu, perfectionné ou maintenu une sûreté sur un bien offert ou pris en garantie ;
3) Le prêteur ou d'autres personnes ont mal évalué ou inspecté la garantie ;
4) La valeur de la garantie a changé ou a été négligée, perdue, détruite ou sous-assurée ;
5) Le prêteur a déprécié la garantie ;
6) le prêteur n'a disposé d'aucune des garanties ;
7) Le prêteur n'a pas effectué de vente commercialement raisonnable ;

8) le prêteur n'a pas obtenu la juste valeur marchande de la garantie ;

9) Le prêteur n'a pas fait ou rendu parfait une réclamation en cas de décès ou d'invalidité de l'emprunteur ou de tout garant du billet ;

10) La situation financière de l'emprunteur ou de tout garant a été surévaluée ou a changé défavorablement ;

11) Le prêteur a commis des erreurs ou des omissions dans les documents de prêt ou dans l'administration du prêt ;

12) Le prêteur n'a pas demandé de paiement à l'emprunteur, à d'autres garants ou à une garantie avant d'exiger le paiement du garant :

13) Le prêteur a porté atteinte aux droits de cautionnement du garant ;

14) Le prêteur a modifié les modalités du billet, sauf pour augmenter les montants dus en vertu du billet. Si le prêteur modifie le billet pour augmenter les montants dus en vertu du billet sans le consentement du garant, le garant ne sera pas responsable des montants majorés et des intérêts et frais connexes, mais demeure responsable de tous les autres montants ;

15) L'emprunteur a évité toute responsabilité sur le billet ; ou

16) Le prêteur a pris une mesure permise en vertu du billet, de la présente garantie ou d'autres documents de prêt.

15. **Aucune renonciation par le prêteur.** Les droits et recours du prêteur aux présentes sont cumulatifs et non exclusifs des droits ou recours prévus par la loi et peuvent être exercés individuellement ou simultanément. Le fait que le prêteur n'exerce pas l'un de ses droits ou recours en vertu du présent billet à ordre ne constitue pas une renonciation à ce droit ou recours ou n'empêche le prêteur d'exercer ce droit ou recours à une date ultérieure. Le prêteur ne peut renoncer à un droit ou à un recours en vertu des présentes que par écrit. La renonciation par le prêteur à tout droit ou recours en vertu des modalités du présent billet, à une occasion donnée, ne doit pas être interprétée comme un obstacle à l'exercice d'un droit, d'un pouvoir, d'un privilège ou d'un recours que le détenteur aurait autrement eu à une autre occasion.

16. **Modification.** Toute modification ou amendement du présent billet à ordre doit être faite par écrit et signée par l'emprunteur et le prêteur.

17. **Droit applicable.** Le présent billet à ordre est régi par les lois de l'État de New York, sans donner effet aux dispositions relatives au choix de la loi applicable indiquant les lois d'un autre État. Tout litige impliquant ou découlant de la présente Note ne sera porté que devant le tribunal d'État ou fédéral situé à New York, New York. L'intention des parties est que le taux d'intérêt prévu aux présentes et tous les autres frais facturés à l'emprunteur soient légaux. Isi, pour quelque raison que ce soit, le paiement d'une partie des intérêts, frais ou redevances exigés par la présente note dépasserait la limite autorisée par la loi applicable, l'obligation de payer des intérêts ou des frais sera automatiquement réduite à cette limite et, si des montants dépassant cette limite ont été payés, ces montants seront appliqués au principal impayé ou remboursés de sorte qu'en aucun cas les intérêts ou les frais ne pourront être remboursés. Les frais exigés en vertu des présentes dépassent le tarif maximum autorisé par la loi. Toute disposition des présentes qui peut s'avérer inapplicable en vertu d'une loi n'affectera pas la validité de toute autre disposition des présentes.

18. **Observations non originales.** L'emprunteur, le garant et le prêteur conviennent par la présente que les signatures électroniques/fac-similées sur ce billet peuvent être considérées comme si elles étaient signées à l'encre humide. Les emprunteurs et le garant renoncent par la présente à toute défense ou argument selon lequel le prêteur n'a pas soumis une note « originale » signée à l'encre humide.

**EN FOI DE QUOI**, les Emprunteurs et le Garant ont dûment signé le présent billet à ordre au jour et l'année indiqués ci-dessus.

**GARANT:**

Par:_____
Nom : Tony M DIAB

SSN:

**GARANT:**

Par:_____
Nom : Daniel March

Numéro de sécurité sociale : ▮▮▮▮ 9617

**EMPRUNTEUR**

BAT Inc a/k/a B.A.T. Inc.

Par:_____
Nom : Tony M Diab
Titre : Officier

**EMPRUNTEUR**

Le groupe de pratique Litige PC

Par:_____
Nom : Daniel March
Titre : Officier

ÉTAT DU
COMTÉ DE

Le ____ février 2023, devant moi, le soussigné, notaire public dans et pour ledit État, a comparu personnellement Tony M Diab que je connais personnellement ou qui m'a prouvé sur la base d'une preuve satisfaisante qu'il était la personne dont le nom est souscrit à l'instrument ci-dessous et je reconnais qu'il l'a exécuté en sa qualité, et que, par sa signature sur l'acte, le particulier, ou la personne au nom de laquelle il a agi, a signé l'acte.

Notaire

ÉTAT DU
COMTÉ DE

Le ____ février 2023, devant moi, le soussigné, notaire public dans et pour ledit État, a comparu personnellement Daniel March que je connais personnellement ou qui m'a prouvé sur la base d'une preuve satisfaisante qu'il était la personne dont le nom est souscrit à l'instrument ci-dessous et je reconnais qu'il l'a exécuté en sa qualité, et que, par sa signature sur l'acte, le particulier, ou la personne au nom de laquelle il a agi, a signé l'acte.

Notaire

## Annexe A

Débours du capital

1.  À l'intention du groupe de pratique en litige PC, le montant de 1 500 000,00 $ représentant à titre de financement du prêt.

Le groupe de pratique Litige PC

17542 E 17e rue, bureau 100

Tustin, Californie 92780

Itinéraire : ████ 9593

Compte : ████ 6512

**RECONNAISSANCE**

Un notaire ou un autre fonctionnaire qui remplit ce certificat ne vérifie que l'identité de la personne qui a signé le document auquel ce certificat est joint, et non la véracité, l'exactitude ou la validité de ce document.

État de Californie
Comté d'Orange

Sur *7 février 2023* devant moi,    Olga Lucia Esquivel, notaire
                                    (insérer le nom et le titre de l'agent)

A comparu personnellement *Daniel S. March*, qui m'a prouvé, sur la base de preuves satisfaisantes, qu'il était la ou les personnes dont le(s) nom(s) est/sont souscrit(s) à l'instrument ci-joint et m'a reconnu qu'il/elle/elles l'ont signé en son/ses qualité(s) autorisée(s), et que par son/ses signature(s) sur l'acte, la (les) personne(s), ou l'entité pour le compte de laquelle la ou les personnes ont agi, exécuté. l'Instrument.

Je certifie en vertu de la PEINE DE PARJURE en vertu des lois de l'État de Californie que le paragraphe précédent est vrai et correct.

TÉMOIN ma main et mon sceau officiel.

Signature _____ **(sceau)**

**RECONNAISSANCE**

Un notaire ou un autre fonctionnaire qui remplit ce certificat ne vérifie que l'identité de la personne qui a signé le document auquel ce certificat est joint, et non la véracité, l'exactitude ou la validité de ce document.

État de Californie
Comté d' *Orange*

Sur *02/07/2023* devant moi, <u>Vanessa Banken-Buchner</u>
(insérer le nom et le titre de l'agent)

Comparution en personne *Tony Maurice Diab*, qui m'a prouvé, sur la base de preuves satisfaisantes, qu'il était la ou les personnes dont le(s) nom(s) est/sont abonné(s) à l'instrument ci-joint et m'a reconnu qu'il/elle/elles l'ont signé en sa (ses) capacité(s) autorisée(s), et que par son/ses signature(s) sur l'acte, la (les) personne(s), ou l'entité pour le compte de laquelle la ou les personnes ont agi, exécuté. l'Instrument.

Je certifie en vertu de la PEINE DE PARJURE en vertu des lois de l'État de Californie que le paragraphe précédent est vrai et correct.

TÉMOIN ma main et mon sceau officiel.

Signature _____ **(sceau)**



# ANNEXE 4

## CONTRAT DE SÛRETÉ

LE CONTRAT DE SÛRETÉ THIS (le « Contrat de sûreté ») est conclu en date du 7 février 2023 par et entre BAT Inc a/k/a B.A.T. Inc. et The Litigation Practice Group PC, (collectivement « LPG » ou « Emprunteur » ou « Emprunteurs » qui peuvent être utilisés de manière interchangeable), et comme personnellement garanti par Daniel March (résidant au 20160 Nob Hill Drive, Yorba Linda, CA 92886) et Tony M Diab (une personne physique résidant en Californie), qui sont tous deux des agents et des dirigeants de LPG avec le pouvoir de les lier à la présente Note (« Garant » ou « Garants » qui peuvent être utilisés de manière interchangeable sans spécification et désigneront collectivement toute personne identifiée dans les présentes) (LPG, Emprunteur et Garant peuvent tous être utilisés de manière interchangeable tout au long de la présente Note) et MCA Fund ADV Inc, ayant un lieu d'affaires au 4714 16th Avenue, Brooklyn NY et/ou à LDR International Ltd., une société à responsabilité limitée des Îles Vierges britanniques, dont le siège social est situé à Yamraj Building, Market Square, 3rd Floor, P.O. Box 3175, Road Town, Tortola VG 1 1 10, Îles Vierges britanniques (« Prêteur » ou « Prêteurs » qui peuvent être utilisés de manière interchangeable), ou l'un de leurs cessionnaires (collectivement les « Parties »),

ATTENDU QUE, l'Emprunteur a signé et remis au Prêteur un certain billet à ordre daté du 7 février 2023 (le « Billet »), en vertu duquel, entre autres, l'Emprunteur a promis de payer au Prêteur la somme principale d'un million cinq cent mille dollars (1 500 000,00 $) (le « Capital )) avec intérêts (selon le Billet) au plus tard le 6 mai 2023 (la « Date d'échéance »).

ATTENDU QUE, pour inciter le prêteur à conclure le billet, l'emprunteur a accepté d'accorder au prêteur une sûreté sur la garantie (telle que définie ci-après), à titre de garantie pour l'exécution intégrale et en temps opportun par l'emprunteur des obligations garanties (telles que définies ci-dessous) ; et

MAINTENANT, DONC, en considération des prémisses ci-dessus et d'autres considérations bonnes et précieuses, dont la réception et la suffisance sont reconnues par les présentes. Les parties aux présentes conviennent de ce qui suit :

1. Afin d'assurer l'exécution intégrale et en temps opportun de toutes les obligations de l'emprunteur en vertu du billet, y compris, sans s'y limiter, le paiement de tous les principaux droits, intérêts et autres montants dus par l'emprunteur au prêteur en vertu du billet (collectivement, les « obligations garanties »), l'emprunteur accorde et transfère par la présente au prêteur une sûreté et un privilège sur les garanties suivantes : tel que ce terme est utilisé à l'article 9 du Code de commerce uniforme (le « UCC ») : autres biens corporels et incorporels, actifs et droits de l'emprunteur actuellement possédés ou acquis par la suite, y compris, sans s'y limiter, tous les biens immobiliers, les intérêts immobiliers, les participations dans toute société/société, qu'elle soit nommée ou non dans les présentes, les comptes clients, les bénéfices, les revenus, la numéraire, les remboursements d'impôts, prêts, financements bancaires, installations, baux, véhicules, licences, équipement, contrats, stocks, matières premières, matériel de bureau, matériel et logiciels informatiques, propriété intellectuelle, réclamations, causes d'action, espèces, comptes bancaires, comptes clients, stocks, polices d'assurance, produits d'assurance et produits y afférents, livres et registres, listes de clients, dossiers de crédit, fichiers informatiques, programmes, impressions et autres documents informatiques et dossiers s'y rapportant, les marchandises qui peuvent être décrites plus en détail dans les pièces jointes, le cas échéant, et tous les produits de la vente et de la production de toutes les sûretés couvertes par le présent contrat de sûreté, qu'elles aient été achetées ou non avec le produit du prêt, ainsi que toutes les substitutions, remplacements et acquisitions de ceux-ci, y compris, mais sans s'y limiter, tout bien immobilier appartenant à l'une des sociétés mentionnées ou non ou le revenu provenant de tout bien immobilier appartenant à l'une des sociétés mentionnées aux présentes, où qu'ils se trouvent, ainsi que le compte réel, les revenus/frais anticipés générés par ceux-ci, à partir de tous les comptes de consommateurs des Emprunteurs (et de leurs sociétés affiliées et autres entités sous

leur contrôle) qui sont débités/traités par l'Emprunteur que l'Emprunteur met en gage à titre de garantie et sous réserve d'un état de financement UCC (le « Garantie »).

2. Séparément, et en aucun cas limité, l'emprunteur déclare et accepte qu'il fournira et accordera en permanence au prêteur un accès en temps réel et continu à son logiciel de gestion de la relation client (« CRM »), étant déclaré que ce même est actuellement connu sous le nom de « Debt Pay Pro ». Si l'emprunteur change le logiciel CRM qu'il utilise, il doit en informer le prêteur avant de changer et doit fournir au prêteur tous les identifiants/capacités de connexion nécessaires pour s'assurer que le prêteur est en mesure d'accéder, en temps réel et en continu, au logiciel CRM de l'emprunteur. L'Emprunteur déclare et accepte également que les instructions appropriées doivent être données au personnel administratif du logiciel CRM pour permettre au Prêteur d'avoir l'accès prévu et envisagé aux présentes. La violation de la présente disposition par l'emprunteur sera considérée comme un cas de défaut qui, s'il n'est pas corrigé après une période de correction d'un (1) jour, sera réputé un défaut du présent accord et une accélération de toute condition envisagée dans les présentes et dans tout autre document signé par l'emprunteur en faveur du prêteur (un billet, un contrat de prêt, etc.) et qui autorisera également le prêteur à exercer tous les recours à sa disposition en vertu du présent accord (et de tout autre document exécutée par l'Emprunteur en faveur du Prêteur (une note, un contrat de prêt, etc.) et/ou en droit.

3. Plus précisément, et en aucun cas de limitation, si l'Emprunteur manque à ses obligations sur le présent Accord, le Note ou tout autre document signé par l'Emprunteur en faveur du Prêteur. le Prêteur aura automatiquement le droit réalisé et acquis d'engager un processeur (tel qu'un processeur ACH) pour débiter/traiter/facturer automatiquement/électroniquement les comptes des clients/clients des Emprunteurs jusqu'à ce que le Principal, Les intérêts et tous les autres frais envisagés par le billet, le présent accord et tout autre document signé par l'emprunteur en faveur du prêteur sont payés en totalité au prêteur.

4. Par les présentes, l'emprunteur désigne le prêteur à titre de mandataire pour traiter les comptes ou les créances envisagés aux présentes, dans le contrat de sûreté ou dans le billet, ou pour protéger autrement l'intérêt du prêteur dans le principal.

5. Jusqu'à ce que le prêteur reçoive la totalité de l'argent envisagé dans le billet, l'emprunteur accepte, déclare, met en gage et promet qu'il ne conclura pas d'accord similaire avec quiconque d'autre, régissant ou lié aux comptes et/ou aux clients de l'emprunteur, et qu'il ne mettra pas en gage, grevera, transférera, vendra, cédera ou interférera de quelque manière que ce soit avec la capacité du prêteur à garantir le remboursement de son capital. L'emprunteur s'engage également, promet et déclare qu'il ne donnera pas, directement ou indirectement, d'instructions ou de guides à l'un de ses clients/comptes/marchands/vendeurs/clients pour payer une autre entité pour les paiements envisagés dans les présentes qui sont et devraient être adressés au prêteur.

6. Jusqu'à ce que le prêteur reçoive la totalité de l'argent envisagé dans le billet, le principal est réputé constituer un privilège sur tous les actifs, comptes, créances, intérêts, etc., de l'emprunteur, qu'ils soient importants, acquis, réalisés ou non.

7. Dégagement de toute responsabilité et indemnisation. L'Emprunteur déclare qu'il se conforme à toutes les lois applicables et qu'il a le pouvoir et l'autorité de conclure le présent Accord et de s'engager dans les actions envisagées dans les présentes. Par la présente, l'Emprunteur indemnise et dégage le Prêteur, ainsi que ses agents, membres et affiliés, de toute réclamation, action, poursuite, procédure, jugement, dommage, responsabilité, coût et dépense, y compris les

honoraires d'avocat découlant directement ou indirectement d'une contestation ou d'une autre violation du présent Accord, autre que la propre négligence du Prêteur.

8. L'Emprunteur autorise par la présente le Prêteur à mettre en gage, prêter ou utiliser la Garantie d'une manière qui porte atteinte aux droits de l'Emprunteur de la racheter. Par les présentes, l'Emprunteur autorise le Prêteur à déposer des relevés de financement UCC contre l'Emprunteur ou tout actif de l'Emprunteur afin de garantir ces obligations dans tout État des États-Unis, contre toute entité ou personne identifiée dans les présentes, ou contre toute entité ou personne découverte par la suite par le Prêteur dans laquelle l'Emprunteur a un intérêt, au besoin, afin de garantir le principal.

9. La seule obligation du prêteur en ce qui concerne la garde, la garde et la préservation physique des biens grevés en sa possession, en vertu de l'UCC ou autrement, est de les traiter de la même manière que le prêteur traite des biens similaires pour son propre compte. Ni le prêteur, ni aucun de ses administrateurs, dirigeants, employés ou agents, ne peuvent être tenus responsables de l'omission d'exiger, de percevoir ou de réaliser la totalité ou une partie de la garantie ou de tout retard à le faire.

10. L'emprunteur fait les déclarations suivantes : (a) l'emprunteur a le droit plein et inconditionnel et l'autorité corporative d'accorder au prêteur cette sûreté et tout privilège accordé aux présentes ; (b) la garantie est la propriété légale de l'emprunteur et est libre et quitte de tous privilèges, sûretés, réclamations, charges, charges, taxes et évaluations, sauf indication contraire expresse dans le présent contrat de sûreté ou enregistrement public ; (c) à l'exception de tout état de financement déposé en faveur du prêteur, ou de tout autre accord de financement hypothécaire qui est déposé auprès du greffier du comté pour la propriété spécifique, aucun état de financement couvrant l'une des garanties n'est déposé dans un bureau public ; (d) aucune modalité ou condition du présent contrat de sûreté n'enfreint les dispositions de tout autre accord auquel l'Emprunteur est partie ; (e) tous les documents qui composent la Garantie sont valides, exécutoires et exécutoires conformément à leurs conditions respectives ; (f) il n'y a aucune action ou procédure en cours, ou à la connaissance de l'Emprunteur, qui pourrait raisonnablement être susceptible d'affecter de quelque manière que ce soit (i) les droits du Prêteur en vertu du présent contrat de sûreté, (ii) la capacité de l'Emprunteur à s'acquitter de ses obligations en vertu des présentes, (iii) le titre de propriété de la Garantie, ou (iv) la validité ou la priorité de la sûreté et du privilège sur la Garantie créée en vertu des présentes.

11. L'emprunteur déclare qu'il a tous les droits, pouvoirs et autorités requis pour signer, livrer et exécuter le présent accord, pour réaliser les transactions envisagées par les présentes et par celui-ci, et pour exécuter ses obligations en vertu des présentes et en vertu de celles-ci. La signature et la livraison du présent Accord et de tout document connexe nonobstant la réalisation des transactions envisagées par les présentes et par celles-ci, ont été dûment approuvés par toutes les parties, et aucune autre action n'est requise pour autoriser le présent Accord, tout Accord connexe auquel quiconque peut être partie, ou les transactions envisagées par les présentes et par conséquent. Le présent Accord, et chacun des Accords connexes, a été dûment et valablement signé et remis par les parties qui l'ont signé et, en supposant l'autorisation, l'exécution et la livraison appropriées et valides du présent Accord par les autres Parties, et de chacun de ces Accords par les autres parties à celui-ci, constitue, ou constituera, une obligation valide et contraignante de la partie désignée à cet égard, exécutoire à son encontre conformément à ses conditions générales, sauf dans la mesure où l'exécution peut être limitée par la faillite, l'insolvabilité, la réorganisation, le moratoire et d'autres lois applicables affectant l'application des droits des créanciers en général et sauf dans la mesure où la disponibilité de recours équitables peut être limitée par la loi applicable.

12. Aucun consentement d'une partie à un contrat, accord, instrument, bail ou licence auquel l'une des parties aux présentes est partie ou auquel l'un de ses biens ou actifs est soumis n'est requis pour la signature, la livraison ou l'exécution par l'emprunteur de toute condition du présent accord. L'Emprunteur déclare qu'il n'est pas tenu de donner un avis,

d'effectuer un dépôt auprès ou d'obtenir une autorisation, un consentement ou une approbation d'un organisme gouvernemental ou d'un tiers, y compris une partie à un contrat cédé, en ce qui concerne l'exécution, la livraison et l'exécution par les parties au présent Accord ou à tout autre accord auquel il est partie ou la réalisation des transactions envisagées par les présentes et par celles-ci.

13. L'emprunteur s'engage et convient de ce qui suit : (a) de payer et d'exécuter toutes les obligations garanties conformément aux modalités du billet et de défendre le titre de la garantie contre toutes les personnes et entités et contre toutes les réclamations et demandes quelles qu'elles soient ; (b) à la demande du prêteur, pour fournir une assurance supplémentaire de titre, signer tout accord écrit ou accomplir tout autre acte nécessaire pour réaliser les objectifs et les dispositions du présent contrat de sûreté, signer tout instrument ou déclaration requis par la loi ou autrement afin de parfaire, maintenir ou résilier la sûreté du prêteur sur le bien grevé et payer tous les frais ou frais de dépôt s'y rapportant ; (c) de payer, à l'échéance, toutes les taxes, cotisations et droits de licence relatifs au Bienfait, qui, s'ils ne sont pas payés, peuvent donner lieu à un privilège, à une charge ou à une charge sur le Bienfait ; (d) de maintenir la garantie, aux frais de l'emprunteur, en bon état et en bon état et de ne pas faire une mauvaise utilisation, un abus, un gaspillage ou de laisser la garantie se détériorer, à l'exception de l'usure normale, et de la mettre à la disposition du prêteur pour inspection à tout moment raisonnable ; (e) de ne pas vendre, échanger, céder, prêter, livrer, hypothéquer ou disposer de toute autre manière des biens grevés pendant la durée de la présente convention de sûreté sans le consentement écrit préalable du prêteur ; (t) de ne pas accorder ou donner une sûreté ou un état de financement couvrant la garantie à quiconque autre que le prêteur ; (g) d'informer immédiatement le prêteur par écrit de tout événement qui, à tout moment, pourrait faire en sorte que les déclarations et garanties énoncées aux présentes ou dans le contrat de prêt cessent d'être vraies ou que le remboursement de celles-ci par le mandant ou le prêteur pourrait être compromis.

14. L'Emprunteur déclare qu'il n'y a aucune Action de quelque nature que ce soit en cours ou, à sa connaissance, menacée contre ou par l'Emprunteur : (a) relative ou affectant les comptes ou créances envisagés dans les présentes ou (b) qui conteste ou cherche à empêcher, interdire ou retarder de toute autre manière les transactions envisagées par le présent Accord. Il n'existe aucun événement survenu ou circonstance susceptible de donner lieu à une telle action ou de lui servir de fondement.

15. L'Emprunteur déclare qu'à sa connaissance, les comptes ou créances envisagés aux présentes ne feront l'objet d'aucun litige ou autre procédure judiciaire et qu'il ne permettra pas qu'ils fassent l'objet d'un autre Accord, d'un contrat de sûreté tel qu'un UCC, ni d'une réclamation de tiers sans le consentement écrit exprès du Prêteur.

16. Les éléments suivants constituent un défaut de la part de l'Emprunteur : (a) tout Cas de défaut en vertu du Note ; (b) le défaut de l'Emprunteur de se conformer ou d'exécuter une disposition du présent Contrat de sûreté ou du Note ou de tout autre accord entre l'Emprunteur et le Prêteur signé en relation avec le Note ; (c) toute déclaration ou garantie fausse ou trompeuse faite ou donnée par l'Emprunteur en relation avec le présent Contrat de sûreté ou toute information/document fourni par l'Emprunteur avant la signature du présent Contrat de sûreté ; (d) tout acte de l'emprunteur qui met en péril la perspective de l'exécution intégrale ou de la satisfaction des obligations garanties ou qui porte atteinte aux droits du prêteur sur la garantie.

17. En cas de défaut de l'emprunteur et au choix du prêteur, les obligations garanties garantis par la présente convention de sûreté deviennent immédiatement exigibles et payables en totalité sans préavis ni mise en demeure, et le prêteur jouit de tous les droits, recours et privilèges relatifs à la reprise, à la conservation et à la vente des biens grevés et à la disposition du produit qui sont accordés à un prêteur par les articles applicables de la CCU

en ce qui concerne « » en vigueur à la date du présent contrat de sûreté, ou tel qu'il peut être accordé au prêteur en vertu du billet ou de tout autre document signé en relation avec le billet.

18. Si l'emprunteur ne paie pas une partie du principal ou des intérêts y afférents à l'échéance, ou s'il est autrement en défaut de ses obligations en vertu du billet, le prêteur doit, en plus de tout autre droit qu'il peut avoir en vertu du présent contrat de sûreté, de l'UCC, du billet, de tout autre document signé en rapport avec le billet, l'UCC (y compris le droit de déposer une UCC contre toute personne ou entité identifiée dans les présentes ou contre toute personne ou entité découverte ultérieurement qui se rapporte à l'Emprunteur et qui peut avoir une obligation envers le Prêteur à titre de garantie pour le Principal ou autrement liée aux présentes), et/ou en droit ou en équité, a le droit de : (a) affecter au paiement les fonds qu'elle a reçus conformément aux dispositions du présent Contrat de sûreté ou de la Note de tout montant dû au prêteur en vertu du billet de la manière qu'il juge appropriée à sa seule discrétion ; (b) pénétrer paisiblement dans les locaux de l'Emprunteur par ses propres moyens ou par voie judiciaire et prendre possession de la Garantie, et l'Emprunteur s'engage à ne pas résister ou interférer avec celle-ci ; (c) exiger de l'Emprunteur qu'il rassemble les Garanties et les mette à la disposition du Prêteur à un endroit qui sera désigné par le Prêteur et qui est raisonnablement pratique pour les deux parties (étant entendu que l'adresse du Prêteur indiquée ci-dessus est un endroit raisonnablement pratique pour un tel rassemblement) ; et (d) vendre, céder et livrer des sûretés lors d'une vente publique ou privée, au comptant, à crédit ou à terme, avec ou sans publicité de l'heure, du lieu ou des conditions de la vente et, à cet égard, pour accorder des options et utiliser les services d'un courtier, sauf que, si la vente est une vente privée, moyennant un préavis écrit de cinq (5) jours à l'emprunteur de la date,  le moment et le lieu de toute vente et les conditions de la vente, dont l'avis que l'emprunteur convient être raisonnable, toutes les autres demandes, publicités et avis étant par les présentes abandonnés. Toute vente sera libre et dégagée de tout droit d'équité ou de rachat, auquel l'Emprunteur renonce et libère absolument et irrévocablement.

19. Lors de toute vente de garantie par le prêteur, le prêteur ou son délégué peut acheter la garantie. Le prêteur n'est pas tenu de procéder à la vente d'une garantie s'il décide de ne pas le faire. même si un avis de vente a pu être donné. Le prêteur peut, sans préavis ni publication, ajourner toute vente publique ou privée ou la faire ajourner de temps à autre et si cette vente est une vente privée par annonce à la date, heure et lieu fixés pour la vente, et cette vente peut, sans autre avis, être faite à la date, heure et lieu où elle a été ainsi ajournée. Si l'une ou l'autre des garanties est vendue par le prêteur à crédit ou pour une livraison future, le prêteur ne sera pas responsable de l'incapacité de l'acheteur à l'acheter ou à la payer et, dans le cas d'un tel échec, le prêteur peut revendre cette garantie. En aucun cas, l'emprunteur ne sera crédité d'une partie du produit de la vente d'une garantie tant que le paiement en espèces n'aura pas été reçu par le prêteur. Dans le cas d'une vente, le prêteur peut d'abord déduire tous les coûts et dépenses de collecte, de vente et de livraison de la garantie et tous les coûts et dépenses qui y sont accessoires, y compris, sans s'y limiter. les frais de poursuite, de recherche, de réception, de prise, de conservation et de stockage de la garantie, de publicité pour la vente de la garantie, les honoraires et débours raisonnables d'avocat, les commissions de courtage et les frais de transfert et taxes,  et appliquera tout reliquat d'abord au paiement de toute avance consentie par le prêteur en vertu du billet, puis aux frais de retard, le cas échéant, puis au paiement des intérêts courus au titre du billet et enfin au paiement du principal impayé. Le solde, le cas échéant, restant après le paiement intégral du principal impayé doit être payé à l'emprunteur, dans la mesure permise par la loi, à moins qu'il n'y ait aucune autre réclamation dont le prêteur a reçu un avis. Toute vente effectuée selon les conditions précédentes ou par toute autre méthode de vente (si elle est menée conformément aux pratiques des banques disposant de garanties similaires) sera considérée comme commercialement raisonnable. L'emprunteur convient que le prêteur a le droit de continuer à conserver la garantie jusqu'à ce que le prêteur, selon son jugement raisonnable, estime qu'un prix avantageux peut être obtenu pour la garantie et, en l'absence de négligence grave, le prêteur ne sera pas responsable envers l'emprunteur de toute perte de valeur de la garantie en raison d'une telle rétention de la garantie par le prêteur. De plus, le prêteur peut choisir de conserver la garantie en règlement intégral du prêt, auquel cas un avis en sera donné à l'emprunteur, et si le prêteur reçoit une objection écrite de l'emprunteur dans les vingt et un (21) jours suivant la signification de l'avis, le prêteur commencera à disposer de la garantie

Me CLAIRE NOTAIRE
HUISSIER
17, bd Albert 1er
MONACO ☎ +377 97 97 09 09

de la manière indiquée aux présentes ; à condition toutefois que. que si le produit net à recevoir d'une aliénation est insuffisant pour régler intégralement les montants dus en vertu des présentes ou du billet, le prêteur ne sera pas obligé d'aller de l'avant avec cette disposition proposée, et aura le droit de conserver la garantie en règlement intégral du billet malgré toute objection de l'emprunteur à une telle rétention.

20. En cas de défaut, les honoraires d'avocat du prêteur et les frais juridiques et autres pour la poursuite, la recherche, le dépôt, les poursuites contre, la réception, la prise, la conservation, l'entreposage, la publicité et la vente de la garantie ou le recouvrement du principal, seront à la charge de l'emprunteur et feront partie de la dette principale et seront réputés garantis en vertu des présentes et par la garantie jusqu'à ce qu'ils soient entièrement payés.

21. L'emprunteur demeure responsable de tout déficit résultant de la vente de la garantie et doit payer un tel déficit immédiatement sur demande.

22. Si l'emprunteur manque à l'exécution de l'une des dispositions du présent contrat de sûreté de la part de l'emprunteur, le prêteur peut l'exécuter pour le compte de l'emprunteur et toute somme dépensée à cette fin sera passible d'intérêts (au même taux que celui qui peut être dû en vertu du billet de temps à autre) à l'emprunteur et ajoutée à la dette garantie par les présentes.

23. En cas de défaut, le prêteur a le droit, mais non l'obligation, de saisir et d'exploiter le bien grevé et d'utiliser les bénéfices de l'opération comme il le juge bon à sa seule discrétion, dans la mesure où l'emprunteur reçoit un crédit pour le montant de ces bénéfices ainsi réalisés par le prêteur. En outre, l'Emprunteur désigne irrévocablement le Prêteur en tant que son mandataire, cette nomination étant assortie d'un intérêt, tant qu'une partie de la dette reste impayée, aux fins de signer et de remettre, au nom et pour le compte de l'Emprunteur, tous les documents, instruments, contrats, formulaires et écrits de quelque nature que ce soit, dont la signature est raisonnablement requise afin de fixer le calendrier, annoncer et réaliser une disposition commercialement raisonnable de la garantie à la suite d'un défaut de l'emprunteur en vertu des présentes, ou en vertu du billet ou de tout autre document signé en relation avec le billet, et d'accomplir tous les autres actes au nom de l'emprunteur et au nom de l'emprunteur que le prêteur peut raisonnablement juger nécessaires ou souhaitables dans le cadre d'une telle disposition de la garantie dans le cadre du respect de toutes les dispositions et exigences prévues par le CCU.

24. Le billet est un instrument distinct et peut être négocié par le prêteur sans libérer l'emprunteur ou la garantie, ou le co-fabricant. L'emprunteur consent à toute prolongation du délai de paiement. S'il y a plus d'un emprunteur ou cosignataire du présent contrat de sûreté ou des billets garantis par les présentes, l'obligation de tous est principale, conjointe et solidaire.

25. La renonciation ou l'acquiescement à un défaut de l'emprunteur, ou le défaut du prêteur d'insister pour que l'emprunteur s'exécute strictement de toute garantie ou accord dans le présent contrat de sûreté, ne constitue pas une renonciation à tout défaut ou défaut ultérieur ou autre.

26. L'UCC régira les droits, les obligations et les recours des parties et toute disposition des présentes déclarée invalide en vertu d'une Jaw n'invalidera aucune autre disposition du présent accord de sécurité.

27. Le prêteur peut céder ses droits sur le présent contrat de sûreté et sur les biens grevés, selon ce qu'il juge approprié, à sa seule discrétion. L'emprunteur ne peut céder ses obligations ou ses droits en vertu du présent contrat de sûreté sans le consentement écrit du prêteur.

28. Le prêteur est autorisé par les présentes à déposer les états de financement de l'UCC qui peuvent être nécessaires pour parfaire l'intérêt du prêteur dans la garantie. Nonobstant ce qui précède, le prêteur n'a aucune obligation de se conformer à l'enregistrement, au réenregistrement, au dépôt, au nouveau dépôt ou à d'autres exigences légales nécessaires pour établir ou maintenir la validité, la priorité ou l'applicabilité, ou les droits du prêteur sur le bien ou une partie de celui-ci.

29. Tous les avis doivent être donnés par écrit et sont réputés avoir été donnés en bonne et due forme : a) au moment de la livraison, s'ils sont remis en personne ; (b) un (1) jour ouvrable (défini ci-dessous) après avoir été déposé pour une livraison le lendemain auprès d'un service de messagerie de nuit réputé ou s'il est envoyé par e-mail ; ou (c) trois (3) jours ouvrables après avoir été déposé dans un bureau de poste ou un dépôt de courrier régulièrement tenu par le service postal des États-Unis et envoyé par courrier certifié, port payé, accusé de réception.

**30. LE PRÉSENT CONTRAT DE SÛRETÉ EST DÉLIVRÉ DANS L'ÉTAT DE NEW YORK ET DOIT ÊTRE INTERPRÉTÉ ET EXÉCUTÉ CONFORMÉMENT AUX LOIS DE LA RÉPUBLIQUE DE NEW YORK, SANS AUCUNE DISPOSITION EN MATIÈRE DE CONFLIT DE LOIS. TOUTE ACTION OU POURSUITE D'UNE RÉCLAMATION OU D'UN RECOURS JURIDIQUE DANS UN FORUM JURIDIQUE EN RELATION AVEC LE PRÉSENT DOCUMENT, DÉCOULANT DE CE DOCUMENT, OU LIÉE À TOUTE OBLIGATION LIÉE AUX PRÉSENTES, DOIT ÊTRE INTENTÉE DEVANT LE TRIBUNAL DE L'ÉTAT OU DE LA FÉDÉRATION SIÉGEANT DANS LE COMTÉ DE NEW YORK, NEW YORK, QUI APPLIQUERA LA LOI DE NEW YORK À L'AFFAIRE SANS QU'IL Y AIT DE « CONFLIT DE LOIS, » ANALYSE.**

31. Dans le cas où un mot, une phrase, un paragraphe ou un article du présent contrat de sûreté serait jugé nul ou annulable, le reste du présent contrat de sûreté sera néanmoins légal et exécutoire avec la même force et le même effet que si les parties nulles ou annulables avaient été supprimées.

32. Chaque partie doit faire et exécuter, ou faire faire et exécuter, tous les autres actes et choses, et doit signer et remettre tous les autres accords, certificats, instruments et documents, que l'autre partie peut raisonnablement demander afin de réaliser l'intention et d'accomplir les objectifs du présent Accord et la réalisation des transactions envisagées par les présentes.

33. Le présent écrit et les documents signés dans le cadre du prêt contiennent l'intégralité de l'accord des parties en ce qui concerne le matériel en question et aucune modification, altération ou renonciation à tout ou partie de la totalité ou d'une partie ne sera valide à moins d'être faite par écrit et signée par toutes les parties aux présentes. Chaque partie déploiera tous les efforts raisonnables pour prendre ou faire prendre toutes les mesures, et pour faire ou faire faire, et pour aider et coopérer avec les autres parties dans l'accomplissement de tout ce qui est nécessaire, approprié ou souhaitable pour réaliser l'intention et les objectifs du présent accord.

34. Le présent contrat constitutif de sûreté peut être signé en deux ou plusieurs exemplaires, dont chacun est un original, mais qui, ensemble, constituent un seul et même instrument. Les signatures électroniques sont considérées comme des originaux et comme si elles étaient signées à l'encre humide. L'emprunteur s'engage à ne pas soulever de réclamation ou de défense quant à l'absence d'un original.

35. Le présent contrat ne peut être résilié par l'emprunteur tant que le prêteur n'a pas reçu tout l'argent, les intérêts, etc. envisagés dans le billet.



36. <u>Confidentialité.</u> Toutes les parties au présent Accord conviennent et reconnaissent que tous les noms, conditions, déclarations, accords, engagements, etc. énoncés dans le présent Accord sont confidentiels (ensemble, les « Informations confidentielles »). Toutes les parties garderont en tout temps les informations confidentielles confidentielles. Aucune partie aux présentes, sans le consentement écrit préalable d'un agent autorisé de toutes les parties au présent Accord, (a) ne copiera, n'utilisera ou ne divulguera des Informations confidentielles, (b) ne livrera ou ne divulguera des Informations confidentielles à toute personne ou entité en dehors du présent Accord, ou (c) n'utilisera les Informations confidentielles pour son propre usage ou ne les utilisera au détriment des autres parties au présent Accord. Nonobstant ce qui précède, les parties aux présentes peuvent, sans consentement, utiliser les renseignements confidentiels et les divulguer et les remettre à leurs employés ou agents, le cas échéant, qui ont besoin de les connaître, à condition que ces employés ou agents aient conclu des ententes écrites approuvées par écrit par le prêteur et contenant des dispositions au moins aussi restrictives que ces dispositions. L'Emprunteur convient et comprend que la divulgation des Renseignements confidentiels en violation du présent Accord peut causer au Prêteur un préjudice irréparable et que toute violation ou menace de violation par l'Emprunteur donne au Prêteur le droit de demander une injonction, en plus de tout autre recours juridique ou équitable à sa disposition, devant tout tribunal compétent.

37. <u>Successeurs et ayants droit.</u> Le présent Accord lie les Parties nommées aux présentes et à leurs successeurs et ayants droit autorisés respectifs (seul le Prêteur peut céder ses droits en vertu des présentes, bien que l'Emprunteur puisse céder ses droits et obligations en vertu des présentes avec le consentement écrit du Prêteur). Ni le présent Accord ni les droits ou obligations d'une Partie en vertu des présentes ne peuvent être cédés par une Partie (sauf à un Affilié de cette Partie) sans le consentement écrit préalable des autres Parties. Le présent Accord liera tout cessionnaire autorisé d'une Patty. Aucune cession n'aura pour effet de libérer l'une des Parties au présent Accord de l'une quelconque de ses obligations en vertu des présentes.

38. <u>Dépenses et honoraires.</u> Sauf disposition contraire des présentes, tous les frais et dépenses encourus en relation avec les transactions envisagées par le présent Accord, y compris tous les frais juridiques, comptables, de conseil financier, de consultation et tous les autres frais et dépenses de Tiers encourus par une Partie dans le cadre de la négociation et de l'exécution des termes et conditions du présent Accord et des transactions envisagées par les présentes, est l'obligation de l'emprunteur.

39. <u>Exécution en nature.</u> Les Parties conviennent qu'un dommage irréparable se produirait si l'une des dispositions du présent Accord n'était pas exécutée conformément aux termes des présentes et que les Parties auront droit à l'exécution spécifique des termes des présentes, en plus de tout autre recours auquel elles ont droit en vertu des présentes, en droit ou en équité.

**40. LES PARTIES AUX PRÉSENTES CONVIENNENT QU'ELLES RENONCERONT À UN PROCÈS DEVANT JURY DANS TOUTE ACTION OU PROCÉDURE INTENTÉE PAR L'UNE DES PARTIES CONTRE L'AUTRE DÉCOULANT DU PRÉSENT CONTRAT DE SÛRETÉ OU S'Y RAPPORTANT DE QUELQUE MANIÈRE QUE CE SOIT.**

EN FOI DE QUOI, les soussignés ont signé et remis la présente convention de sûreté au jour et au millésime indiqués ci-dessus.

**GARANT:**

**EMPRUNTEUR**

BAT Inc a/k/a B.A.T. Inc.

Par:_____
Nom : Tony M DIAB

**GARANT:**

Par:_____
Nom : Daniel March

| **PRÊTEUR:** | **PRÊTEUR:** |
|---|---|
| Fonds MCA ADV Inc. | LDR International Ltd., |
| Par:_____ <br> Titre : Officier | Par:_____ <br> Titre : Officier |

Par:_____
Nom : Tony M Diab
Titre : Officier

**EMPRUNTEUR**

Le groupe de pratique Litige PC

Par:_____
Nom : Daniel March
Titre : Officier

**RECONNAISSANCE**

| Un notaire ou un autre fonctionnaire qui remplit ce certificat ne vérifie que l'identité de la personne qui a signé le document auquel ce certificat est joint, et non la véracité, l'exactitude ou la validité de ce document. |
|---|

État de Californie
Comté d'Orange

Sur *7 février 2023* devant moi, <u>Olga Lucia Esquivel, notaire</u>
(insérer le nom et le titre de l'agent)

A comparu personnellement *Daniel S. March,* qui m'a prouvé, sur la base de preuves satisfaisantes, qu'il était la ou les personnes dont le(s) nom(s) est/sont souscrit(s) à l'instrument ci-joint et m'a reconnu qu'il/elle/elles l'ont signé en son/ses qualité(s) autorisée(s), et que par son/ses signature(s) sur l'acte, la (les) personne(s), ou l'entité pour le compte de laquelle la ou les personnes ont agi, exécuté. l'Instrument.

Je certifie en vertu de la PEINE DE PARJURE en vertu des lois de l'État de Californie que le paragraphe précédent est vrai et correct.

TÉMOIN ma main et mon sceau officiel.

Signature _____ **(sceau)**

**RECONNAISSANCE**

> Un notaire ou un autre fonctionnaire qui remplit ce certificat ne vérifie que l'identité de la personne qui a signé le document auquel ce certificat est joint, et non la véracité, l'exactitude ou la validité de ce document.

État de Californie
Comté d' *Orange*

Sur *02/07/2023* devant moi, <u>Vanessa Banken-Buchner</u>
           (insérer le nom et le titre de l'agent)

Comparution en personne *Tony Maurice Diab*, qui m'a prouvé, sur la base de preuves satisfaisantes, qu'il était la ou les personnes dont le(s) nom(s) est/sont abonné(s) à l'instrument ci-joint et m'a reconnu qu'il/elle/elles l'ont signé en sa (ses) capacité(s) autorisée(s), et que par son/ses signature(s) sur l'acte, la (les) personne(s), ou l'entité pour le compte de laquelle la ou les personnes ont agi, exécuté. l'Instrument.

Je certifie en vertu de la PEINE DE PARJURE en vertu des lois de l'État de Californie que le paragraphe précédent est vrai et correct.

TÉMOIN ma main et mon sceau officiel.

Signature _____ **(sceau)**



# ANNEXE 5

Objet : The Litigation Practice Group PC          Laurent Reiss          **GROBSTEIN TEEPLE**
Récapitulatif des débours
Activité post-pétition (20/03/2023 – aujourd'hui)

| Nom de la banque | Nom du compte | Numéro de compte | Date de la déclaration | Transaction Date | Numéro de contrôle | Débit/Charge | Mémo |
|---|---|---|---|---|---|---|---|
| Banque d'Amérique | Prime Logix LLC | 9201 | 31/03/2023 | 31/03/2023 | | 105,000.00 | TYPE DE FIL : INTL DATE DE SORTIE :230331 HEURE :1 616 ET TRN :2023033100711963 SERVICE REF :750657 BNF : LAURENT REISS ID :CH020851 50006666 BNF BK : BANK JULIUS BAER & CO L ID :006550073440 PMT DET :6MM3MVZ S7 POP Loan Payment |
| Banque d'Amérique | Prime Logix LLC | 9201 | 30/04/2023 | 06/04/2023 | | 105,000.00 | TYPE DE FIL : INTL DATE DE SORTIE :230406 HEURE :091 0 ET TRN : 2023040600267985 SERVICE REF :1 98400 BNF : LAURENT REISS ID : CH020851 50006666 BNF BKBANK JULIUS BAER & Co L 1D006550073440 PMT DET :4329749 76 PAIEMENT DE PRÊT POP AUTRE/PAIEMENT DE PRÊT |
| Banque d'Amérique | Prime Logix LLC | 9201 | 30/04/2023 | 25/04/2023 | | 50,000.00 | TYPE DE FIL : INTL OUT DATE230425 TIME1 704 ET TRN20230425004781 19 SERVICE REFQ73702 BNF : LAURENT REISS ID :CH020851 50006666 BNF BKBANK JULIUS BAER & CO L 1D006550073440 PMT DET : 4354749 36 POP SERVICES |
| Banque d'Amérique | Prime Logix LLC | 9201 | 30/04/2023 | 26/04/2023 | | 100,000.00 | TYPE DE FIL : INTL DATE DE SORTIE 230426 HEURE : 1 628 ET TRN :2023042600480836 SERVICE REF357121 BNF : laurent reiss ID : CH02085150006666 BNF BKBANK JULIUS BAER & CO L ID006550073440 PMT DET :4356383 58 POP SERVICES |

| Banque d'Amérique | Prime Logix LLC | ▉ 9201 | 30/04/2023 | 28/04/2023 | | 100,000.00 | DATE DE SORTIE 230428 HEURE 1 311 ET TRN : 2023042800529701 SERVICE RÉF : 427036 BNF : LAURENT REISS ID : CH020851 50006666 BNF BKBANK JULIUS BAER & CO L 1D006550073440 PMT DET : 4360210 86 POP SERVICES |
|---|---|---|---|---|---|---|---|
| Banque d'Amérique | Prime Logix LLC | ▉ 9201 | 31/05/2023 | 03/05/2023 | | 250,000.00 | TYPE DE FIL. INTL OUT DATE.230503 TIME1 708 ET TRN2023050300481 807 SERVICE REF : 770508 BNF : LAURENT REISS ID : CH020851 50006666 BNF BKBANK JULIUS BAER & CO L 1D006550073440 PMT DET.54GW97H DQ POP remboursement de prêt |
| Banque d'Amérique | Prime Logix LLC | ▉ 9201 | 31/05/2023 | 08/05/2023 | | 1,000,000.00 | TYPE DE FIL : INTL OUT DATE230508 HEURE :1 415 Er TRN : 2O23050800424500 SERVICE REF :913176 BNF : LAURENT REISS ID : CH02085150006666 BNF BKBANK JULIUS BAER & CO L IDO06550073440 PMT DETCBJHZ5TYT POP remboursement du prêt |
| | | | | | | 1,710,000.00 | |

# ANNEXE 6

Mᵉ CLAIRE NOTARI
HUISSIER
17, bd Albert 1ᵉʳ
MONACO ☎ +377 97 97 09 09

**Votre compte courant**

## BANQUE D'AMÉRIQUE

PRIME LOGIX LLC / Compte # ▓▓▓ 9201 / Du 1er mars 2023 au 31 mars 2023

### Retraits et autres débits – suite

| Date | Description | Quantité |
|---|---|---|
| 31-03-23 | TYPE DE FIL - INTL DATE DE SORTIE: 230331 HEURE 1.856 ET TRN 2023033100717028 SERVICE REF: 750065* BNF LAURENT REISS ID: CH020851 500086666 BNF BK - BANK JULIUS BAER & CO LTD: 008650073440 PMT DET: 6MM1MV Z S* POP Loan Payment | 105.000,00 |

Compte de carte # XXXX XXXX XXXX 7115

Sous-total pour le compte de carte # XXXX XXXX XXXX 7115
Total des retraits et autres débits

### Contrôles

| Date | Vérifier# | Quantité | | Date | Vérifier # | Quantité |
|---|---|---|---|---|---|---|
| | | | | | | |
| | | | | Total des contrôles | | |
| | | | | # total de vérifications | | 3 |

*Il y a un gab dans les numéros de contrôle séquentiels*

**Votre compte courant**

## BANQUE D'AMÉRIQUE

PRIME LOGIX LLC / Compte # ████ 9201 / Du 1er avril 2023 au 30 avril 2023

**Retraits et autres débits – suite**

| Date | Description | Quantité |
|------|-------------|----------|
| ██████ | TYPE DE FIL INTL DATE DE SORTIE 25/406 HEURE 091 0 ET TRN 2023040600267955 SERVICE REF 198400 BNF LAURENT REISS ID CH02085150000666 BNF BK BANK JULIUS BAER & CnL 190005500073940 PMT DET 3329749 76 PAIEMENT DE PRÊT POH ALTRE PAIEMENT DE PRÊT | ████████ |



**Votre compte courant**

## BANQUE D'AMÉRIQUE

PRIME LOGIX LLC / Compte # ▮▮▮ 9201 / Du 1er avril 2023 au 30 avril 2023

### Retraits et autres débits – suite

Quantité

| Date | Description | |
| --- | --- | --- |

**Votre compte courant**

## BANQUE D'AMÉRIQUE

PRIME LOGIX LLC / Compte # ███████ 9201 / Du 1er mai 2023 au 31 mai 2023

**Dépôts et autres crédits - suite**

| Date | Description | Quantité |
|------|-------------|----------|

Total des dépôts et autres crédits

**Retraits et autres débits – suite**

| Date | Description | Quantité |
|------|-------------|----------|

01.05.23  TYPE DE PIE INTLOC CDATE 230503 TIME 708 ET TRN 20230503004817807 SERVICE REF 770508 BNF LAURENT REISS ID CH02185150006666 BNF BK BANK PHILISBAER & CO B 1300065500 1440 PMT DET 54CAS271 DO POP remboursement de prêt    250.000,00

Me CLA    HUISSIER
17, bd Albert 1er
MONACO ☎ +377 97 97 09 09

PRIME LOGIX LLC / Compte # ▮▮▮▮ 9201 / Du 1er mai 2023 au 31 mai 2023

## Retraits et autres débits – suite

| Date | Description | Quantité |
|------|-------------|----------|
| 01.05.23 | TYPE DE FIE INTL OUT DATE 230506 HEL REF 11 415 ET FRN 2023050R00414500 SERVICE REF 913176 BNF LAURENT REISS ID CH0208513000666666 BNF BK BANK JULIUS BAER & CO L T0600635007344 TMT DE T CBH Z5TY T PoRemboursement du pret | 1,000,000.00 |

FACE ANNULÉE - Article 13
de la loi n 1221 du 9 novembre 1999

CLAIRE NOTARI
HUISSIER
17, bd Albert 1er
MONACO ☎ +377 97 97 09 09

| Attorney or Party Name, Address, Telephone & FAX Nos., State Bar No. & EmChristopher Celentino (131688) , Yossina M. Lissebeck (201654)<br><br>Christopher B. Ghio (259094); Jacob R. Bothamley (319457)<br><br>DINSMORE & SHOHL LLP<br><br>655 West Broadway, Suite 800, San Diego, CA 92101 - 619.400.0500<br><br>Christopher.celentino@dinsmore.com;  Yosina.lissebeck@dinsmore.com<br><br>Christopher.ghio@dinsmore.com;  Jacob.bothamley@dinsmore.com<br><br>*Attorney for Plaintiff, Richard A. Marshack, Trustee of the LPG Liquidation Trust* | FOR COURT USE ONLY |
|---|---|

## UNITED STATES BANKRUPTCY COURT
### CENTRAL DISTRICT OF CALIFORNIA – SANTA ANA

| In re:<br><br>The Litigation Practice Group P.C.<br><br>Debtor(s). | CASE NO.: 8:23-bk-10571-SC<br><br>CHAPTER: 11<br><br>ADVERSARY NUMBER: 8:25-ap-01190-SC |
|---|---|
| Richard A. Marshack, Trustee of the LPG Liquidation Trust,<br><br>Plaintiff(s)<br><br>Versus<br><br>Laurent Reiss, a Monaco resident; MCA Fund ADV Inc., a New York Corporation; LDR International Ltd., A British Virgin Islands Limited liability company, and DOES 1-10, inclusive | **ANOTHER SUMMONS AND NOTICE OF STATUS CONFERENCE IN ADVERSARY PROCEEDING [LBR 7004-1]** |

TO THE DEFENDANT(S): A Complaint has been filed by the Plaintiff against you. If you wish to defend against the Complaint, you must file with the court a written pleading in response to the Complaint. You must also serve a copy of your written response on the party shown in the upper left-hand corner of this page. The deadline to file and serve a written response is **30 days after service of this summons.** If you do not timely file and serve the response, the court may enter a judgment by default against you for the relief demanded in the Complaint.

A status conference in the adversary proceeding commenced by the Complaint has been set for:

| | |
|---|---|
| Date: | **September 24, 2026** |
| Time: | **10:00 a.m.** |
| Hearing Judge: | **Scott C Clarkson** |
| Location: | **411 W Fourth St., Crtrm 5C, Santa Ana, CA 92701** |

This form is mandatory. It has been approved for use in the United States Bankruptcy Court for the Central District of California.

December 2016         Page 1         **F 7004-1.SUMMONS.ADV.PROC**

You must comply with LBR 7016-1, which requires you to file a joint status report and to appear at a status conference. All parties must read and comply with the rule, even if you are representing yourself. You must cooperate with the other parties in the case and file a joint status report with the court and serve it on the appropriate parties at least 14 days before a status conference. A court-approved joint status report form is available on the court's website (LBR form F 7016-1.STATUS.REPORT) with an attachment for additional parties if necessary (LBR form F 7016-1.STATUS.REPORT.ATTACH). If the other parties do not cooperate in filing a joint status report, you still must file with the court a unilateral status report and the accompanying required declaration instead of a joint status report 7 days before the status conference. The court may fine you or impose other sanctions if you do not file a status report. The court may also fine you or impose other sanctions if you fail to appear at a status conference.

KATHLEEN J. CAMPBELL
CLERK OF COURT

Date of Issuance of Another Summons and Notice of Status Conference in Adversary Proceeding: March 12, 2026

By: _____"/s/" Nickie Bolte_____

Deputy Clerk



This form is mandatory. It has been approved for use in the United States Bankruptcy Court for the Central District of California.

December 2016

Page 2    **F 7004-1.SUMMONS.ADV.PROC**

## ATTACHMENT A
### Names of plaintiffs and defendants

| Plaintiff(s): | Defendant(s): |
|---|---|
| Richard A. Marshack | Laurent Reiss<br><br>MCA Fund ADV Inc.<br>LDR International Ltd. |

This form is mandatory. It has been approved for use in the United States Bankruptcy Court for the Central District of California.

## ATTACHMENT A

# UNITED STATES BANKRUPTCY COURT

## Early meeting of Counsel and Status Conference Instructions

1. **Service of Order.** A copy of this Order re: Rule 26(f) Meeting, Initial Disclosures, and Scheduling Conference must be served with the summons and complaint. The proof of service of the summons and complaint must indicate that a copy of this order was served therewith.

2. **Local Bankruptcy Rule 7026-1.** Compliance with Local Bankruptcy Rule 7026-1 ("LBR 7026-1") is required in ALL adversary proceedings.

3. **Rule 26(f) Meeting.** Unless all defendants default, the parties must meet and confer pursuant to Rule 26(f) of the Federal Rules of Civil Procedure ("Rule 26(f) Meeting") at least 21 days before the status conference date set forth in the summons. The status conference set forth in the summons shall also serve as the initial Rule 16(b) Scheduling Conference in this adversary proceeding.

The parties are jointly responsible for arranging and attending the Rule 26(f) Meeting, which may be conducted in person or by telephone. During the Rule 26(f) Meeting, the parties must, at a minimum: (a) discuss the nature and basis of their claims and defenses and the possibilities for a prompt settlement or resolution of the case; (b) make or arrange for the initial disclosures required by Rule 26(a)(1); and (c) develop a proposed discovery plan. The discussion of claims and defenses must be substantive and meaningful. The parties are directed to approach the Rule 26(f) Meeting cooperatively and in good faith.

4. **Initial Disclosures.** Rule 26(a)(1) states that a party must, without awaiting discovery request, provide to other parties:

   a. The name and, if known, the address and telephone number for each individual likely to have discoverable information - along with the subjects of that

information - that the disclosing party may use to support its claims or defenses, unless the use would be solely for impeachment.

b. A copy of - or a description by category and location - of all documents, electronically stored information, and tangible things that the disclosing party has in its possession, custody, or control and may use to support its claims or defenses, unless the use would be solely for impeachment;

c. A computation of each category of damages claimed by the disclosing party - who must also make available for inspection and copying under Rule 34 the documents or other evidentiary material, unless privileged or protected from disclosure, on which each computation is based, including materials bearing on the nature and extent of injuries suffered; and

d. For inspection and copying as under Rule 34, any insurance agreement under which an insurance business may be liable to satisfy all or part of a possible judgment in the action or to indemnify or reimburse for payments made to satisfy the judgment.

F.R.Civ.P.26(a)(1)(A). Rule 26(a)(1) requires a party to make its initial disclosures based on the information that is reasonably available to it. A party is not excused from making its disclosures because it has not fully completed its investigation of the case or because it challenges the sufficiency of another party's disclosures or because another party has not made its disclosures.

F.R.Civ.P.26(a)(1)(E).

5. **Alternative Dispute Resolution ("ADR").** The parties must explore the feasibility of ADR to reach a settlement or early resolution of the adversary proceeding. The specific reasons for any decision not to participate in a form of early ADR must be explained in the Joint Status Report. If the parties elect not to participate in an early ADR effort, the Court may nonetheless direct the parties to ADR before trial.

6. **Discovery Plan.** At the Rule 26(f) Meeting, the parties must also discuss issues about preserving discoverable information and develop a proposed discovery plan. The discussion regarding discovery following the initial disclosures must address the relevance of the discovery

sought and the sequence and timing of such discovery, including whether the discovery will be conducted informally or formally. The deadlines in the discovery plan must be mutually agreeable, with a view to achieve resolution of the case with a minimum of expense and delay.

7. **Joint Status Report.** A status report must be filed within the time frames specified within LBR 7016-1(a)(2). The Joint Status Report must contain the information set forth in LBR 7016-1(a)(2), and a statement that the parties have completed the Rule 26(f) Meeting and made the initial disclosures required by Rule 26(a)(1). The Joint Status Report shall also serve as the written report of the Rule 26(f) Meeting. If Defendant(s) have not filed and served an answer to the Complaint, a Unilateral Status report is due seven (7) days prior to the first status conference hearing.

8. **Status Conference/Rule 16(b) Scheduling Conference.** At the Rule 16(b) Scheduling Conference, the Court will review the discovery plan set forth in the Joint Status Report and set appropriate deadlines.

Counsel representing any party in conjunction with the Rule 26(f) Meeting, Joint Status Report, and Rule 16(b) Scheduling Conference must be authorized to bind the party on all matters to be covered.

9. **Default.** If no response to the complaint is timely filed, plaintiff should request entry of default by the clerk <u>prior</u> to the status conference date set forth in the summons. F.R.Civ.P.55(a). Plaintiff may also request entry of a default judgment by filing and serving an appropriate motion. F.R.Civ.P.55(b)(2).

10. **Sanctions. Failure to comply with these instructions may subject the responsible party and/or counsel to sanctions, which may include dismissal of the adversary proceeding. The failure of either party to cooperate in the preparation of timely filing of a**

Joint Status Report or appear at the status conference may result in the imposition of sanctions under LBR 7016-1(f) or (g).

11. Joint Pre-Trial Order. Failure to timely file a Joint Pre-Trial order may subject the responsible party and/or counsel to sanctions, which may include dismissal of the adversary proceeding. The failure of either party to cooperate in the preparation of timely filing of a Joint Pre-Trial Conference or appear at the Joint Pre-Trial Conference may result in the imposition of sanctions under LBR 7016-1(f) or (g).

Honorable Scott C. Clarkson
United States Bankruptcy Judge

# PROOF OF SERVICE OF DOCUMENT

I am over the age of 18 and not a party to this bankruptcy case or adversary proceeding. My business address is:

A true and correct copy of the foregoing document entitled: ANOTHER SUMMONS AND NOTICE OF STATUS CONFERENCE IN ADVERSARY PROCEEDING [LBR 7004-1] and (2) the accompanying pleading(s) entitled:

will be served or was served (a) on the judge in chambers in the form and manner required by LBR 5005-2(d); and (b) in the manner stated below:

1. **TO BE SERVED BY THE COURT VIA NOTICE OF ELECTRONIC FILING (NEF)**: Pursuant to controlling General Orders and LBR, the foregoing document will be served by the court via NEF and hyperlink to the document. On (date) _____. I checked the CM/ECF docket for this bankruptcy case or adversary proceeding and determined that the following persons are on the Electronic Mail Notice List to receive NEF transmission at the email addresses stated below:

☐ Service information continued on attached page

2. **SERVED BY UNITED STATES MAIL**: On (date) _____. I served the following persons and/or entities at the last known addresses in this bankruptcy case or adversary proceeding by placing a true and correct copy thereof in a sealed envelope in the United States mail, first class, postage prepaid, and addressed as follows. Listing the judge here constitutes a declaration that mailing to the judge will be completed no later than 24 hours after the document is filed.

☐ Service information continued on attached page

3. **SERVED BY PERSONAL DELIVERY, OVERNIGHT MAIL, FACSIMILE TRANSMISSION OR EMAIL** (state method for each person or entity served): Pursuant to F.R.Civ.P. 5 and/or controlling LBR, on (date) _____. I served the following persons and/or entities by personal delivery, overnight mail service, or (for those who consented in writing to such service method), by facsimile transmission and/or email as follows. Listing the judge here constitutes a declaration that personal delivery on, or overnight mail to, the judge will be completed no later than 24 hours after the document is filed.

☐ Service information continued on attached page

I declare under penalty of perjury under the laws of the United States that the foregoing is true and correct.

| Date | Printed Name | Signature |
|------|--------------|-----------|
|      |              |           |

This form is mandatory. It has been approved for use in the United States Bankruptcy Court for the Central District of California.

December 2016

**F 7004-1.SUMMONS.ADV.PROC**

**TRADUCTION SIMPLE**

| | |
|---|---|
| Nom de l'avocat ou de la partie, adresse, numéro de téléphone et de code de naissance, n° de barreau de l'État & EM Christopher Celentino (131688), Yossina M. Lissebeck (201654)<br><br>Christopher B. Ghio (259094) ; Jacob R. Bothamley (319457)<br><br>DINSMORE & SHOHL LLP<br><br>655 West Broadway, Suite 800, San Diego, CA 92101 – 619.400.0500<br><br>Christopher.celentino@dinsmore.com ;<br>Yosina.lissebeck@dinsmore.com<br><br>Christopher.ghio@dinsmore.com ; Jacob.bothamley@dinsmore.com<br><br>Avocat du demandeur, Richard A. Marshack, fiduciaire du LPG Liquidation Trust | À L'USAGE DES TRIBUNAUX UNIQUEMENT |

**TRIBUNAL DES FAILLITES DES ÉTATS-UNIS**
**DISTRICT CENTRAL DE CALIFORNIE – SANTA ANA**

| | |
|---|---|
| En objet :<br><br><br>The Litigation Practice Group P.C.<br><br><br><br>Débiteur(s) | CAS N° : 8:23-bk-10571-SC<br><br>CHAPITRE : 11<br><br><br>NUMÉRO DE L'ADVERSAIRE : 8:25-ap-01190-SC |
| Richard A. Marshack, fiduciaire du LPG Liquidation Trust,<br><br>Demandeur(s)<br><br>Contre<br><br>Laurent Reiss, résident monégasque ; MCA Fund ADV Inc., une société new-yorkaise ; LDR International Ltd, une société à responsabilité limitée des Iles Vierges Britanniques, et DOES 1-10, inclus | UNE AUTRE CITATION À COMPARAÎTRE ET UN AVIS DE CONFÉRENCE DE MISE EN ÉTAT DANS LE CADRE D'UNE PROCÉDURE CONTRADICTOIRE [LBR 7004-1] |

AU(X) DÉFENDEUR(S) : Une plainte a été déposée par le demandeur contre vous. Si vous souhaitez vous défendre contre la plainte, vous devez déposer auprès du tribunal un acte de procédure écrit en réponse à la plainte. Vous devez également signifier une copie de votre réponse écrite à la partie indiquée dans le coin supérieur gauche de cette page. Le délai pour déposer et signifier une réponse écrite est **de 30 jours après la signification de la présente assignation**. Si vous ne déposez pas et ne signifiez pas la réponse en temps opportun, le tribunal peut rendre un jugement par défaut contre vous pour la réparation demandée dans la plainte.

Une conférence de mise en état dans la procédure contradictoire engagée par la plainte a été fixée pour :

| | |
|---|---|
| **Date:** | **24 Septembre 2026** |
| **Heure:** | **10 h** |
| **Juge d'audience :** | **Scott C Clarkson** |
| **Emplacement:** | **411 W Fourth ST., Crtrm 5C, Santa Ana, CA 92701** |

Ce formulaire est obligatoire Son utilisation a été approuvée par le tribunal des faillites des États-Unis pour le district central de Californie

Décembre 2016                    Page 1      **Référence F7004-1. CONVOCATION. ADV. PROC**

**Vous devez vous conformer à la LBR 7016 1, qui vous oblige à déposer un rapport de situation conjoint et à comparaître à une conférence de mise en état.** Toutes les parties doivent lire et respecter la règle, même si vous vous représentez vous-même. Vous devez coopérer avec les autres parties à l'affaire, déposer un rapport de situation conjoint auprès du tribunal et le signifier aux parties concernées au moins 14 jours avant la conférence de mise en état. Un formulaire de rapport de situation conjoint approuvé par le tribunal est disponible sur le site Web du tribunal (formulaire LBR F 7016-1.STATUS. RAPPORT) avec une pièce jointe pour d'autres parties si nécessaire (formulaire LBR F 7016-1.STATUS. RAPPORT. JOINDRE). Si les autres parties ne coopèrent pas au dépôt d'un rapport de situation conjoint, vous devez tout de même déposer auprès du tribunal un rapport de situation unilatéral et la déclaration requise qui l'accompagne au lieu d'un rapport de situation conjoint 7 jours avant la conférence de mise en état. **Le tribunal peut vous imposer une amende ou d'autres sanctions si vous ne déposez pas de rapport d'étape. Le tribunal peut également vous imposer une amende ou d'autres sanctions si vous ne vous présentez pas à une conférence de mise en état.**

KATHLEEN J. CAMPBELL
GREFFIER DU TRIBUNAL

Date de délivrance d'une autre assignation et d'un avis de conférence de mise en état dans le cadre d'une procédure contradictoire : <u>12 mars 2026</u>

Par:    « /s/ » Nickie Bolte

Greffière adjointe

---

Ce formulaire est obligatoire. Son utilisation a été approuvée par le tribunal des faillites des États-Unis pour le district central de Californie.

**ANNEXE A**

Noms des demandeurs et des défendeurs

| Demandeur(s) : | Défendeur(s) : |
| --- | --- |
| Richard A. Marshack | Laurent Reiss<br>Fonds MCA ADV Inc.<br>LDR International Ltd. |

---

Ce formulaire est obligatoire. Son utilisation a été approuvée par le tribunal des faillites des États-Unis pour le district central de Californie.

**ANNEXE A**

## TRIBUNAL DES FAILLITES DES ÉTATS-UNIS

### Réunion anticipée des Conseils et instructions sur la conférence de mise en état

1. **Notification de l'Ordonnance.** Une copie de cette ordonnance concernant la règle 26(f) sur la réunion, les divulgations initiales et la conférence de planification doit être signifiée avec la convocation et la plainte. La preuve de signification de la convocation et de la plainte doit indiquer qu'une copie de cette ordonnance a été signifiée avec.

2. **Règlement local sur la faillite 7026-1.** Le respect de la Règle locale sur la faillite 7026-1 (« LBR 7026-1 ») est exigé dans TOUTES les procédures adverses.

3. **Réunion prévue par la règle 26(f).** Sauf défaut de tous les défendeurs, les parties doivent se réunir et échanger conformément à la règle 26(f) des Règles fédérales de procédure civile (« Réunion de la règle 26(f) ») au moins 21 jours avant la date de la conférence de mise en état fixée dans la convocation. **La conférence de mise en état prévue dans la convocation servira également de première conférence de planification prévue par la règle 16(b) dans cette procédure contradictoire.**

Les parties sont conjointement responsables de l'organisation et de la participation à la réunion prévue par la règle 26(f), qui peut se tenir en personne ou par téléphone. Lors de la réunion prévue par la règle 26(f), les parties doivent au minimum : (a) discuter de la nature et du fondement de leurs revendications et défenses ainsi que des possibilités d'un règlement ou d'une résolution rapide de l'affaire ; (b) effectuer ou organiser les divulgations initiales requises par la règle 26(a)(l) ; et (c) élaborer un plan de découverte proposé. La discussion des revendications et des moyens de défense doit être substantielle et significative. Les parties sont invitées à aborder la réunion prévue par la règle 26(f) de manière coopérative et de bonne foi.

4. **Divulgations initiales.** La règle 26(a)(1) stipule qu'une partie doit, sans attendre la demande de divulgation, fournir aux autres parties :

a. Le nom et, si connus, l'adresse et le numéro de téléphone de chaque individu susceptible de détenir des informations découvrables – ainsi que les personnes concernées – que la partie divulgatrice pourrait utiliser pour étayer ses allégations ou défenses, sauf si l'utilisation ne vise que la destitution.

b. Une copie – ou une description par catégorie et lieu – de tous les documents, informations stockées électroniquement et objets tangibles que la partie divulgatrice détient en sa possession, sa garde ou son contrôle et peut utiliser pour étayer ses revendications ou défenses, sauf si l'utilisation vise uniquement la destitution ;

c. Un calcul de chaque catégorie de dommages réclamés par la partie divulgatrice – qui doit également mettre à disposition pour inspection et copie, en vertu de la règle 34, les documents ou autres éléments probants, sauf si ils sont privilégiés ou protégés contre la divulgation, sur lesquels chaque calcul est fondé, y compris les documents relatifs à la nature et à l'étendue des blessures subies ; et

d. Pour l'inspection et la copie, comme prévu par la règle 34, tout contrat d'assurance en vertu duquel une entreprise d'assurance peut être tenue de satisfaire tout ou partie d'un jugement éventuel dans l'action ou d'indemniser ou de rembourser les paiements effectués pour satisfaire le jugement.

F.R.Civ.P.26(a)(1)(A). La règle 26(a)(1) exige qu'une partie fasse ses premières divulgations en se basant sur les informations raisonnablement accessibles. Une partie n'est pas dispensé de faire ses divulgations parce qu'elle n'a pas entièrement terminé ses investigations sur l'affaire, ou parce qu'elle conteste la suffisance des divulgations d'une autre partie, ou parce qu'une autre partie n'a pas fait ses divulgations. F.R.Civ.P.26(a)(1)(E).

5. **Résolution alternative des litiges (« RAD »).** Les parties doivent examiner la faisabilité de la RAD pour parvenir à un règlement ou à une résolution rapide de la procédure adverse. Les raisons spécifiques de toute décision de ne pas participer à une forme de RAD anticipée doivent être expliquées dans le rapport de

situation conjoint. Si les parties choisissent de ne pas participer à une tentative de RAD antérieure, la Cour peut néanmoins ordonner aux parties de faire une RAD avant le procès.

6. **Plan de découverte.** Lors de la réunion de la règle 26(f), les parties doivent également discuter des questions relatives à la préservation des informations découvrables et élaborer un plan de découverte à proposer. La discussion concernant la découverte après les divulgations initiales doit aborder la pertinence de la découverte demandée ainsi que la séquence et le moment de cette découverte, y compris si la découverte sera réalisée de manière informelle ou formelle. Les délais prévus dans le plan de découverte doivent être mutuellement conciliés, afin d'obtenir une résolution de l'affaire avec un minimum de frais et de retards.

7. **Rapport d'état commun.** Un rapport d'état doit être déposé dans les délais spécifiés dans le LBR 7016-1(a)(2). Le rapport d'état commun doit contenir les informations énoncées dans la LBR 7016-1(a)(2), ainsi qu'une déclaration indiquant que les membres ont terminé la réunion de la Règle 26(-f) et effectué les premières divulgations requises par la Règle 26(a)(l). Le rapport de statut conjoint servira également de rapport écrit de la réunion de la règle 26(f). Si le(s) défendeur(s) n'ont pas déposé et signifié de réponse à la plainte, un rapport de statut unilatéral est dû être dû sept (7) jours avant la première audience de la conférence de statut.

8. **Conférence de statut/ Conférence de calendrier prévue à la Règle 16(b).** Lors de la conférence de planification prévue à la règle 16(6), la Cour examinera le plan de découverte défini dans le rapport d'état conjoint et fixera des délais appropriés.

Les avocats représentant une partie lors de la réunion de la règle 26(f), du rapport de situation conjoint et de la conférence de planification de la règle l 6(b) doivent être autorisés à lier la partie sur toutes les questions à couvrir.

9. **Défaut.** Si aucune réponse à la plainte n'est déposée dans les délais, le demandeur doit demander l'enregistrement de défaut par le greffier _avant_ la date de la réunion de situation fixée dans la convocation.

F.R.Civ.P.55(a). Le demandeur peut également demander l'énoncé d'un jugement par défaut en déposant et en signifiant une requête appropriée. F.R.Civ.P.55(b)(2).

10. Sanctions. Le non-respect de ces instructions peut exposer la partie responsable et/ou son avocat à des sanctions, qui peuvent inclure le rejet de la procédure adverse. Le défaut de coopération de l'une ou l'autre partie à la préparation en temps voulu du dépôt d'un rapport conjoint de statut ou de ne pas comparaître à la conférence de situation peut entraîner l'imposition de sanctions en vertu de la LBR 7016-1 (f) ou (g).

11. Ordonnance préalable conjointe. Le non-dépôt en temps opportun d'une ordonnance conjointe préalable au procès peut soumettre la partie responsable et/ou son avocat à des sanctions, qui peuvent inclure le rejet de la procédure adverse. Le manquement de coopération de l'une ou l'autre des parties à la préparation en temps voulu du dépôt d'une conférence conjointe préalable au procès ou à la présence lors de la conférence conjointe peut entraîner l'imposition de sanctions en vertu de la LBR 7016-1 (f) ou (g).

Honorable Scott C. Clarkson

Juge des faillites des États-Unis

## PREUVE DE LA SIGNIFICATION OU DE LA NOTIFICATION DU DOCUMENT

J'ai plus de 18 ans et je ne suis pas partie à cette affaire de faillite ou à cette procédure contradictoire. L'adresse de mon entreprise est la suivante :

Une copie conforme et correcte du document ci-dessus intitulé : **UNE AUTRE CITATION À COMPARAÎTRE ET AVIS DE CONFÉRENCE DE MISE EN ÉTAT DANS UNE PROCÉDURE CONTRADICTOIRE [LBR 7004-1]** et (2) le(s) plaidoirie(s) ci-joint(s) intitulé(s) :

sera signifié ou a été signifié ( **a**) au juge en chambre sous la forme et de la manière requises par LBR 5005-2(d) ; et **(b)** de la manière indiquée ci-dessous :

**1. À SIGNIFIER PAR LE TRIBUNAL VIA L'AVIS DE DÉPÔT ÉLECTRONIQUE (NEF) :** Conformément aux ordonnances générales de contrôle et au LBR, le document susmentionné sera signifié par le tribunal via le NEF et un hyperlien vers le document. Le *(date)* _____, j'ai vérifié le rôle CM/ECF pour ce cas de faillite ou cette procédure contradictoire et j'ai déterminé que les personnes suivantes sont sur la liste des avis de courrier électronique pour recevoir la transmission du NEF aux adresses e-mail indiquées ci-dessous :

[] Suite des informations sur le service sur la page jointe

**2. SIGNIFIÉ PAR COURRIER DES ÉTATS-UNIS :** Le *(date)* _____, j'ai signifié les personnes et/ou entités suivantes aux dernières adresses connues dans cette affaire de faillite ou de procédure contradictoire en plaçant une copie conforme et correcte de celle-ci dans une enveloppe scellée dans le courrier des États-Unis, de première classe, affranchi et adressé comme suit. L'inscription du juge ici constitue une déclaration selon laquelle l'envoi par la poste au juge sera effectué au plus tard 24 heures après le dépôt du document.

[] Suite des informations sur le service sur la page jointe

**3. SIGNIFIÉ PAR LIVRAISON EN MAINS PROPRES, COURRIER DE NUIT, TRANSMISSION PAR TÉLÉCOPIEUR OU PAR COURRIER ÉLECTRONIQUE** (indiquer la méthode pour chaque personne ou entité signifiée) : Conformément au F.R.Civ.P. 5 et/ou contrôlant LBR, le *(date)* _____, j'ai signifié les personnes et/ou entités suivantes par livraison en mains propres, service de courrier de nuit, ou (pour ceux qui ont consenti par écrit à ce mode de signification), par télécopie et/ou par courrier électronique comme suit. L'inscription du juge ici constitue une déclaration selon laquelle la remise en mains propres ou le courrier de nuit au juge sera effectuée au plus tard 24 heures après le dépôt du document.

[] Suite des informations sur le service sur la page jointe

Je déclare, sous peine de parjure en vertu des lois des États-Unis, que ce qui précède est vrai et exact.

_____        _____        _____
*Date*                 *Nom imprimé*           *Signature*

Ce formulaire est obligatoire. Son utilisation a été approuvée par le tribunal des faillites des États-Unis pour le district central de Californie.

*Décembre 2016*                **Référence F7004-1. CONVOCATION. ADV. PROC**